```
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF MICHIGAN
 2                          SOUTHERN DIVISION

 3    Lisa Domski,

 4                        Plaintiff,

 5    -v-                                      Case No. 23-12023

 6    Blue Cross Blue Shield of Michigan,

 7                        Defendant.
      _____/
 8
                          JURY TRIAL - VOLUME 1
 9                         November 4, 2024

10             BEFORE THE HONORABLE DAVID M. LAWSON
                     United States District Judge
11
           Theodore Levin United States District Courthouse
12                 231 West Lafayette Boulevard
                         Detroit, Michigan
13

14    APPEARANCES:

15    FOR THE PLAINTIFF:    JONATHAN R. MARKO
                            Marko Law
16                          1300 Broadway, Suite 500
                            Detroit, Michigan  48236
17                            and
                            NOAH S. HURWITZ
18                          Hurwitz Law PLLC
                            340 Beakes Street, Suite 125
19                          Ann Arbor, Michigan  48104

20    FOR THE DEFENDANT:    BRANDON C. HUBBARD
                            NOLAN JOHN MOODY
21                          MAUREEN J. MOODY
                            Dickinson Wright PLLC
22                          123 West Allegan Street, Suite 900
                            Lansing, Michigan  48933
23

24            To Obtain a Certified Transcript Contact:
                Rene L. Twedt, CSR-2907, RDR, CRR, CRC
25                     www.transcriptorders.com
```

**TABLE OF CONTENTS**

MATTER                                                                    PAGE

**JURY TRIAL - VOLUME 1**

**MOTION TO INCLUDE/EXCLUDE DEMONSTRATIVE EXHIBITS**
Argument by Mr. Marko..................................    4
Argument by Mr. Moody..................................    7
Ruling by the Court ...................................   10

**MOTION FOR SEQUESTRATION OF WITNESSES GRANTED**.........   15

**DISCUSSION RE: EXHIBITS**...............................   34

**OPENING STATEMENT FOR THE PLAINTIFF BY MR. MARKO**.......   36
**OPENING STATEMENT FOR THE DEFENSE BY MR. HUBBARD**.......   68


**WITNESSES**

**WALTER JOSEPH PTAK**
Direct Examination by Mr. Marko........................   77
Cross Examination by Mr. Moody.........................   96
Redirect Examination by Mr. Marko......................  103


**EXHIBITS RECEIVED**

206     Religious Accommodation Request.................   79


**CERTIFICATE OF COURT REPORTER**.........................  110

**\*\*REPORTER'S NOTE:**  Material read into the record is
transcribed verbatim, as read, and therefore may not
reflect exact quotes from the documents or exhibits.

 1  Detroit, Michigan

 2  November 4, 2024

 3  9:37 a.m.

 4                          *       *       *

 5          THE CLERK:  All rise.  The United States District

 6  Court for the Eastern District of Michigan is now in session,

 7  the Honorable David M. Lawson presiding.

 8          THE COURT:  You may be seated.

 9          THE CLERK:  Now calling the case of Lisa Domski

10  versus Blue Cross Blue Shield of Michigan, Case Number

11  23-12023.

12          THE COURT:  All right.  Good morning, counsel.

13          The record should reflect we had a conversation in

14  chambers regarding the incapacitation of Juror Number 9.

15          I intend to inform the jury of that circumstance so

16  that they know why one of their number is missing and excuse

17  Juror Number 9, Ms. Wilson, for cause, unless there is an

18  objection.

19          MR. MARKO:  No objection, your Honor.

20          MR. HUBBARD:  None, Judge.

21          THE COURT:  All right.  We also had a discussion --

22  the chambers meeting was intended solely to inform the

23  parties of the juror situation, but there was a discussion

24  apparently about -- not apparently -- there was a discussion

25  about demonstrative exhibits.

1           Does anybody want to put anything on the record

2    before we bring in the jury concerning those issues?

3           MR. MARKO:  Yes, Judge.  Thank you.  Jon Marko for

4    the plaintiff, Lisa Domski.

5           We addressed the timeline, which I provided case law

6    and a brief, and it was indicated that I would proceed if I

7    believe that the evidence will show that, which I do.

8           THE COURT:  Where did you provide the case law in

9    the brief?  I haven't seen it.

10          MR. MARKO:  I'm sorry.  I have --

11          THE COURT:  Did you docket it?

12          MR. MARKO:  Yes, your Honor.

13          Can I approach?

14          THE COURT:  All right.  That's not been provided

15   to me.

16          MR. MARKO:  Can I approach?

17          THE COURT:  No.  Just go ahead and summarize what you

18   want to summarize.  I want to get the jury in the courtroom.

19          MR. MARKO:  Yes.

20          So the defendants objected to a one-page timeline

21   which they incorrectly and falsely allege is 29 pages in their

22   brief.  It's a one-page timeline.  I have it right here and

23   I showed it to the Court.  It's blown up.

24          And I cited you numerous cases, including from the

25   Sixth Circuit, which says that it's a, quote, "established

1   tradition," end quote, of using demonstrative exhibits such

2   as a timeline.  And that's U.S. versus Bakke, which is 942

3   F.2d 977, Sixth Circuit, 1991.  Cited a Steven Murphy case,

4   which is Monty versus Crossfire LLC from Judge Murphy of this

5   District.  I also cited numerous other cases, including United

6   States versus Morris, which allow for the use of -- counsel to

7   promise what he believes the evidence will show in his opening

8   statement.

9          And the timeline, I can tell the Court, is very short

10  and based on what we believe.

11         THE COURT:  No, I have seen it and I understand your

12  argument.

13         Do you have anything further?

14         MR. MARKO:  No.  Not on the timeline.

15         THE COURT:  All right.  Anything else you would like

16  to summarize from chambers discussion?

17         MR. MARKO:  Yes, your Honor.  Defendants raised an

18  issue about Blue Cross Blue Shield's financial status, which

19  is derived directly from their own publications and will be

20  used with witnesses in this case.

21         As you know, this case involves punitive damages.

22  I have cited to this Court on pages 9 and -- 9 and 10 of my

23  brief numerous authorities that the financial status of a

24  defendant is relevant and admissible.  As the Sixth Circuit

25  said in Romanski versus Detroit Entertainment:  Since a fixed

1    dollar award will punish a poor person more than a wealthy

2    one, one can understand the relevance of the defendant's

3    financial position, which is a Sixth Circuit case from 2005.

4              We talked about in chambers the questions and that

5    were -- that were part of an exhibit which I intend to discuss

6    with the jury.  That exhibit has been stipulated to between

7    the parties previously, which I'm going to move after we're

8    done here for the admission of those exhibits, and defendant

9    is going to move for admission of his exhibits in that regard.

10             And I talked to brother counsel who has indicated

11   that he plans on using two exhibits in his opening.  As we

12   agreed, there is -- of course, you can use stipulated-to

13   exhibits in your opening.  There is no objection on either

14   side to that.

15             And I provided all the demonstrative exhibits to

16   brother counsel pursuant to your court order which required

17   them two business days before trial.  They were provided last

18   Thursday.  So they have a copy of everything that I plan on

19   using.  They did not object to any of those exhibits except

20   the ones mentioned in their brief, which I believe we have

21   addressed here today.

22             THE COURT:  Anything else?

23             MR. MARKO:  No, your Honor.

24             THE COURT:  Thank you.

25             Does the defense wish to summarize anything regarding

1    the chambers discussion?

2            MR. MOODY:  We do, your Honor.  Thank you.  In our --

3            THE COURT:  Get closer to the microphone, if you

4    would, please --

5            MR. MOODY:  Yes, sir.

6            THE COURT:  -- Mr. Moody.

7            MR. MOODY:  Judge, in our objections to plaintiff's

8    demonstratives which were filed with the Court we cited a

9    Johnson versus Lexington SNF case which quotes from a Sixth

10   Circuit opinion.  What Johnson said is opening is not meant

11   for argument.  It's not meant to poison the jury's minds.

12   Demonstratives at opening, when confusing or inflammatory,

13   should not be used.  Slides that repeatedly reference disputed

14   allegations or excluded evidence should not be used.

15           In that case, the Court excluded counsel from using

16   demonstratives of that ilk in their opening.  And that comes

17   under FRE 103(d) which says that the Court should not --

18   should do its best to not permit admissible evidence to even

19   be suggested to the jury.

20           THE COURT:  I presume you mean inadmissible evidence?

21           MR. MOODY:  Thank you, your Honor.  And that is

22   exactly what I mean.

23           Your Honor, to that end, our objections to six groups

24   of evidence are largely because they are inadmissible

25   evidence.

1            The first is the Domski timeline.

2            And just for clarity, they keep saying that we have

3     identified it as a 29-page timeline.  The sentence says:

4     Plaintiff's first demonstrative is a 29-page document

5     containing a self-made timeline.

6            The opening document that they are using is 29 pages.

7     One of those pages is the timeline.

8            And the problem with the timeline for us is that it

9     references an HR recording that the Court is well aware of

10    and the Court said, I don't see the relevance right now.  And

11    if you want to try and use it, we're not going to do it in

12    front of the jury, and you have got to sidebar with me.  So

13    now they are going to use a timeline that specifically tells

14    the jury about the recording.  We don't believe that's ever

15    coming in and we believe that's highly prejudicial for those

16    reasons.

17           The second, your Honor, is the summary of two lost

18    earnings documents.  I understood from Mr. Marko that those

19    have been removed, and if Mr. Marko clarifies that, I think

20    we can move from those; is that right?

21           MR. MARKO:  Yeah, they have been removed in the

22    opening statement, but I plan on using them later in the

23    case. And those are financial -- I can show you later, Judge,

24    but it's just a financial summary of lost wages.

25           THE COURT:  Well, when it comes up, we will deal

1  with it.

2          MR. MOODY:  Okay.  I think that one is handled.

3          The next group is Blue Cross's CEO salary and Blue

4  Cross's net revenue.

5          Despite what Mr. Marko said, that evidence is not

6  coming in through any witness on any of their witness lists.

7  They are not going to know.  That is not going to be evidence

8  in this case.  So all that is going to do is inflame the jury

9  and provoke them to want to look outside the facts and issue a

10  larger verdict if they decide to go that way.  The evidence is

11  inadmissible and it's irrelevant anyway.

12          The HR transcript and recording, I understand the

13  Court has already ruled on, and I understand that that is out.

14          And finally, the fifth topic is a pie chart

15  summarizing the requests denied and confirmed denied and

16  approved by Blue Cross.

17          The pie chart, it will not come in as evidence

18  because they don't have anyone to authenticate the document

19  that will know the information.  So again, it's not going to

20  come in and it's just prejudicial evidence that won't be part

21  of the trial and, again, that would fall back on FRE 103(d).

22          Lastly, your Honor, is the list of accommodation

23  request questions that were never asked.  We have briefed

24  this issue, your Honor.  We have been before the Court many

25  times on this issue.  The Court has already indicated, asking

1    specifically to counsel, how is this relevant if the

2    over-the-counter questions were never asked?

3          Blue Cross doesn't know as it sits here today if they

4    were asked.  Yet they are going to use the document to show

5    the jury that those questions exist despite it having no

6    relevance.  So we would object to the use of that document as

7    a demonstrative at this time when it won't be evidence or at

8    least the over-the-counter discussion will not be brought up

9    at trial at any point.

10          Mr. Marko even said when we addressed this issue,

11   Judge, I'm taking it out of my case-in-chief.  I'll only use

12   it on impeachment.

13          It's out of his case-in-chief, but it's in his

14   opening.  That, your Honor, is highly prejudicial.  And to

15   me, respectfully, we would ask that the Court not allow it,

16   especially at this time.

17          That's all the issues we have for the record.

18          THE COURT:  All right.  The demonstrative exhibits

19   with respect to the timeline, I think I saw that timeline, and

20   I believe that it's appropriate to use that as a demonstrative

21   exhibit to summarize what the plaintiff believes the evidence

22   will show and what the issues are in the case, which, of

23   course, is the purpose of an opening statement.

24          Any exhibits, any demonstrative exhibits that

25   reference items of evidence that we have addressed in motions

1    in limine and have been excluded may not be used.

2          If there are interview questions that were not asked,

3    then they should not be mentioned to the jury during opening

4    statement or any other time.

5          If there is a pie chart that references how Blue

6    Cross dealt with a volume of exemption requests, I don't know

7    that that is something that might come into evidence or not.

8    I question the relevance of it.  But out of caution, it

9    probably should not be used during opening statement unless

10   the plaintiff's attorney has high confidence that it will be

11   part of the case-in-chief.

12         And I have mentioned that demonstrative exhibits and

13   items mentioned during opening statement are presented to

14   the jury at the plaintiff's peril.  That if there are items

15   mentioned that will not be evidence in the case, then the

16   plaintiff runs the risk of a mistrial with associated costs

17   and expenses imposed, or simply a tactical error, which

18   I really have no comment on, which might result from

19   overpromising the jury.

20         That was the discussion in chambers.

21         Mr. Marko, do you have something else?

22         MR. MARKO:  Yes.  I agree with everything.  I agree

23   with your characterization, except for these questions are

24   part of an exhibit that is agreed on, which is defendant's

25   exhibit.

```
 1            THE COURT:  You heard my ruling.  If you think that
 2   is coming in, then it's coming in, and you can summarize it as
 3   part of your opening statement as what the evidence will show.
 4            MR. MARKO:  Understood.
 5            THE COURT:  Now, are those your items there along the
 6   side wall?
 7            MR. MARKO:  Yes, your Honor.
 8            THE COURT:  I need that aisle clear.  That's where
 9   the jury comes in and out.
10            There is a briefcase there, and your colleague that
11   just stood up is in a chair that -- and she will have to move.
12            When we -- after opening statements are completed the
13   lectern is going right there in the corner and that's where
14   witness examination will take place.
15            MR. MARKO:  Understood, Judge.
16            THE COURT:  So we just need that space.
17            MR. MARKO:  Absolutely.  We're working on that
18   right now.
19            We would move, pursuant to our previous discussions,
20   for admission of stipulated exhibits.
21            THE COURT:  Yes.  I would like to do that after I
22   give the jury its initial instructions, and we will do it
23   before the jury so they know that they have been received.
24            MR. MARKO:  Understood.
25            THE COURT:  In other words, in the jury's presence.
```

 1              MR. MARKO:  Understood.

 2              MR. HUBBARD:  Your Honor.

 3              THE COURT:  Yes?

 4              MR. HUBBARD:  Sequestration.

 5              THE COURT:  Ah, yes.  Your motion?

 6              MR. HUBBARD:  Yes, your Honor.  As I think your Honor

 7   may well understand that we're moving to sequest any

 8   witnessing that may well be testifying in this trial.

 9              Obviously we don't want them seeing either of the

10   opening or hearing the testimony or looking at the exhibits

11   that are being brought into the trial before they have an

12   occasion to testify, for the reason that it may well

13   influence, of course, their testimony.

14              I understood from Mr. Marko --

15              THE COURT:  That's your motion?

16              MR. HUBBARD:  Yes, your Honor.

17              THE COURT:  Is there an objection?

18              MR. MARKO:  There is no objection.  Both ways,

19   obviously, because I notice there are some --

20              THE COURT:  Okay.  It's a mutual motion?

21              MR. MARKO:  Correct.

22              THE COURT:  Any objection to the sequestration?

23              MR. HUBBARD:  No, Judge.

24              THE COURT:  All right.  I didn't know "sequest" was a

25   verb.

1        MR. HUBBARD: Well, I have been known to not use the

2  English language perfectly.

3        THE COURT: No, I'm always willing to be educated,

4  and if that's the case, I appreciate it.

5        MR. HUBBARD: I think you got me there.

6        THE COURT: The parties will exclude from the

7  courtroom any witnesses except for those parties necessary to

8  the presentation of the case.

9        Obviously, the plaintiff may stay in the courtroom,

10  and if you have a corporate representative necessary to the

11  presentation of the defense, that person may stay in the

12  courtroom as well.

13        All other witnesses should be excluded, and I'm going

14  to leave to the responsibility of each side -- leave to each

15  side, I'm sorry -- responsibility of ensuring that that order

16  is enforced.

17        THE COURT: Mr. Marko or Mr. Hurwitz, did you make

18  arrangements for a witness room?

19        MR. MARKO: No, your Honor.

20        THE COURT: All right. We're going to see if the

21  attorney conference room is available and we will put your

22  witnesses down there.

23        Is the plaintiff ready for the jury?

24        MR. MARKO: Yes, your Honor.

25        THE COURT: Defense?

1          MR. HUBBARD:  Yes, Judge.

2          THE COURT:  Bring the jury in, please.

3          Those people standing in the back of the room, either

4   find a seat or step outside.

5          THE CLERK:  All rise for the jury.

6      (Jury entered courtroom at 9:53 a.m.)

7          THE COURT:  You may be seated.

8          Good morning, ladies and gentlemen.

9          JURORS COLLECTIVELY:  Good morning.

10         THE COURT:  One of your number has been excused.

11  Ms. Wilson had a medical event over the weekend and she was

12  hospitalized and is unable to continue.  So for that reason,

13  we have excused her from the jury in this case.

14         You may recall that when we asked you questions

15  during the jury selection process you took an oath to tell

16  the truth when you answered the questions.

17         We now have another oath to administer for you

18  concerning your duties as a juror in this case.  So if you

19  will all stand and raise your right hands.

20         Listen to the oath that Ms. Pinkowski reads to you

21  and answer out loud when she is finished.

22      (Jury sworn at 9:54 a.m.)

23         THE COURT:  Thank you.  You may be seated.

24         Members of the jury, I want to speak to you briefly

25  about the function of a judge in a civil trial and your

 1    function as jurors.

 2          You have just been sworn as the jury in this case,

 3    and by your verdict you will decide the disputed issues of

 4    fact that exist between the parties.

 5          I will decide questions of law that arise during the

 6    trial, and before you retire to deliberate at the close of the

 7    trial I will instruct you on the law that you are to follow

 8    and apply in reaching your verdict.

 9          My practice is to give you the instructions verbally

10    in court, but also furnish you with written copies of the

11    instructions so that you can have them during your

12    deliberations and follow along as I am giving you those

13    instructions.

14          It's my responsibility to conduct this trial in an

15    orderly, fair, and efficient manner, to rule on questions of

16    law that arise during the course of the trial, and to instruct

17    you on the law that applies to this case.

18          You can look on my function, that is, the function of

19    the Court or the Judge, as that of a referee or an umpire.

20    I have no personal or professional interest in how this case

21    turns out.  The outcome will be up to you as the jury.

22          My job is to see to it that only legally admissible

23    evidence is received in this court and to tell you what the

24    law is during and at the end of the trial and to settle any

25    disputes between the attorneys that might arise during the

1    course of the trial.

2         Now, as we mentioned before, the seats that you are

3    in are the seats that you will take whenever you are in the

4    courtroom.  Even though there is an empty seat between you,

5    please keep those same seats.  And remember that order as you

6    did this morning so that you can file in and it's easier to

7    assume your seats coming into the jury box.

8         Now, you all have juror badges on, and it's important

9    that you wear those badges and keep them visible while you are

10   in the building and even during breaks or if you leave the

11   building and walk around town you have them on as well.

12        The reason is that there are several people in this

13   building and in the vicinity of the courthouse who may be

14   attorneys or witnesses or others who have an interest in

15   seeing this case and it's important that they know you are

16   a juror.  Those people involved in the case know that they

17   may not speak to you.  In fact, they may not even allow an

18   opportunity to appear if they are -- that they are conferring

19   with you.  And it's important that you put the public on

20   notice that you are jurors, so it is important that the badges

21   are worn and visible.

22        Now, I will tell you a little bit more about the

23   staff assigned to every Federal Judge so that you know what

24   they are doing during the course of the trial.

25        As I mentioned earlier, Ms. Twedt is our certified

1    court reporter.  She takes down and has been taking down

2    everything that is said in this trial on a small machine

3    called a stenotype machine.

4         Now, there is certainly technology, but the basic

5    stenotype machine emits strips of paper, and those strips

6    of paper contain court reporter notes.  She is skilled and

7    trained in that function, and if it becomes important to

8    determine during the course of the trial what an exact

9    question was or what an exact answer was from a witness, she

10   can interpret those court reporter notes on the tape and read

11   it back.

12        If it becomes necessary during or later to determine

13   what went on during the entire trial, then she can prepare a

14   typed written transcript from those notes.

15        I tell you this because those transcripts cannot be

16   produced instantaneously, at least in clean copy, and we don't

17   have that capacity to simply push a button and generate a

18   transcript.  So it is important that you pay attention to the

19   testimony as it is presented to you.

20        At the conclusion of the trial sometimes jurors ask

21   what a specific witness said or what testimony came in.  We

22   can have the court reporter read that back to you, but it is

23   somewhat of a cumbersome process and it is time consuming.

24   So it's important that you pay attention as the testimony is

25   presented to you.

1        Also, you met our courtroom deputy clerk, Ms. Susan

2   Pinkowski.  Her job is to see to it that the business of this

3   Court goes on while I am occupied during this trial.

4        Now, this is obviously not the only case that is

5   assigned to me.  There are hundreds of cases assigned to

6   each Federal Judge in various stages of development.  And

7   Ms. Pinkowski's job, one of her jobs, is to make sure that

8   those cases move forward even if I am not dealing with them

9   at the time myself.

10       So you will see her in the courtroom.  Sometimes she

11   will leave to do some work back in the office.  She may come

12   to get you in the morning from the jury room on the fifth

13   floor.  She or one of the law clerks will escort you in and

14   out of the courtroom.  And she may come in and hand me certain

15   papers to sign, but usually it has nothing to do with this

16   case and that activity should not pose a distraction to you

17   from paying attention to the presentation of the evidence.

18       In addition, there are two law clerks that are

19   assigned to every Federal Judge.  Mr. Michael Shaffer is our

20   senior law clerk.  He is not in the courtroom right now, but

21   you may see him from time to time.  Mr. Adam Beyer is our term

22   junior law clerk and he is -- has primary responsibility for

23   assisting me on this case.

24       When I say that these individuals are law clerks,

25   that's really somewhat of a misnomer.  They are attorneys.

1    They have graduated law school and passed the bar.

2            And they stay with me for a period of time.  They

3    perform a number of functions, one of which is to do research,

4    so that if I instruct you on the law at the -- during the case

5    or at the conclusion of the trial it is absolutely current and

6    updated law.

7            The law is in a state of flux and sometimes it

8    changes daily.  So when I give you the law I want to be sure

9    it is current and accurate.

10            Again, they may spend some time in the courtroom or

11   come and go or hand me papers to sign and, again, that should

12   not be a distraction to you.

13            Now, the building that we're in was built in 1932,

14   during the -- it began construction during the Herbert Hoover

15   Administration and it was completed during Franklin

16   Roosevelt's first term.  It was constructed before the advent

17   of modern air-handling equipment, I can tell you that.

18            We have done some pretty extensive updates to this

19   historic structure, but sometimes the building engineers get a

20   little too enthusiastic about the heat or the cold, so I would

21   advise you to bring a sweater that you can put on or take off

22   at your -- as your comfort dictates, and you may bring that

23   into the courtroom if you like.

24            The hours that we are in session are from 8:00 a.m.

25   to 5:00 p.m., but I have given you some schedule as to how

1      we're going to be conducting this trial.  We have modified

2      that slightly from the schedule we gave you last week.  We

3      will continue this case until 12:30 p.m. today and then there

4      is other court business that I must attend to and we will

5      adjourn around that time.

6            Tomorrow we will begin at 10:30 and continue through

7      4:00.  We will take a lunch break.  We will begin at 8:30 on

8      Wednesday and 9:30 on Thursday.  That schedule will be posted

9      in the jury room for you.

10           Now, these times are approximate, and what we usually

11     do is try to take a break at a logical point in the case.  We

12     will be taking breaks during the day as well.

13           For example, a logical breaking point would be after

14     the conclusion of a witness's testimony or between one side's

15     examination and the other side's examination.

16           As I mentioned before, and I do thank you for being

17     attentive to this today, we want to have you in the jury room

18     on the fifth floor, oh, 15 to 30 minutes before we're to start

19     in the courtroom so that we can all have you assembled as a

20     group and bring you up to our jury room and we can start on

21     time.

22           Now, there should be water bottles in front of you.

23     Do each of you have some?

24           We will be taking these short breaks during the day.

25     When you return to the jury room, if you do return to the jury

1    room, you should stay in the jury room unless I tell you that

2    our break will be long enough for you to leave the jury room.

3    Don't leave the jury room without the Court's permission.

4         We have now nine jurors.  A minimum of six jurors

5    is required to decide this case.  We empanel more than the

6    minimum requirement because, as we know and as we have seen,

7    there are -- in the ordinary experiences of life people do get

8    sick or have accidents or emergencies.

9         We empanel what some people refer to as extra jurors;

10   however, none of you is an extra juror.  All of you will be

11   deliberating on the case at the conclusion of the trial when

12   you attempt to reach a verdict.

13        Now, I would like to explain the general order of the

14   procedure in the trial.

15        First, when I'm finished with these instructions

16   the attorney for the plaintiff will be permitted to make an

17   opening statement.  An opening statement is an opportunity

18   for the plaintiff to outline her theory of the case and what

19   she believes the evidence will show.

20        When the plaintiff is finished with the opening

21   statement, the defense has an opportunity likewise to make

22   an opening statement for the same purpose or the defense may

23   choose to reserve it and give it later on in the trial.

24        The opening statements are not evidence.  They are

25   only intended to assist you in understanding the viewpoints

1    and the claims of the parties.  You will be called upon to

2    decide the case based on the evidence and not the statements

3    or arguments of the lawyers.

4          After opening statements we will begin taking the

5    evidence.  The attorney for the plaintiff will present the

6    evidence first.  He may do that by calling witnesses or

7    offering exhibits.  Exhibits are documents or physical objects

8    that you may consider when you decide the case.

9          After a witness is called, the witness will be sworn

10   to tell the truth.  The witness will sit right over here in

11   this witness box, and then we will proceed by question and

12   answer.

13         The person calling the witness will, first of all,

14   conduct the examination and ask questions and we call that

15   direct examination.

16         When that person is finished the attorney for the

17   opposite side will have the opportunity to ask the witnesses

18   questions and we call that cross examination.

19         We allow cross examination in order to test the truth

20   and accuracy of the witness's testimony or to elicit testimony

21   that might be favorable to that side.

22         After the direct and cross examination and possibly

23   redirect and recross examination the witness will be excused,

24   the plaintiff will call another witness, and we will repeat

25   the process until all of the witnesses have testified for that

1    side.

2           Once that occurs and the exhibits are offered and

3    received the plaintiff will rest.

4           At that point if the defense has not made an opening

5    statement the defendant may do so then.  And then the defense

6    may present their case by the same fashion, calling witnesses,

7    conducting a direct examination, the plaintiff may conduct a

8    cross examination, and the defendant may offer exhibits as

9    well.

10          Once the defense has completed its presentation it

11   may -- the defense will rest and we may have an additional

12   presentation by the plaintiff for rebuttal witnesses that are

13   called who may challenge new matters that were brought up by

14   the defendant, although that's not always a circumstance in

15   the case.

16          Once the testimony is presented then I will give you

17   some preliminary instructions that I mentioned before on the

18   law, both verbally and in writing, and then we will have what

19   we call closing arguments.

20          The closing arguments are presented by the attorneys

21   to assist you in understanding the evidence and the theory of

22   each party.

23          Once again, however, the closing arguments are not

24   evidence in the case.  They are merely intended to assist you

25   in understanding each party's position.

1          When you decide the case, you must decide it only on

2    the evidence itself.

3          Then following the closing arguments I will give you

4    some final instructions on the manner of your deliberations

5    and the possible verdicts that you may return and then you

6    will retire to the jury room to deliberate on your verdict.

7          You will do that by applying the law as I give it

8    to you to the facts as you determine them to be.

9          Your function -- the function of the jury is to

10   determine the facts, and you are the sole and exclusive judges

11   of the facts.  You alone will determine the weight, the

12   effect, and the value of the evidence as well as the

13   credibility of the witnesses.

14         You must consider and weigh the testimony of all the

15   witnesses who appear before you and you alone are to determine

16   whether to believe any witness and the extent to which you

17   think a witness should be believed.

18         It is your responsibility to consider any conflicts

19   in the testimony which may arise during the course of the

20   trial.

21         Your decision as to any fact is final.

22         On the other hand, it is your duty to accept the law

23   as I give it to you.

24         Your determination of the facts of this case must

25   be based only on the evidence that is offered and received in

1   this courtroom.

2          The evidence consists of the sworn testimony of

3   the witnesses.  It may also include exhibits, which may be

4   documents or physical objects, as I mentioned before.  It

5   may also include some things which I will simply instruct

6   you to consider as evidence.

7          As to evidence, the questions that the lawyers ask

8   the witnesses are not themselves evidence.  It is the answers

9   that the witnesses give that provide the evidence in the case.

10         Your function as the jury, of course, is equally as

11  important as the function of the Court and the attorneys.

12         You should give careful attention to the testimony as

13  it is presented for your consideration.  You should keep an

14  open mind and not form any opinion or express any opinion

15  about the case until after you have heard all of the evidence,

16  the closing arguments, and the instructions on the law, and

17  until you have retired to the jury room to deliberate on your

18  verdict.

19         From this point forward you must not discuss the case

20  with anyone, not even members of your own family or even your

21  fellow jurors.  It would be unfair to discuss the case among

22  yourselves or with family or friends before you retire to

23  consider your verdict.

24         So you may tell your family and friends that you have

25  been selected as a juror, but then you must tell them that

1    you are under instructions from the Court that you are not to

2    discuss the case with them until I permit you to do so.

3           After the case is submitted to you for your

4    deliberations you still must discuss it only when I instruct

5    you to do so and only in the jury room and in the presence of

6    all your fellow jurors.

7           When this trial is over you may discuss the case with

8    anyone you wish, but until that time we ask you to control the

9    natural desire to discuss the case both here and at home.

10          The only information that you will receive about this

11   case will come to you while you are all together as a jury

12   in the presence of the Court and the attorneys and all the

13   parties involved.  You must not consider any information which

14   may come to you outside or from outside the jury room.

15          This trial, like all federal trials, is governed by

16   rules that have to do with the admissibility of evidence.

17   These rules include the Federal Rules of Civil Procedure and

18   the Federal Rules of Evidence.

19          These rules have been debated and established by

20   Congress and the United States Supreme Court over many

21   years.  Many of the rules have to do with the reliability or

22   unreliability of certain evidence.  Evidence that has been

23   determined to be unreliable may not be admissible and may not

24   be considered by you as a jury.

25          In many cases I rule on the admissibility of evidence

1    before the trial even begins, so it is extremely important

2    that you follow the instruction that you may only consider

3    the evidence that is admitted into this courtroom during the

4    trial.

5         So you must not read any newspapers articles in print

6    or online, if there are any, relating to this trial.  You must

7    not watch or listen to any television or radio commentary or

8    any accounts, if there are any, about this trial while it is

9    in progress.  You may not visit any scene that is mentioned in

10   the evidence in this case.

11        If it should become necessary that you should visit

12   a scene, which is entirely unlikely in this case, but if it

13   should become necessary, you will be taken as a group under

14   the supervision of the Court.

15        You must not consider as evidence any personal

16   knowledge that you might have of any scene or place mentioned

17   in the evidence.

18        You must not make any investigation of any kind on

19   your own or conduct any experiments of any kind.

20        I know that many of you are technologically adept.

21   You use Smartphones and tablets and have access to the

22   internet and other tools of technology.  However, you should

23   not or may not consult any of those sources about anything

24   having to do with this trial or any of the issues in the case

25   while the trial is underway.

1          You also must not talk to anyone about the case or

2   use these tools to communicate electronically with anyone

3   about the case.  These include your family and friends.

4          So you may not communicate with anyone about the case

5   on your phones or on your tablets or through email or any text

6   messaging or chat sites or blog or post anything online

7   regarding this case, become active in any internet chat room

8   or by way of any other social networking websites.

9          You should not consult any dictionaries or reference

10  materials, search the internet, websites, blogs, or use any

11  other electronic tools to obtain information about the case

12  or to help you decide the case.  Please do not try to find out

13  any information from any source outside the confines of this

14  courtroom.

15         You may not permit anyone to communicate with you or

16  accept any communications that are directed to you having

17  anything to do whatsoever with this trial.  If anyone attempts

18  to contact you about this case you must report that to me

19  immediately.

20         The issues regarding obtaining information from

21  outside the courtroom are very serious, because if that

22  happens it could result in having to declare a mistrial and

23  having to begin again with the attendant costs.

24         Now, a trial follows long-established rules of

25  evidence and procedure and the attorneys are trained in these

 1   rules, and from time to time they may make objections or

 2   motions.

 3          Now, I will rule on these objections and motions and

 4   most of the time I will do that in your presence.  You should

 5   not conclude from any of my rulings that I have any opinion on

 6   the case or that I favor one side or the other.  If I sustain

 7   an objection to a question and do not permit a witness to

 8   answer you should not guess what the answer might have been

 9   nor should you draw any inference from the question itself.

10          At times the attorneys and I are required to take up

11   matters of objection and motions outside of your hearing.  We

12   will take care of those matters maybe at the bench, and if so,

13   the lawyers will come up here and we will have a sidebar

14   conference.

15          When we do have a sidebar conference I will activate

16   what we call our white noise system to keep the conversation

17   from traveling across the courtroom.  I'll turn that on for

18   you now so you know what it is.

19      (White noise demonstrated.)

20          THE COURT:  And that's the white noise system.

21          Some people consider that to be irritating and,

22   frankly, so do I.  We did have a juror once that listened to

23   the white noise system and thought that it sounded like waves

24   crashing on the beach.  Now that is -- that is a very positive

25   attitude.

1          So if we activate our white noise system, then just

2    consider that and kick back and we will get back to you as

3    soon as we can.

4          The sidebar conferences usually have to do with some

5    procedural issues that are not directly involved in the

6    information that you need to decide the case.

7          Sometimes these issues are a little bit more

8    complicated, and under those circumstances, we may excuse

9    you from the courtroom to go back to the jury room, have our

10   arguments on the record, make the determination, and then

11   bring you back to continue the trial.

12         Now, I don't have a way to predict when any of these

13   things might arise, but I will pledge to you that we will

14   attempt to decide these issues as quickly as possible so that

15   we can get you back into the courtroom and have you hearing

16   the testimony so you can complete the case and get on with

17   your lives.

18         Now, I may give you additional instructions during

19   the course of the trial, and I will give you detailed

20   instructions at the end of the trial, as I mentioned before.

21         All these instructions are important, because

22   together they state the law that you are to apply to the case.

23         You will be permitted to take notes during the trial.

24   Of course, you are not obliged to take notes.  And if you do

25   not take notes, you should not be influenced by the notes of

1    another juror but rather you should rely on your own

2    recollection of the evidence.

3         Also, notetaking should not distract you from what

4    you are here to do; that is, to pay attention to what happens

5    in court and listen to the testimony of the witnesses.

6         Now, your notes are not evidence in the case and

7    they should not take precedence over the independent

8    recollection of the evidence received.  Notes are only an aid

9    to recollection and are not entitled to any greater weight

10   than the actual recollection or the impression of each juror

11   as to what the evidence actually is.  Any notes taken by a

12   juror should not be disclosed to anyone other than a fellow

13   juror.

14        You all were provided with notebooks.  I suggest you

15   write your names in them, in addition to your juror numbers.

16   And those notebooks can be used by you when you're in the

17   courtroom.  They should stay in the jury room overnight.  You

18   should not take the notebooks home with you.

19        At the conclusion of the trial you may take your

20   notes with you or, if you leave them in the notebooks, the

21   notes will be shredded.  They will be destroyed and no one

22   will have access to them, so you can be confident that they

23   are your private notes.

24        During the trial we will take certain recesses and

25   you will be permitted to separate and go about your personal

1    affairs if I take a recess long enough that permits you to

2    leave the jury room.

3            During recesses, whether you remain in the jury room

4    or not, you should not discuss the case among yourselves or

5    with anyone else and you should not let anyone say anything to

6    you or in your presence about this case.

7            If anyone does try to say anything to you or in your

8    presence about the case you should tell them that you are a

9    juror sitting on this trial and ask them to stop.  If they

10   persist and do not stop, then you should advise me immediately

11   upon your return to the jury room about that encounter.

12           Now, during the trial I would like you to let me know

13   by raising your hand if you cannot hear a witness or see what

14   is being demonstrated.

15           If I am distracted and don't see you raise your hand,

16   feel free to speak up so that we are confident that you are

17   able to see and hear what's going on.

18           That concludes my preliminary instructions.  We will

19   now hear from the plaintiff.

20           Mr. Marko, are you prepared to address the jury?

21           MR. MARKO:  I am, your Honor.

22           THE COURT:  You may proceed.

23           MR. MARKO:  Thank you.

24           Good morning.  Good morning, ladies and gentlemen.

25           THE COURT:  Do that from the lectern, please.

```
 1          MR. MARKO:  Your Honor.  We have to move first --
 2          THE COURT:  Oh, I'm sorry.  You had that business
 3    to take care of.  I apologize.
 4          MR. MARKO:  That's okay, Judge.  It's been a long
 5    morning.
 6          We move to admit Plaintiff's Exhibits 1 through 60 at
 7    this time.  My understanding is every one is stipulated to
 8    except for Exhibit 46, 48, and 50 through 54.
 9          THE COURT:  I'm sorry, 46, 48, and what?
10          MR. MARKO:  50 through 54.  So 50, 51, 52, 53, and
11    54.
12          THE COURT:  50 through 54.
13          MR. MARKO:  Yes, your Honor.
14          THE COURT:  Any objection to admission of Exhibits 1
15    through 45, and 47, 49, and 55 through 60?
16          MS. MOODY:  Yes, your Honor.  Blue Cross objects
17    to --
18          THE COURT:  Well, wait a minute.  I thought that we
19    had an agreement.
20          MR. MARKO:  So did I.  I talked to Mr. Hubbard last
21    week.
22          If I made a mistake on an exhibit, please let me
23    know.
24          MR. HUBBARD:  Mr. Marko, is Exhibit 47 the HR
25    recording?
```

```
 1              MR. MARKO:  No.  Exhibit 46 is the HR recording.  And
 2     that's why I said you didn't agree to it.
 3              THE COURT:  Exhibit 46 is listed as a Facebook social
 4     media post.
 5              MR. MARKO:  I'm sorry.  They got moved.  You're
 6     right, brother counsel.  I apologize.  47 is the HR audio and
 7     video recording.  46 -- so we will move --
 8              THE COURT:  Is there an objection to 46?
 9              MS. MOODY:  There is no objection to 46,
10     your Honor --
11              THE COURT:  All right.
12              MS. MOODY: -- to the extent we're working from
13     Docket 103.
14              THE COURT:  I don't know about a docket.  You were
15     ordered to submit to me your exhibit lists, and I'm working
16     off the exhibit lists that were submitted to the Court.
17              MR. MARKO:  So 46 is also their exhibit, so we can
18     cut to the chase.  I'm not objecting to their exhibit.  I'm
19     assuming they are not objecting to the same one.
20              THE COURT:  Okay.  Let's do it this way.
21              Is there any objections to Exhibits 1 through 46?
22              MS. MOODY:  Yes, your Honor.  There are objections
23     to Exhibits 13 and --
24              THE COURT:  Apparently we don't have an agreement,
25     Mr. Marko.
```

 1          I'm going to proceed with opening statements.  We
 2   will take a break after the opening statements are concluded
 3   and maybe we can get this straightened out.
 4          MR. MARKO:  Understood, Judge.  Thank you.
 5          THE COURT:  All right.  You may address the jury.
 6          MR. MARKO:  Thank you, your Honor.
 7          I want to first start out by thanking you.  I know
 8   this is a tremendous sacrifice.  I know many of you have to
 9   drive far and to come downtown and to be here and take time
10   out of lives.
11          I'm going to respect that.  I'm going to move as
12   quickly as I can.  I promise.  I am longwinded.  Okay?  I'm
13   going to do the best to cut that down.  I'm going to do the
14   best to move this quickly to respect your time.
15          But I also need to do justice.  Lisa has been waiting
16   here a really long time to get here to present our case to
17   you.  So I'm going to try to respect everybody in this case.
18          And this is a really important case.  This is a very
19   important -- we're here in a federal court.  Okay?  There is a
20   lot of other courts.  You have courts down the street from
21   your house.  You have district courts.  There's circuit courts
22   in your county.  We're here in federal court for the Eastern
23   District of Michigan.
24          This is a case about your right to practice your
25   religion or to not practice any religion at all, to say

1   I don't -- I maybe don't believe in -- I'm agnostic or I'm

2   atheist.  This is your -- this case is about your right, your

3   God-given right as an American, to practice your religion.

4   Okay?

5           And a corporation does not have a right, under the

6   law, to tell you what to believe in or what to do with your

7   body or what to do with your mind.  And the Judge is going to

8   instruct you on the law.

9           And that's what happened in this case.  This is a

10  simple case.  Lisa Domski was terminated after working at

11  Blue Cross Blue Shield for 38 years.  She worked from home.

12  She wasn't even out there in public.  She worked from home.

13          And they terminated her after 38 years of service and

14  they made -- they gave her a choice.  You can choose to give

15  up your faith and give up your religion and give up your

16  beliefs or you can choose between that and your career.

17          And she chose her faith over her career that she had

18  worked her way up.  She was making almost -- without a college

19  education, she was making nearly $100,000 a year that she had

20  worked from going to Woodhaven High School, from coming from

21  nothing.  And she said, I am not going to give up my faith.

22  I'm not going to deny my faith.

23          You may disagree with her faith.  You may say that's

24  not my belief.  You may have different beliefs about the

25  vaccine.  That's okay.  That's okay.  Because that's your

1    right.  That's your right to believe that.  It's your right

2    to believe in whatever God you want to believe in or no God

3    at all.

4             And the government and certainly a corporation has no

5    right to tell you that you have to choose between that faith

6    and your career and your livelihood and your family.

7             You may say, well, you know what, I got vaccinated or

8    I believe there is public safety.  That's fine.  That's fine.

9    There's other options available.  She was working from home.

10            And when you hear about why she believes what she

11   believes, you hear about how sincere her belief is, there is

12   no witness in this case who is going to tell you that she is

13   not sincere in her religious beliefs.  And she was terminated

14   because of those beliefs.  I promise you that you're going to

15   hear from friends, family, from a priest, from everyone who

16   knows about it.

17            Let's talk a little bit about how we got here and why

18   we're here in federal court.

19            Now, hopefully my electronics work here, which they

20   are already not working.

21            So I'm going to show you some exhibits in this case

22   and they have already been agreed on.

23            Are we good here, Craig?  No?

24            This always happens at the worst time.

25            THE COURT:  Members of the jury, some of our

1    electronic tools allow us to present some visuals.  You have

2    flat-panel monitors in front of you there.  I would like the

3    jurors in the front row to put one hand on each side and pull

4    them up so that you can see them and jurors in the back row

5    can see them as well.

6           MR. MARKO:  All right.  Hopefully the last time,

7    but probably not.  But I want to be able to show you this

8    evidence, because I'm going to prove to you these things that

9    I'm telling you in opening statement.

10          I'm going to get down, they are going to get up, and

11   they are going to tell you some things, and I'm going to

12   address those, but we need to --

13          THE COURT:  Excuse me, Mr. Marko.

14          Are you able to see the images?

15          JURORS COLLECTIVELY:  Yes.

16          MR. MARKO:  Thank you so much, Judge.

17          And we're talking about, how did we get here?  How

18   are we in a federal court in the United States of America

19   in front of a judge who was appointed by the President of the

20   United States?  And that's how important this is.

21          And Judge Lawson told you last week, when we met for

22   the first time, about how this all started.  It all started in

23   England with people fighting, because they had to fight for

24   their right to a trial by jury, the same rights that we're

25   here under today.

1          And in England, as many of you probably know, and as

2    Judge Lawson explained, they had to get together and demand

3    these rights from the king.  Because back then if the king

4    happened to be a different religion than you, you know,

5    whether he happened to be Catholic at the time or Anglican or

6    Protestant, you could be in big trouble if you didn't happen

7    to be the same religion as the king.

8          And there was inquisitions, and people's houses

9    were broken into, and people were killed, and people died for

10   these rights.

11         So a lot of people came to America who were

12   persecuted in England.  And one of the main reasons was

13   freedom of religion.  And it was so important to our founding

14   fathers, this freedom of religion, that in the Bill of Rights,

15   the very first amendment, they put the freedom of religion,

16   the freedom of religion for everybody.

17         They didn't say you have to be Catholic.  They said

18   you have the freedom to practice whatever religion in your

19   heart you want to be.  Whatever religion that is, you want to

20   be Protestant, that's fine.  You want to be a Sikh, that's

21   fine.  You want to be Catholic, that's fine.  You want to

22   believe in nothing, that's fine.

23         But the government can't tell you how you are going

24   to think or how you are going to believe.  And the very First

25   Amendment, passed in 1789, 1789, Congress shall make no law

1    respecting an establishment of religion or prohibiting the

2    free exercise thereof.

3              And that's why we're in a federal court, because

4    you're going to hear about the laws that were passed.

5              Because it's not Judge Lawson who makes a decision

6    in this case.  The founders said we only are going to trust

7    a jury to protect our community from the tyranny of others,

8    corporations and the government.  That's what they believed.

9    And that's why we're here.

10             You have to make a decision at the end of this case,

11   because you are the only people that can enforce the law as

12   it relates to this case.  You are the only people.  Not the

13   government, not even Judge Lawson, and not -- certainly not a

14   corporation.  Certainly not a corporation.

15             So let's talk about what happened.

16             So in -- so the First Amendment is passed.

17             And I have a timeline that I'm going to show you guys.

18             But in 1964, President Lyndon Johnson passed -- he

19   signed -- it was a bipartisan bill.  Everybody came together

20   and said we need to protect these rights for every single

21   American.  And he passed what's called the Civil Rights Act

22   of 1964.

23             It was signed and it was a big deal, because that

24   same law from 1964 is the same law that we're here under today

25   in a federal court.  And they said that if your rights are

1    violated, you have a right to seek protection in a federal

2    court of law before a federal judge just like Judge Lawson and

3    a jury just like this.  And this protects everybody.

4          And it was a big deal back then.  And I'll show you

5    the law.  The law protects people's religious beliefs.  It

6    protects your race.  It protects if you are black, white,

7    Asian, whatever.  It protects every single person in this room

8    from being discriminated against not for the content of their

9    character or not because of their ability to do their job, but

10   because of things that are discriminatory and that violate our

11   rights.  And that's what was passed.  And that's why we're

12   here.

13         And you know, tomorrow is the election.  All right?

14   And your vote, if you vote, is going to -- or if you already

15   voted -- is going to be 1 in about 150 million.  Okay?

16   150 million.

17         Your vote in this case is going to be 1 in 9.  And

18   you're going to have an opportunity at the end of this case

19   to do justice for Lisa Domski, to enforce the laws that our

20   founding fathers established and that the Civil Rights Act of

21   1964 established.

22         It's a big deal.  This is an important case that's

23   going to have implications beyond this courtroom, beyond Lisa

24   Domski, and beyond the community.

25         Let me tell you a little bit about Lisa, so you guys

1   can understand how she got here and how we're all here having

2   to take you out of your lives.  Okay?

3        Lisa Domski grew up in Detroit.  And you're going to

4   hear that she had a dysfunctional family.  Her mother was very

5   abusive.  And she had to raise -- she was one of, I believe it

6   was, six, and she had to raise and help her brothers and her

7   sisters, and it was very abusive.

8        It was so bad that at one point Lisa had to go into

9   the foster care system for a little bit.  Okay?  And Lisa's

10   way to escape this horror and this abusive family was to go

11   to church.  She started going to church and she found safety

12   and comfort in the church.  And it wasn't even a Catholic

13   church back then.  She went to, I believe it was, a Baptist

14   church back then.  But she found comfort in the church.  And

15   so she escaped this kind of hell that she was living in by

16   going to church and meeting people at church and going with

17   her family.  She prayed a lot.

18        She went through some very difficult times.  You're

19   going to hear that her sister died of drugs.  Her sister had

20   substance abuse problems and died.  And when her sister --

21   before her sister passed away, she became pregnant, and her

22   sister wanted to have an abortion.

23        And her sister was not able to raise that child.  And

24   Lisa said, I'm going to help you.  I don't want you to have to

25   do that.  I don't want you to have to do that, just because

1    you're not able, because of your problems.  And Lisa raised

2    that child.  And you're going to hear from him in this case.

3    She raised him and helped him grow up and become a productive

4    person.  And she is -- and in her words, she saved him.  Okay?

5         Now, this case isn't about your beliefs on abortion.

6    This is not what this case is about.  But it's about Lisa's

7    right to have her beliefs, just as you all have the right to

8    have your own beliefs and not be judged, not be told you can't

9    go to work because of those beliefs.

10        Lisa eventually converted to Catholicism.  Okay?  And

11   you're going to hear she had a wonderful daughter named Alyse

12   who you're going to hear from in this case.

13        She met Larry.  This gentleman on the far right of

14   the screen is Larry.  You're going to hear from Larry.

15        And Lisa made a choice to convert to Catholicism,

16   which it's a lot easier if you're just born and baptized, you

17   know, like I was as a baby.  To convert, you have to make a

18   conscious decision.  She had to go through what's called RCIA.

19   She had to go through the church process.  And she had to make

20   a conscious decision to join the Catholic Church.  And she

21   did that because Larry was Catholic.  She had a strong belief

22   in Catholicism, and she loved -- and it goes back to her

23   childhood -- she loved the safety and the comfort that

24   religion gave her, and it gave her life purpose.

25        And you're going to hear from her.  Look, this is

1    not a judgmental person.  So if you're thinking -- you know,

2    there's all kinds of different types of people in terms of

3    religion.  She is not a judgmental person.  And she is going

4    to be the first person to tell you, what you believe is your

5    choice.  But please, what I believe, please respect, it's also

6    my choice.

7            And you're going to hear that she would have

8    Thanksgiving community dinners for the impoverished.  She

9    would throw -- through her faith and through the church, she

10   would have dinners to give to the people who were needy and

11   who were not able to eat for themselves on Thanksgiving.  And

12   she lived by the word of her faith.

13           And she sent her daughter Alyse to Catholic school

14   because she wanted her to have that foundation which was,

15   again, her choice.  It was her choice that she was making

16   in her life.

17           She had a -- you're also going to hear that part of

18   her beliefs is she had a very difficult time getting pregnant.

19   In fact, she had a miscarriage and it was very traumatic for

20   her.  And so it was very important, when she had her daughter,

21   Alyse, to be able to be a role model and to be able to help

22   Alyse not go through the same abuse and torment that she went

23   through as a child.

24           Here's -- this is -- she became a eucharistic

25   minister of the holy communion, where she -- you're going to

1   hear all about her church activities.  You're going to hear

2   all about them.  I'm not going to go through a list up here.

3   It's not like a resume; right?  It's not -- you can't -- you

4   know, religion is a difficult thing; right?  It's like, how do

5   we do a litmus test for if you're religious or not?

6          But you're going to hear that's essentially what Blue

7   Cross did in this case.  Let us do a 15-minute interview with

8   you and we will do a little inquisition, and we're going to

9   determine -- we're going to be the judges, a corporation,

10  of whether you are honestly religious or not.  Okay?  That's

11  what they did in this case.

12         But you're going to see that even with that test, she

13  would pass with flying colors.  She was -- she was -- this

14  isn't someone who just, you know, said, I want to be religious

15  because I don't want to get vaccinated.  This is somebody who

16  lived by this her whole life, since she was an abused little

17  girl, she lived by this.

18         She became a -- she got married in the church.

19  She -- her supervisor at Blue Cross was the godmother of her

20  child, you're going to hear in this case.

21         So let's talk about what happened.  So let's talk

22  about Blue Cross a little bit.  Okay?

23         We all heard them voir dire everybody.  Had a lot

24  of opinions on Blue Cross.  But let's talk about Blue Cross.

25  All right?

 1          Blue Cross is all over the state of Michigan.  It is
 2   a big corporation.  Okay?  You're going to hear, according to
 3   their own public financial documents, that in 2022 Blue
 4   Cross's total revenue was 32.8 billion with a B, billion
 5   dollars.  And just to, you know, take that down a little
 6   bit, that's 32,000 800 million dollars.  32,000 800 million
 7   dollars.  Okay?
 8          And Lisa began working -- Lisa, you're going to hear,
 9   she worked her whole life.  She worked since she was 13 years
10   old.  See babysat.  She worked at a doctor's office.
11          And Lisa began working for Blue Cross in 1984.  1984,
12   she began working for Blue Cross Blue Shield.  And you're
13   going to hear she worked there consistently, she took a
14   little break when she had her child, but she worked there
15   consistently for 38 years.  38 years she worked there.
16          And you're going to hear that she was an awesome
17   employee.  You're going to hear that -- I know some of these
18   are hard to see, but she worked her way up from the bottom at
19   Blue Cross over the years.  And this is her résumé.  And we're
20   going to go through it.  But she worked her way up there
21   and she kept getting promoted and promoted and promoted and
22   promoted.  She stayed after hours.  She did extra work.
23          You're going to -- you're going to hear from her.
24   She is not going to come in here and bad mouth Blue Cross,
25   because she loved that job.  She loved her job.  She'll tell

1   you she would go and clean toilets for Blue Cross if that's

2   what they asked her to do.  She would do anything for Blue

3   Cross except deny her faith.  Except deny her faith.  It's the

4   one thing she wasn't willing to do.

5          She worked her way all the way up.  You're going to

6   see over ten promotions that she worked her way up through.

7   And she is going to take you through this.  And so she became

8   an IT Specialist.  All right?

9          Now we're kind of getting to when COVID hits; right?

10  We all remember.  It's not a fun time.  But she was actually

11  working from home before COVID hit.  So before COVID even hit,

12  Blue Cross said, you are such a great employee, you have given

13  so much to us, you can work from home.  You can work from

14  home.  Because she was in IT and she did a stellar job.

15         And we're going to show you, we have records going

16  back -- this is -- this is Lisa and she -- this is when she

17  was at the office a little while ago, but this was when she

18  was at the office and she was getting recognized for some of

19  her stellar work at Blue Cross and she loved it.  She loved

20  her work.  And she was given certificates of achievement,

21  five years, ten years.  She was somebody that they would

22  have -- that they should have held onto.

23         Let's take a look at what her own -- her own bosses

24  said about her.  Here's 2019.

25         Now look, we have got records going back to 1984.

1   I'm not going to show them all to you.  But let's just go look

2   at the last four years.  This is what they said.

3          They said that she was a role model.  It's a pleasure

4   to work with Lisa.  She is a great role model for the team.

5   She is proactive.  She is engaged and involved.

6          It says that Lisa, in 2020, we look to get her more

7   involved in financial goals and professional development

8   goals.  Our team would not have been as successful without

9   Lisa Domski.

10          This is from her own supervisor.

11          We have more.

12          Lisa did a phenomenal job of providing support to me

13   and the team.  She is a role model, because you know when you

14   give a task to Lisa, she is going to follow through and follow

15   up as needed.

16          And then they gave her a thing -- here's -- here's

17   the rankings that they can give you.  It goes all the way from

18   needs improvement to being a role model.  Her own supervisor

19   characterizes her as a role model employee.  A role model

20   employee.

21          And there is not a single person there they could

22   find to bring in here to tell you that she was a bad employee.

23   This is not a case where you're going to hear, oh, she was

24   messing up all over the place.  She had problems.  She made

25   something up so she could go to court in front of a bunch of

1    strangers in a federal court.  You're not going to hear a

2    single person say a bad thing about her performance, because

3    we have records going back to 1984, and they show that she was

4    a stellar role model employee.

5           And we have more.  We can -- we have got role models.

6           Just run through these, Craig.

7           Because fully, fully, every single review is going to

8    be positive that you're going to see in this case.

9           Here's another one.

10          In addition, Lisa has been involved in taking

11   advantage of professional development opportunities.  She

12   was at the Ronald McDonald House where she volunteered and

13   coordinated and organized the event.  Lisa provided the same

14   level of excellence to the team's volunteer events as she

15   does with her day-to-day work and commitments.

16          We have -- again, we have in 2021 -- now 2021,

17   remember, this is after COVID hit, because COVID hit in March

18   of 2020, we're really hit, hit.  Okay?  In 2021, so after

19   COVID has already been out for a year, she is still getting

20   stellar reviews.

21          Lisa has done a great job of supporting our

22   divisional talent plan.  Lisa is a key resource.  That's what

23   they called her, a key resource.  She is a valued employee in

24   our organization.

25          These are the words you're not going to hear from

1    these -- from these people in this case, but these are the

2    words of Blue Cross management as it relates to Lisa.

3            And it continues.  And we can go through these.  I'm

4    not going to waste your time.  You understand and we will have

5    all these as exhibits for you.

6            So Lisa is doing great.  All right?

7            So what happened?  So what happened?  Okay?

8            Why in the world are we here if you have this

9    wonderful employee who has been there for 38 years?

10           Well, COVID happened.  Okay?  And there's three

11   vaccines available in Detroit.  Remember when the vaccines

12   came out, it was like, what's going on?  It was a lot of

13   confusion.  There was, are they safe?  You hear all these

14   different things about the vaccines.

15           There was three vaccines available in Detroit that

16   you could get.  There was a Johnson & Johnson vaccine, there

17   was a Moderna vaccine, and there's a Pfizer vaccine.  All

18   right?

19           Now, what's the problem for Lisa getting this

20   vaccine?  It's undisputed that the Johnson & Johnson vaccine

21   used aborted fetal cells in all phases of development.  So

22   in researching it, and in developing it, and in producing it.

23           So Lisa said, I can't do that.  She did some

24   research, you're going to hear.  She said, that goes against

25   my belief.

1              You may disagree with her.  You may say that's a

2     stupid belief.  And you have a right to believe that.  You

3     have a right to believe that.  But she has a right to believe

4     in accordance with her conscience and with her soul that

5     that's wrong.  And nobody can tell her, not the government,

6     not a corporation, that she needs to change her mind or she

7     gets fired or she goes to jail or she has some other thing.

8     She has a right to believe that.

9              Moderna and Pfizer vaccine, Moderna and Pfizer, it's

10    undisputed, used fetal cells in the development process of the

11    vaccine.  Fetal -- aborted fetal cells were used, which come

12    from, like, the '60s and '70s when they started using some of

13    them.  And then when they developed these vaccines, they used

14    them.

15             So, well, what's the problem?  So on October 12 of

16    2021, Blue Cross begins discussing having a mandate, a forced

17    mandate of their entire work force.  Okay?  They said we are

18    going to make every single employee get one of these vaccines.

19             And they had a meeting where there was a lawyer

20    there, who you're going to hear from in this case, and there

21    was a whole bunch of people from the Human Resources

22    Department.  They have a fancy name for their HR.  It's like

23    Labor and Development or Labor and Employee -- Labor and

24    Employee Relations is what they call it.  But it's just a

25    fancy word for HR.

1        They have a meeting, and right off the bat they are

2    talking about what is our process going to be.  Because they

3    know when they tell their workforce that they have to get

4    vaccinated, there is going to be some problems with that.

5        So they tell -- so right off the bat the VP, the

6    head of their HR says, we're not going to accept all these

7    religious accommodation requests.  Those are her words.  We're

8    not -- they don't even know what the people are going to say.

9    They don't even know.

10        They say right off the bat, we're not going to accept

11    all these.  You're going to hear, they rejected the majority

12    of religious accommodation requests.  75 percent.  Okay?  They

13    said, we're not going to accept these.

14        Then the lawyer says, I'm going to set up a

15    process -- and we're going to show you documents that prove

16    this -- who helped develop this whole process to basically --

17    it's an inquisition of, we're going to interview people and

18    make them defend their religion, is essentially what they do.

19        We're going to ask them a bunch of questions and make

20    them defend.  And he set up all kinds of other part of the

21    process.  His name is Bart Feinbaum is the lawyer's name.  And

22    you're going to hear from him.  I'm going to call him as a

23    witness in this case, Bart Feinbaum.

24        He compares it -- now, this gentleman has been a

25    lawyer for a very long time.  And you're -- you're going to

1    hear that he compared it to cross examinations in court.

2         So it's something that you're about to see, where a

3    witness is going to have to get up on that stand and be cross

4    examined by me and then my witnesses are going to have to

5    be cross examined by these people over there for Blue Cross

6    Corporation.

7         And he compares -- he says, we're just going -- you

8    know, we're going to cross examine these people and it's going

9    to be fun.  That's the word he used.  This is going to be,

10   quote, "fun."  It's going to be fun to interrogate our own

11   workers about their religious beliefs.

12        People start getting excited.  One HR professional,

13   this was the team that was developing this says, can we be in

14   the background of these interviews -- if you can call them an

15   interview -- and not say anything, just so we can watch,

16   because this sounds like fun.

17        And the attorney says, no way.  Quote, "Because you

18   will be a witness and then they can depose you."

19        And depose means, ask you questions under oath in a

20   court case.  Okay?

21        So that's how this process got started.

22        Now, this individual then developed questionnaires.

23   And then they announced to the -- right following this

24   meeting, we're going to show you documents and we're going to

25   put people on the stand about this, that they then made people

1    submit what's called a request for religious exemption.  Okay?

2              So Lisa submitted a request.  She did what she was

3    told.  And she didn't know what to do, because Blue Cross

4    didn't give any guidance to its employees.

5              They didn't say, look, here's the criteria.  We need

6    to make sure that you're telling -- that you're honest and

7    sincere.  Here's what we're going to look at.  You know, they

8    didn't go talk to her priest.  They didn't go talk to anybody

9    around her.  They didn't go talk to her neighbors.

10             They didn't go talk to the godmother of her kids, who

11   was her boss, who was also working at Blue Cross Blue Shield.

12   They didn't walk down to the office and say, hey, do you think

13   -- I know you're the godmother.  Do you think she is really

14   religious?  Because she is claiming she is religious.  We

15   need -- we need to look into this.  We need to cross examine

16   her.

17             So Lisa goes online and starts looking up, what am

18   I going to do; right?  She has never been through this.  What

19   am I going to do?

20             And she finds some religious accommodation request

21   templates online that she looks at that explain, here's what

22   other people are doing.

23             And so she looks at those and then she prays on it.

24   You're going to hear that she prayed for a long time about it.

25   And then she still wasn't even done, because she still felt

1    worried about it.  She had worked there for almost 38 years
2    and she was having a crisis of conscience.  And she wanted to
3    continue to work there.
4            So she went to see her priest.  And he is going to be
5    my first witness.  His name is Father Ptak.  It's her priest.
6    And he's going to tell you, she came to him.  She was upset.
7    She was torn about what to do.
8            She said:  Father, I don't know what to do.  They are
9    making me choose between my religious beliefs and getting
10   something, this vaccine, that I don't believe in because of
11   the fetal cell issue.
12           And the priest told her:  Lisa, you have to follow
13   your conscience.  You have to follow what your conscience
14   tells you.  That's God's way of talking to you.  That's the
15   Holy Spirit.  You need to follow what you believe in your
16   heart and your conscience.
17           And that's what she did.  She made a religious
18   exemption request, which we're going to show you.
19           And she said:  Due to the sincerely held personal
20   religious beliefs and sanctity of my conscience I am not able
21   to receive this vaccine.  While I understand that I am not
22   legally required to justify the basis for my sincerely held
23   religious belief, nevertheless, I am providing several reasons
24   for why this policy violates my Christian faith and why
25   I cannot therefore in good conscience take part in it.

1          We will show you this whole thing throughout this

2     trial.  There is a lot of other stuff.  She quotes the Bible.

3     She quotes St. Paul.  She quotes a lot of people.

4          And she says the COVID vaccine manufactured by

5     Moderna and Pfizer has used aborted fetal cells in the testing

6     process and the one manufactured by Astra Zeneca and Johnson &

7     Johnson used aborted fetal cells in every step of the process,

8     including development, production, and lab testing.

9          That was her reason.  Again, you may disagree with

10    her decision to do that, but it was her decision.

11         So she makes this religious accommodation request.

12    And by the way, when she makes the request she has to fill out

13    this, like, six page -- six questions, not six pages.  It's a

14    six-question questionnaire that Blue Cross made up.  Okay?

15    That they made up this questionnaire.

16         And she tells them in the questionnaire, and I'm

17    going to show it to you, she says, here's my priest.  If you

18    have further questions contact Father Ptak, address, phone

19    number, email, everything.

20         So here's what Blue Cross does.  And this was -- this

21    was pursuant to their policy that they made.  This is how they

22    handled all the requests.

23         Go back a second.

24         So they tell her, you have to go into an interview

25    now.  I know you submitted all this written documentation, but

1    now you have to go into an interview.  The interview was with

2    an HR professional and a lawyer.  Okay?

3          So imagine this.  Lisa is being told, you need to now

4    go before the inquisition panel, I'll call it that, but the

5    interview panel, and there's going to be a lawyer and an HR

6    person.

7          And so the employees asked, well, can I bring a

8    representative?  No.  Well, Blue Cross, can I bring a lawyer?

9    No, absolutely not.  Well, did you give them guidance?  No.

10   No guidance.  They said, show up at the interview, and we're

11   going to ask you a bunch of questions.

12         The interview was 15 minutes long.  That's how -- the

13   max time of the interviews could be, was 15 minutes, and then

14   they went on to the next person.

15         And they are going to say that was their process and

16   it was a fair process.  How in the world -- you know, you have

17   Martin Luther, you have biblical scholars defend theology for

18   their entire lives, and they want an employee to defend their

19   religion in 15 minutes or less without doing any

20   investigation?

21         So she went to the interview.  They told her at the

22   beginning of the interview, this is completely voluntary,

23   Lisa.  Don't worry.  You don't have to do this interview.

24   This is completely voluntary.  She went anyways.

25         And she just had her -- a family member, she had a

 1    family member die the day before the interview.  She had

 2    to bury a family member at a funeral and then go to this

 3    interview with Blue Cross the next day, this interview.

 4    It's absurd.

 5          And Lisa goes to the interview.  They say, this is

 6    completely voluntary.

 7          We're going to show you.  There is a transcript.

 8          Go to the next one, Craig.  Please go to the next --

 9    no, go to the transcript.

10          So Lisa has -- I don't know if anybody uses Word with

11    dictation.

12          No, keep going, Craig.  There is a transcript,

13    please.

14          And they give the interviewers all these questions.

15    And this is an exhibit in this case, and we're going to talk

16    about that.

17          So here's the transcript.  So Lisa says -- so

18    remember, there is a meeting.  There is that October 12

19    meeting between the lawyers and HR, right, where they say

20    we're not going to accept all these religious accommodation

21    requests.

22          So Lisa -- so Lisa says, can I record the meeting?

23    And they say no.  So what Lisa does is she has, you know, a

24    Word document, you can hit -- there is like a dictate button

25    and so she dictates it so it makes a little transcript of the

 1   meeting.

 2           And then she went back and she put in the names of

 3   the people that are there.  This is an exhibit.  They are

 4   going to show it to you in this case and we're going to show

 5   it to you in this case.

 6           So they first tell her, don't worry.  They don't even

 7   use the word, voluntary.  They say it's completely voluntary.

 8   Lisa Domski, who's been here for 38 years, who has worked late

 9   nights, who has given up and sacrificed time with her family.

10   This is completely voluntary for you.

11           So Lisa says, okay.  Well, sirs, Mr. Lawyer and

12   Mr. HR Person, I have already submitted your questionnaire

13   online, and I have already submitted a statement, and I have

14   given you my priest's information.  What else do you possibly

15   need?  What can I tell you in 15 minutes to defend my

16   religious beliefs?

17           So they say:  Well, are you refusing to answer our

18   questions?  Are you declining to answer all of our questions?

19           And Lisa says:  I'm not declining to answer your

20   questions.  I have submitted a statement.

21           And this is what they say:  You're declining; right?

22   You're declining to answer the questions we have.  Okay.

23           Lisa says:  I have to say it again.  I apologize.

24   But I have submitted a statement to you outlining my religious

25   beliefs.

1          Then she says:  Can you submit the questions to me

2    in writing and I can get them back to you?

3          She says, no, we don't -- they say, no, we don't do

4    that.  That's not how this process works.  Everyone has

5    cooperated and, no, we don't provide that.

6          And by the way, they didn't even have her written

7    statement.  They didn't even take a look prior to this

8    interview.  This is how sloppy this process was, how bad it

9    was.  They didn't even have her written statement or questions

10   at the interview to look at.

11         Go ahead.

12         So she is interviewed on December 1.  They tell her

13   multiple times this is completely voluntary.  And then the

14   next day, one day later, they just say, you're denied.  Your

15   request for religious exemption is completely denied.  You

16   don't have a right to appeal it.  You don't have a right to --

17   you can't provide additional information.

18         They didn't say -- they didn't say, Lisa, we need

19   some more information.  You know, Lisa, you know, we don't

20   want to go back to your priest.  You need to go talk to your

21   priest.  They didn't give her any opportunity to provide any

22   additional information whatsoever.

23         They just said, you're denied.  Good-bye.  Box up

24   your stuff and send it back to us.  Thanks for 38 years.

25         They didn't even say thank you for 38 years.  Here's

1    what they said.  They denied her religious exemption and they

2    said you have until December 8th to get vaccinated.  We don't

3    care about your religious beliefs.  You either get vaccinated

4    or you're fired.

5            And Lisa was upset.  And Lisa cried.  And Lisa talked

6    to her family.  And Lisa prayed.  And Lisa said, I am not

7    going to do something that I believe is against my religion

8    and my conscience.

9            And she was fired from Blue Cross Blue Shield after

10   38 years of hard work and service because she refused to give

11   up her religious beliefs.  That's what this case is about.

12   And it's illegal.  It is illegal, what they did to Lisa

13   Domski.  They cannot do that.

14           That's not what our founders intended.  That's not

15   what the Civil Rights Act of 1964 allows for.  And that's why

16   we're going to ask for a verdict at the end of this case that

17   tells Blue Cross Blue Shield you can't do this to Lisa Domski.

18   You can't do this to anybody.  You can't do this to anybody.

19           And we're going to be asking for a large verdict,

20   millions of dollars, that sends a message to Blue Cross Blue

21   Shield, that says what you did, you violated her civil rights.

22   You took away 38 years that she had given to this company

23   without so much as a thank you, because she refused to give

24   up her religious beliefs.  It was her choice, and she wasn't

25   hurting anyone.  She worked from home.  She worked from home.

1        They sent her a single letter in the mail.  This was

2  what she got for 38 years, by the way.  This is an exhibit.

3        They said:  Our records indicate you're not in

4  compliance with this vaccine requirement nor have you been

5  approved for an accommodation.  This letter serves as your

6  notice that your employment is terminated effective January 5

7  of 2022.

8        That's what she got for 38 years of giving to them.

9  She gave them 38 years of her life.  She got a letter saying,

10  we don't care about your religious beliefs.  You're fired.

11        They said, box up your stuff at your house.  Box up

12  your computer.  Box up everything else you have and send it

13  to us in the mail in a UPS box.  Good luck.  Good luck.

14        That's illegal.  And that's why you're here.  That's

15  why you're here.  Because nobody can stop it except you.

16  Nobody can do justice in this case except you.

17        And that's why this case is so important.  It's

18  important because it's about an individual's right to believe

19  in what they want to believe in and not have a corporation

20  tell them, if you don't do or say or walk or talk like we

21  want, you're fired.

22        So you're going to hear about this financial distress

23  that Lisa -- it did on Lisa.  Lisa had worked her way up

24  and was making close to $100,000 a year without a college

25  education, over 38 years of service.

```
1              She started applying at TJ Maxx.  And people were
2    asking her, wait a minute, why would you give up a job at
3    Blue Cross Blue Shield making $100,000 a year to work at
4    TJ Maxx?  To work at TJ Maxx.  But she tried.
5              She applied to Henry Ford.  I don't know if you guys
6    know the Henry Ford Village, the Henry Ford Museum.  She
7    got a job at Henry Ford working in a back room answering
8    telephones.  She made about $5,000 that year.  She went from
9    making $100,000 a year to making $5,000 working at Henry Ford
10   in a back room answering a telephone.
11             She applied to General RV.  She interviewed.  She
12   was driving all over.  You're going to hear that Lisa and her
13   family are from downriver and she was driving all over trying
14   to find a job.
15             And her friends were saying, why are you driving all
16   over?  She said, nobody wants to hire me.  Who is going to
17   hire somebody who at 55, she was terminated at 55, who gave
18   up a job because of her faith and she had to explain it to
19   people?
20             And you're going to hear she was embarrassed that she
21   had to defend her faith to random strangers, that she is going
22   to have to do in this courtroom with all of us, defend her
23   faith in front of all of us, but she is going to do it.  And
24   so she applied for all these jobs.
25             So what are the defenses in this case?  You're going
```

1     to see two defenses that -- I think, in this case.  You're

2     going to hear the first defense which is just to blame --

3     I call it the blame-Lisa defense.  All right?

4          Because here's what they don't have.  They can't come

5     in here and say she was a bad employee that deserved to get

6     fired.  So what they are going to say is, you know what, it's

7     her fault.  She should have known somehow to provide more

8     or better information to us, even though she answered the

9     questionnaire that they gave her.

10         She -- even though she didn't have the benefit of

11    a lawyer, I -- she -- I didn't know Lisa at that time.

12    Mr. Hurwitz didn't know Lisa at that time.  They told her she

13    couldn't have a lawyer.  So even though they got a lawyer and

14    they got an HR person, that she should have just done better

15    in this interview.  And that's a bunch of ridiculousness.

16         THE COURT:  Mr. Marko, you have about five minutes.

17         MR. MARKO:  Five minutes.

18         They told us -- I told you I was longwinded.  I'm

19    doing my best.

20         They told her, this interview is completely

21    voluntary.  They said it twice.  They didn't say it's

22    voluntary.  They said it's completely voluntary.

23         And she said, okay, wow, good, what a relief.

24    I don't have to defend my faith before strangers, lawyers,

25    and strange HR people, after 38 years, in an interview, in

1    an inquisition.

2            And they are going to get up here and they are going

3    to tell you it's her fault.  She should have answered the

4    questions better in the interview.  That's ridiculous.

5            If you look at the transcript, it says completely

6    voluntary, twice.  Completely voluntary.

7            The day after she had to bury a family member, you're

8    going to make her come in and defend her faith.  Nobody

9    that -- she did not deserve that.  Nobody deserves that.

10           You're going to hear that her --  and this is it,

11   and I'll show it to you again -- the answers are completely

12   voluntary.  And this is it.  This is -- this is the thing

13   that she filled out.

14           She put right on there, please, you can contact

15   Father Ptak if you have questions, Our Lady of Sorrows,

16   Farmington Hills.  He is a pastor.  Here's his email and

17   here's his telephone number.

18           What other proof?  How do you give proof about your

19   religion?  How in the world can you prove what you believe

20   inside your soul and your heart?  What else can you do?  What

21   else should you have to do?

22           The last thing is -- oh, and they are going to say,

23   oh, well, Lisa's religious accommodation request looked

24   somewhat like a template for employees that was placed on a

25   Christian Catholic website.  Of course it did.  Of course

```
1    it did.  She didn't know what to do.  She went online and
2    she said -- she looked up, what should I do?  I don't have a
3    lawyer.  I don't have an HR person with me.  I don't have a
4    labor representative.  They didn't tell me what they want.
5    So she did the best that she could.
6         The second thing that I think you're going to hear is
7    that it's for everybody's own good.  We're sorry about what
8    happened to Lisa, but you know what, it was for our own -- it
9    was for everybody's own good that she had to be forced to be
10   vaccinated or lose her job, because we were in a pandemic.
11        Lisa was working from home.  There was alternatives
12   available.  She -- when Lisa went out in public, she was safe.
13   She wore a mask.  She didn't endanger anybody else.  She never
14   endangered anybody else.  But it was her choice.  It was her
15   choice to live her life privately how she wanted to do.  It
16   didn't hurt anybody else.  She didn't put her beliefs on
17   anybody else and they can't put their beliefs on her.  That's
18   the deal that we have under the law in America.  They can't
19   put their beliefs on you any more than she can put her beliefs
20   on them.
21        And they didn't offer any accommodation.  Remember.
22   When they get up here and tell you it was for their own good,
23   it was for your own good.  That -- a corporation cannot have
24   policies that violate the Constitution or the Civil Rights Act
25   of 1964.
```

```
 1              Ladies and gentlemen, thank you very much.  I look
 2    forward to presenting this case to you.  I'm going to sit
 3    down.  The attorneys for the Blue Cross Corporation are going
 4    to talk to you and then we're going to start presenting
 5    evidence in this case.
 6              Thank you so much.
 7              THE COURT:  Thank you, Mr. Marko.
 8              All right.  Mr. Hubbard, are you prepared to address
 9    the jury?
10              MR. HUBBARD:  I am, your Honor.
11              THE COURT:  You may proceed.
12              MR. HUBBARD:  Thank you, Judge.
13              Good morning.
14              JURORS COLLECTIVELY:  Good morning.
15              MR. HUBBARD:  As a reminder, my name is Brandon.
16    With us here today are Nolan Moody, Carrie Voss, Maureen
17    Moody, Rudy Makupson.
18              Rudy Makupson is in-house counsel for Blue Cross.  He
19    is our client representative.  I have had the privilege of
20    working with Rudy for quite some time.
21              You'll remember that Nolan and Maureen, they are
22    brother and sister.
23              And Carrie, she is our paralegal and she runs all
24    things evidence for us during the course of this trial.  So
25    you'll see her put some stuff up on the screen for you,
```

 1    including right now.

 2            To start, I want to thank you.  I understand that

 3    this is taking time out of your daily lives and it disrupts

 4    what you would otherwise be doing.  So thank you.  And it is

 5    a privilege to be trying this case in front of you.

 6            We all lived through it, the pandemic.  COVID-19.

 7    The shutdown.  It was an unprecedented and trying time.

 8    No question about that.

 9            And that included for Blue Cross, a healthcare

10    company headquartered in Detroit in one of the nation's

11    hardest hit cities by the virus.

12            For Blue Cross, yeah, it wanted to fight back against

13    that deadly virus, not just for the safety of its employees,

14    but for its community.  And part of that decision to fight

15    back was to implement a vaccine policy.

16            No, it wasn't an easy decision, but not many were

17    when it came to COVID-19.  And for Blue Cross, being in the

18    healthcare industry, seeing the havoc that that deadly virus

19    was wreaking on employees and the community, it wanted to

20    fight back.  It didn't want to be defeated by it.

21            As for the policy, not everybody had to be

22    vaccinated.  There were two exemptions.  The first was

23    medical.  If you had a medical reason why you couldn't get

24    the vaccine, you could apply for and be approved for an

25    accommodation, an exemption.  Didn't have to get it.

1          The second, religious.  If you had a sincerely held

2    religious belief that conflicted with the vaccination policy

3    such that you couldn't get the vaccine, you too would be

4    granted an exemption.

5          Blue Cross, it received hundreds of vaccination --

6    excuse me -- religious requests.  That's a lot.

7          Blue Cross, it took the process very seriously.  It

8    wanted to hear from the employees in their own words what it

9    was about their religious beliefs that prevented them from

10   getting the vaccine.  Blue Cross wanted to be informed.  And

11   that makes sense, because religion, you can't see it.

12         You may well be able to ascertain, and I think you

13   can, my gender.  You could probably guess my age and even my

14   weight.  But what about my religious beliefs?

15         This case, it's about what you can't see in

16   Ms. Domski's religion.  She alleges that Blue Cross

17   discriminated against her on the basis of her sincerely held

18   religious beliefs.

19         Now, I would like to share with you a couple of words

20   that I think will be important in this case.

21         The first, inform.

22         Ms. Domski, she has to establish in this case that

23   she has a sincerely held religious belief that conflicts with

24   the vaccination policy.  But she has to establish that she

25   informed Blue Cross about that.  Informed.

1          The second word, cooperation.

2          Ms. Domski was asked during the interview that she

3    had, the meeting that she had with Jeff Walters -- you're

4    going to hear from Jeffrey Walters.

5          And Jeff said:  We're looking for your cooperation.

6          Her answer:  Absolutely.

7          Now, the Judge told you that opening statements, it's

8    not evidence.  And so what I say and what Mr. Marko says isn't

9    evidence in this case.  What is evidence is what the witnesses

10   testify to and the exhibits that you actually see and read.

11   That's the evidence.

12         So what is the evidence going to show?  Ms. Domski,

13   she submitted a request for religious accommodation.  It was

14   a short letter, just over a page.  And not long after having

15   submitted that, she met with employee Jeff Walters.

16         And you will hear from Jeff.  He was the decision

17   maker relative to Ms. Domski's request.  He will share

18   with you that when he asked Ms. Domski about the religious

19   beliefs that she followed and why she was asking for the

20   accommodation, she was unwilling to answer.

21         But Jeff, he wanted to understand Ms. Domski's

22   beliefs in her own words.  And you will hear from Ms. Domski.

23   Ms. Domski will testify that her letter that she submitted

24   was based upon her being Catholic and a member of the Catholic

25   Church.  You actually heard some of that in Mr. Marko's

1    opening statement.

2          But here's the problem.  Ms. Domski, when she

3    submitted that letter, it didn't make any reference to her

4    being Catholic or part of the Catholic Church.  And when Jeff

5    Walters asked her questions during the interview, she didn't

6    share those beliefs with him either.  She never informed

7    Blue Cross of that.

8          I'm going to show you Exhibit 206.  This is the

9    letter that Ms. Domski submitted.  I told you it was just

10   over a page.  That's the first page.  That's the second.

11         And you can see that it bears her signature.  But it

12   doesn't make reference to her being Catholic, her beliefs.

13   It doesn't make reference to her religion.

14         So Blue Cross, wanting to learn more, wanting to be

15   informed, I think you will agree, is understandable.  You

16   saw the -- I think Mr. Marko referred to it as a transcript of

17   sorts relative to the meeting that Ms. Domski had with Jeff

18   Walters, and it's Exhibit 16.

19         And I would like to actually go through with you the

20   questions and the answers, including what Jeff asked and how

21   she answered them.

22         Question one, Jeff says:  Why are you requesting an

23   accommodation to the vaccine?

24         Answer, her exact words:  I understand the company

25   has issued a vaccine mandate.  I have asked for a religious

1    accommodation.  I have submitted a statement in support of the

2    accommodation and the statement speaks for itself.  I have

3    nothing to add.

4           That's it.

5           Second question.

6           Same question asked by Mr. Walters.  He tries again.

7           And her exact response:  Again, I put it all in my

8    statement which supports everything and what I have to say.

9    Supports everything and what I have to say.  I have attached

10   it and sent it to the appropriate people and the statement

11   speaks for itself.  Nothing more.

12          Jeff, he asks her a third question:  What religious

13   beliefs do you follow?

14          Her exact response:  I understand the company has

15   issued a vaccine mandate.  I have asked for a religious

16   accommodation.  I have submitted a statement in support of the

17   accommodation and the statement speaks for itself.  I have

18   nothing to add.

19          Jeff Walters, he asked those questions and

20   Ms. Domski, that's how she answered them.

21          Among many other things, Jeff, he is going to testify

22   that, yes, he reviewed the letter that Ms. Domski submitted

23   before he met with her.

24          He remembers the meeting with Ms. Domski mostly

25   because she was unwilling to answer any of the questions that

1   he had about her religious beliefs.

2            He did not know that Ms. Domski was Catholic.  And

3   because Ms. Domski was unwilling to answer the questions that

4   were being asked, Jeff, he was left with the honest belief

5   that the letter and the contents were not her own.

6            Because if they were her own, and she genuinely did

7   not want to take the vaccine because of her Catholic faith and

8   Catholicism, Jeff believed that she would be willing to talk

9   about it with him.  But she did not.  And so based on his

10  honest belief, he denied her request.

11           And now she has sued Blue Cross and she is going to

12  ask for a lot of money.  But remember, the burden is on

13  Ms. Domski to prove not only that she has a sincerely held

14  religious belief that conflicts with the vaccine policy, but

15  that she informed Blue Cross of that conflict.

16           The evidence in this case is going to point in

17  one direction.  Blue Cross, it wanted to be informed about

18  Ms. Domski and why she was requesting the accommodation.  But

19  she was unwilling to answer the questions that were asked

20  about her religious beliefs.  Is that cooperation?

21           At the end of this case I'm going to ask you to

22  return a verdict that Ms. Domski is not entitled to any

23  damages, because Blue Cross did not discriminate against

24  her on the basis of her sincerely held religious beliefs.

25           Ms. Domski may well tell you that she is a devout

1   Catholic, and she may well tell you that her Catholicism

2   prevented her from getting the vaccine, but she never

3   informed Blue Cross of that.

4           Thank you.

5           THE COURT:  All right.  Mr. Hubbard, thank you very

6   much.

7           Members of the jury, those are the opening

8   statements.

9           We're going to take a break.  Would you put those

10  monitors down?  I think it's easier to get in and out of the

11  jury box if they are not up.

12          Please do not discuss the case among yourselves.

13  Please do not leave the jury room.  The break will be about

14  15 minutes or so.  And then we will come back and begin

15  taking the evidence in the case.

16          Mr. Beyer, would you escort the jury out, please?

17          THE CLERK:  All rise for the jury.

18     (Jury left courtroom at 11:24 a.m.)

19          THE COURT:  Either side have anything for the record

20  before we take a break?

21          MR. MARKO:  No, your Honor.

22          THE COURT:  15 minutes.  Court is in recess.

23          MR. MARKO:  Thank you, your Honor.

24     (Recess taken from 11:25 a.m. to 11:45 a.m.)

25          THE CLERK:  All rise.  Court is back in session.

1          You may be seated.

2          Is the plaintiff ready for the jury?

3          MR. MARKO:  Yes, your Honor.

4          THE COURT:  Defendant?

5          MR. MOODY:  Yes, your Honor.

6          THE COURT:  Bring the jury in, please.

7          THE CLERK:  All rise for the jury.

8     (Jury entered courtroom at 11:46 a.m.)

9          THE COURT:  You may be seated.  You heard the

10   statements of the attorneys and now we will begin with the

11   presentation of evidence.

12          Mr. Marko, you may call your first witness.

13          MR. MARKO:  Thank you, your Honor.  We will call

14   Father Ptak to the stand.

15          THE COURT:  Are you Walter Ptak?

16          THE WITNESS:  I am.

17          THE COURT:  Would you step forward, please?

18          Just pause right there for a moment.  Raise your

19   right hand and be sworn.

20     (Oath administered at 11:47 a.m.)

21          THE COURT:  Would you have a seat right over here in

22   the witness box, please?

23          THE WITNESS:  Thank you.

24          THE COURT:  Please adjust that -- you might want to

25   pull it a little closer to you, so that you can speak into the

```
 1    tip of it.
 2            Would you state your full name and spell your last
 3    name?
 4            THE WITNESS:  My full name is Walter Joseph Ptak,
 5    P-t-a-k.
 6            THE COURT:  You pronoun is Ptak?
 7            THE WITNESS:  Ptak.
 8            THE COURT:  Thank you.  Good morning.
 9            THE WITNESS:  Good morning.
10            THE COURT:  You may proceed.
11            MR. MARKO:  Thank you.
12                        *      *      *
13                        WALTER JOSEPH PTAK
14             was called as a witness, after having
15              been duly sworn to testify to the truth.
16                        *      *      *
17
18                        DIRECT EXAMINATION
19    BY MR. MARKO:
20    Q.   Good morning, sir.  Father.
21    A.   Good morning.
22    Q.   Tell the jury, who are you?
23    A.   My name is Father Walter Ptak.  I'm a priest of the
24    Archdiocese of Detroit.  I am pastor at Our Lady of Sorrows in
25    Farmington, Michigan.
```

1    Q.   And you have your official garments on today?

2    A.   I do.  I have been given the honor of being called a

3    canon.  It's an honorary title in the church given to me by

4    Cardinal Dziwisz, who was Pope John Paul's right-hand man,

5    with the concurrence of the Archbishop of Detroit.

6    Q.   So let me ask you something.  When most people see you

7    out in the street in that, in your garb, do they have an

8    understanding that you're Catholic?

9    A.   I would say yes.

10   Q.   And the reason I ask, Father, when people talk to you, do

11   they use the word, Father?

12   A.   Almost always.

13   Q.   And does the word Father or Most Reverend denote a

14   Catholic priest or Catholic position?

15   A.   In my understanding, it does.

16   Q.   And the reason I ask is, let me show you what's been

17   marked as Defendant's Exhibit 206, which is Lisa Domski's

18   religious accommodation request to Blue Cross Blue Shield.

19            And I want to focus specifically on the last page.

20            MR. MARKO:  Is this working?

21            THE COURT:  No.  It's also not been admitted.

22            MR. MARKO:  This is Defendant's Exhibit 206.

23            THE COURT:  Right.  It's not been offered or

24   admitted.

25            MR. MARKO:  It's been stipulated to.  I move for

 1    admission.  It's been stipulated to previously.

 2              THE COURT:  Is there any objections to Exhibit 206?

 3              MR. MOODY:  None, your Honor.

 4              THE COURT:  All right.

 5         (Defense Exhibit 206 received.)

 6              MR. MARKO:  All right.  Now that's admitted, and I

 7    apologize for that.  This is Defendant's Exhibit 206, which

 8    has been represented to be Lisa Domski's accommodation

 9    request.

10              And is it working now?  Okay.  Okay.

11    BY MR. MARKO:

12    Q.  So because based on your title, your uniform, and you are

13    a -- you're stationed where, sir, did you say?

14    A.  Our Lady of Sorrows in Farmington, Michigan.

15    Q.  All right.  So let's look at what Lisa Domski put on the

16    last page of her religious accommodation request.

17              It says Religious Accommodation Request at the top.

18    Do you see that?

19              Can you see that on your screen?

20    A.  Yes, I do.

21    Q.  And then is that you?  Very Reverend Canon Walter Ptak?

22    A.  It is.

23    Q.  From Our Lady of Sorrows?

24    A.  It is.

25    Q.  And is that a Catholic Church?

1    A.   It is.

2    Q.   And so if someone at Blue Cross just went on the internet

3    and Googled Our Lady of Sorrows would their website pop up that

4    it's a Catholic Church?

5    A.   It does.

6    Q.   And it has even your address of the church?

7    A.   Uh-huh.  Technically, that's the address of the school,

8    but we're on about eight or ten acres of land.  So.

9    Q.   Is that a Catholic school?

10   A.   It is a Catholic school.

11   Q.   And it has your email, wptak@ourladyofsorrows.com?

12   A.   That is.

13   Q.   And is that your phone number?

14   A.   I believe so.  I'm not there quite four years, so there's

15   so many phone numbers, but it does look familiar.

16   Q.   All right.  So, I mean, just reading that, based on your

17   experience, would that just lead a normal person listing a

18   Catholic Church, listing a priest, to know that it's related to

19   Catholicism?

20         MR. MOODY:  Your Honor, I'm going to object.  It

21    calls for speculation.

22         THE COURT:  It does.  The objection is sustained.

23   BY MR. MARKO:

24   Q.   Let me ask it this way.  It's undisputed that this is --

25   206 was provided to Defendant Blue Cross.

```
 1              Did Blue Cross and Blue Shield ever call you on the
 2    phone to ask you about Lisa Domski's religious accommodation
 3    request?
 4    A.   No.
 5    Q.   Did Blue Cross Blue Shield ever send you an email that
 6    said they wanted more information, Very Reverend Canon Father,
 7    about her religious accommodation request?
 8    A.   No.
 9    Q.   Did they ever write you a letter in the mail that said we
10    are investigating this and we need some more information about
11    Lisa Domski?
12    A.   No.
13    Q.   Has Blue Cross Blue Shield, during all the relevant time
14    periods of this case, ever made any attempt whatsoever, to your
15    knowledge, to contact you to ask for information about the
16    sincerity of Lisa Domski's religious beliefs?
17    A.   To my knowledge, no.
18    Q.   Had Blue Cross Blue Shield, had the defendant in this case
19    called you, written you a letter, whatever, contacted you in
20    any way, shape, or form and asked you to provide background or
21    supporting evidence for Lisa Domski, would you have done it?
22    A.   I probably would have, but I would have checked with
23    Bodman, because that's the Archdiocese attorney, and we're told
24    whenever there is anything legal to consult with them.  And
25    I probably also would have checked with Lisa just to make sure,
```

1    because a relationship with priest and parishioner is, you

2    know, something I would want to make sure.  But I -- I would

3    have been -- I would have answered at least.

4    Q.  Sure.  And if Lisa said -- as you can see, she put down

5    your information to Blue Cross Blue Shield.

6             If Lisa told you, Father, go ahead, would you have

7    provided a letter or other information to Blue Cross Blue

8    Shield?

9    A.  Absolutely.

10   Q.  And just to be clear, no one from -- anyone, not any

11   member of any Blue Cross, ever contacted you in any way, shape,

12   or form, to your knowledge, sir?

13   A.  Not to my knowledge.

14   Q.  Okay.  Now let me ask you another question.

15            Catholicism.  Okay.  And I want to show you Lisa's --

16   this is exhibit -- Defendant's Exhibit 206, which has been

17   represented as a religious accommodation request that says --

18   no, it's part of the same exhibit.  So this is part of the same

19   exhibit.

20            So it says:  I am not able to receive the vaccine due

21   to my sincerely held religious beliefs and the sanctity of my

22   conscience.  It violates my Christian faith.

23            Sir, are all Catholics Christians?

24   A.  I would say so.

25   Q.  What's -- so are all Christians Catholics?

1  A.   No.

2  Q.   Okay.  So when someone uses the word, Christian, does that

3  include necessarily, based in your experience and training, the

4  Catholic faith?

5  A.   I would say yes.

6  Q.   All right.  Let's talk a little bit about Lisa.

7        Tell us, Father, how did you get to know Lisa Domski?

8  A.   So it goes back to the late '80s.  I was newly ordained.

9  Sent to St. Alfred's Parish in Taylor, Michigan, and began

10 there on July 1 of 1988.

11       I believe at the festival in September of '88, we

12 have a parish festival every year, Larry, which now is her

13 husband but at the time was not, was an auxiliary cop for the

14 City of Taylor, and I believe that's where we first met, and

15 shortly after I met Lisa, and have known them every since.  So

16 that's 35, 36 years ago.

17 Q.   And tell us just about your experiences with the Domski

18 family.

19 A.   Well, we became quick friends, because we had lots of

20 similar interests.  Larry was outgoing and Lisa was outgoing

21 and we hit it off.  I prepared them for marriage and married

22 them.

23       I know the day, because it was All Souls Day, and

24 I kind of told them, I can't imagine being married on All Souls

25 Day, for in the Catholic Church it's such a -- you know, it's

1   kind of the day of the dead; right?  And -- but they were in

2   love and they wanted that date, so I believe that was 1990.

3   It goes back a few years.  But I know it was All Souls Day.

4        And so during that preparation we became closer

5   friends in the sense that we had many of the same likes and

6   dislikes and --

7   Q.   What were the likes?

8   A.   Well, that they were both people of faith.  They were both

9   fun-loving.  They both enjoyed to socialize and to get together

10  and they were young, I was young, at the time.  And we just

11  kind of became friends.  It just happened.

12       There's people you meet in your life that just become

13  friends with -- without any real reason other than that you hit

14  it off well.  And so they became close friends of mine over the

15  last 35, 36 years.

16  Q.   And did you say you got to know them as both a parish

17  priest and did you see them outside of the parish?

18  A.   Sure.  I was only there for three years, and then I was

19  sent to another assignment.  And then after that assignment of

20  one year, I was sent to Wyandotte, to where I grew up.  And

21  they were living in Wyandotte at the time, and they joined the

22  parish that I was the pastor at and we became closer friends.

23       And, yeah, we socialized.  I have been to their house

24  a few times and they have been to the rectory where I live a

25  few times.  And, you know, many of the parish events, the

1    festivals and dances and school activities over the years.

2         So yes.  We both were -- I was not only their priest

3    and their pastor, but also a friend as well.

4    Q.  Now, when you first met Lisa was it before she was married

5    to Larry?  Because you said you helped prepare them for

6    marriage.

7    A.  Yes, I believe so.  It's going back a few years.  But it

8    would have to be, because they were married in '90.  I arrived

9    there in '88.  So, sure, that was before they were married.

10   Q.  Was Lisa Catholic at that time?

11   A.  I don't believe so.

12   Q.  So at some time after you met her she had converted to

13   Catholicism?

14   A.  She did.  I think it's at least 25, 24, 23 years ago,

15   somewhere at the end of the 20th Century there.

16   Q.  Just tell the jury briefly -- I know, look, we all know

17   the Catholic Church has a lot of rules, but tell the jury

18   briefly about, what does it take to convert to Catholicism?

19   A.  Well, there is a process called the Right of Christian

20   Initiation for Adults.  So it usually begins in the fall and

21   then ends at Easter when they are brought into the church,

22   and whether they need to be baptized, if they had not been

23   baptized, they're to make a profession of faith.

24        So there's a series of weekly classes that are held

25   between the fall and Easter and they learn about the ways of

1    faith and then are prepared to enter into the Catholic Church.

2    Q.   Were you able to observe, through your time knowing the

3    Domski family, them participate in religious activities such as

4    Catholic activities or Christian activities?

5    A.   Sure.  They were involved -- even before Lisa became

6    Catholic, they were involved, because they were husband and

7    wife and were helping raise Lisa's nephew.  And later on when

8    they were blessed with a daughter, of course, bringing her into

9    the faith and into the parish.  So yes.

10   Q.   Tell us a little bit about this raising of Lisa's nephew.

11   A.   I have to think, because it's a long time ago, but I

12   believe it's Lisa's sister's son.  And shortly after he was

13   born, Lisa and Larry were awarded foster care of Mark.  And

14   they helped raise him and then helped the father of her nephew

15   gain custody.  And I know he was a frequent visitor to their

16   home, and I know they helped the father of Mark gain the

17   custody and help raise the child.

18   Q.   Is one of the tenets of the faith charitableness to the

19   less fortunate?

20   A.   Absolutely.  Absolutely.

21   Q.   Did Lisa aspire or attempt to fulfill that Catholic

22   obligation of charitableness?

23   A.   According to what I observed, yes.

24   Q.   Did you see her participate in the Catholic upbringing of

25   her children?

1    A.   Uh-huh.   Of course.

2    Q.   Tell the jury.

3    A.   Well, she would have been, you know, bringing her for --

4    to church on Sundays, obviously.   They were regular attendees

5    at mass.   And then, I believe, enrolling her in the school.

6    I don't know -- you know, there's a lot of kids in the school

7    and that's a lot of years ago, but I am sure they -- Lisa was

8    involved in the school or went to the school there, and they

9    were involved in the life of the school, the life of the

10    parish, all the activities.

11         I mean, they modeled faith.   In fact, I think when

12    Lisa wanted to become Catholic I had to remind myself that

13    she wasn't, because she just was, you know, a person of faith.

14    I mean, that was very evident.   And, you know, those are the

15    things that I can recall.

16    Q.   When you said -- you used the word, they modeled faith,

17    what does that mean?

18    A.   Modeling faith would be that they, in their own lives,

19    practiced the teachings of the church and followed the

20    teachings of Christ especially, to be kind and loving and

21    concerned and generous.   They were all of those things, in my

22    experience of them, in both St. Alfred's Parish and then later

23    on at Our Lady of Mt. Carmel in Wyandotte.

24    Q.   Father, based on all your experiences with the Domski

25    family and with Lisa Domski, in all your training and

1  experience, in your perception, was she genuine in her

2  religious beliefs?  Was she sincere?

3  A.   I never knew her not to be.  She was always genuine in

4  what she said and she followed through.  I mean, they -- again,

5  active and involved.  And I can't say that about every

6  parishioner or every person that attended church or had

7  children in the school.  That's just not the way it happens.

8          But they were people that I knew I could go to if I

9  needed a hand or needed anything, that they were people I could

10  count on because they followed through in their actions.

11  Q.   By the way, is there some type of test that can be given

12  to parishioners to determine if they are really religious

13  or not?

14  A.   Not that I am aware of.  That would be hard to do.

15  Because, you know, in the end it's what is in our heart, only

16  God sees.  You know, we could do a good job pretending or we

17  could do a good job actually being people of faith and people

18  who love the Lord and serve the Lord.  So to my knowledge,

19  there is no such test, no.

20  Q.   Now, you have been given the title -- and I'm sorry,

21  Very --

22  A.   Very Reverend Canon.

23  Q.   Very Reverend Canon.

24  A.   I know it's a lot.

25  Q.   And you have been doing this for how many years,

1    practicing as a member of the clergy?

2    A.   I was ordained in November of 1987, so later this month

3    will be 37 years.

4    Q.   All right.  Given your 37 years of experience being

5    trained as and being -- working as a Catholic priest, would

6    you be able to determine the sincerity of someone's religious

7    beliefs in 15 minutes?

8    A.   No.

9    Q.   Why not?

10   A.   I wouldn't have enough information, because a lot of times

11   faith can't be observed.  What is in our heart, we really

12   don't -- we can't project that.  I mean, you can't see faith.

13   There is no way to measure it other than to get to know them

14   and to see them in action and to listen to them.

15          I mean, I know I try not to judge anybody what their

16   faith is, because you take it on face value that if they say

17   they're believers, they are.  But when you get to know someone

18   over the course of years, you can see that evident.

19          Now, again, is that 100 percent?  I don't know.  But

20   based on everything that I have observed, I would say, yes, she

21   is definitely a person of faith who loves the Lord and does her

22   best to serve him.

23   Q.   Let's talk now a little bit about this vaccine mandate.

24   Okay?

25   A.   Okay.

1   Q.   Did there come a time -- did you know Lisa worked for

2   Blue Cross Blue Shield?

3   A.   I did.

4   Q.   And how did you know that?

5   A.   Through our conversations.  I believe she was there for a

6   long, long time, if my memory serves me right.  But again, it's

7   hard to remember.  There's lots of people in 37 years that you

8   meet.  Even though they are friends of mine, but to recall

9   every detail, but I recall she has been there probably -- was

10  probably there at least 30 years.

11  Q.   Were you able ever to form an impression before she was

12  terminated of the value that Lisa put on her job or the

13  enjoyment that she derived out of her career?

14  A.   Oh, I know it came up in conversation.  She loved her job.

15  She loved what she did, working with people and helping people.

16  I mean, that's, I think, just who she is.  You know, she

17  was happy working there.  I mean, that came through in

18  conversations over the years.

19          I mean, specific details, I can't remember, but

20  I know it does come up when you're sitting around having dinner

21  or barbecue or whatever it may be.

22  Q.   Now, did there come a time when Lisa contacted you --

23  first of all, just for -- as a general proposition, do

24  parishioners sometimes contact you to help discuss issues that

25  they are having in their personal lives or in their faith or

1    to seek guidance?

2    A.   Sure, they do.   Often.   I mean, I don't know how many

3    times a week, but often.

4    Q.   Did Lisa Domski contact you to seek your guidance when she

5    was told that she had to get vaccinated by Blue Cross Blue

6    Shield of Michigan?

7    A.   She did.

8    Q.   Tell the jury.

9    A.   She contacted me --

10         THE COURT:  Tell the jury what?  Excuse me.  Ask a

11    question.

12   BY MR. MARKO:

13   Q.   What was your understanding of what was happening?

14   A.   Well, when Lisa contacted me she was concerned that this

15   would violate her conscience, that she did not believe in the

16   vaccine and that that would be against what she held in her

17   heart.  And she said, what can I do?  So we talked about it.

18   Q.   Was it your understanding that she had been praying about

19   what decision to make?

20   A.   Yes.  It was obvious from our conversation she was very

21   concerned, very upset, not knowing what to do.  I mean, knowing

22   what she wanted to do, but not really knowing what to do.

23   I mean, she was wrestling with this decision.

24   Q.   So you said she was concerned.  She was upset.  She was

25   wrestling with the decision.

1            What do you mean, wrestling with the decision?

2  A.   Well, it was obvious, again, that she had been praying

3  about it, thinking about it, not knowing what to do.  And

4  in other words, she was struggling, like, should I do this?

5  Should I follow what they are asking or should I object

6  because of my beliefs?  And so that's what I would say was

7  her wrestling with her conscience over this matter.

8  Q.   Did you provide guidance as her priest or as a priest?

9  A.   I did.

10  Q.   Can you tell the jury what guidance you provided?

11  A.   I told her, as I would tell anyone in any circumstances

12  when it comes to a matter of conscience, that your conscience

13  has to be your ultimate guide, you know, but it has to be a

14  well-informed conscience; that you have to look at what the

15  church teaches, what you hold, and come up with a decision.

16  And so I told her, let your conscience be your guide.  And

17  if you feel that strongly, I think you have your answer.

18  Q.   All right.  So let me break that down again.

19            You said let your conscience be your guide.  And is

20  that right?  You said let your conscience be your guide?

21  A.   Right.  But I told her, I cautioned her, like I would

22  anyone, because, you know, conscience, a well-informed

23  conscience is our best way to come to a conclusion, because

24  if your conscience isn't informed, in other words, if you don't

25  know what the issue is or why you feel that way, then how can

1    you say that your conscience is guiding you?  And the Church

2    teaches that our conscience, a well-informed conscience is our

3    best guide.

4              So she said, well, Father, I have been wrestling with

5    this.  I have been praying about it.  I have been talking about

6    it.  And so I said, well, I think you have your answer.

7    Q.   Did you have any question that this crisis of conscience,

8    so to speak, was sincere?

9    A.   No.  There was no question that it was very sincere.

10   Q.   And you said you think -- I don't want to put words in

11   your mouth, but something to the effect of it, seems like you

12   have your answer.

13   A.   Yes.  I told her, I -- yeah, I believe you have your

14   answer.  Because she was -- you know, she -- in our

15   conversation she was, well, this is what I want to do, because

16   this is what I believe in.

17             And so I said, well, if your conscience is informed

18   and you have prayed and you have talked and you have consulted,

19   then I think you have your answer.

20             So without -- I mean, I didn't tell her what to do.

21   That's not my role.  I never tell people what to do, because

22   they have to decide on their own whether this is what they

23   truly believe in.

24   Q.   But you're a man of the faith, of the cloth.  And you said

25   you're not going to tell your own parishioner what to do as it

1    relates to the vaccine.  Why not?  Why is it that you didn't

2    feel like it was your place to tell another human being what to

3    do with their conscience?

4    A.   Well, I believe my role as a priest is to guide people

5    closer to the Lord and not to tell them what to do but let them

6    come to their own decision, to work with them and guide them

7    along that path, to help them, you know, inform themselves, but

8    they have to make their own decision, because you can't force

9    someone into belief.  It just does not work.

10   Q.   Were you -- was it your understanding at the time that you

11   were providing this religious and spiritual counseling to her

12   that her employer was attempting to force her to get the

13   vaccine?

14   A.   In the conversation --

15          MR. MOODY:  Objection, your Honor.  Calls for

16   speculation.

17          MR. MARKO:  Judge, he talked to her about it.  He

18   counseled her.  He knows the facts.  He has a proper

19   foundation.

20          THE COURT:  I'm not sure anything about speculation.

21   That objection is overruled.

22          MR. MOODY:  Your Honor, I'll further object to the

23   form of the question as well.  He was using the word "forced"

24   to get the vaccine.

25          THE COURT:  That's the question.  The witness either

```
 1     knows or he doesn't.  The objection is overruled.
 2              MR. MARKO:  Thank you, Judge.
 3     BY MR. MARKO:
 4     Q.  Now I forgot the question, Father, in front of all these
 5     people here.
 6              Was it --
 7              THE COURT:  Were you aware that Ms. Domski was in
 8     an employment situation in which her employer had a policy
 9     requiring her to be vaccinated?
10              THE WITNESS:  I was, because at the beginning of
11     the conversation, she made me aware of that.
12              THE COURT:  The answer is that you were aware of
13     that?
14              THE WITNESS:  Yes.
15              THE COURT:  Okay.  Move on.
16              MR. MARKO:  Thank you, Judge.
17     BY MR. MARKO:
18     Q.  So is there anything inconsistent with Lisa's beliefs
19     regarding -- was it your understanding she believed it would be
20     a sin to get the vaccine given the development and production?
21     A.  That was my understanding from talking with Lisa, that it
22     would be sinful because of what she held as truth.
23     Q.  Is there anything inconsistent with her personal beliefs
24     about that and everything that you have told us about and the
25     teachings of the Catholic Church?
```

1          In other words, does the Catholic Church say you have

2    to get vaccinated?

3    A.   No, there is nothing inconsistent about that in the

4    teachings of the Church.

5    Q.   And Father, had Blue Cross contacted you, and again,

6    assuming your attorney from Bodman said it was okay and

7    assuming Lisa told you that it was okay, would you have told

8    them the same things that you just told us in this federal

9    courthouse in front of this jury?

10   A.   I would.

11          MR. MARKO:  Father, thank you so much.  I don't have

12    any other questions for you right now.

13          THE COURT:  Thank you.

14          Counsel, move the easel.

15          MR. MARKO:  Yes, your Honor.

16          THE COURT:  Cross examine?

17          MR. MOODY:  Yes.

18          THE COURT:  You may proceed.

19                    CROSS EXAMINATION

20   BY MR. MOODY:

21   Q.   Good afternoon, Father.

22   A.   Good afternoon.

23   Q.   My name is Nolan Moody.  I'm an attorney for Blue Cross

24   Blue Shield of Michigan.

25          You mentioned this earlier, so I apologize, it's just

1    a little bit redundant, but you're a pastor at Our Lady of

2    Sorrows Catholic parish; correct?

3    A.    I am.

4    Q.    And that parish is a member of the Archdiocese of Detroit;

5    yes?

6    A.    It is.

7    Q.    And you have been a pastor there since July 1st of 2021;

8    is that right?

9    A.    That is correct.

10   Q.    Okay.  And so if Blue Cross's policy regarding COVID

11   vaccination came out in approximately October of 2021, you

12   would have been pastor at that time?

13   A.    I was.

14   Q.    And you were speaking or advising -- speaking with or

15   advising Ms. Domski long before that time; is that right?

16   A.    Advising as to?

17   Q.    As -- well, as a pastor, as a father.

18   A.    Sure.

19   Q.    Providing religious advice to Ms. Domski?

20   A.    Over the last 35 years, sure.

21   Q.    Okay.

22   A.    I mean, when it came up.  I mean, not, like, every day

23   or -- I mean, whenever they had a question they would call upon

24   me and ask.  I mean, whether -- whatever matter of faith it

25   would be, sure.

 1   Q.   Okay.  The Archdiocese of Detroit will, from time to time,
 2   provide guidance to the priests on how to address matters with
 3   parishioners; yes?
 4   A.   They do.
 5   Q.   And you follow that guidance provided by the Archdiocese;
 6   yes?
 7   A.   Yes.
 8   Q.   You're aware that when the COVID vaccine hit, the
 9   Archdiocese provided guidance to its priests on how to discuss
10   vaccine policy mandates with its parishioners?
11   A.   Yes.
12   Q.   And part of -- you're aware that part of what the
13   Archdiocese told its priests to tell its parishioners is to
14   affirm the moral permissibility of COVID-19 vaccines; right?
15   A.   That's -- they did say that, yes.
16   Q.   The Archdiocese also told priests that when ethically
17   irreproachable COVID-19 vaccines are not available, it is
18   morally acceptable to receive COVID-19 vaccines that have
19   used cell lines from aborted fetuses in their research and
20   production process; correct?
21   A.   That was their guidelines, yes.
22   Q.   The Archdiocese also told priests to discuss with
23   parishioners that being vaccinated safely against COVID-19
24   should be considered an act of love of our neighbor and part
25   of our moral responsibility for the common good; yes?

1   A.  They did.

2   Q.  Now, the Archdiocese also said that within the Catholic

3   faith it's not a moral obligation and the choice is voluntary;

4   agree?

5   A.  Absolutely.

6   Q.  Okay.  The Archdiocese stated that in this way it -- the

7   priest is to affirm to the parishioner that the individual

8   right of conscience which also affirms our shared

9   responsibilities to protect our own health and the health of

10  others in which -- the community we live, they said that as

11  well; yes?

12  A.  They did.

13  Q.  Okay.  So as it pertains to Catholics in general, not all

14  Catholics are prohibited from taking the COVID vaccine?

15  A.  I would say, yes, they are not prohibited.

16  Q.  So merely identifying oneself as Catholic would not,

17  standing alone, be sufficient for you to say, yes, you're

18  prohibited from taking the vaccine; correct?

19  A.  As a general rule, correct.

20  Q.  Okay.  You mentioned earlier you spoke to Ms. Domski about

21  her religious objection to the vaccine; correct?

22  A.  I did.

23  Q.  You advised her from a religious perspective on what she

24  should do; right?

25  A.  I did.

1    Q.   Okay.  And I don't want to put words in your mouth, but

2    the words I wrote down is you told her to follow her heart,

3    let her conscience be her guide; is that right?

4    A.   I did.

5    Q.   Okay.  You didn't tell her that she was prohibited from

6    taking the vaccine because she is Catholic; right?

7    A.   No, I did not tell her that.

8    Q.   And you would agree that the Catholic faith generally

9    allows its parishioners, depending on their own personal moral

10   compass, to take the COVID vaccine; correct?

11   A.   Correct.

12   Q.   And that's true even with COVID vaccines developed using

13   fetal stem cells; yes?

14   A.   According to the Archdiocese, yes.

15   Q.   And you follow the Archdiocese; yes?

16   A.   To the best of my ability, yes.

17   Q.   Okay.  I imagine you have spoken with many of your

18   parishioners over the years about the COVID vaccine and whether

19   they should take it or not take it; is that fair?

20   A.   That is fair.

21   Q.   And I'm sure that at certain points you have had

22   parishioners that you have encouraged to get the vaccine

23   because they felt it was the right thing to do; yes?

24   A.   Absolutely.

25   Q.   Okay.  So back to Ms. Domski for a moment.  You met with

1    her to discuss how she felt about the vaccine; right?

2    A.   Yes.

3    Q.   You asked her questions about how she felt and she told

4    you; right?

5    A.   Yes.

6    Q.   So she articulated the reasons why her Catholicism don't

7    allow her to take the vaccine; yes?

8    A.   Yes.

9    Q.   I asked you earlier, when you hear someone is Catholic you

10   don't necessarily know if they can or can't take the vaccine

11   just standing alone; right?

12   A.   Right.

13   Q.   If you hear someone is Christian you don't necessarily

14   know that their religion prohibits or allows taking the

15   vaccine; right?

16   A.   Correct.

17   Q.   And saying that you're Christian doesn't mean you're

18   necessarily Catholic; right?

19   A.   Sure.  Absolutely.

20   Q.   If I said I'm Christian, I haven't informed you that

21   I'm Catholic, just with that sentence; correct?

22   A.   Say that again.  I'm sorry.

23   Q.   If I said to you, Father, I'm Christian, that alone would

24   not inform you that I am also Catholic?

25   A.   Correct.

```
 1    Q.  You spoke earlier about how religious beliefs are
 2    difficult to define and difficult to understand.
 3              Do you remember that?
 4    A.  I do.
 5    Q.  You speak with many of your parishioners about their
 6    religious beliefs; correct?
 7    A.  I do.
 8    Q.  You've come to understand those religious beliefs of your
 9    parishioners; right?
10    A.  Yes.
11    Q.  Would you say that an important part of that is
12    communication from the parishioner?
13    A.  Absolutely.
14    Q.  The parishioner telling you, Father, I believe this
15    because that, that's the kind of conversation you have; right?
16    A.  Usually, yes.
17    Q.  If a parishioner said to you, Father -- strike that
18    question.
19              You testified earlier that you believed Ms. Domski's
20    religious beliefs to be sincere; correct?
21    A.  I did.
22    Q.  And you also testified that you came to learn that because
23    you talked to her about her religious beliefs; yes?
24    A.  Yes.
25    Q.  You asked questions and she gave the answer of what she
```

Jury Trial - Volume 1 - November 4, 2024

1    believed; yes?

2    A.   Yes.  But along with her actions and her life, I mean.

3    Q.   Fair enough.  She provided you lots of information for you

4    to make that assessment; right?

5    A.   Absolutely.

6    Q.   Okay.  Because without information you can't really assess

7    somebody's sincerely held religious belief; right?

8    A.   That's what I believe, yes.

9    Q.   You were not present during Ms. Domski's religious

10   accommodation interview with Blue Cross; correct?

11   A.   No, I was not.

12   Q.   Okay.  You don't know what she did or did not articulate

13   in her interview about her religious beliefs; correct?

14   A.   I do not.

15   Q.   So you do not know what Blue Cross used to evaluate

16   Ms. Domski's religious beliefs because you weren't there;

17   correct?

18   A.   Correct.

19            MR. MOODY:  That's all the questions I have.

20            Thank you.

21            THE COURT:  Thank you.

22            Anything further?

23            MR. MARKO:  Yes, your Honor.

24            THE COURT:  All right.

25                          REDIRECT EXAMINATION

```
 1   BY MR. MARKO:
 2   Q.  So let's talk a little bit about some of these questions
 3   you were asked.
 4            Specifically I'm going to show you Defendant's
 5   Exhibit 206, where it says:  As a Christian I live every day
 6   through my faith in God and the Bible which I believe to be
 7   God's revealed and inspired word.
 8            And then it talks about the Apostle Paul.
 9            What's an apostle?
10            MR. MOODY:  Your Honor, I'm going to object.  This
11   is outside the scope of my cross.
12            MR. MARKO:  He asked specifically questions about
13   conveying information to Blue Cross and that -- a Catholic
14   versus Christian and whether that identifies specific things.
15            THE COURT:  Yeah.  You're on the edge.  I'll let
16   you inquire a little bit, but keep it quick.
17            MR. MARKO:  Fair enough.
18   BY MR. MARKO:
19   Q.  What's an apostle?
20   A.  An apostle in the strictest sense of the word would be the
21   twelve men that Jesus called to accompany him during his life.
22   Q.  Are they associated often with Catholicism?
23   A.  Yes.
24            THE COURT:  Is Paul an apostle?
25            THE WITNESS:  Well, Paul claimed to be an apostle
```

1    outside the normal course, because technically he was not

2    called by Jesus.  He was -- he had his conversion when he was

3    knocked off his horse after Christ had already died and rose

4    from the grave.  So technically, he is not one of the twelve,

5    no.

6    BY MR. MARKO:

7    Q.   But he was Saul?

8    A.   Right.  He called himself an apostle outside the normal

9    course of things.

10   Q.   And why did he do that?

11            MR. MOODY:  Your Honor, I'm going to object to this

12   line of questioning.  It's just not --

13            MR. MARKO:  I'll withdraw it and move on, Judge.

14            THE COURT:  Thank you.

15            MR. MARKO:  I'll withdraw it and move on.  All right.

16   BY MR. MARKO:

17   Q.   So when you talked about this discussion with Lisa,

18   you were asked questions about that.

19            Was it -- when you have discussions about people's

20   internal religious beliefs, are they often intensely personal

21   and private discussions?

22   A.   Yes.

23   Q.   Was the discussion that you had with Lisa a private

24   discussion?

25   A.   The discussion about the vaccine?

1    Q.   Yes.

2    A.   Yes.

3    Q.   Like, for example, was your Bodman lawyer there --

4    A.   No.

5    Q.   -- when you were talking about religious beliefs?

6    A.   No.

7    Q.   How about the Human Resources Department from Our Lady of

8    Sorrows, were they there?

9    A.   No.

10   Q.   Why not?

11   A.   Well, it would be a private matter.  I would never discuss

12   that with other people present.  It was -- it was Lisa and I.

13          It wasn't in person.  It was, you know, over the

14   phone or through text.  But, you know, we live a distance away

15   from each other.

16   Q.   And then you were asked, Father, about the teachings of

17   the Archdiocese.  Okay?  Let me ask you some questions related

18   to that.

19          Does the Catholic Church teach that a person may be

20   required to refuse a vaccination if it goes against their own

21   personal conscience?

22   A.   Yes.

23   Q.   Why?

24   A.   Because the Church respects the conscience of individuals

25   to make that informed decision.  As priests we were not

1   mandated to take the vaccine.  The Archbishop encouraged us,

2   but he said, guys, I'll leave it up to you.  You have to make

3   your own decision.

4   Q.  Is vaccination according to the Catholic Church morally --

5   a moral obligation; in other words, you have to do?  You have

6   to do it?

7   A.   In this matter, as far as I know, no.  I don't think it

8   ever has been, but I could be wrong on that.  But in this

9   matter, it was very clear that there is no -- no absolute moral

10  obligation to take the vaccine; that we would encourage them,

11  but they can make their decision based on their conscience.

12  Q.  Does the Catholic Church inform you and its parishioners

13  that there is a moral duty to refuse the use of medical

14  products, including vaccines, that are created using aborted

15  fetal cells?

16  A.  Can you state the beginning of the question again?

17  Q.  Is there a moral duty to refuse the use of certain medical

18  products?

19          MR. MOODY:  I'm going to object.  Outside the scope

20  to the extent other medical products is the question.  I heard

21  vaccines.

22          MR. MARKO:  We're talking about vaccines.

23          THE COURT:  Yeah.  Just withdraw that question and

24  restate it, if you would, please.

25          MR. MARKO:  Understood, Judge.

Jury Trial - Volume 1 - November 4, 2024

1    BY MR. MARKO:

2    Q.   Is it in line with the Catholic Church, is it acceptable

3    for a parishioner to refuse a medical product such as a

4    vaccine, we will talk specifically about vaccines, if there

5    is fetal cells used in the production of the vaccine?

6    A.   So my answer, yes, would mean that they could morally

7    object?  Am I understanding that right?

8    Q.   Yes, sir.

9    A.   Yes.  So the Church --

10   Q.   Why?  Why?

11   A.   Because, again, the Church respects the conscience of the

12   individual to make that decision.  And in this matter for sure

13   there was no mandate that you must receive as a Catholic.

14   Q.   So I understand you, the Catholic Church, had no vaccine

15   mandate?

16   A.   As far as I know, no.  I mean, they highly encouraged and

17   they did tell Catholics that it would be morally acceptable to

18   use the vaccine, even though it had fetal parts or made from

19   fetal parts, if I'm understanding how that process worked, but

20   again, that there was no mandate that they must.

21   Q.   And was it always taught that your conscience must guide

22   you above all?

23   A.   Yes.

24           MR. MARKO:  Thank you, Father.

25           I don't have any other questions.

1          THE COURT:  Anything else?

2          MR. MOODY:  No, Judge.  Thank you.

3          THE COURT:  Thank you.  Reverend Ptak, thank you.

4    You are excused.

5          THE WITNESS:  Thank you.

6          THE COURT:  Members of the jury, I think according to

7    our schedule, we were breaking today at 12:30 and it is 12:28,

8    so we will end the session today.

9          Tomorrow we will start at 10:30, so I would like

10   you to be in the jury assembly room sometime between 10:00 and

11   10:15.  That's on the fifth floor.  And then we will bring you

12   up to our jury room here.

13         Please do not discuss the case among yourselves.  I'm

14   going to be telling you this a lot.  But don't try to gather

15   any information on your own.  And don't let anybody talk to

16   you about the case.  And don't discuss the case with others

17   outside the courtroom.

18         Have a good rest of the day.

19         If you haven't voted, I encourage you to do that.

20   And you should have enough time tomorrow before court to do

21   that and also after our session before the polls close in

22   the afternoon tomorrow as well.

23         Have a good afternoon.  Be safe.

24         Would you escort the jury out, please?

25

1        THE CLERK:  All rise for the jury.

2     (Jury left courtroom at 12:29 p.m.)

3        THE COURT:  From the plaintiff, anything further for

4   the record today before we close it today?

5        MR. MARKO:  No, your Honor.

6        THE COURT:  Defendant?

7        MR. MOODY:  Nothing, your Honor.  Thank you.

8        THE COURT:  All right.  Court is in recess.  I would

9   like to see counsel at the bench.

10           (Proceedings adjourned at 12:30 p.m.)

11                      *      *      *

12

13              **CERTIFICATE OF COURT REPORTER**

14

15       I certify that the foregoing is a correct transcript

16   from the record of proceedings in the above-entitled matter.

17

18       _____          **November 4, 2024**
          *s/ Rene L. Twedt*
     RENE L. TWEDT, CSR-2907, RDR, CRR, CRC      Date
19       Federal Official Court Reporter

20

21

22

23

24

25