```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                         SOUTHERN DIVISION

 3    Lisa Domski,

 4                        Plaintiff,

 5    -v-                                    Case No. 23-12023

 6    Blue Cross Blue Shield of Michigan,

 7                        Defendant.
      _____/
 8
                          JURY TRIAL - VOLUME 4
 9                         November 7, 2024

10            BEFORE THE HONORABLE DAVID M. LAWSON
                   United States District Judge
11
          Theodore Levin United States District Courthouse
12                 231 West Lafayette Boulevard
                         Detroit, Michigan
13

14    APPEARANCES:

15    FOR THE PLAINTIFF:     JONATHAN R. MARKO
                             Marko Law
16                           1300 Broadway, Suite 500
                             Detroit, Michigan  48236
17                              and
                             NOAH S. HURWITZ
18                           Hurwitz Law PLLC
                             340 Beakes Street, Suite 125
19                           Ann Arbor, Michigan  48104

20    FOR THE DEFENDANT:     BRANDON C. HUBBARD
                             NOLAN JOHN MOODY
21                           MAUREEN J. MOODY
                             Dickinson Wright PLLC
22                           123 West Allegan Street, Suite 900
                             Lansing, Michigan  48933
23

24            To Obtain a Certified Transcript Contact:
              Rene L. Twedt, CSR-2907, RDR, CRR, CRC
25                    www.transcriptorders.com
```

1                                **TABLE OF CONTENTS**

2     **MATTER**                                                                    **PAGE**

3     **JURY TRIAL - VOLUME 4**

4     **WITNESSES**

5     **LISA DOMSKI**
      Direct Examination by Mr. Marko.......................      6
6     Cross Examination by Mr. Hubbard......................     72
      Redirect Examination by Mr. Marko.....................    121
7     Recross Examination by Mr. Hubbard....................    139

8     PLAINTIFF RESTS.......................................    141

9     **MOTION FOR JUDGMENT AS A MATTER OF LAW**
      Argument by Ms. Moody.................................    144
10    Argument by Mr. Marko.................................    147
      Motion Taken Under Advisement by the Court............    149
11

12    **OBJECTIONS TO JURY INSTRUCTIONS**.......................    150

13    DEFENSE RESTS.........................................    161

14    Preliminary Closing Instructions......................    161
      Closing Argument for the Plaintiff by Mr. Marko.......    184
15    Closing Argument for the Defense by Mr. Hubbard.......    212
      Rebuttal Argument for the Plaintiff by Mr. Marko......    230
16

17    **EXHIBITS RECEIVED**

18    NONE

19

20    **CERTIFICATE OF COURT REPORTER**.........................    250

21

22

23       **\*\*REPORTER'S NOTE:**  Material read into the record is
         transcribed verbatim, as read, and therefore may not
24       reflect exact quotes from the documents or exhibits.

25

1  Detroit, Michigan

2  November 7, 2024

3  8:40 a.m.

4                    *      *      *

5          THE CLERK:  All rise.  The United States District

6  Court for the Eastern District of Michigan is now in session,

7  the Honorable David M. Lawson presiding.

8          THE COURT:  You may be seated.

9          THE CLERK:  Now calling the case of Lisa Domski

10  versus Blue Cross Blue Shield of Michigan, Case Number

11  23-12023.

12          THE COURT:  All right.  Good morning, counsel.

13          I read last night the briefs that you filed on

14  various issues.  I think the best way to approach this,

15  however, is to continue with the testimony and complete that,

16  and then we will take up a couple of matters after everyone

17  rests outside the jury's presence, and we will finalize the

18  jury instructions at that time.  All right?

19          MR. MARKO:  Understood, your Honor.  We do have a

20  stipulation that will help you.

21          THE COURT:  I'm sorry?  Say it again.

22          MR. MARKO:  We do have a stipulation on the reduction

23  to present value.

24          Do you want to know about that now or wait?

25          THE COURT:  Oh, yeah, sure.  What is it?

1           MR. MARKO:  So I misspoke when I said it was the

2    Alaska method in chambers yesterday.  That's something else.

3    I was thinking of a setoff.  It's called the total offset

4    method, and we do have a --

5           THE COURT:  They don't use that in Alaska?

6           MR. MARKO:  I don't know, Judge.  I don't know.

7    Maybe.

8           But the total offset method we have agreed on, which

9    means that we are waiving an instruction and demand for

10   inflation.  We are waiving and not going to ask for interest

11   as it relates to jury-imputed interest in the verdict, which

12   they would be instructed pursuant to the law.

13          And they are waiving -- they, Blue Cross, is waiving

14   a claim for reduction to present value.  So it's -- the

15   jury -- it's going to be an offset, the numbers are what they

16   are, without those adjustments.

17          THE COURT:  Correct?

18          MR. MOODY:  Correct, your Honor.

19          THE COURT:  All right.  So we had, I think, a rather

20   fulsome discussion about front pay, which much of this deals

21   with, and I came to the conclusion yesterday, and I might

22   as well address it now in light of the stipulation, which

23   I accept, that I'm going to instruct on front pay, but that

24   doesn't mean I'm going to award front pay.

25          I think the jury -- under the law, the Court makes

1    the determination as to whether front pay is appropriate

2    or not, but the jury has to make a determination as to the

3    amount.  So I'm going to allow the jury to consider that and

4    return a verdict for two reasons.

5            First of all, I want to be able to assess all of the

6    testimony to determine whether front pay is appropriate.  And,

7    secondly, there is a state law count that future damages is

8    relevant to, if I said that correctly, grammatically.

9            In any event, the jury may or may not return a

10   verdict on that claim.  So I'm going to allow the jury to

11   make that determination and then make my appropriate findings

12   at the time that it's appropriate to formulate and enter a

13   judgment.

14           Mr. Marko, do you have any problem with that?

15           MR. MARKO:  No, your Honor.

16           THE COURT:  All right.  Mr. Moody?

17           MR. MOODY:  No, your Honor.

18           THE COURT:  Ready for the jury?

19           MR. MARKO:  Yes, Judge.

20           MR. HUBBARD:  Yes, Judge.

21           THE COURT:  Ms. Domski, you were testifying.  You

22   can resume the witness box, if you would.

23           And would you bring in the jury, Mr. Beyer?

24           Good morning.

25

| | |
|---|---|
| 1 | THE CLERK:  All rise for the jury. |
| 2 | (Jury entered courtroom at 8:44 a.m.) |
| 3 | THE COURT:  You may be seated. |
| 4 | Good morning, ladies and gentlemen. |
| 5 | JURORS COLLECTIVELY:  Good morning. |
| 6 | THE COURT:  You may remember, when we ended our |
| 7 | session yesterday, Ms. Domski was testifying on direct |
| 8 | examination.  So we will continue with that today. |
| 9 | Mr. Marko, you may proceed. |
| 10 | MR. MARKO:  Thank you, your Honor. |
| 11 | Good morning, ladies and gentlemen. |
| 12 | JURORS COLLECTIVELY:  Good morning. |
| 13 | *     *     * |
| 14 | LISA DOMSKI |
| 15 | was recalled as a witness, after having |
| 16 | been previously sworn to testify to the truth. |
| 17 | *     *     * |
| 18 | DIRECT EXAMINATION |
| 19 | BY MR. MARKO: |
| 20 | Q.   Lisa, good morning. |
| 21 | A.   Good morning. |
| 22 | Q.   We talked about some deep stuff yesterday, so let's start |
| 23 | off on a little more positive note this morning, and let's talk |
| 24 | about Larry, your husband, Larry. |
| 25 | When did you marry Larry? |

 1              And let me show you Exhibit 58D, which is a
 2    stipulated-to exhibit and entered into evidence.
 3    A.   Yes.  Larry and I were married in 1990, on November 2nd.
 4    Q.   And what caused you to fall in love with Larry?  Tell the
 5    jury.
 6    A.   Well, I met Larry, we were at a dance club together.  And
 7    I saw this gentleman walk in, and I remember what he was
 8    wearing.  He was wearing a pink polo shirt and he --
 9    Q.   A pink polo shirt?
10    A.   Yes.  Light pink.
11    Q.   Larry was?
12    A.   Yes, he was.  And gray and pink striped pants.  And
13    I thought how adorable he looked.  And we kept staring at each
14    other through the whole evening.  And I finally walked over
15    and I sat down and introduced myself.  And I wrote my name and
16    number on a napkin, because I didn't have anything with me, to
17    carry it, not knowing whether or not he would call.  And so the
18    evening progressed and, of course, we all left and went home.
19              And maybe a week or two later I had gotten a message.
20    He had called my house.  And back then you didn't have
21    cellphones.  So there was a message from Larry Domski that he
22    was up at a racket club, which was like a mile from my house
23    where I lived.  And so when I returned home I looked that
24    number up and I called him.
25              I called him, and I interrupted his game, whatever he

1   was playing at the racket club.  And we spoke, and we made a

2   date.  And from there on in, we saw each other numerous times.

3   Lots of dinners.  Lots of friends.

4            But the really important piece, that night when I met

5   him, and I swear in my heart and soul, that I said this is the

6   guy I'm going to marry.  I knew right from the moment I laid

7   eyes on him that he was my man.

8   Q.   Come on.  That night?

9   A.   Absolutely.

10  Q.   With a pink polo shirt on?

11  A.   With a light pink polo shirt on.

12  Q.   All right.  Well, and you're still married today?

13  A.   And we're still married today.

14  Q.   And where did you get married?  I'm going to show you 58E.

15  A.   Yes.  That's St. Alfred's church, Catholic church, in

16  Taylor, Michigan.

17  Q.   And who married you?  Do you remember?

18  A.   Father Ptak.

19  Q.   Father Ptak, the first witness we saw, the Very -- the

20  Very Reverend -- I always mix it up, but the Very Reverend?

21  A.   Correct.

22  Q.   And as part of your marriage to Larry and the development,

23  did you convert to Catholicism?

24  A.   Not immediately.

25  Q.   Why not?

1   A.   I needed some time.  I think I needed to -- I was just not

2   sure what direction I was going.  I knew that I had my personal

3   relationship with God, but I had already been baptized Baptist.

4   I -- the more time that I spent with his family, the more that

5   it brought me closer, it wasn't really until the birth of my

6   child and watching her go through the Catholic school that made

7   me determine that I needed to convert.

8   Q.   And so unlike many of us kind of have it easy who are

9   baptized at birth, did you make a conscious decision at some

10  point in your life to convert to Catholicism?

11  A.   I absolutely did.  You know, you met a couple of my

12  friends here as witnesses.  You know, I worked through them,

13  going to church all the time, being involved in the activities,

14  being friends with Father Ptak, all of those things, watching

15  my daughter aspire and become part of the church.  I thought

16  I needed to be a good example for her if I was asking her to

17  go through this as well.

18  Q.   Let's talk a little bit -- when you say your daughter,

19  you're talking about Alyse?

20  A.   I'm talking about Alyse.

21  Q.   And tell the jury a little bit about how Alyse came to be.

22  Well, not like, you know -- we don't need to hear like details

23  inside the house, but, I mean, like, did you have trouble at

24  first getting pregnant?

25  A.   Yes.  So I'd like to tell a little story, if that's okay,

1  about -- it started out with --

2          THE COURT:  Well, usually we go by question and

3   answer.

4          THE WITNESS:  I'm sorry.

5          THE COURT:  So let's try it that way, if we could.

6  BY MR. MARKO:

7  Q.   How is it that you ended up making the decision or having

8  Alyse?  Was there some trouble along the way?

9  A.   Yes, there was trouble along the way.

10  Q.   And what was it?

11  A.   It was beginning when I took Mark under my care as a

12  foster child and wanting to raise him.  And then I had to give

13  him back to his dad, because that was the right thing to do,

14  because he wanted him.  It made that yearning to want to have

15  my own child.

16  Q.   Was that hard to have to -- how long did you -- did you

17  help care for Mark?

18  A.   I've cared for him his whole life.  I mean, he was brought

19  to us at just a year old.  I fostered him for a couple of

20  years.  His dad got custody.  And he has been a big part of my

21  life.  He is 32 now.  He is -- every day I talk to him, at

22  least once a day.

23  Q.   What do you -- well, tell us why you say it was hard to

24  give him back and why it was the right thing to do.

25  A.   Yeah.  He -- he took a part of me that I had buried from

 1   childhood as a child, and I wasn't sure that I could be a

 2   good enough parent.  I wasn't sure if I could take on that

 3   responsibility with all of those feelings that I had from my

 4   childhood.  But when he came into my life I felt that was a

 5   message from God to say, this is it, you can do this.

 6   Q.  And after Mark, did you then have a desire to have another

 7   child?

 8   A.  I absolutely did.  The one thing that I didn't know is

 9   that I was going to have a hard time having a child.  It took

10   me five years before I got pregnant.  And that was my first

11   pregnancy.  I actually had a miscarriage after nine weeks.

12           And the doctor, when I talked about it, and we did

13   what was medically necessary, and a few months later I was

14   able to try and conceive again and along came Alyse.

15   Q.  And you said that Alyse has been a big part of helping

16   you with your faith.

17           Can you describe to the jury why that is?

18   A.  Sure.  She was the most blessing thing in my life.

19   Looking through her eyes I got to -- I got to live the life

20   that I always wanted to live.

21           Sorry.

22           MR. MARKO:  Judge, may Ms. Teal approach?

23           THE COURT:  Oh, of course.

24           Do you have water there?

25           THE WITNESS:  I do.

1          THE COURT:  Okay.

2          THE WITNESS:  Sorry.  Thank you.

3          I felt that I was able to give her the kind of life,

4     the kind of love that I didn't get as a child.

5     BY MR. MARKO:

6     Q.  Let's talk about -- and I said I was going to try to keep

7     it on a more positive note today.  I did a really bad job of

8     that already.

9          Let's talk about when you started at Blue Cross

10    Blue Shield.  We started to talk about it a little bit.

11         I'm going to show you -- well, actually, before we

12    get there, did you -- tell us -- I'm showing Plaintiff's

13    Exhibit Number 56 -- about your conversion to Catholicism.

14         And so did you have to go through a program at the

15    church?

16    A.  Yes, I did.  It was about a nine-month program, and

17    I had many meetings, many prayer groups, many discussions.

18    My sponsor, Dawn Rodriguez, attended those with me.

19    Q.  And Dawn was who we heard from on the video?

20    A.  Yes.  She was the video.  Yes.

21    Q.  And so did you get confirmed in the Catholic church?

22    A.  I did.

23    Q.  And you had to go through this whole kind of program?

24    A.  I did.  I went through.  It was called the right of

25    initiation.  And what it is, is once I learned about the

1    teachings, I had to profess my faith in front of the whole

2    congregation, and part of that was through confirmation.  And

3    they actually had a nice ceremony.  There were several of us

4    in there.  There were about 10 adults.

5    Q.  And I'm going to show you Plaintiff's Exhibit Number 57,

6    which is in evidence.

7             So did you become a minister of communion?

8    A.  I did.

9    Q.  And just tell the jury, what does that mean?

10   A.  Yes.  So I distributed communion, the body and the blood

11   of Christ.  And what it is, is it's a gift of offering.  And as

12   Catholics, we believe that they are transformed, the bread and

13   the wine, into the body and the blood of Christ, and we share

14   that as a community in our church.

15   Q.  And was the Domski family, you and the rest of your family

16   members, active in your church community?

17   A.  Yes, we were.

18   Q.  Can you tell the jury about how you were active in your

19   community?

20   A.  Yes.  Not only was I a eucharistic minister, but I also

21   joined parish council as a vice president.

22   Q.  What's a parish council?

23   A.  We see the needs of the parish, and we assist the pastor

24   in any communications that he needed.  We help with any of the

25   fundraisers.  And that was for about a year.  And then later I

1    was elected the president of parish council.  And the same kind

2    of thing where we support the parish and the church.  If there

3    is any needs of our parish, we would see to them.

4    Q.   And tell us about other things.

5           Did you participate in auctions -- and I know -- fish

6    fries and things of that nature?

7    A.   Of course, yes.

8           At Our Lady of Mt. Carmel we all -- so what happened

9    is the schools merged together.  There were three schools.  And

10   so we would have the fish fries at Our Lady of Mt. Carmel, and

11   yes, we would help with those.  Those were during Lent season.

12   And --

13   Q.   And what's Lent?

14   A.   Lent is where we give up meat, eating meat.  It's a

15   sacrifice for the Lord.

16   Q.   Did you give it up just on Friday or the whole Lent?

17   A.   It would be on Ash Wednesday, when we would get ashes,

18   and on Fridays only.

19   Q.   Now, did you actually -- who did you pick to be the

20   godmother of your daughter?

21   A.   Well, while working at Blue Cross you make many friends,

22   relationships, acquaintances.  I had the pleasure of meeting

23   Deborah Knapp.  She actually was a consultant, and her and

24   I worked together.

25   Q.   And did she become your boss?

```
 1   A.   Much later in life.  We met when I was 30 years old.
 2   Q.   And so when you were terminated, how old were you?
 3   A.   I was 55.
 4   Q.   So was she still your boss at the time you were
 5   terminated?
 6   A.   She was.  She had just been my boss about maybe a year
 7   and a half.
 8   Q.   And so your boss, you had such a close relationship with
 9   your boss at work, and, of course, she wasn't your boss at the
10   time, but that you actually made -- chose her, selected her to
11   be the godmother for Alyse?
12   A.   I did.
13   Q.   Did you have a good working relationship with your boss,
14   Deborah Knapp?
15   A.   I did.  She -- I always strictly made it professional.
16   I never wanted anything personal.  I don't share things about
17   my personal life.  And we had such a wonderful relationship.
18   It was easy for us to work and get things done.  And it wasn't
19   like I directly worked with her.  We had teams.  And so
20   I supported some of those teams.
21   Q.   Now, would you describe faith as being one of the most
22   important things in your life?
23   A.   It is absolutely the most important thing in my life.
24   Q.   Are you the type of person that was going around
25   Blue Cross trying to convert people, trying to, you know,
```

```
 1   baptize other people?
 2   A.   Gosh, no.  I -- I didn't -- I might have spoken with --
 3   one-on-one meetings with some of my former leaders, but it
 4   wasn't something that -- or maybe some of my colleagues, but
 5   it wasn't something that I walked around discussing.
 6   Q.   Why not?  Why didn't you walk around trying to impose your
 7   beliefs on other people?
 8   A.   Because everyone has a freedom of choice.  They can choose
 9   to believe or not believe, whatever their feelings are.
10   Q.   And we're going to talk about what happened with your
11   freedom of choice, but did you feel that Blue Cross Blue Shield
12   in 2021 took away your freedom of choice?
13   A.   I absolutely do feel like that.
14   Q.   Do you feel like that today?
15   A.   I feel like that today.
16   Q.   Let's talk about the good times at Blue Cross.  So let's
17   go back to 1984 when you first started working for the
18   defendant corporation.
19          You told us that you were how old?
20   A.   I was 17 years old.
21   Q.   And how excited were you to get that job, which I believe
22   you said you were making $7 an hour?
23   A.   I was.  I was super excited, because I was only making
24   3.35 at the doctor's office, and I thought that, wow, I'm
25   grown up here, I'm going to meet all these important people,
```

1    I'm going to move up in the career ladder, and just be able

2    to support myself, get away from everything at home.

3    Q.  All right.  So I'm going to show you this.  It's

4    Plaintiff's Exhibit 39.  It's an exhibit.  It's stipulated to.

5            So we're going to go and look at some of your

6    experience here.

7            Is this your résumé?

8    A.  It is.

9    Q.  Okay.  So tell the jury -- look, we're not going to go

10   through 38 years of your day-to-day at the defendant's company,

11   but tell the jury kind of how you progressed at Blue Cross

12   Blue Shield.

13           So did you start right here?  Was this the $7 an hour

14   job?

15   A.  Yes, that was, membership and billing analyst.

16   Q.  All right.  You told us yesterday about that.  And then

17   tell us how you kind of progressed up through these different

18   positions that we can see here.

19   A.  Sure.  So when I actually joined the company as a

20   membership and billing analyst, I had joined the union.  So

21   I decided that I wanted to broaden my horizons and I wanted

22   to be a salaried employee.

23           And so that's where the end stage renal disease

24   coordinator came in.  And I was actually tapped on the shoulder

25   by my leader, and she offered it to me.  I didn't even have to

1    apply for it.  She thought I would be a great fit based on my

2    experience that she had overseen.

3              And from there, you learn a lot about coordinations

4    of claims and Medicare and just people.  And so from those

5    experiences I was able to apply for a job in the underwriting

6    department.  And I was an underwriter.  That was my title.

7    And we worked --

8    Q.   Did you become a senior underwriter?

9    A.   I did.  And, again, my new leader tapped me on the

10   shoulder and asked me to do this interim for her.  And it was

11   a leadership role, and I had five people under me at the time.

12   Q.   And were you able to do this all back then without a

13   college degree?

14   A.   Yes, I was.

15   Q.   Has that changed over the years, I mean, in terms of these

16   types of jobs that you were able to get starting in '84,

17   without a college degree, compared to today?

18   A.   Yes.  I was able to progress without my college degree.

19   I was grandfathered.

20   Q.   What do you mean when you say you were grandfathered?

21   A.    It said it was in lieu of, if I had enough experience and

22   understanding, in lieu of a degree.

23   Q.   Okay.  And let's go through -- did you then continue

24   working there and get other jobs?  Tell the jury about your

25   other jobs through your progression at Blue Cross.

1    A.   Well, sure.  You know, I took a little, brief leave, but

2    Blue Cross somehow found me and they called me back and asked

3    me if I could come in and just help them out with a project for

4    a period of time.  So I came back through a staffing company

5    called Bartech as a senior analyst.  And after a year of being

6    there, the leader there offered me a permanent position back.

7    Q.   And then what's an analyst?  Because Blue Cross is --

8    I mean, we know -- we all think we know what Blue Cross is,

9    but Blue Cross, is it an insurance company?

10   A.   It is.

11   Q.   Okay.  And what did you then -- we're not -- just briefly

12   go through these other roles that you worked your way up

13   through the ranks.

14   A.   Sure.  So, you know, as the years progressed, it wasn't

15   always about getting a promotion, it was about learning the

16   business and getting knowledge.  So sometimes you took

17   different courses and different paths in order to get to that

18   next promotion.

19        So sometimes that's what I did.  And so if you

20   scroll down, you'll see that I was a risk analyst or a field

21   accountant, maybe, individual -- okay -- individual risk

22   analyst.  And those functions were basically working with

23   our senior customers.

24   Q.   What do you mean, senior customers?  Like the elderly?

25   A.   So those are customers that may be on Medicare.  And we

1   were -- and we worked with them making sure that they had the

2   best insurance that they needed, doing audits, making sure

3   that they were actual people living in Michigan, using their

4   benefits.

5   Q.   Did you feel good about that, being able to do a job --

6   because you talked about -- we heard that the Domski family

7   would put on this Christmas for the less fortunate and things

8   of that nature.

9   A.   I did.  I did.  I met some wonderful people.  I actually

10  got to call them and speak with them and help them answer

11  any questions that they had about some of their services, or

12  maybe even direct them to the appropriate place that they

13  needed to go.

14  Q.   And then take us to your last job that you were in when

15  Blue Cross terminated you.  What was your position there?

16  A.   So it was called an IT Process Specialist II.  And it was

17  a job that I was in charge of writing processes and procedures

18  within the IT organization.

19  Q.   Okay.  And were you able to work from home in this IT job?

20  A.   Oh, yes, we did.  We were allowed to work before

21  Blue Cross even installed the program.  It was called

22  Blue Space.  And that was a program that they developed to

23  kind of test out and see how everyone would do working three

24  to four days a week at home.

25  Q.   Was this before COVID even hit?

Jury Trial - Volume 4 - November 7, 2024

1   A.   Yes, it was.

2   Q.   So before COVID hit, you were working from home.

3            And Larry said there is some type of office set up in

4   your basement or something.  Can you tell the jury?

5   A.   Sure.  Because part of the requirements for working

6   Blue Space is that you had to have a safe area that no one

7   would be able to see any of your paperwork and that you

8   wouldn't be distracted if you had calls.  So Larry built this

9   little office area in our basement with a little bi-fold door

10  and set up a nice desk area for me.

11  Q.   And did you work down there and do your job as

12  IT Specialist II?

13  A.   I did.

14  Q.   I'm not going to go through all of your employment

15  performance reviews, but I'm going to show you Plaintiff's

16  Exhibit 10.  We're just going to just look at just a few.

17           Did you get annual performance reviews from

18  Blue Cross Blue Shield?

19  A.   Yes, I did.

20  Q.   Okay.  And we will just look at 2019, and let's read what

21  it says:

22           Overall it has been a pleasure to work with Lisa.

23  She is a great role model for the team as it relates to being

24  proactive, being engaged and involved, and always looking

25  for ways to help.  She played a critical role in various

1    objectives.  I don't think the team would have been as

2    successful as we were this year without her preparation and

3    support.  Lisa embodies the cultural beliefs.  I'm excited to

4    work with Lisa in 2020 as we look to get her more involved in

5    financial goals.

6           Whose words are those, ma'am?

7    A.   That was my supervisor, Harlan Fisher.

8    Q.   Did it feel good to get this feedback for all your hard

9    work from Blue Cross Blue Shield, working there all the way

10   from 1984, to be recognized?

11   A.   Yes, it did.

12   Q.   I'm not going to go through each one, but I'll show the

13   last one before you were terminated, which is 2021.  This is

14   Plaintiff's Exhibit 12, which has been entered.

15          So 2021, this is the -- is this the same year that

16   you were forced to choose between your faith and getting the

17   vaccine?

18   A.   Yes, it was.

19   Q.   And let's take a look at this one.

20          It says:  She is respected by the core team and Lisa

21   is a key resource -- here we go.

22          She is a valued employee in our organization.

23   Excellent job, Lisa, exclamation point.

24          Do you see that?

25   A.   I do.

```
 1    Q.   Did you consistently receive high marks from your direct

 2    supervisors at Blue Cross Blue Shield?

 3    A.   Yes, I did.

 4    Q.   Had you ever been suspended?

 5    A.   Never.

 6    Q.   Had you ever been put on a performance improvement plan?

 7    A.   No.

 8    Q.   Had you ever been told, look, you got to shape up or ship

 9    out of this company?

10    A.   No.

11    Q.   Had you ever had warnings of misconduct or anything of

12    that nature?

13    A.   No.

14    Q.   So generally, and without going through every single one

15    of these and being here for a long time, was your -- were your

16    reviews consistently positive, as we have shown the jury with

17    these two examples?

18    A.   Yes, they were.

19    Q.   Okay.  And were you recognized at work -- and let me show

20    you Plaintiff's Exhibit 58A, and were you recognized at work

21    by your co-workers, your boss, the people around you, for

22    everything that you gave in your heart and soul to this

23    company?

24    A.   I always was.  Sometimes they couldn't do -- they used

25    to have a thing about Spot awards or PIE awards, pride in
```

1    excellence awards.  I received some of those.  But we would

2    also have -- just to get acknowledgement.  Like Act Now is an

3    example.  It was a card, and they would describe what I did

4    following our cultural beliefs.  I received many of those.

5    Q.  And were you given, like, certificates of achievement?

6    This is Plaintiff's Exhibit 59.

7    A.  Yes.

8    Q.  Okay.  So let's just go to 2021 now.  All right.  So COVID

9    hit in 2020.

10           Does that sound right?

11   A.  Yes.  Mm-hmm.

12   Q.  All right.  And you're working -- are you working from

13   home at the time?

14   A.  Yes.  We had been working from home.

15   Q.  And were you fully remote after COVID hit?

16   A.  Yes, we were.

17   Q.  So you already had your office set up.  Did you -- did

18   you already have your office set up before COVID hit?

19   A.  I did.

20   Q.  So you -- could you just slide -- so you didn't have to

21   make too much adjustments?

22   A.  I did not.  I had everything already there.  Before COVID,

23   when see started the Blue Place -- or Blue Space program,

24   we had to clear off our desks and take everything home so that

25   there was nothing left, because the idea is that that one day

1    or two days that we would return back to the office, we would

2    find a spot and then we would just keep our belongings with us.

3    Q.   And -- but did that ever happen?

4    A.   During -- before COVID, as part of the Blue Space, yes.

5    Q.   Oh, before COVID.  After COVID --

6    A.   After COVID, no, I never returned back to the office.

7    Q.   Okay.  And, like, if we go into your mindset in 2021,

8    before the vaccine mandate came down, I mean, what were your

9    plans for the future, Lisa?

10            Did you plan on continuing to work for Blue Cross

11   Blue Shield as you have for the last 38 years?

12   A.   I absolutely did.  The thought never crossed my mind at

13   that time.

14   Q.   Did you have any plans to leave Blue Cross Blue Shield?

15   A.   No, I did not.

16   Q.   Did you have any plans to retire early?

17   A.   No, I did not.

18   Q.   And how old were you at the time?  Tell us.

19   A.   I was 55.

20   Q.   Okay.  Did you plan on -- had this not happened, were your

21   career goals to continue to get promotions and keep doing what

22   you had been doing for 38 years?

23   A.   Absolutely.  I loved the area in IT that I was.  I had

24   many connections there.  I did numerous responsibilities

25   and supported not just my area but other areas within the

```
 1    organization.  I loved it there.  I had no idea when I was
 2    going to retire.  It wasn't even in my mind.
 3    Q.  And had -- you had gotten up and done this work for
 4    Blue Cross for 38 years?
 5    A.  Correct.  Yes.
 6    Q.  And how -- I mean, how much of a part of your life --
 7    you said faith.
 8    A.  Mm-hmm.  Faith.
 9    Q.  What else?
10    A.  Yes.  Faith.  It was a longing.  It was an identity.  It
11    gave me a purpose.  It was -- I got up every morning.  I felt
12    like I was contributing.  I was helping.  I was bringing home
13    a paycheck.  I could help my family.  I could also help my
14    colleagues.  I always asked, what can I do to help anyone?
15    What can I do to help make your job easier?  What can I help
16    do to help make your deadlines met?
17    Q.  And would you sometimes have to put in early mornings or
18    late nights?
19    A.  Always.  Always.
20    Q.  And did you have to make sacrifices, for example, like
21    have Alyse go to latchkey sometimes because you had to work?
22    A.  Yes, that is correct.
23    Q.  And was Larry working as well?
24    A.  Larry was working.
25    Q.  So when this -- did you know -- did you have any idea,
```

```
 1    prior to this trial, that in October 12 of 2021, that while
 2    you were working, there was a meeting going on between Bart
 3    Feinbaum, Patricia Snyder, the head of VP and other people in
 4    the HR department?
 5    A.   I was not aware of that.
 6    Q.   Did you have any inkling -- what were you doing in --
 7    around October of 2021?  Were you still going -- were you still
 8    working?
 9    A.   I was still working.  I was actually in the middle of the
10    IT budget finance year.
11    Q.   And did you have any idea that -- or any inkling that a
12    vaccine policy mandate was being discussed behind closed doors
13    by upper management?
14    A.   I did not.
15    Q.   Did you -- was there an announcement on October 29 of 2021
16    that all employees, including yourself, would have to be
17    vaccinated?
18    A.   There was an announcement.
19    Q.   How did you find out?
20    A.   I don't remember.  I believe it was through some sort of
21    communication that was distributed across the organization.
22    Q.   Had you been vaccinated at that point?
23    A.   No.
24    Q.   What did you do when you heard that there was this vaccine
25    mandate?  Or what went through your head when you heard that
```

1    this mandate had come down?

2    A.   So many things.  I struggled with, you know, what do I do,

3    what do I -- how do I address this?  What's my next move?  What

4    does this mean for my job?  What does this mean for my beliefs?

5    Q.   And your -- are you still working from home 100 percent at

6    this time?

7    A.   Yes, I was.

8    Q.   And were you out there endangering other people?

9    A.   I was not.

10   Q.   Did you try to be as safe as you could during COVID?

11   A.   Sure.  Of course.  I followed the guidelines.  I wore

12   masks when I had to go grocery shopping.

13   Q.   And why did you begin to research the vaccines?

14   A.    Well, I wanted to understand what it was about, because

15   I had certain beliefs in my faith, and I wasn't sure if I

16   would be, you know, violating what I believe.  So, of course,

17   I went on the internet, and there is nothing that I could find

18   anywhere else from the company, so I decided to go online.

19   Q.   And why did you -- were you concerned about injecting the

20   Johnson & Johnson, the Moderna, or the Pfizer vaccine that

21   Blue Cross had listed as the options into your body?

22   A.   Yes.  Because it goes against what I believe in.  Using

23   fetal cells to promote testing or developing as part of that

24   process, I could not inject that into my body.

25   Q.   Now, did you shame or, you know, criticize other people

```
 1   who made their own decisions for their body?
 2   A.  Of course not.  I would never do that.  I -- everyone has
 3   the right to choose what they want to do, whatever is best for
 4   them, and that's what I was doing for myself.
 5   Q.  As part of this, did you pray to God?
 6   A.  Yes, I did.  I spent many days and nights praying about
 7   it.
 8   Q.  And do you pray a lot?
 9   A.  Oh, absolutely.  It's all part of my life.
10   Q.  Did you call or contact Father Ptak to discuss what you
11   should do?
12   A.  Yes.  He was the first person I thought of.
13   Q.  And what did you tell him?
14   A.  I just explained to him what was going on, how I was
15   tormented between what I believe in and what I needed to do
16   to keep my family supported, what I needed to do to keep the
17   livelihood, the love of going into the office -- or not into
18   the office, but love of doing my job.  It was really hard for
19   me.  I wanted to understand if this was a sin.  Was it a sin?
20   Was it against -- was it against my conscience?  Was it --
21   I just felt so many different things.
22   Q.  What do you mean when you say you were tormented?
23           I'm sorry.  This thing is so loud.
24   A.  That's okay.
25   Q.  It's annoying.
```

```
 1              What did you mean --
 2    A.   I -- I felt like I had to choose between my faith and
 3    my job.
 4    Q.   Was that an easy decision for you?
 5    A.   It was not.
 6    Q.   Did you think about just saying, you know what, I'm just
 7    going to get it for my family's sake?
 8    A.   No.
 9    Q.   Why not?
10    A.   I couldn't.  I -- I believe so strong and it's -- my
11    faith has carried me throughout my whole life, my prayers,
12    my connection that I felt with God, there was no way, no way
13    I could do this.
14    Q.   Well, did you know that there was potential that you could
15    be terminated from a job that you had been in for 38 years and
16    had worked your way up to making about $100,000 a year?
17    A.   I wasn't sure.  I wasn't sure where it was leading to.
18    I knew that there was a mandate.
19    Q.   Did you know that -- so who did you -- let's go back to
20    Father Ptak.
21              Did Father Ptak help you come to a decision?
22    A.   He absolutely did.  He was my comfort outside of my
23    husband, because my husband was the job side and Father Ptak
24    was my faith side.  And he reassured me that if I felt that
25    it was going against my conscience that I should follow that.
```

1   Q.   Okay.  And when we use the word "conscience" as a

2   Catholic, what does that mean to you?  Is that related to

3   God and religion?

4   A.   It is.  It's -- it is.  And everything -- when I prayed,

5   I felt the Holy Spirit speaking through my heart, and that made

6   me understand, and with Father Ptak's guidance, that I knew

7   what I needed to do.

8   Q.   Did Father Ptak tell you something to the effect of, you

9   know, it seems like you already know what you need to do?

10          MR. HUBBARD:  Objection, your Honor.  It's leading.

11   I think the proper question --

12          THE COURT:  The objection is sustained.

13  BY MR. MARKO:

14  Q.   What did Father Ptak tell you?

15  A.   Yes.  He told me that it was okay because everyone has

16  their own belief.  Everyone has their own feelings.  Everyone

17  has their own relationship with God and their own conscience

18  to make those decisions.

19  Q.   Okay.  So let's go to the process.  We have heard a lot

20  about process, process, process.  Okay.

21          Did you -- were you instructed by Blue Cross to

22  submit a questionnaire online?

23  A.   Yes, I was.

24  Q.   And I'll show you -- this has been -- I think it's

25  Defendant's Exhibit 206.

1          Let me just ask you before this, did Blue Cross

2    Blue Shield -- first of all, had you ever had to submit a

3    religious accommodation request for anything in your life

4    before?

5    A.   Never.

6    Q.   Had you got, like, special privileges at work, like, you

7    know, you needed a parking spot close to the office or anything

8    like that?  Had you ever requested specific treatment from your

9    job before?

10   A.   No.

11   Q.   Was this the first time that you ever had to make an

12   accommodation request?

13   A.   It was.

14   Q.   In 38 years, you had never made an accommodation request

15   before to be treated differently than anybody else?

16   A.   I had not.

17   Q.   Okay.  And did Blue Cross, whether through just talking

18   to you, like, like person-to-person, or giving you written

19   guidance, ever give you a criteria or guidebook on how to do

20   this?

21   A.   No.  There was nothing.  There was no instructions except

22   an email or something -- I don't recall -- but some kind of

23   instructions to go to this link, and once you're on there,

24   answer the questions, follow the directions, and the last

25   part was to submit it.

1   Q.   Okay.  And did you do that?

2   A.   I did.

3   Q.   And these questions, just so we understand, did you make

4   up these questions or did Blue Cross make up these questions?

5   A.   Oh, it came from Blue Cross Blue Shield.

6   Q.   Okay.  And you filled these out, and we already went over

7   them, but let's look at the last, Question 12.

8            Did you list Father Ptak as a spiritual religious

9   leader contact information?

10  A.   I did.

11  Q.   And why did you do that?

12  A.   Because it was an option to do that, and I figured that

13  they would be calling him just to maybe confirm or investigate.

14  I wasn't sure.  But I filled it in, because he was my spiritual

15  leader.

16  Q.   And did they ever tell you that you would be denied unless

17  you provided a statement from Father Ptak?

18  A.   No.

19  Q.   Did they -- did you assume that Blue Cross would be able

20  to contact Father Ptak if they needed additional information?

21  A.   I absolutely did.

22  Q.   And did you fill out this information, you know, candidly

23  to them?

24  A.   Yes.

25  Q.   And okay.  So were you surprised to learn that Jeff

1  Walters didn't contact a single spiritual advisor for the
2  hundred-plus people that he interviewed?
3  A.  I was very surprised.
4  Q.  Why?
5  A.  Because I thought that would help them confirm, maybe, or
6  validate or whatever their process was.  I mean, I assumed that
7  since they asked the question, they wanted it for a purpose.
8  Q.  Oh.  Now, did you submit a statement with an attached
9  statement to the -- this SurveyMonkey religious accommodation
10  request?
11  A.  I did.
12  Q.  Now, I don't know if you remember, but it was mentioned
13  before that Blue Cross Blue Shield has submitted two different
14  statements in this case, two different accommodation
15  statements.
16          Do you remember that?
17          MR. HUBBARD:  Objection, your Honor.  Is there a
18  question?
19          THE COURT:  Well, let's -- maybe there is, but we
20  have to wait until he is finished.
21          MR. HUBBARD:  Yeah.  I mean, the objection is
22  leading.
23  BY MR. MARKO:
24  Q.  Well, let me show you -- let me withdraw the question and
25  do it this way, because they are both exhibits in this case.

1             So let me show you the first exhibit from Blue Cross.

2    And this is Plaintiff's Exhibit 13.  It's in evidence.

3             Okay.  So -- so your interview, is it -- when was

4    your interview?  Do you remember?

5    A.   December 1.

6    Q.   December 1st.  And we're going to talk about leading up

7    to that.

8             But when did you submit your religious accommodation

9    request on that SurveyMonkey thing?  Do you remember?

10   A.   I'm not sure.  I believe it was November 10.

11   Q.   Okay.  Right on.  Good memory.  November 10.

12            So let's -- let's look at this.  This is Lisa Domski,

13   and it says:  Subject.  Employee request letter for exemption

14   to COVID vaccine.

15            Do you see that?

16   A.   I do.

17   Q.   And it's a docx.  What's a docx?

18   A.   It's a Word document.

19   Q.   Just a little Word document on your computer?

20   A.   Yeah.

21   Q.   All right.  Now, in drafting this accommodation request,

22   did you -- did Blue Cross give you any guidance or advice on

23   what they needed in the request?

24   A.   There was nothing.  I had no idea how to approach this,

25   how to deliver it.  I did what I did in my job.  When we

 1   needed assistance or we needed help trying to develop policies,

 2   procedures, processes, we went out and looked for best

 3   practices.  We looked out for things that we could borrow or

 4   utilize, meaning even templates.

 5   Q.   And, Lisa, did you have -- I'm sorry to interrupt you.

 6   A.   That's okay.

 7   Q.   Did you have any legal background?  Like, do you know the

 8   EEOC guidelines and the Civil Rights Act of 1964 and how the

 9   First Amendment applies to the states and things of that

10   nature?

11   A.   I did not.  I had no idea about any of this.  I have never

12   had to do anything like this before.  I had no guidance.  I

13   went out and searched.  I even found this website called the

14   Healthy American where they gave free advice.

15   Q.   And so how did you seek advice?  Did you go online to try

16   to find out what you should do?

17   A.   I did.

18   Q.   Was this frustrating for you that you're applying for

19   religious accommodation with your job potentially on the line

20   and your employer doesn't give you any guidance or information

21   on how to do it?

22   A.   It was very frustrating.  It was frustrating.  It was --

23   it was hard.

24   Q.   So how did you come up with your religious accommodation

25   written request that was attached to that SurveyMonkey?

1    A.   Yes.  So --

2    Q.   Other than -- I'm sorry to interrupt you.  But other than,

3    obviously, like what you already told us about, like praying,

4    Father Ptak, things of that nature.

5    A.   Sure.  Sure.  I mean, there were many people's opinions

6    and people's ideas, sharing their experiences.  You know,

7    after reviewing all of that, I drafted many versions of what

8    I thought should be.  I toyed with how much should I put in

9    there, what should I put in there.  Is this too much?  Is this

10   too little?

11   Q.   Why?  Why were you so worried, is this too much, is this

12   too little?

13   A.   Well, I didn't want to offend anyone.  I didn't want to

14   say the wrong thing.  But I wanted to get the point across

15   about my beliefs.

16   Q.   And were you honest and sincere in your religious beliefs

17   that you put pen to paper and gave to Blue Cross?

18   A.   I absolutely was.

19   Q.   All right.  So let's look at this.  This is Exhibit 13.

20              THE COURT:  I thought this was Exhibit 10.

21              MR. MARKO:  No, this is Plaintiff's Exhibit 13.

22              THE COURT:  Because you mentioned Exhibit 10 earlier.

23              MR. MARKO:  I'm so sorry.  Yeah.  I'm so sorry.  We

24    have, like, a hundred exhibits.

25              THE COURT:  I just want to make sure the record is

```
 1   clear.
 2            MR. MARKO:  Yeah.  This is Plaintiff's Exhibit 13.
 3   It's Blue Cross Blue Shield, produced by them --
 4            THE COURT:  You know what, you're correct.  My
 5   mistake.  It said November 10, and I was thinking it was
 6   Exhibit 10.  You are correct.  My apologies.
 7            MR. MARKO:  Oh, thank you, Judge.  It's a first.
 8   Thank you so much, Judge.
 9   BY MR. MARKO:
10   Q.  The -- all right.  So let's go to the last page.
11            And so is that your signature right there?
12   A.  It is my signature.
13   Q.  And what are these?  Like, what are these footnotes that
14   you had there?
15   A.  It was information that talked about what was in the
16   vaccines, the ingredients, how they were tested, produced.
17   Q.  And did you know -- did you ultimately submit this
18   particular document, Exhibit 13, or did you submit a different
19   one?
20   A.  You know, I -- I honestly can't recall.  I had so many
21   different versions.  I know that I kept taking things out,
22   adding things in.
23   Q.  Why were you spending so much time on this document?  Why
24   would you be taking things out and putting things in?
25   A.  I just wanted -- I wanted it to be perfect.  I wanted to
```

1   make sure that they understood my sincerely held beliefs.

2   I wanted to know -- them to know, you know, what my feelings

3   were.

4   Q.  And did you look for guidance -- prior to submitting this,

5   did you look for help on, like, Christian websites or anything

6   of that nature?

7   A.  Yeah, absolutely.  It was called thehealthyamerican.com.

8   It was a Christian website.  Her husband was a pastor.

9   Q.  Okay.  Was that helpful?

10  A.  It was extremely helpful.

11  Q.  And did you then submit a -- an accommodation request as

12  part of this SurveyMonkey thing where you just attached it?

13  A.  I did.  I added it, attached it, and submitted.

14  Q.  Okay.  And now here's -- here's another accommodation

15  request that Blue Cross produced.  This is Defendant's

16  Exhibit 206.

17         And were your accommodation requests that you had

18  been tinkering with -- I know you said one had a footnote or

19  not -- but were they substantially similar at their core?

20  A.  They were.

21  Q.  Okay.  And did your accommodation request discuss that you

22  had a sincerely held religious belief that would prevent you

23  from getting the vaccine?

24  A.  It did say that.

25  Q.  And is that the honest to God's truth, Lisa Domski?

Jury Trial - Volume 4 - November 7, 2024

40

1   A.   It is the honest to God's truth.

2   Q.   And did anybody from Blue Cross, after you submitted this

3   form pursuant to their policy, ever contact you prior to your

4   interview and say there is any problems with your answers?

5   A.   No one contacted me.

6   Q.   Did anybody from Blue Cross Corporation contact you and

7   say that your statement was not sufficient for any reason

8   whatsoever?

9   A.   No.

10  Q.   Did anyone from Blue Cross contact you and say they

11  needed additional information so they could evaluate your

12  accommodation request?

13  A.   No one did.

14  Q.   So did you go and have a next step here where you had to

15  go online and schedule an interview?

16  A.   I did.

17  Q.   And let me show you Defendant's Exhibit 208 regarding

18  this.

19         Okay.  So this is on November 15 of 2021.

20         Do you see that?

21  A.   I see.

22  Q.   And did you read this email regarding scheduling an

23  interview?

24  A.   Yes.

25  Q.   And so did you have to click on this link here, this

1    signupgenius.com, to schedule an interview?

2    A.   I did.

3    Q.   Was there any instructions accompanying this, like an

4    attachment, saying here's what to expect during your interview?

5    A.   Nothing was attached.  It was an opening of here's a time

6    slot.  Pick your time slot that you're available.

7    Q.   Was there any things in this email that said they needed

8    additional information?

9    A.   No.

10   Q.   Okay.  Now, we have been in this federal court trying this

11   case for almost a week now.

12            How long did Blue Cross Blue Shield tell you that

13   your interview to determine the sincerity of your religious

14   beliefs was going to be?

15   A.   Around 15 minutes.

16   Q.   15 minutes?

17   A.   Mm-hmm.

18   Q.   Okay.  And did you then try to sign up?

19            And I'm showing you this -- so it looks like this --

20   A.   I did try to sign up.

21   Q.   Yes.  So this is sent at 10:42 p.m., this first email.

22   And then did you --

23            THE COURT:  Are we still in the same exhibit?

24            MR. MARKO:  Yes, your Honor.

25            THE COURT:  All right.

```
 1              MR. MARKO:  I'm just scrolling up.
 2   BY MR. MARKO:
 3   Q.   Then on November -- the very next day, did you email them
 4   back after trying to sign up?
 5   A.   Yes.
 6   Q.   And what happened?
 7   A.   There were no available time slots.  There was nowhere
 8   that I could sign up.
 9   Q.   And did they tell you that they were going to get some
10   more times?
11   A.   They did.
12   Q.   And let me show you this.  This is page 2 of the same
13   exhibit.
14              Did they get back to you?  Did they not respond to
15   you?
16   A.   They did not.  And so I have a habit of following up,
17   because I want to follow the rules.  I wanted to make sure
18   that I didn't get missed.
19   Q.   So were you trying to duck the interview so you could
20   hide your sincerely held religious beliefs?
21   A.   Absolutely not.
22   Q.   So Blue Cross promises you that they are going to get you
23   an interview time, and you try to sign up and it doesn't work.
24              They tell you that they are going to get you a new
25   time, and they don't, so you have to follow up with them?
```

Jury Trial - Volume 4 - November 7, 2024

1   A.   That is correct.

2   Q.   And here we go.  This is November 18 at 11:30.

3          Did they inform you that they extended the deadline

4   to have an interview?

5   A.   They did inform me.

6   Q.   Okay.  And we will go to -- this is -- did you have

7   something happen that made it difficult for you to -- this is

8   the same exhibit -- that made it difficult for you to attend a

9   15-minute interview regarding your faith?

10  A.   It did.  I had a family member who was very sick, and she

11  ended up passing away.

12  Q.   Tell the jury, who is it?

13  A.   It was my sister-in-law, Judy Domski.

14  Q.   And is that Larry's sister?

15  A.   That was Larry's brother's wife.

16  Q.   Larry's brother's wife.  Did you have a close relationship

17  with her?

18  A.   Yes.  I had a very close relationship with all the Domski

19  family.

20  Q.   Did Larry and Alyse have a close relationship with her?

21  A.   Yes, they did.

22  Q.   And so during this time where you're trying to set up an

23  interview to defend your faith with Blue Cross, you have a

24  family member pass away; is that --

25  A.   That is correct.

1    Q.   And did you have to go to a funeral to bury her?

2    A.   I did.

3    Q.   When did you bury her?

4    A.   November 30th.

5    Q.   November 30th.  Was that right before you have to go to an

6    interview with human resources and a lawyer not acting as a

7    lawyer?

8    A.   Yes, it was.

9    Q.   Was that difficult for you?

10   A.   Absolutely.  I was emotional about the event that had

11   just occurred.  I was emotional about having to go into this

12   interview.  I had never been into a meeting with an attorney

13   before.

14   Q.   And did you go anyways?  Or did you say, you know what,

15   I got too much going on, I got to put this off?

16   A.   No, absolutely, I still attended.  Like I said, I try to

17   follow the rules.

18   Q.   And prior to going into the interview, did you receive

19   any input or guidance from Blue Cross?

20   A.   Nothing.

21   Q.   Did Blue Cross give you the questions that they expected

22   you to answer in the interview in advance?

23   A.   No, they did not.

24   Q.   Did you have any idea what the questions were even going

25   to be?

1    A.   I did not.

2    Q.   Were you nervous?

3    A.   I was absolutely nervous.

4    Q.   Let's -- so let's go to Exhibit 16, which is the

5    transcript of this interview.

6         So who was in the interview?

7    A.   It was Jeff Walters, the HR manager, and Bruce Henderson,

8    I believe is his name, the attorney.

9    Q.   Okay.  Well, what did you think when you found out that

10   instead of being with, like, your boss, for example, that this

11   religious accommodation interview was with a senior HR person

12   and general counsel for Blue Cross Blue Shield?

13        MR. HUBBARD:  Objection, your Honor.  The

14   characterization as to who was present is inaccurate.  It's

15   not in evidence.

16        MR. MARKO:  I'm sorry.  Assistant general counsel.

17        THE COURT:  Excuse me.  The objection is sustained.

18   BY MR. MARKO:

19   Q.   What did you think when you found out that your meeting

20   was with an HR person and a lawyer?

21   A.   It was very intimidating.  It did not make me feel like

22   I would be in a safe environment.

23   Q.   Why not?

24   A.   I didn't know who these people were.

25   Q.   Had you ever met them before?

1   A.   No, I did not.

2   Q.   Had you ever been in trouble before?

3   A.   No, I have not.

4   Q.   Had you ever had to defend your religious beliefs with

5   strangers in a professional setting?

6   A.   Never.

7   Q.   So were you a union member at this time given your job

8   position?

9   A.   No, I was not.

10  Q.   Did you have -- so did you have a union representative

11  that you could call to rely on or ask for advice?

12  A.   We were told we could not have -- bring anybody or have

13  anybody there.

14  Q.   Were you allowed to have your lawyer on your side?  A

15  lawyer at all?

16  A.   No.  No lawyers, no nothing.

17  Q.   Did you wonder why there was a lawyer in a religious

18  accommodation meeting?

19  A.   I definitely wondered why.

20  Q.   What went through your mind?

21  A.   Was I in trouble?  Was there some legal ramifications?

22  Was there something that I did wrong.

23  Q.   Let's take a look at this interview transcript, which is

24  Plaintiff's Exhibit 16.  It's been admitted.

25            All right.  Did you -- were you told by the

```
 1    interviewers that you were not allowed to record the meeting?
 2    A.   I was.
 3    Q.   And what did they tell you?
 4    A.   They said no, there is no recording.  It's not allowed.
 5    It's against the policy.
 6    Q.   So did you make an audio recording or video recording of
 7    the interview?
 8    A.   I did not make an audio record or video.  But what I did
 9    is, what I do in my meetings, when I would have to do meeting
10    minutes, I used the Word program and I used the dictate button,
11    and it dictates everything that's being talked about.
12    Q.   Now, Jeff Walters testified -- did you hear Jeff Walters
13    testify?
14    A.   I did.
15    Q.   Did you hear him testify that as far as he could tell this
16    was an accurate transcript of the meeting?
17    A.   Yes.
18    Q.   Do you agree with that?
19    A.   Yes.
20    Q.   Okay.  How did you feel when you were told at the
21    beginning of the meeting that the answers to the interview are
22    completely voluntary?
23    A.    I felt like a weight had been lifted off my shoulders.
24    I was relieved.
25    Q.   Why, Lisa?  Why?
```

1  A.   Because I felt like I was alone.  I had no one there with

2  me, and there are these two people questioning, or about to

3  question, everything that I had written already and provided

4  to them timely.

5  Q.   What did you take that to mean when they used the words,

6  completely voluntary?

7  A.   It was my choice.

8  Q.   Did they ever tell you this is not your choice?

9  A.   No.

10 Q.   Did they ever tell you this is involuntary?

11 A.   No.

12 Q.   Did they ever tell you, Lisa, if you don't answer all

13 of our questions, we have no choice but to fire you?

14 A.   No.

15 Q.   Did they ever give you any type of warning whatsoever

16 during this interview that it was compulsory; in other words,

17 you had to do it or you risk losing your job?

18 A.   No, that was never communicated.

19 Q.   And at the top, what did you think when Jeff Walters told

20 you that his colleague Bruce Henderson was with the office of

21 general counsel?

22 A.   It was very intimidating for me.

23 Q.   So tell us what happened at the meeting?

24 A.   Well, they introduced themselves and said what they were

25 about to do.  And, you know, again, I understood that anything

```
 1    that I decided to do was voluntary, my choice.  And I felt that
 2    I had said everything that I needed to say within my statement
 3    that I attached.
 4    Q.   And when they said -- after they told you it was
 5    completely voluntary, did Jeff Walters say:  Are you declining
 6    to answer all questions?
 7    A.   He did say that.
 8    Q.   And what did you tell him?
 9    A.   I said:  I am not declining.
10    Q.   And did you ask them if they could submit a -- if you
11    could submit a written statement?
12    A.   I did.
13    Q.   Another written statement?
14    A.   I did.
15    Q.   Did they ever tell you that -- did they tell you that they
16    had read your written accommodation request?
17    A.   They never said that.  They said they didn't have it in
18    front of them.
19    Q.   Did they give -- did they say anything -- did you hear
20    Jeff Walters testify that he had reviewed your religious
21    accommodation request?
22    A.   I heard that.
23    Q.   Okay.  Did they say anything during this meeting that
24    indicated to you that they had actually read it?
25    A.   No.
```

1   Q.   Did Bruce tell you again at the end of this interview that

2   it is, quote, "completely voluntary for you"?

3   A.   Yes, he did.

4   Q.   Did Bruce tell you:  We understand that you want to rely

5   on your statement and that's fine?

6   A.   He did.

7   Q.   And what did you think, Lisa, during this interview when

8   Blue Cross Blue Shield's attorney -- or I'm sorry -- lawyer not

9   acting as a lawyer says that it's fine to simply rely on your

10  statement?

11  A.   I was relieved.  I thought that, okay, I did what they

12  asked me to do.  I'll wait for the next step.

13  Q.   Okay.  You'll wait for the next step.  And what was the

14  next step?

15  A.   To my surprise, it was, sorry, you have been declined.

16  You do not meet the criteria for sincerely held religious

17  belief.

18  Q.   And when was that, Lisa?

19  A.   The next day, December 2nd.

20  Q.   The very next day.  To your knowledge, did Blue Cross do

21  any investigation whatsoever?

22  A.   Not to my knowledge.

23  Q.   Did they contact anyone?

24  A.   Not to my knowledge.

25  Q.   Prior to denying your request for religious accommodation,

1    did they ever ask you for more information?

2    A.   They did not.

3    Q.   Did they ever tell you, anyone from Blue Cross ever say

4    that the information they have is not enough?

5    A.   They never said that.

6    Q.   Did they ever give you an opportunity to get them more

7    information?

8    A.   Could you repeat the question?

9    Q.   Yeah.  Did they -- did they ever, like, say, you know

10   what, we need a statement from Father Ptak --

11   A.   No, they --

12   Q.   -- you go get it on your own because we're not going to

13   take the time to call him?

14   A.   They never asked for that.

15   Q.   Had you been told by defendant Blue Cross, to save your

16   job of 38 years, that you needed a statement from Father Ptak,

17   would you have called Father Ptak?

18   A.   Absolutely.

19   Q.   Would you have asked him to write you a statement?

20   A.   I would have.

21   Q.   Would you have called, if you needed to, any of the

22   other people that the jury heard from in this case, such as

23   Dawn Rodriguez, your daughter, Larry, Jill Fortener, your

24   hairdresser, or anybody else who could write a statement

25   for you?

Jury Trial - Volume 4 - November 7, 2024

1   A.   I would have done all of that.

2   Q.   Okay.  Why didn't you do it?

3   A.   I didn't feel that I needed to.  I felt that I had said

4   everything that I had to say and everything was communicated

5   to them.  I did everything that they asked.

6   Q.   Were you -- how did you feel when, the day after this

7   interview, you get a communication saying that your religious

8   exemption request is denied and you must go get vaccinated to

9   keep your job?

10  A.   I was betrayed.  I was angry.  I was sad.  I was --

11  I can't believe this.  It was disbelief.  I had worked there

12  for so long.  I had done so much for the company.

13  Q.   Did you become emotional about it?

14  A.   Absolutely.

15  Q.   So what did you do next?  Did you think -- did you have a

16  debate internally or with other people about what to do?

17  A.   I mean, I mostly prayed about it.  I mostly, you know,

18  talked to my husband about it.  You know, getting ready, what

19  are we going to do, how are we going to handle this?  What's

20  our next steps?

21  Q.   And tell the jury just at this time, like, what the

22  household situation was in terms of who is the breadwinner.

23  A.   Well, at the time, I was.

24  Q.   And where was Larry working at the time?  Do you remember?

25  A.   I don't -- I don't recall.  I know -- he might have been

 1   working -- he was an inspector.  He was working for one of the

 2   cities, perhaps.  I honestly don't remember.

 3   Q.  And were you the main income source for the family?

 4   A.  I was.

 5   Q.  And did you have financial obligations that you were using

 6   your financial income for your own family?

 7   A.  I did.  Yes.

 8   Q.  So when you received -- and I'll show you Plaintiff's

 9   Exhibit -- this is Exhibit 9, which is Blue Cross Blue Shield's

10   62247.  Okay.

11         How did you receive this letter?

12   A.  I received a letter in the mail.

13   Q.  And tell us what it was like opening this letter after

14   38 years.

15   A.  I was in disbelief.  I couldn't believe that this is what

16   happened.  I had so much love for the job, love of helping

17   people.  I couldn't believe this was happening to me.

18   Q.  And this is from Patricia Snyder.  Did you -- had you met

19   with her before?  Did you know who she was?

20   A.  I knew her name.  I have never met her.

21   Q.  In between this time of December 2nd, 2021, the day after

22   the interview, and the time that you got this termination

23   letter in the mail, did anyone from Blue Cross ask for any

24   additional information for the religious accommodation request?

25   A.  No.

1   Q.   And did you ever get -- did you get -- what did you do

2   when you get this termination letter in the mail?

3   A.   You know, I -- the feeling of abandonment.  The feeling --

4   all of those feelings that I have hidden for so long began to

5   stir up again.

6   Q.   What do you mean by that?

7   A.   Feelings of betrayal, feelings of abandonment, feelings

8   from my childhood, feelings of, I gave my life to this.  I --

9   this place was my identity.  It's what I got up every day and

10  went for.  It's how I supported my family.  It's how my future

11  was going to lay out with, you know, the plans that I had

12  working there.

13  Q.   Did you feel like the company that you had worked for for

14  38 years made you choose between your faith and religion and

15  your career?

16  A.   I did.  I absolutely felt that way.

17  Q.   How did that feel?

18  A.   It was -- it was horrible.  It was -- it was probably one

19  of the worst times in my life next to my childhood.

20  Q.   If -- if you -- if this job was so important to you, why

21  didn't you just do what they wanted you to do and choose your

22  career?

23  A.   There was no way that I was choosing my faith over my job

24  because God had carried me through my whole life.

25  Q.   Was this one of the most difficult decisions you ever had

1   to make in your life?

2   A.   Yes.

3   Q.   Now, we have been here -- it's been a long road.

4        Do you -- do you have any regrets about the decision

5   that you made?  Do you regret choosing your faith over your

6   career?

7   A.   I do not.

8   Q.   Why?

9   A.   Because I feel that strong about my relationship with God.

10  And that -- I know that I didn't commit any sins, and you can

11  still get into the gates of heaven.

12  Q.   Did you ever get to have -- did you hear Jeff Walters talk

13  about how happy he was to have his retirement party and go into

14  retirement?

15  A.   I did.

16  Q.   Did you ever get to have -- to go out on your own terms

17  from your job?

18  A.   I did not.

19  Q.   Did you ever get to have a retirement party at Blue Cross

20  Blue Shield?

21  A.   I did not.

22  Q.   What did you have to do with the Blue Cross Blue Shield

23  stuff that you had at your house?

24  A.   I had to box it up, take it to the UPS office myself, and

25  they mailed it back.

1   Q.   And was that it?

2   A.   That was it.  It was the last I heard.

3   Q.   After 38 years of work, this January 4 letter

4   terminating -- half-a-page letter terminating your employment

5   was what you got?

6   A.   That's what I got.

7   Q.   So let's talk about what you started to do, Lisa, after

8   you were terminated in 2022.

9         And I would first like to talk about what benefits

10  were taken away from you.  Okay?

11        So -- and we show -- this is Plaintiff's Exhibit 37.

12  And this is 2021.

13        So approximately how much money had you worked your

14  way up to making at Blue Cross Blue Shield?

15  A.   It was almost -- around a hundred thousand, almost.

16  Q.   Okay.  And did you get other benefits that were included

17  with that?  Did Blue Cross give you life insurance?

18  A.   They did.

19  Q.   Did you earn -- like, did you have to earn vacation time

20  over 38 years?

21  A.   You did, yes.  It was based on your years of service.

22  I think when I left I had 20 days of PTO time, paid time off.

23  Q.   And did you have to work your way up and earn that time?

24  A.   You do.  It was -- yes, because it was years of service.

25  Q.   And did you get a 401(k)?

```
 1   A.   I did.  I had a 401(k) and the company would match it.

 2   Q.   And did you get disability insurance?

 3   A.   Yes.

 4   Q.   Did you get life insurance?

 5   A.   Yes.

 6   Q.   Did you get vision insurance?

 7   A.   Yes.

 8   Q.   Did you get short- and long-term disability?

 9   A.   Yes.

10   Q.   Had you earned those --

11   A.   Yes.

12   Q.   -- benefits?

13            So we have about 100 -- you said disability, life,

14   vision, vacation.

15            Were you able to donate, out of your own money, to

16   charitable organizations through your work at Blue Cross?

17   A.   I did.  It was through the United Way Foundation.

18   Q.   Did you donate to United Way out of your own paycheck?

19   A.   I did.

20   Q.   What's United Way?

21   A.   Well, it's a group of organizations that you can help

22   support people that are less fortunate.

23   Q.   Did you get bonuses?

24   A.   I did get bonuses.

25   Q.   Tell the jury.
```

1    A.   Yes.  I received yearly bonuses.

2    Q.   Had you been climbing -- like, we all -- like, had your --

3    had your earnings been going up over a period of 38 years of

4    working there?

5    A.   Yes.  My earnings went up.  I also received an annual

6    merit raise.

7    Q.   What does that mean?  Tell the jury.

8    A.   Yes.  So after our performance reviews we were rated and

9    we would get a certain percentage yearly.  Maybe --

10             THE COURT:  Percentage of your salary?

11             THE WITNESS:  I'm sorry.  A certain percentage of

12    my salary, yes.

13   BY MR. MARKO:

14   Q.   And how much was it?

15   A.   It could range anywhere from 3 to 5 percent.

16   Q.   And so $3,000 to $5,000 approximately?

17   A.   Could be, yes.  Mm-hmm.

18   Q.   And, I mean, was this a -- were you pretty happy with the

19   benefits that had -- you had earned over 38 years?

20   A.   Yes, I was.

21   Q.   And when you were terminated, were all these taken away

22   from you?

23   A.   They were.

24   Q.   And so what did you do?

25   A.   Well, I -- I began -- I began my prayer time.  I began

1    feeling very distraught, very withdrawn.

2    Q.   Did you have to go back for the first time in 38 years,

3    since you were 17, and try to put together a résumé?

4    A.   I did.

5    Q.   Did you have to put together cover letters?

6    A.   Yes, I did.

7    Q.   I want to talk a little bit about some of the places that

8    you tried to apply for, which is Plaintiff's Exhibit 40.  And

9    we have a demonstrative that I have already produced to the

10   defendants prior to trial showing some of the job applications.

11          But let's talk a little bit about where you --

12          THE COURT:  I'm not sure anybody can see that,

13   Mr. Marko.  Do you have it online?

14          MR. MARKO:  I don't know if we have this online or

15   not.

16          THE COURT:  Well, just proceed.

17          MR. MARKO:  I can refer to it, because -- I apologize

18   if everybody can't see it.

19          THE COURT:  Well, just go ahead with your

20   questioning.  We will see what we can.

21          MR. MARKO:  Okay.

22   BY MR. MARKO:

23   Q.   Did you apply to Habitat for Humanity?

24   A.   I did.

25   Q.   In Ann Arbor?

1   A.   Yes.

2   Q.   And did you get that job?

3   A.   No, I did not.

4   Q.   Why not?

5   A.   They went with another candidate.

6   Q.   Okay.  Well, how did this feel?  Like, had you had to

7   apply for -- I mean, I know you had promotions and things of

8   that nature, but did you have to be out searching for a job --

9   when was the last time you had been out searching for a job

10  like this?

11  A.   When I was 15.

12  Q.   So how did this feel?

13  A.   It was hard.  It was -- in some respects, it was

14  humiliating.  Sometimes, you know, the -- looking at lower

15  classified, lower paying, from what I had come from and what

16  I knew that I could do, and -- and being rejected, maybe

17  because I was overqualified, it was very hard.

18  Q.   And did you find yourself at a disadvantage in the 2022

19  workforce that you did not have a college degree?

20  A.   I absolutely did.

21  Q.   Tell the jury.

22  A.   Yes.  Numerous times I searched the internet looking for

23  something closely related to what I knew from Blue Cross

24  Blue Shield.  Most of them said a degree was required.

25  Q.   And so were you eligible to even apply for those jobs

1    without a college degree?

2    A.   I was not.

3    Q.   Were you able to find any -- did you look for a job that

4    was comparable to what you had at Blue Cross Blue Shield?

5    A.   I did.

6    Q.   Were you able to find one?

7    A.   I was -- I did not.

8    Q.   Did you apply to Grosse Ile Township School?

9    A.   I did.

10   Q.   Did you get that job?

11   A.   No.

12   Q.   Did you apply to General RV?

13   A.   I did.

14   Q.   Did you get that job?

15   A.   I did not.

16   Q.   What were you trying to do for General RV?

17            What's General RV?

18   A.   It's a camping facility.  And because I enjoy camping,

19   I thought it would be a good place for me since I was familiar

20   with how, you know, camping works, and offer my experience.

21   Q.   Why do you like camping so much?

22   A.   It's super peaceful.  It's away from everything.

23   Q.   So what job did you apply for at General RV?

24   A.   It was helping them -- once they had sold a camper or a

25   product, I was able to facilitate and show the people what

1    their product ended up looking like.

2    Q.   Did you get that job?

3    A.   I did not.

4    Q.   So no Habitat for Humanity, no Grosse Ile Township,

5    no General RV.

6             Did you apply to Ryder Systems, Inc.?

7    A.   I did.

8    Q.   What's that?

9    A.   It's a trucking company.

10   Q.   What were you going to do?  Do you know how to drive a

11   truck?

12   A.   No.

13   Q.   What were you going to do for a trucking company?

14   A.   It was an administrative-type role.  And it was helping

15   truckers when they would come in and need to load and unload,

16   and it was facilitating that process.

17   Q.   Did you get that job?

18   A.   I did not.

19   Q.   How about John Paul II Classical Catholic School, that

20   sounds like a good job for you.  Did you apply for that job?

21   A.   I did.

22   Q.   And what were you going to do for them?

23   A.   A secretary.

24   Q.   Did you get that job?

25   A.   I didn't get that job.

1   Q.   What about All Saints Catholic School?  Did you apply for

2   that job?

3   A.   Yes, I did.

4   Q.   Did you get that job?

5   A.   No, I did not.

6   Q.   What were you going to do for them?

7   A.   I was going to be the priest admin.

8   Q.   And were you able to ever find a comparable job to

9   Blue Cross Blue Shield?

10  A.   I was not.

11  Q.   Were you -- did you find -- how -- did you have to drive

12  to some of these interviews in person?

13  A.   I did, yes.

14  Q.   And were some of them very far from your house?

15  A.   Yes, they were.

16  Q.   Tell the jury.

17  A.   Yes.  Sometimes I would drive -- one of them was 40 to

18  45 minutes away.

19  Q.   Why would you apply for a lower paying job outside of your

20  skill set that's 45 minutes away from your house?

21  A.   Because I wanted to help contribute to my family.  I felt

22  something is better than nothing.

23  Q.   How did it feel having to drive all over the place to

24  these jobs, after working at Blue Cross for 38 years, and being

25  told that you're not good enough for those jobs?

1    A.   It felt horrible.  It felt -- again, I felt betrayed.

2    I felt -- I just -- disbelief.  How could they do this to me?

3    Q.   Now, did you submit a résumé to these jobs?

4    A.   I did.

5    Q.   Was it the résumé I just showed the jury?

6    A.   Yes.

7    Q.   So did employers ask you, hey, Lisa Domski -- something to

8    the effect of, Lisa Domski, why did you leave a job that you

9    were at for 38 years making $100,000 a year?

10   A.   I was embarrassed.  I couldn't tell them.  I just said

11   I retired.

12   Q.   But did you ever get to really retire?

13   A.   No.

14   Q.   Did you finally get a job at Henry Ford Museum or -- is it

15   Greenwich Village [sic]?  Or what is it?  Tell the jury.

16   A.   Yes.  It's Greenfield Village.  It's a museum located in

17   Dearborn, Michigan.  And I answered telephones for them in a

18   backroom.

19   Q.   What do you mean, in a backroom?

20   A.   It was not a very nice office.  It was very old and dingy.

21   Q.   But it was better -- was it better than nothing?

22   A.   It was better than nothing.

23   Q.   All right.  And let's look at your paycheck, which is

24   Plaintiff's Exhibit 38.  It's in evidence.

25           Is this your paycheck from the Edison Institute?

1    A.   Yes.  Yes, it is.

2    Q.   Okay.  It looks like you made $1,560 from the Edison

3    Institute.

4    A.   Yes.

5    Q.   Now, did you eventually get a job at Ward Church?

6    A.   I did.

7    Q.   Okay.  And tell the jury, what's Ward Church?

8    A.   Ward Church was a faith-based Presbyterian church.

9    Q.   Okay.  Not a Catholic church, but a Presbyterian.

10   Christian?  Is it a Christian church?

11   A.   Yes.

12   Q.   Okay.  And what did you do for Ward Church, Lisa?

13   A.   I was a secretary.

14   Q.   Okay.  And what do you mean?  Like as a secretary, what

15   did you do?

16   A.   Sure.  I helped prepare things for -- my boss was the --

17   sorry.  I'm trying to recall here.  My boss was the person who

18   went out and went to different countries and --

19   Q.   Like a missionary?

20   A.   Like a missionary.  Thank you.  Yes.  She was a

21   missionary.  And so I helped prepare her for that.  Organized

22   the things that were needed, the insurance that was needed, got

23   plane tickets for her, established, you know, meeting minutes,

24   met with some of the congregation who would give us donations,

25   kept track of all of that.

1  Q.   Now, let's look at your paycheck from Ward Church.

2  It looks like you made $4,236.50 from Ward Church.

3  A.   Correct.

4  Q.   Okay.  And so you were able to take that, put it together

5  with the Edison money, and you're at -- if we give them the

6  benefit of the doubt, about $6,000 approximately?

7  A.   Correct.

8  Q.   Okay.  Now, what's going on in your household at this

9  time?  Is -- are you concerned about finances?

10  A.   I was extremely concerned.  I was the one who did the

11  bills.  I was the one who promised my daughter that we could

12  carry her through college.

13  Q.   Why did you make that promise?

14  A.   Because I'm her parent.  That was my obligation to her.

15  That's what I wanted to do.

16  Q.   And did Larry have to change his career plans in order to

17  adjust for this sudden change in your family's life?

18  A.   He did.

19  Q.   Tell the jury.

20  A.   Yes.

21  Q.   What did he do?

22  A.   He tried to find higher paying jobs.  He took a job that

23  was an hour -- almost an hour and 20 minutes away from our

24  home because it increased his salary to help make up for the

25  difference or at least part of the difference.

```
 1   Q.   The -- so at some point we know COVID ended, the COVID
 2   vaccine mandate ended.
 3   A.   Yes.
 4   Q.   And when the COVID vaccine mandate ended from Blue Cross
 5   Blue Shield, did anyone from Blue Cross Blue Shield contact you
 6   or call you and say:  You know what, Lisa, let's just forget
 7   about all that bad stuff that happened, there is no more
 8   mandate, you can come back to work?
 9   A.   They didn't directly contact me.
10   Q.   Did anybody offer you full reinstatement?
11   A.   No, they did not.
12   Q.   Did -- would you be able -- let's just say hypothetically
13   that after this whole trial had -- we have gone through all
14   this, that somebody from Blue Cross says:  You know what, Lisa,
15   we made a big mistake.  Come on back.  No hard feelings.
16        Would you be able, physically and mentally able, to
17   go back to Blue Cross Blue Shield after everything that you
18   have been through?
19   A.   There is no way.  They betrayed me.  They lost my trust.
20   I compared it to being married to someone.  If someone betrayed
21   a husband or a wife, how could that person stay with that
22   person?
23   Q.   How -- how has it been for you to have to defend your
24   faith in front of strangers?
25   A.   It's been very difficult.  It's very private and personal.
```

1    Q.   I want to talk a little bit about some of the mental

2    effects that this has had on you, okay, emotionally.  We talked

3    about some benefits that you lost, but just tell the jury how

4    this has affected you personally as a human being.

5    A.   Well, I became withdrawn, isolating myself, not wanting

6    to spend time with people.  I did still pray a lot.  But I'm

7    human.  These things don't go away.  Guilt.  I couldn't help

8    my family.

9    Q.   Why?  Why do you feel guilt?

10   A.   Did I do something wrong?  I didn't think I did.

11   I followed everything.  I wasn't going to give up my faith.

12   Q.   I have got to ask you a couple questions that are a little

13   uncomfortable.  I'm sorry.

14           But did you have physical changes as a result of

15   this?

16   A.   Yes.  I did gain weight.  Anywhere between 20 to

17   30 pounds.

18   Q.   What about your sleeping?

19   A.   Practically no sleep.  And if I did fall asleep, I was

20   awoke -- I was awake because I couldn't turn my mind off.

21   I kept thinking about everything.  I became very distraught,

22   very depressed.

23   Q.   Did you ever have to deal with other people who

24   disapproved of the decision that you made for yourself?

25   A.   I did.  I didn't want to have to deal with it.  I didn't

Jury Trial - Volume 4 - November 7, 2024

```
1    want to have to answer to anybody.  I couldn't talk about it.
2    Q.   Are you working right now?
3    A.   I am not working right now.
4    Q.   How has your family had to readjust to this?
5    A.   We just made changes in our lives.  We couldn't have the
6    luxuries that we had when I was working.  There was no more,
7    hey, let's just go here, let's go out to eat, let's take a
8    vacation to Myrtle Beach, or -- let's watch what we're spending
9    at the grocery store, let's make sure we, you know, keep the
10   lights on -- off, turn the heat down, just things like that.
11   Q.   Had you ever been terminated from a job before in your
12   life?
13   A.   Never.
14   Q.   Had you -- had you been able to write your own story, your
15   own ending to your work story, what would it have been at
16   Blue Cross had this not happened, had you not been terminated?
17          Prior to this -- prior to this mandate, did you
18   plan -- and your termination, did you plan on working there
19   until you could retire?
20   A.   I did plan on working there.  You know, I didn't think
21   about that.  I was -- I would think I would stay there until
22   my late 60s.  I wasn't thinking about retiring.  I was thinking
23   about, you know, my daughter.  She just got her bachelor's
24   degree, perhaps she is going to move on to her master's degree.
25   You know, there is weddings, all of those things.  Those were
```

1   things that I wanted to provide to her.

2   Q.   Did all of this place a strain on your relationship with

3   Larry?  I'm not saying, you know, it ruined the relationship

4   or anything like that, but did it put a strain on your

5   relationship with your husband, having to make these changes

6   and abruptly?

7   A.   Of course.  Something like that just doesn't -- doesn't

8   settle.

9   Q.   Did you have to drain your retirement that your family had

10  been saving for all those years?

11  A.   I absolutely did.

12  Q.   Tell the jury.  What did you have to do?

13  A.   I had to withdraw thousands of dollars to help pay for my

14  daughter, to help our living expenses.  I was the one in charge

15  of the bills.  I had to make sure that we could survive, we

16  didn't have to sell our house.

17          MR. MARKO:  Lisa, thank you so much.  I'm so sorry

18  that I had to ask you these questions.  I don't have any other

19  questions for you, but the defense attorney might.

20          THE COURT:  Members of the jury, we're going to take

21  a break between the direct and cross examination here.

22          Please don't discuss the case among yourselves.  It

23  will be about 15 minutes.  So kindly stay in the jury room

24  during the break.

25          Would you move your things, please?

```
 1              MR. MARKO:  Absolutely, Judge.  We're on it.

 2              THE COURT:  Mr. Beyer, would you escort the jury out

 3    as soon as that's out of the way?

 4              THE CLERK:  All rise for the jury.

 5         (Jury left courtroom at 10:15 a.m.)

 6              THE COURT:  Court is in recess.

 7         (Recess taken from 10:16 a.m. to 10:36 a.m.)

 8              THE CLERK:  All rise.  Court is back in session.

 9              THE COURT:  You may be seated.

10              Mr. Marko, ready for the jury?

11              MR. MARKO:  Yes.

12              THE COURT:  Mr. Hubbard, ready for the jury?

13              MR. HUBBARD:  I am, your Honor.

14              THE COURT:  I'm sorry?

15              MR. MARKO:  I'm sorry.  Do you want her to go back up

16    there right now, your Honor?

17              THE COURT:  Yes.  I was just about to say that.

18              MR. MARKO:  I'm sorry.

19              THE COURT:  That's all right.

20              Bring in the jury, Mr. Beyer.

21              THE CLERK:  All rise for the jury.

22         (Jury entered courtroom at 10:38 a.m.)

23              THE COURT:  You may be seated.

24              Mr. Hubbard, you may proceed.

25              MR. HUBBARD:  Thank you, your Honor.
```

```
 1                        *      *      *
 2                    CROSS EXAMINATION
 3   BY MR. HUBBARD:
 4   Q.   Ms. Domski, you have seen me in court a number of times.
 5           You understand my name is Brandon; yes?
 6   A.   Yes.
 7   Q.   And today is not the first time we have seen each other
 8   in court; correct?
 9   A.   Correct.
10   Q.   Okay.  And, in fact, even before this trial we had had
11   occasion to meet in court before; yes?
12   A.   No.
13   Q.   Well, you were in court in October with your lawyer
14   present; yes?
15   A.   Oh, I'm sorry.  I did forget about that.  Yes.
16   Q.   Okay.  So you were present during --
17   A.   I apologize.
18   Q.   -- during that hearing as well; yes?
19   A.   Yes.
20   Q.   Okay.  And so we had occasion to see each other then
21   as well?
22   A.   Can you repeat that?
23   Q.   We had occasion to see each other then as well; yes?
24   A.   We saw each other then.
25   Q.   Catholic; yes?
```

1   A.   Yes.

2   Q.   And we can agree that, as part of being Catholic, the

3   Ten Commandments, you're familiar with those?

4   A.   Yes.

5   Q.   And one of those is relative to being honest; yes?

6   A.   Correct.

7   Q.   And you follow that?

8   A.   To the best of my ability.

9   Q.   And throughout your everyday life; yes?

10  A.   To the best of my ability.

11  Q.   And we can agree, then, that notwithstanding the oath that

12  you took today, that to the best of your ability, you carry

13  yourself out honest every day?

14  A.   Yes.

15  Q.   Your position with Blue Cross, ma'am, was IT Specialist;

16  yes?

17  A.   IT Process Specialist.

18  Q.   Fair enough.  Thank you.

19        And we can agree that IT stands for information

20  technology?

21  A.   Yes.

22  Q.   And in the world of IT, that means computer systems and

23  the like?

24  A.   That is involved in it, yes.

25  Q.   And a component of your job while at Blue Cross was

1   delivering and supporting IT services to the business; correct?

2   A.   Sometimes to the business and sometimes inside IT as well.

3   Q.   And part of your job was to have good communication

4   skills; you would agree?

5   A.   I would agree.

6   Q.   And so we're going to take a look at Exhibit 222, and

7   this is already in evidence.

8           And do you see where the description of your job is

9   other skills and abilities?  Do you see that?

10  A.   I do.

11  Q.   And it states:  Written and verbal communication skills,

12  interpersonal skills.

13          Do you see that?

14  A.   I'm sorry.  I'm not -- interpersonal skills, oh, I see.

15  I'm sorry.  Yes.

16  Q.   And you would agree that you had those skills; yes?

17  A.   Yes.

18  Q.   And, in fact, you would agree with me that one of your

19  core strengths is communication; correct?

20  A.   Yes.

21  Q.   And, in fact, when we were looking at earlier today

22  Exhibit 221, this is a résumé that you compiled; correct?

23  A.   Correct.

24  Q.   And we have -- up in the upper left-hand corner of that

25  document, it says:  Core strengths.

1              Do you see that?

2    A.   I do.

3    Q.   And it says:  Internal and external communications.

4              Do you see that?

5    A.   Yes.

6    Q.   And do you see at the top there where it talks about who

7    you are, just says Lisa E. Domski?

8    A.   Yes.

9    Q.   Okay.  And I see an email address there.

10             That's your email address; correct?

11   A.   It is.

12   Q.   Do you happen to use any others?

13   A.   I do have another address, yes.

14   Q.   And what is that?

15   A.   It's a Gmail account.

16   Q.   Do you recall what the address is?

17   A.   I believe it's ldomski6451@gmail.com.

18   Q.   And is it only you that uses that email?

19   A.   Is it only me that uses the email?

20   Q.   That's correct.

21   A.   Yes.

22   Q.   Okay.  And the same thing for lisadomski@aol.com, only you

23   use that email; is that correct?

24   A.   To my knowledge.

25   Q.   We're going to go to Exhibit 221, which actually I think

1    that we're at.

2           You had a prior position at Blue Cross.  That was a

3    senior analyst; correct?

4    A.   I did.  I had a -- I think two jobs titled that.

5    Q.   Okay.  Fair enough.

6           And when explaining your job responsibilities when

7    you were a senior analyst, you had explained that one of your

8    job responsibilities was to explain benefits and fielding

9    questions and addressing concerns; yes?

10   A.   Yes.

11   Q.   And when applying for new jobs after you left your

12   employment with Blue Cross, we can agree that you would explain

13   to potential employers that you had professional skills; yes?

14   A.   I -- yes.  I come from a professional skill base, yes.

15   Q.   And so bottom line, would you agree with me that one of

16   those skills is that you're excellent in communication; yes?

17   A.   I feel like I have very good communication skills.

18   Q.   Excellent?

19   A.   Yes.  That's what I said.  Yes.  I guess it is excellent.

20   Yes.

21   Q.   And we can agree that the COVID-19 pandemic, that happened

22   around March of 2020; correct?

23   A.   Correct.

24   Q.   We have heard you testify that, well, before the pandemic

25   hit, you were already working from home.

```
 1              Do you recall that testimony?
 2   A.   Yes.
 3   Q.   And so that would include 2019?
 4   A.   Yes.
 5   Q.   Okay.  And so how often would you actually go to the
 6   office, then, in 2019?
 7   A.   So we worked from home either three to four days a week,
 8   and one to two days I would be in the office.
 9   Q.   Okay.  And so if you had to say how many days you were
10   in the office in 2019, what would you say?
11   A.   I would say two.
12   Q.   In the aggregate, is my question.
13   A.   I'm sorry.  Can you explain that?
14   Q.   In the entire year of 2019, how many days in the aggregate
15   would you say that you actually reported physically to the
16   office?
17   A.   Well, outside of PTO days, I have no idea.  Maybe I took
18   days off of work.  Our schedule was -- I believe I had signed
19   up for three days at home and two days in the office.
20   Q.   So --
21   A.   But sometimes we could work more than that if our
22   supervisor approved it.
23   Q.   More than 50 days in the office in 2019?
24   A.   No.  I mean, working either three to four days at home and
25   coming in the office either one to two days.
```

 1    Q.   Okay.  And so -- and I just want to make sure my question

 2    is clear.

 3              In 2019, would you say that you worked more than

 4    50 days or less than 50 days physically in the office?

 5    A.   I can't recall if I worked more than 50 or less than 50.

 6    I would assume it would be more, but I'm not sure, without

 7    looking at the calendar and counting which days I had off and

 8    what were holidays.

 9    Q.   What about more or less than a hundred?

10    A.   I don't know how many days.  I know what my schedule was,

11    but I'm not sure about how many days I was actually in the

12    office.

13    Q.   So when you went to the office you actually had a badge?

14    A.   I did, yes.

15    Q.   Okay.  And so being in IT, it probably doesn't come as a

16    surprise to you that Blue Cross is able to determine who comes

17    and goes because of the use of the badge; correct?

18    A.   Sure.  Of course.

19    Q.   Okay.  And so I'm going to point to -- forgive me here as

20    I get the exhibit -- Exhibit 17.

21              And this is your exhibit, ma'am.

22    A.   Okay.

23    Q.   And I would like to first pull up where it says "Spouse"

24    in the left corner.

25              Do you see that?

1    A.   I see the X.

2    Q.   And that box is checked, isn't it?

3    A.   Yes.  Yes, it is checked.

4    Q.   Okay.  And let's go over to Column E.  And I will bring

5    that out for you.  And it says actual number of days worked

6    in Detroit, and it says 104.

7             Do you see that?

8    A.   I do see that.

9    Q.   Okay.  And so if I were to tell you that based on your own

10   tax returns you worked 104 days physically in Detroit, you

11   would have no reason to disagree with that; correct?

12   A.   I wouldn't.

13   Q.   And so when we hear questions elicited from you about,

14   well, you were already working from home pre-pandemic, we can

15   agree that you were also working at least 104 days physically

16   in the office as well; correct?

17   A.   In 2019.

18   Q.   In 2018?  Or 2019, ma'am?

19   A.   No, I was asking you.  I'm sorry.

20   Q.   Fair enough.  2019.

21   A.   Okay.  Yes.  If I reported on my income tax return,

22   then --

23   Q.   No reason to -- well, you would be truthful on your income

24   taxes; yes?

25   A.   I would be very truthful.

1    Q.   Okay.  And then when we go forward to 2020, before the

2    pandemic hit, we can agree that you were also still working in

3    the office; yes?

4    A.   In 2020.

5    Q.   Yes, ma'am.

6    A.   I worked in the office until they announced the pandemic

7    and we could no longer return back to the office, which was

8    sometime in March of 2020.

9    Q.   Okay.  And so for January, February, and before the

10   shutdown in March of 2020, we can agree that you were still

11   physically reporting to the office; yes?

12   A.   For January and February, yes.  But in March I was not,

13   because my sister passed away, and I had a funeral.  I was

14   working from home then.

15   Q.   Okay.  Well, I'm sorry to hear of your sister.  That was

16   in March of 2020.

17            And we can agree that March of 2020 is also when the

18   pandemic happened; yes?

19   A.   Correct.

20   Q.   And so March of 2020 is also when the shutdown happened;

21   yes?

22   A.   Correct.

23   Q.   Okay.  And so at that point everybody was working from

24   home; correct?

25   A.   Yes.

1   Q.   Ms. Domski, you had testified about having applied for

2   jobs after having left Blue Cross in January of 2022; yes?

3   A.   Yes.

4   Q.   And we can agree that your frame of mind at that time was

5   you're retired?

6   A.   That wasn't my frame of mind.  That was my way to avoid

7   saying that I got fired in a job interview.

8   Q.   I see.  And so if in January of 2022 you were using the

9   word, retired, were you trying to convey to your potential

10  employers that you were retired?

11  A.   No.  I was just trying to convey that the reason I was no

12  longer at Blue Cross, for myself, and that I didn't get fired,

13  that I would use the word, retired.

14  Q.   I'm sorry.  One more time.

15  A.   Yeah.  Can you ask the question again?

16  Q.   Sure.

17  A.   I'm sorry.

18  Q.   My question to you is, when you're applying for employment

19  and you used the words, I'm retired --

20  A.   Yes.

21  Q.   -- my question to you is:  It's true that you were trying

22  to convey to your potential employers that you were, in fact,

23  retired; yes?

24  A.   Yes.

25  Q.   And your testimony today is that even though you used the

1    word, retired, that it -- that was not your frame of mind?

2    A.   That was not my frame of mind for myself and my family.

3    Q.   And is that because you were, I'm gathering, embarrassed

4    to share with folks the circumstances?

5    A.   Yes.  I was embarrassed to share that I was fired.

6    Q.   Okay.  And so what I would like to do is, we're going to

7    go to Exhibit 2 -- bear with me here -- Exhibit 41.

8          And let's first look at the date of this, which is

9    January 23, 2022.

10         Do you see that?

11   A.   I do.

12   Q.   And do you see that this is your endeavor to secure

13   employment from the Habitat for Humanity?

14   A.   Yeah.  It looks -- yes, it looks like a cover letter.

15   Q.   Understood.  And in the second paragraph, we can agree

16   that it opens with:  It has always been my desire to use my

17   skills and talents once I retired towards a meaningful position

18   within the community.

19         Do you see that?

20   A.   I see it.

21   Q.   And so your testimony today is that you didn't actually

22   mean that you were retired even though you wanted Habitat for

23   Humanity to believe that you were retired; yes?

24   A.   Yes.

25   Q.   And the reason, again, for that, is because you were

1   embarrassed to share the circumstances of what had happened;

2   yes?

3   A.   Yes.

4   Q.   And we can agree that January 5 of 2022 was essentially

5   the last day of employment at Blue Cross; yes?

6   A.   Correct.

7   Q.   And we can agree that January 23 of 2022 is just a couple

8   of weeks thereafter; yes?

9   A.   Yes.

10  Q.   Okay.  And in the next paragraph you spoke of, in my

11  previous role; yes?

12  A.   That's what it says.

13  Q.   And when you're speaking of your previous role, you're

14  speaking of your role at Blue Cross?

15  A.   I am.

16  Q.   And, of course, at the bottom of that very same letter you

17  share that you are effective at communication because that's

18  one of your skills?

19  A.   Yes, that's what it says.

20  Q.   And you meant that; yes?

21  A.   Yes.

22  Q.   So let's go to Exhibit 45.

23       And, Ms. Domski, first let's go to the date of

24  Exhibit 45, which is December 10, 2021.

25       Do you see that?

1   A.   I do.

2   Q.   And so we can agree that December 10 of 2021 is after you

3   have learned that your request for an accommodation has been

4   denied; yes?

5   A.   Yes.

6   Q.   And we can agree that this email is from you,

7   lisaedomski@aol.com; correct?

8   A.   Yes.

9   Q.   And we can agree that this is an email from you to the

10   press saying you're hoping that somebody in the news industry

11   will feel compelled to tell your story.

12   A.   Yes, that's what it says.

13   Q.   Okay.  And I just want to make sure I have got it right,

14   which is, in January 23 of 2022, you were using the word,

15   retired, because you wanted to convey to your potential

16   employer that you were retired, but you didn't want to express

17   to them the actual circumstances; yes?

18   A.   To -- I wanted to convey that I was retired because I was

19   embarrassed, yes.

20   Q.   And notwithstanding being embarrassed, per your testimony,

21   in December of 2021 you were asking the news to run a story?

22   A.   Yes.

23   Q.   Ms. Domski, you also had occasion to post on Facebook

24   about the circumstances; correct?

25   A.   I did not post about the specific situation.

```
 1    Q.   Okay.  Well, let's take a look.

 2    A.   Okay.  Oh.

 3    Q.   First, this is your Facebook address; yes?

 4    A.   That is, yes.  Yes.

 5    Q.   Okay.  And you say:  I too am about to be fired from my

 6    job of 31 years.

 7              Do you see that?

 8    A.   I see it.

 9              THE COURT:  Is this an admitted exhibit?

10              MR. HUBBARD:  Yes, your Honor.

11              THE COURT:  What's the exhibit number?

12              MR. MARKO:  Plaintiff's Exhibit 46.

13              THE COURT:  46.  Thank you.  Go ahead.

14              MR. HUBBARD:  Thank you, Judge.

15    BY MR. HUBBARD:

16    Q.   And it says:  Fired from my job of 31 years.

17              Correct?

18    A.   That's what it says, yes.

19    Q.   And Mr. Marko is your lawyer; yes?

20    A.   Yes.

21    Q.   And he speaks on your behalf in this court; yes?

22    A.   Yes.

23    Q.   And you heard him say a number of times to this jury that

24    you had been there for 38 years.

25              Do you recall that?
```

1   A.   I do.

2   Q.   And you knew that 38 years was not true.

3   A.   38 years was not true?  It was my length of service,

4   according to my pension benefits, besides the -- besides the

5   break in --

6   Q.   Besides the break?

7   A.   Besides the break, yes.

8   Q.   And so 31 years accounts for the break?

9   A.   I think that was a typo.

10  Q.   So I just want to make sure that you're saying that

11  31 years was a typo?

12  A.   Yes.

13  Q.   Okay.  But you also agree 38 years is inaccurate because

14  it doesn't account for a break?

15  A.   Well, 38 -- 38 years would have been -- that's correct.

16  Q.   Okay.  And so Mr. Marko has represented a number of

17  times -- in fact, today during your questioning, I counted

18  at least, I think, four -- that it was 38 years.

19          And you and I can agree that that's not accurate;

20  yes?

21  A.   Yes.  It should be 32, I believe.

22  Q.   Okay.  And did you ever have occasion to nudge Mr. Marko

23  and say that it's not 38 years, it's actually 32?

24          MR. MARKO:  Judge, is he asking Ms. Domski what my

25   attorney-client conversations are regarding this case?

```
 1    I object.
 2              THE COURT:  Sounds like it.  The objection is
 3    sustained.
 4              MR. HUBBARD:  I'll rephrase.
 5    BY MR. HUBBARD:
 6    Q.  Were you okay with Mr. Marko representing to the Court and
 7    to the jury that it was 38 years even though that you knew that
 8    it was 32?
 9    A.  To be quite honest, didn't even think about it.  I didn't
10    realize that -- it's a very trying and emotional situation.
11    Q.  On this Facebook post you say:  I am submitting a
12    religious exemption because I feel very strongly about my
13    religious beliefs.
14              You said that; yes?
15    A.  I did write that.
16    Q.  Okay.  And just above that you said:  I too am about to be
17    fired; yes?
18    A.  Yes, it does say that.
19    Q.  And so before you had actually submitted your request for
20    an accommodation, you were already conveying to the public that
21    you are going to be fired?
22    A.  I'm not sure.
23    Q.  How are you not sure?
24    A.  Oh, yeah, I see.  I'm reading it.  I'm not recalling what
25    I said, so I'm reading the whole thing.
```

```
 1    Q.   Sure.

 2    A.   I apologize.

 3    Q.   No problem.

 4    A.   Yeah, it -- it is -- yeah, because I have the date.

 5    I will find out on November 24.

 6    Q.   So we can agree that you were publicizing on Facebook

 7    that you are about to be fired at a time before you had even

 8    submitted your accommodation request; correct?

 9    A.   I did write that.  I wasn't sure what was going to happen.

10    But it could have been a possibility.

11    Q.   Well, you didn't use -- and respectfully --

12    A.   Sure.

13    Q.   You did not use the word, a possibility, did you?

14    A.   I did not.

15    Q.   In fact, you said it with certainty; correct?

16    A.   I said it with a lot of anger.

17    Q.   So before submitting the accommodation request and before

18    having gone into the meeting with Jeff Walters, you were

19    already experiencing anger?

20    A.   I don't know if it was before I submitted my request or

21    not.

22    Q.   Well, I would like --

23    A.   Oh, yeah, December 10.  It was December 10.  I just needed

24    to refresh my memory when I submitted it.

25              Was it November 10?
```

1    Q.   Roughly November 10.  And so I just -- I just want to
2    understand that before you submitted the accommodation request
3    and before you had already gone through the meeting with
4    Mr. Walters, your frame of mind was you're about to be fired
5    and you're upset?
6    A.   I can say that it was before my interview, but I don't
7    know if it was before I submitted my request.  I don't know
8    what the -- I don't know what date this was posted.
9    Q.   Well, I'm -- and not to get into it too much, but it
10   doesn't say "I have submitted," it says "I am submitting";
11   correct.
12   A.   Well, it states that, yes.
13   Q.   Okay.  And so we can agree that if you had already
14   submitted it, you may well have said, I have already submitted
15   my request; correct?
16   A.   I don't know that I would have said it any differently.
17   Q.   Okay.  But we can at least agree that before the meeting
18   and before you actually found out; yes?
19   A.   Yes.
20   Q.   Ms. Domski, it's true that in January of 2022 you were
21   using the word, retired; correct?
22   A.   Yes.
23   Q.   Okay.  And the use of the word, retired, continued more
24   than a year thereafter; yes?
25   A.   It may have.

1    Q.   Okay.  Let's take a look at Exhibit 44.

2            Could we please take a look at the date first?

3            Okay.  So here we are nearly a year to the day after.

4            It says January of 2023; correct?

5    A.   It does say that.

6    Q.   Okay.  And you're applying for a position; yes?

7    A.   Yes.

8    Q.   And it says here that:  I have been retired just over a

9    year and am looking for a part-time position; correct?

10   A.   It does say that.

11   Q.   And so we can agree that you were conveying again to an

12   employer that you were retired; yes?

13   A.   I did convey that.

14   Q.   And we can agree that, when conveying that, you wanted

15   your employer or potential employer to be under the impression

16   that you were retired; yes?

17   A.   I wanted them to know that I was not working at Blue Cross

18   Blue Shield anymore.

19   Q.   And to convey that, you used the word, retired?

20   A.   I did.

21   Q.   And it doesn't say, I'm looking for full-time work, but if

22   you happen to have it, I'll take a part-time position, does it?

23   A.   No, it doesn't say that.

24   Q.   In fact, it says, I'm looking for a part-time position;

25   yes?

1    A.    It does, because that's what they offered.

2    Q.    And so we can agree that you were looking for employment

3    and you were applying for part-time positions; yes?

4    A.    I was looking for anything that would hire -- anyone that

5    would hire me and anyone that would pay me.

6    Q.    March 20 of '23, Exhibit 44, you sent another cover

7    letter, and it says:  I have been retired just over a year

8    and am very interested in a part-time position?

9    A.    Yes.  That's all that was offered.  A friend recommended

10   this position to me.

11   Q.    And we heard testimony about where you had applied,

12   including these part-time positions.

13          Did you ever happen to apply to a job within the same

14   industry as Blue Cross?

15   A.    I looked for the same type of industry, but again, like

16   I said, the jobs that I thought fit my skills and abilities,

17   most of them required degrees.

18   Q.    Did you ever have occasion to write to a potential

19   employer that was in the industry of Blue Cross and say,

20   I don't have a degree, but I have 32 years of experience?

21   A.    No, I never did that.

22   Q.    Why not?

23   A.    Honestly, it never crossed my mind to do that.  I just

24   took the job postings, literally, and said it was -- it was

25   a requirement, so --

Jury Trial - Volume 4 - November 7, 2024

1   Q.   And where did it say that it was a requirement?

2   A.   Within the job posting.

3   Q.   Yes, ma'am.

4   A.   No, that's where it said it, within the job posting,

5   within the application, applicants, you know, when you're

6   online and you're searching for jobs.

7   Q.   And you answered the question, but I was actually trying

8   to get to something else.  And you said where was -- where was

9   it at, and you said when you looked at the job description.

10           I'm just saying, what employer?

11  A.   I don't recall.

12  Q.   Okay.  And so what we do have is the letters that you

13  wrote to potential employers saying that you're retired

14  and that you're looking for part-time employment; yes?

15  A.   Yes.

16  Q.   But we also have your testimony that you didn't seek

17  full-time employment within the industry because of the issue

18  relative to the college degree; correct?

19  A.   I didn't say I didn't seek full-time employment.  Any of

20  the jobs that I had reviewed that were in the industry required

21  degrees.

22  Q.   And as you sit here today, you're unable to tell me which

23  of those employers or the identities of those employers;

24  correct?

25  A.   I don't remember.

1    Q.   Our Lady of Sorrows is your church?

2    A.   It's my priest's church.  I visit there often.  It's not

3    my parish.

4    Q.   What is your parish?

5    A.   Christ the Good Shepherd.

6    Q.   And is that a Catholic church?

7    A.   Yes, that's a Catholic church.

8    Q.   Okay.  So Our Lady of Sorrows is not actually where you

9    attend church?

10   A.   I visit there.  With the Catholic faith, you can go to any

11   church that you like depending on the mass that fits your

12   schedule.

13   Q.   Okay.  And so you have occasion to visit there, then?

14   A.   I have occasion to.

15   Q.   Remind me of the name of the church that you regularly

16   attend.

17   A.   Christ the Good Shepherd.

18   Q.   A member of the Archdiocese of Detroit?

19   A.   That's correct.

20   Q.   Same thing with Our Lady of Sorrows?

21   A.   Yes, I believe so.

22   Q.   I would like to take a look of -- at your accommodation

23   request.

24        And so we can start with you, actually pulled the

25   template from online; correct?

1    A.    Yes.

2    Q.    And you would send it to yourself over email; correct?

3    A.    I did.

4    Q.    And so let's take a look at Exhibit 205.

5          And could we zero in on the date, please?

6          You sent this to yourself on November 1 of 2021;

7    correct?

8    A.    Yeah.  It looks that way, yes.

9    Q.    Okay.  No reason to dispute it as we're here today; right?

10   A.    None.

11   Q.    Okay.  And if we turn the page, go down to the next one,

12   this is the template of sorts that you had sent to yourself;

13   correct?

14   A.    Well, I'm not sure if it's the template or if it's my own

15   words.

16   Q.    Okay.  It says -- let's go to the second page.

17         We can agree that this document doesn't bear your

18   signature; correct?

19   A.    That document does not bear my signature.

20   Q.    Okay.  But we -- so let's just -- so that we're on the

21   same page, your testimony is you went to the internet, you

22   pulled the template request, you sent that template request to

23   yourself, but as you sit here today, you're not sure if this is

24   the template request?

25   A.    It does look like a template.  It doesn't have my

1    signature on it.

2    Q.   Understood.  And so we can agree that this document isn't

3    one that you actually sent to yourself -- or excuse me.  I'll

4    rephrase.

5         We can agree that this document isn't one that you

6    actually submitted to Blue Cross?

7    A.   I don't believe so.

8    Q.   You actually had occasion to revise that template, to

9    modify it a little bit to include, for example, reference to

10   Blue Cross and in having your signature, correct, at some point

11   in time, either that same day or the next day?

12   A.   I believe that I used many different versions of creating

13   my statement.

14   Q.   Okay.  Would it help if I showed you a document to refresh

15   your memory on that?

16   A.   Perhaps it might.

17             MR. HUBBARD:  Okay.  Permission to approach,

18   your Honor?

19             THE COURT:  You may.

20             No, no, show counsel first, please.

21             MR. MARKO:  I'm sorry.  There is just a bunch of

22   tabs.

23             MR. HUBBARD:  I'm just asking her to look at the

24   first tab.

25             MR. MARKO:  Okay.

 1    BY MR. HUBBARD:

 2    Q.   So, Ms. Domski, if you could take a moment and look at the

 3    first tab.

 4    A.   Tab 1 is -- it's an email.  Is it from and to, is that

 5    what --

 6    Q.   I'm sorry?

 7    A.   The first tab says:  From Lisa Domski.

 8    Q.   To Lisa Domski?

 9    A.   To Lisa Domski.  Yes.  Thank you.  Sorry.

10    Q.   That's your email, lisadomski@aol?

11    A.   That is, yes.

12    Q.   Okay.  And so we can agree that you sent this to yourself;

13    yes?

14    A.   Yes.

15            THE COURT:  Well, let's -- read it over to yourself

16     and let us know when you're finished.

17        (Witness reviewing document.)

18            THE WITNESS:  This is from --

19            THE COURT:  Just read it to yourself.

20            THE WITNESS:  Okay.  Sorry.

21            Okay.  And then can you repeat the question?  I'm

22     sorry.

23    BY MR. HUBBARD:

24    Q.   Sure.  Can you go to the second page of it as well?

25    A.   Oh, I did not.

1    Q.   Yeah.  I would like you to.  Not the second tab, the

2    second page.

3    A.   Okay.

4    Q.   Thank you.

5    A.   Sure.

6         Okay.

7    Q.   Okay.  And because it bears your signature on that second

8    page, am I correct that this refreshes your memory now?

9    A.   It does refresh my memory with my signature there.

10   Q.   Okay.  That you what?  I'm sorry?

11   A.   It refreshes with the signature there, yes.

12   Q.   Okay.

13   A.   Yes, of course.

14   Q.   And so we can agree that the template that was the prior

15   exhibit that you looked at, 205, which was up on the screen,

16   you then sent it to yourself again and it bears your signature;

17   yes?

18   A.   I think I was having -- yes.  I'm recalling now I was

19   having trouble using a signature on my own computer, so

20   I tried to get it from my Blue Cross computer.

21   Q.   Okay.  And then what I -- you sent to yourself another

22   one, and I would like you to turn the page to see if that

23   refreshes your memory.

24   A.   Another --

25   Q.   Tab 2.

1   A.   Okay.

2        Okay.

3   Q.   And what --

4   A.   I'm sorry.  The question?

5   Q.   That's okay.  If you could just paginate through the full

6   Tab 2.

7   A.   Okay.  Sure.

8        I don't recall this version, but it looks like I sent

9   it to myself.

10  Q.   Do you have any reason to dispute that you sent that to

11  yourself?

12  A.   I mean, it could be I -- I guess it could be the same

13  attachment, but I'm not sure.

14  Q.   Okay.  So your testimony is that the document behind it,

15  you're not sure if you actually sent that one to yourself?

16  A.   I'm just not remembering this particular version.  I'm

17  sorry.

18  Q.   Does the fact that it makes reference to the Catholic

19  church jog your memory at all?

20  A.   I mean, I used several versions of templates to create

21  my own.

22  Q.   Okay.  Can you -- you eventually had occasion -- opposing

23  counsel showed it to you, where you had a request that had

24  footnotes below it.

25        Do you remember that?

1    A.   I do.

2    Q.   Okay.  And if you could, turn to the page -- third tab.

3         I anticipate that you do recognize that because it

4    bears your signature and it has those footnotes; yes?

5    A.   There is no signature on this one.

6    Q.   On Tab 3?

7    A.   There is -- it just -- it's a form, but it just says,

8    respectfully.

9         MR. HUBBARD:  Permission to approach, your Honor?

10        THE COURT:  And why would that be?

11        MR. HUBBARD:  To see if a tab is off in what the

12   witness has.

13        THE COURT:  Well, I'm understanding you're trying to

14   refresh memory, but there's no question on the floor that

15   suggests that it needs to be refreshed.

16        MR. HUBBARD:  Understood.

17        THE COURT:  So why don't you lay a foundation, and

18   then we can proceed from there.

19        MR. HUBBARD:  Okay.

20   BY MR. HUBBARD:

21   Q.   Let's go to the actual exhibit that has the footnotes.

22   A.   Okay.  Is it in the book?

23        THE COURT:  It's going to come up on the screen in a

24   minute.

25

```
 1              MR. HUBBARD:  Exhibit 205.
 2              THE COURT:  I don't think that's the one with the
 3    footnotes.
 4              MR. MARKO:  No, I don't either.  I don't think this
 5    is even an exhibit.
 6              MR. HUBBARD:  Excuse me.  206.
 7              MR. MARKO:  Well, I mean, we had no objection
 8    entering them all.
 9              THE COURT:  I thought we did that.
10              MR. HUBBARD:  I'm sorry, Judge?
11              THE COURT:  Just stand by a second.
12              206 was received.
13              MR. MARKO:  He wasn't showing 206.
14              THE COURT:  I thought I saw the 206 sticker come up.
15              MR. MARKO:  He did, and then he shifted to a
16    different one.  I don't care.  I really don't care.  There's
17    no objection.
18              MR. HUBBARD:  Your Honor, I'm just trying to pull up
19    the exhibit that actually has the footnotes, and I know that
20    it's in evidence, and forgive me.
21              THE COURT:  Oh, no, I understand that, but just to
22    make things clear, I want to be sure that the record correctly
23    identifies the exhibit number.
24              MR. MARKO:  The exhibit with the footnotes is already
25    entered.  It's Plaintiff's Exhibit 13.
```

```
 1              THE COURT:  All right.  Is there a defense exhibit
 2   that corresponds?
 3              MR. MARKO:  No.
 4              THE COURT:  Doesn't have to be.  So do you want to
 5   pull up 13?  Is that what you want to see, Mr. Hubbard?
 6              MR. HUBBARD:  That's fine, your Honor.  Yeah.  We
 7   will do that.
 8              THE COURT:  Okay.
 9              MR. HUBBARD:  Thank you, Judge.
10   BY MR. HUBBARD:
11   Q.  And we can agree that this version has --
12              THE COURT:  Well, wait a minute.  Do you see that on
13   your screen?
14              THE WITNESS:  I see it on my screen.  Yes, I see it
15   on my screen.
16              THE COURT:  Go ahead.
17   BY MR. HUBBARD:
18   Q.  Forgive me.  I had seen it on the screen earlier, so
19   I thought we were on the right exhibit, but I think now
20   we're on the same page.
21              And this one contains the footnotes; yes?
22   A.  It does.  Yes.
23   Q.  And it bears your signature; yes?
24   A.  It has my signature on there.
25   Q.  And earlier today during your testimony there was an
```

 1    inquiry of you as to whether or not you submitted this one or

 2    a different one.

 3              Do you recall that?

 4    A.   Yes.

 5    Q.   Okay.  And your testimony, as you sit here today, was you

 6    can't recall?

 7    A.   Honestly, I don't remember which one I sent.  I had worked

 8    through so many templates.  Even just now, with you showing me,

 9    I don't -- I'm confused.  I don't see -- I don't remember all

10    of those templates.

11    Q.   Okay.  And so let's look at 206, which is our -- and so

12    you're saying that you have confusion, as you sit here today,

13    as to whether you submitted 206, which is this version, that

14    doesn't have the footnotes --

15    A.   Correct.

16    Q.   -- compared to the version that does have the footnotes;

17    correct?

18    A.   That is correct.

19    Q.   Okay.  But you submitted a sworn declaration to this Court

20    that bears your signature, and it was under oath, that actually

21    said you submitted that one; correct?

22              THE COURT:  I'm sorry.  "That one" doesn't tell the

23    record what you're referring to.

24              MR. HUBBARD:  Forgive me.  206.  The one that's up in

25    front of the witness now.

```
 1              THE WITNESS:  I'm sorry.  Can you repeat the
 2    question?  I apologize.
 3    BY MR. HUBBARD:
 4    Q.   You submitted a sworn declaration to this Court back in
 5    September of this year.
 6              You recall that, don't you?
 7    A.   I do.
 8    Q.   Okay.  And in that very same sworn declaration, you swore
 9    under oath that the religious accommodation request that you
10    submitted was that one there at 206; correct?
11    A.   If that's what I submitted, then that's what I meant.
12    Q.   Okay.  And so you have no reason to doubt that what you
13    told the Court back in September is that you submitted 206;
14    yes?
15    A.   If this is the same one, then I would agree, whatever
16    I submitted to, that that's what I sent.
17    Q.   Okay.  And being effective in communication and before
18    submitting a document to the Court that's under oath, you would
19    be careful about what you actually attested to under oath;
20    correct?
21    A.   Yes, I should be.
22    Q.   And so you didn't tell the Court back in September that
23    you submitted the one with the footnotes, then; correct?
24    A.   Again, if this is -- if the one that you're showing, 206,
25    was the one that was submitted with the affidavit, then yes.
```

```
 1   Q.   And excuse me.  In that same affidavit that you submitted
 2   to the Court, you said that:  The reasons stated in my
 3   accommodation request for refusing the COVID-19 vaccine are
 4   rooted in the teachings of the Catholic church.
 5          Do you recall doing -- excuse me -- doing that?
 6   A.   I don't recall the exact statement.  I'm sorry.
 7   Q.   Would it help to see it to refresh your memory?
 8   A.   Sure.
 9          MR. HUBBARD:  Permission to approach, Judge?
10          THE COURT:  Yes, you may.
11          THE WITNESS:  I do -- I remember this document,
12    yes. Was that your question?  Sorry.
13   BY MR. HUBBARD:
14   Q.   It refreshes your memory, doesn't it?
15   A.   It refreshes my memory, yes.
16   Q.   And you can agree that it was something you submitted to
17   this Court in September of 2024, less than two months ago; yes?
18   A.   Yes.  That's what it says on here, yes.
19   Q.   Okay.  And it bears your signature; yes?
20   A.   It has my signature on there, yes.
21   Q.   And so we can agree that at the time you submitted that
22   you were telling the truth; yes?
23   A.   Yes.
24   Q.   Okay.  And we can agree that you told the Court that
25   the reasons stated in my religious accommodation request for
```

1   refusing the COVID-19 vaccine are rooted in the teachings of

2   the Catholic church; yes?  That's at paragraph 14.

3   A.   Thank you.  I was just going to ask you, is that on a

4   particular page?  Can you --

5   Q.   Page 4.

6   A.   Thank you.

7   Q.   No problem.

8   A.   Oh, I see.  Yes.

9   Q.   Okay.  And, in fact, throughout this declaration there is

10  a number of references, you would agree, to the Catholic

11  church; right?

12  A.   Yes.  Things that I accessed.

13  Q.   Okay.  And this document is fairly lengthy in terms of

14  pagination, eleven pages; yes?

15  A.   Yes, there is eleven -- yes, there is eleven pages here.

16  Q.   And we can agree that the document you submitted to

17  Blue Cross, which is Exhibit 206, is one and a half pages; yes?

18  A.   It is one and a half.

19  Q.   And we can agree that the document that you submitted to

20  Blue Cross, even though that you attested under oath that it's

21  rooted in the Catholic teachings, doesn't actually make

22  reference to the Catholic teachings; correct?

23  A.   I say I'm a Christian.  Correct.  I don't -- I don't see

24  it saying Catholic teachings.

25  Q.   And so we can agree that what you submitted to Blue Cross

 1   makes no reference to the Catholic church, you being Catholic,

 2   or Catholicism; correct?

 3   A.   Not in this accommodation request.

 4   Q.   Which you swore under oath is the one that you submitted

 5   to Blue Cross?

 6   A.   Correct.

 7   Q.   Okay.

 8   A.   Correct.

 9   Q.   And what I would like to do is move on to your meeting

10   that you had with Jeff Walters.  And your testimony is you

11   recorded that meeting, maybe not by audio, but through a --

12   A.   It was transcribed, like I did with meeting minutes.

13   Q.   You did it with what?

14   A.   I did it with meeting minutes in my job.  I used the Word

15   document.

16   Q.   Okay.  And so that there is a function that apparently I'm

17   not aware of, but that you can record and it transcribes as the

18   words are coming out?

19   A.   It actually types while you're speaking.  It's called

20   dictation.

21   Q.   Okay.  You testified earlier -- well, hold on one second.

22        This was over -- this meeting that you had with Jeff,

23   it was over Microsoft Teams; yes?

24   A.   Yes.

25   Q.   And you were in your home when you had it; yes?

1    A.   Yes.

2    Q.   And your testimony earlier was that while you were having

3    this meeting with Jeff you didn't feel like you were in a safe

4    environment?

5    A.   I didn't feel the way the meeting was set up was a safe

6    environment, through a Teams screen.

7    Q.   Okay.

8    A.   With two people that I did not know and an attorney.

9    Q.   Okay.  And so you felt safe where you were at, at the

10   time; yes?

11   A.   Sure.  In my own home.

12   Q.   We can agree that when you met with Jeff you didn't

13   explain to him that you had had a funeral just the prior day;

14   correct?

15   A.   No.  I would have assumed he would have known because

16   I quoted it in my email.

17   Q.   Your email to Jeff?

18   A.   No.  An email to schedule.

19   Q.   Okay.  What I would like to do is -- I think it's 208.

20   And if we could zoom in on this particular email at the top.

21        And I assume that this is the email that you're

22   talking about, where a Blue Cross employee says to you:  Please

23   accept my deepest condolences.  I will cancel the meeting for

24   today.  No problem at all.

25        Do you see that?

```
 1    A.   I do see that.

 2    Q.   And that's what was said; yes?

 3    A.   Yes.

 4    Q.   And then they went on to say:  I see you signed up for

 5    Wednesday.  I will be adding times for Thursday, if that works

 6    better for you.

 7              Do you see that?

 8    A.   I do see that.

 9    Q.   You proceeded on Wednesday nonetheless; correct?

10    A.   I'm not sure if I -- I'm sorry.  I don't know if I signed

11    up on Wednesday or not.  I mean, she says I did, but I -- what

12    date was Wednesday?  Can you tell me that?

13    Q.   We can determine that, yeah.  We will come back to that,

14    and I'll confirm it for you.

15    A.   Okay.  Thank you.

16    Q.   The transcript that was dictated through the Microsoft --

17    is it Microsoft Word?

18    A.   I believe so.

19    Q.   You have the ability to edit that after it's done; yes?

20    A.   You do, yes.

21    Q.   Okay.  And so when it's dictating, it doesn't add

22    exclamation points, does it?

23    A.   It does not.

24    Q.   Okay.  And when it's dictating, it doesn't add bolded

25    letters, does it?
```

1    A.   It does not.

2    Q.   Okay.  Did you do that?

3    A.   I added it, yes.

4    Q.   Okay.  And let's -- let's pull that exhibit up, please,

5    and we're going to go through it.

6             We can agree that this is the transcript; yes?

7    A.   Yes.

8    Q.   And we can agree that Jeff said to you, we appreciate your

9    cooperation; yes?

10   A.   He did say that.

11   Q.   Okay.  And after he said that, we can agree that your

12   answer to him was:  Absolutely; yes?

13   A.   My "absolutely" was responding to that complete sentence

14   regarding that the interview was completely voluntary.

15   Q.   And that he was looking for your cooperation?

16   A.   Sure.  He was looking for cooperation.  Sure.

17   Q.   Okay.  So the entire sentence?

18   A.   Yes.

19   Q.   And then he proceeded to ask you a question.  Question

20   number 1.

21             Do you see that?

22   A.   I do see that.

23   Q.   Okay.  And what question -- what is it that he asked you?

24   A.   Why are you requesting accommodation to the vaccine?

25   Q.   And -- and what was your answer?

1   A.   It says:  I understand the company has issued a vaccine

2   mandate.  I have asked for a religious accommodation.  I have

3   submitted a statement in support of the accommodation and the

4   statement speaks for itself.  I have nothing to add.

5   Q.   Let's look at the second question.

6        What did Jeff ask you there?

7   A.   So why are you requesting an accommodation to the vaccine?

8   Q.   And so we can agree that he asked the same question of you

9   twice; yes?

10  A.   He did.

11  Q.   Okay.  And what was your answer?

12  A.   I said:  Again, I put it all in my statement, which

13  supports everything and what I have to say.

14  Q.   And then it continues with what you further said; yes?

15  A.   Yes.

16  Q.   And what does that say?

17  A.   It says:  Attached it --

18       (Technical disruption.)

19            MS. VOSS:  I apologize.

20            THE WITNESS:  Attached it and sent to the appropriate

21   people and the statement speaks for itself.

22  BY MR. HUBBARD:

23  Q.   Okay.  And then he had occasion to ask you a third

24  question; yes?

25  A.   Yes, he did.

1    Q.   Okay.  And what was the third question that he asked you?

2    A.   It says:  What religious beliefs do you follow?

3    Q.   And did you again say that:  I understand the company

4    has issued a vaccine mandate.  I have asked for religious

5    accommodation.  I have submitted a statement in support of the

6    accommodation and the statement speaks for itself.  I have

7    nothing to add.

8    A.   I did say that.

9    Q.   And so when conveying that to Jeff, you were conveying to

10   Jeff that you had nothing else to say other than what was in

11   Exhibit 206, which is the one-and-a-half-page letter that you

12   submitted; correct?

13   A.   That's what -- yes, I said whatever I said in my statement

14   is my beliefs.

15   Q.   I understand that.

16   A.   That's all I have to say.

17   Q.   But what you said to him is you have nothing else to say

18   beyond what's in Exhibit 206, which is what you submitted to

19   Blue Cross, that one-and-a-half-page letter; correct?

20   A.   Yes.  Because I figured it was voluntary.  I didn't need

21   to answer the questions.

22   Q.   Let's talk about that.  Because you gave an answer the

23   same way precisely twice.

24        You can agree with me on that; yes?

25   A.   I did.

```
 1   Q.   Okay.  And that tells me that you actually had that
 2   answer written down before you went into the meeting; right?
 3   A.   I can't recall that I did.
 4   Q.   So you don't have occasion to repeat a paragraph word
 5   for word precisely the same in a conversation, do you?
 6   A.   Probably not.
 7   Q.   Okay.  And so we can agree, then, that you using precisely
 8   the same language when responding to questions would be unusual
 9   for you in the ordinary course; yes?
10   A.   Well, I guess it depends on the conversation.  This was a
11   different conversation, and I was choosing not to respond to
12   any of the questions because it said it was voluntary.  So this
13   was the answer that I gave so that I wasn't just saying
14   I wasn't going to answer it.
15   Q.   But you knew going into the meeting that that's precisely
16   how you were going to answer?
17   A.   I did not know that, because I was so relieved knowing
18   that that was completely voluntary.  I was very distraught.
19   I was very -- it wasn't comfortable for me.
20   Q.   And so your testimony is that, even though you used the
21   same precise language in responding to the questions, that it
22   wasn't written down, you hadn't planned to say that, and that
23   it was purely spontaneous that you answered the same exact way
24   multiple times because in the spur of the moment they said it's
25   completely voluntary?
```

1    A.   That is what I said.

2    Q.   You were in court on October 15.

3              You recall we met each other that day; yes?

4    A.   Was that at your office building?

5    Q.   No.  That was here in court.

6    A.   Oh, okay.  I'm sorry.

7    Q.   Remember, we had a long day in court before the trial

8    started?

9    A.   We did.  That's right.

10   Q.   Okay.

11   A.   Thank you.

12   Q.   Of course.  And Mr. Marko was representing you there?

13   A.   Yes.

14   Q.   Okay.  And you were in court that day; right?

15   A.   I was sitting here.

16   Q.   And so you would agree that in court that day Mr. Marko,

17   talking on your behalf, said it will be impossible for us to

18   be able to prove to the jury --

19             MR. MARKO:  Judge, I'm going to object to motion

20   hearings that we had, because if we want to get into motion

21   hearings, we have a lot of things that we can talk about that

22   went on.  For him to read transcripts of a motion hearing to

23   this witness that has nothing to do with this, then it would

24   open the door to me talking about motion hearings that we had

25   involving other evidence in this case.

```
 1              THE COURT:  And the ground for your objection is
 2    what?
 3              MR. MARKO:  Is that it's not relevant.  It calls for
 4    a legal conclusion, foundation, and it's more prejudicial than
 5    probative.
 6              MR. HUBBARD:  I'll rephrase, Judge.
 7              THE COURT:  Okay.  You're withdrawing the question?
 8              MR. HUBBARD:  Yes.
 9              THE COURT:  All right.
10    BY MR. HUBBARD:
11    Q.  Do you think it's possible for you to prove to the jury
12    your Catholic beliefs?
13    A.  Do I think it's possible to prove -- yes.
14    Q.  Okay.  And to do that, you need to inform them of your
15    Catholic beliefs; correct?
16    A.  I would have to inform them of my Catholic beliefs.
17    Q.  Okay.  And to do that you would agree with me that you
18    would talk about going to the Catholic church?  In fact, you
19    have done that today with your testimony; correct?
20    A.  Yes.
21    Q.  And you conveying your religious beliefs relative to
22    Catholicism is something that you're able to do because it's
23    something that you believe?
24    A.  Yes.
25    Q.  And you're able to do that in front of the jury because
```

1    you want the jury to understand that you're Catholic; yes?

2    A.   Yes.

3    Q.   And that you have been Catholic for a number of years;

4    yes?

5    A.   Yes.

6    Q.   And attend mass?

7    A.   Yes.

8    Q.   Serve the eucharist?

9    A.   Yes.

10   Q.   Raised your family Catholic?

11   A.   Yes.

12   Q.   We can agree that all of that relative to your beliefs as

13   to Catholicism, which informs what you submitted to Blue Cross,

14   is not actually contained in anything that you submitted to

15   Blue Cross; correct?

16   A.   The word "Catholic" or "Catholicism" is not in there

17   because I didn't know that I had to include it.

18   Q.   But --

19   A.   I had no guidelines.  I said I was a Christian.  We're all

20   Christians in the Bible.  That's what I --

21   Q.   The letter is rooted in your Catholic faith; yes?

22   A.   Sure.

23   Q.   And we can agree that you left that out; yes?

24   A.   It's not in there.

25   Q.   And we can agree that in prior versions of accommodation

1    requests that you had sent to yourself, you had actually

2    included footnotes that contained more information about your

3    beliefs; yes?

4    A.   Yes, it did.

5    Q.   And then when it came time to actually submit it to

6    Blue Cross, you removed that information from it; yes?

7    A.   Yes.  I had different versions.

8    Q.   And so, Ms. Domski, you submitted a declaration to federal

9    court that was talking about your religious beliefs, and it

10   contained a number of references to Catholicism; yes?

11   A.   Yes.

12   Q.   And you are suing Blue Cross for discrimination on the

13   basis of your religion; yes?

14   A.   The basis of my religious beliefs, yes.

15   Q.   And the basis of your religious beliefs are rooted in

16   Catholic teachings and the Catholic church; yes?

17   A.   Yes.

18   Q.   But you never informed Blue Cross of that, did you?

19   A.   I did not include it in my letter.  I...

20   Q.   But you're alleging that Blue Cross discriminated against

21   you on the basis of those beliefs that you did not include in

22   your letter; yes?

23   A.   Beliefs that are in the Bible for all of us Christians.

24   I didn't know it had to be related to a specific type of

25   religion.

Jury Trial - Volume 4 - November 7, 2024

1    Q.   Okay.  And so when Mr. Walters asked you during your

2    meeting with him, in your -- you have an excellent skill of

3    communication.

4             And when Mr. Walters asked you, why are you

5    submitting your accommodation request, you made no reference

6    to Catholicism, did you?

7    A.   I did not.

8    Q.   And when Mr. Walters asked you what are your religious

9    beliefs, you made no reference to Catholicism, did you?

10   A.   I did not.

11   Q.   You heard Mr. Walters' testimony?  You were here in

12   court; yes?

13   A.   Yes.

14   Q.   My question to you is this:  That man testified that he

15   read your letter both before and after having met with you.

16            Do you think that man discriminated against you on

17   the basis of your religion?

18   A.   On the basis of what I believe about abortion, perhaps, on

19   the basis of my belief about the fetal cells that were taken

20   from an aborted fetus.

21   Q.   Which are, again, rooted in your Catholicism; yes?

22   A.   It's rooted in many religions.

23   Q.   And because it's rooted in many religions, you can

24   understand, then --

25   A.   Mm-hmm.

1   Q.   -- why somebody might have an inquiry about your religious

2   beliefs; yes?

3   A.   Possibly.

4   Q.   And Mr. Walters made those inquiries of you, didn't he?

5   A.   He asked questions of me, yes.

6   Q.   And you never once told him, despite being an effective

7   communicator, about your Catholic beliefs, did you?

8   A.   I didn't know it was required.  Everything was voluntary.

9   I had an attorney there.  I was very intimidated.  I didn't --

10  Q.   My question is, you never told him about your Catholic

11  beliefs, did you?

12  A.   I never specified that I was Catholic.

13  Q.   You had occasion, after your employment with Blue Cross,

14  to seek employment elsewhere; yes?

15  A.   Yes.

16  Q.   And you had occasion to attend interviews; yes?

17  A.   Yes.

18  Q.   And you had occasion to submit a cover letter and résumés

19  for that employment; yes?

20  A.   Yes.

21  Q.   During those interviews, when they asked you about your

22  job skills and the like, did you say:  I have submitted a cover

23  letter, a corresponding résumé, it has everything I have to

24  say, I have got nothing to add?  Did you do that?

25  A.   My religious beliefs are personal.  That was for a job.

1   Q.   And your religious beliefs are -- according to Mark, who

2   you helped raise, are easy for you to share and explain; yes?

3   A.   With him.  Not an attorney or an HR manager.

4   Q.   Did you ever explain during the meeting with Mr. Walters

5   that you were uncomfortable?

6   A.   I did not, because I was so relieved once he said that

7   all of my answers were completely voluntary, and that when

8   Mr. Henderson indicated that that was fine, I could rely on my

9   statement.

10  Q.   And that's when you gave the same exact answers word for

11  word when answering his questions; yes?

12  A.   I did, because I wanted -- didn't want to say that I

13  wouldn't answer a question.  I answered his question the way

14  that I felt I needed to.

15  Q.   But we can agree that before you had ever even attended

16  that interview with Mr. Walters, who you heard testify in

17  court, before you met with him, we can agree that you were

18  posting on Facebook that you too are about to be fired; yes?

19  A.   Those were my words on there, yes.

20  Q.   And so going into that meeting with Mr. Walters, we can

21  agree that you announced to the public that you were going to

22  get fired before you met with that man and before you knew

23  whether or not the request was going to be granted; yes?

24  A.   I guess I used the wrong choice of words.  That's what

25  it says.

1    Q.   But you're a very effective communicator; yes?

2    A.   Yes.  When I'm not emotional or under pressure or in a

3    meeting with an attorney and a HR manager who I have no idea

4    what they are going to do with whatever I say.  So I felt

5    it comfortable to just say the same thing and rely on my

6    statement, because that's how I felt.

7    Q.   And you wanted Blue Cross to be fully informed about

8    your religious beliefs; correct?

9    A.   I did that through my statements.

10   Q.   And again, to be fully informed about your beliefs, we

11   have to talk about Catholicism?

12   A.   Well, I guess I didn't realize that.  I had no -- no

13   guidance, no training, no nothing.  I didn't know what they

14   wanted.  I did the best that I could with what I thought was

15   the right thing to do.  That's the honest truth.

16   Q.   And so back to my question.

17         Based on what Mr. Walters had and contrasting that

18   with what you have told the jury about your Catholic beliefs,

19   do you believe Mr. Walters discriminated against you on the

20   basis of your religion?

21   A.   Meaning defining Catholic, Baptist, Protestant, it had to

22   be a specific name.  I honestly did feel that he discriminated

23   against me because I had a certain belief.  And they said

24   I did not meet the criteria of sincerely held religious

25   beliefs.  That's what I believed I was denied on.

1  Q.   Do you go to mass every Sunday?

2  A.   Yes.  Well, I can go on Saturdays too.  It doesn't have to

3  be a Sunday.

4  Q.   Sure.  You can go to Saturday evening mass?

5  A.   Yes.

6  Q.   Okay.  And you take the eucharist?

7  A.   I do.

8  Q.   In fact, you're able to serve the eucharist?

9  A.   I did, yes.

10 Q.   You're -- you're a eucharistic minister; yes?

11 A.   I was.  My time expired.  I have to renew it.

12 Q.   And all of those things relative to Catholicism were never

13 shared with Mr. Walters; correct?

14 A.   No.

15          MR. HUBBARD:  Thank you.

16          THE COURT:  No further questions, Mr. Hubbard?

17          MR. HUBBARD:  Not presently, Judge.  Thank you.

18          THE COURT:  Thank you.

19          You may redirect.

20          MR. MARKO:  Thank you, your Honor.

21                    *      *      *

22                    REDIRECT EXAMINATION

23 BY MR. MARKO:

24 Q.   Okay.  Lisa, let me show --

25          MR. MARKO:  Hey, Sam, can you please get that stuff

```
 1    up?
 2    BY MR. MARKO:
 3    Q.   Let me show you what's been marked as Defendant's
 4    Exhibit 210, which is in evidence.  And I don't think we have
 5    looked at this document yet, but I want to represent to you
 6    that this is an interoffice communication about your interview.
 7              Do you see that?
 8    A.   I see this.
 9    Q.   Okay.  Let me show you this.
10              So, first of all, this says -- again, you asked
11    about, like, are you -- did you give the same -- if we look
12    here, it says it's completely voluntary.
13              Do you see that?
14    A.   I do.
15    Q.   And then let me look at this question from Blue Cross.
16              What religious beliefs do you follow?
17              This question is not asking what religion.  This
18    question is not asking what religion.
19              What does that mean to you?
20    A.   That means it doesn't matter if you're Catholic or Baptist
21    or Protestant.  When I'm looking at this, it's saying what is
22    my belief.
23    Q.   Were you aware that Blue Cross, prior to your interview,
24    their own internal communications, told their interviewers that
25    the operative question is not what religion you are, but what
```

Jury Trial - Volume 4 - November 7, 2024

1    your beliefs are?

2    A.   I have not seen this document before.

3    Q.   So if the question was not what your religion is, but what

4    your beliefs are, did you tell Blue Cross in your statement

5    that you provided to them, that they said was completely fine,

6    what your religious beliefs are?

7    A.   I did.

8    Q.   And do you see up there it says from Rudy Makupson?  Do

9    you see that?

10   A.   I see the name, yes.

11   Q.   And interviewers Bruce Henderson and Jeff Walters, are

12   they the ones that interviewed you?

13   A.   They did.

14   Q.   And this is the answer that Jeff Walters put for you on

15   Exhibit 210.

16        MR. HUBBARD:  Objection.  Foundation.  Witness has

17    testified she is not aware of what this document is.

18        THE COURT:  The objection is sustained.

19   BY MR. MARKO:

20   Q.   If somebody said that you said -- did you state during

21   the interview, quote, "I am declining to answer all questions.

22   I have submitted a statement and that's all I will do?"

23        Did you say that?

24   A.   Those are not my words.

25   Q.   Are those anywhere in the transcript?

Jury Trial - Volume 4 - November 7, 2024

```
1   A.   Those are not.
2   Q.   Do you know how and why this -- this ended up on an
3   internal memorandum, which is Defendant's Exhibit 210, entitled
4   "Jeffrey Walters Interview Notes," Blue Cross 0023635?
5   A.   I am not aware.
6   Q.   Okay.  Let's talk about just a couple little things we're
7   going to clean up.
8            So 38 years.  Okay.  You understand I have been using
9   that throughout this trial; right?
10  A.   I --
11  Q.   So let's do some simple math.
12           You started working at Blue Cross in 1984; right?
13  A.   Yes.
14  Q.   You were fired in what year?
15  A.   2022.
16  Q.   So 2022 minus 1984 is how many years?
17  A.   I can't -- I can't think.  I -- can you help me?  It's
18  over 30 years.  I know that.
19  Q.   Would it surprise you that it's 38 years?
20  A.   Okay.  Thank you.
21  Q.   Okay.  When we --
22  A.   Sorry.
23  Q.   When you talk about how long you work somewhere, do you --
24  you know, typically cut out Saturdays and Sundays or vacation
25  time that you have or things of that nature?
```

1    A.    No, I do not.

2    Q.    Okay.  Had you worked for Blue Cross -- and I understand

3    you had a small break where -- with related to Alyse, who

4    went -- who used to be here, who was right there, is in the

5    bathroom apparently.

6          But you had a small break with Alyse?

7    A.    I did.

8    Q.    And then did you go back?

9    A.    I did.

10   Q.    Okay.  And your whole career for 38 years, other than that

11   break, has been with Blue Cross Blue Shield of Michigan?

12   A.    Yes.

13   Q.    Okay.  Working from home.  Let's talk about that.  Okay?

14          Explain to the jury prior to COVID -- I want to make

15   sure we're real clear on this.

16          Prior to COVID, were you still working from home?

17   A.    I was working from home.

18   Q.    And this was part of what?  Blue Space, you said?

19   A.    It was a program that the company was implementing called

20   Blue Space.  And we --

21   Q.    And you --

22   A.    Sorry.

23   Q.    I'm sorry.  Go ahead.

24   A.    And I believe we were one of the pilots to implement that.

25   Q.    Okay.  And this was before COVID hit?

1    A.   Yes, it was.

2    Q.   And so was the majority of your work from home?  Was it in

3    the office?  Do you not remember?

4    A.   No.  The majority was work from home, because -- because

5    it was so -- the majority of my work, I had to go out and

6    purchase my own larger monitor, because I dealt with large

7    spreadsheets.  I needed to be able to read them off of --

8    I couldn't use the little laptops that Blue Cross provided.

9    Q.   Did you use your own money for that?

10   A.   I did.

11   Q.   And you purchased a monitor so you could work from home

12   prior to COVID?

13   A.   Yes, I did.

14   Q.   Okay.  The -- with regard to -- let's talk about making

15   this religious accommodation request.

16        So -- and do you still have that little binder that

17   the defense attorneys gave you?

18   A.   Yes.

19   Q.   All right.  Did you try to get help from many different

20   online resources prior to submitting your final religious

21   accommodation statement?

22   A.   I did.

23   Q.   And did -- was your -- was the different various

24   accommodation statements that you looked at based on fetal

25   cells and objections to fetal cells?

1   A.   Yeah, the majority of them were.

2   Q.   And why, why, Lisa, did you not just take the first

3   religious accommodation request that you could find and just

4   sign it and submit it?

5        Why did you go through, according to those documents,

6   November 1, November 2, November 3, November 11, November --

7   November 11 was apparently after.

8        But November 1, 2, 3, and then the documents that

9   we have in evidence, why did you bother to look at so many

10  different requests before submitting?

11  A.   Well, I wanted it to be in my own words.  I wanted to

12  use what I actually felt in my heart and explain and inform

13  Blue Cross this is why I cannot take the vaccine.  There were

14  many statements that were personal to me.  My conscience.

15  The fetal cells.  I listened to God, not man.

16  Q.   Did you lie to Blue Cross in your written statement?

17  A.   I did not.

18  Q.   And let's take a look at this written statement.

19       By the way, is there anything wrong, before we do

20  that, with using resources such as other people's suggested

21  templates at your workplace at Blue Cross?

22  A.   No.  I used it throughout my whole career.  I was taught

23  to do that.  Why create something that's already out there?

24  Q.   And, for example, when you were terminated, did you hear

25  Patricia Snyder state that her termination was based on a

1    template?

2    A.   She testified that.

3    Q.   Do you remember her saying that?

4    A.   I remember her saying that.

5    Q.   Okay.  And so you -- let's go over your request; okay?

6    And I want you to read the entire request to the jury.

7    A.   Are you putting it on screen?

8    Q.   Yes, ma'am.  I'm so sorry.

9    A.   Okay.  Okay.

10          THE COURT:  You want her to read the statement that

11    she submitted to Blue Cross?

12          MR. MARKO:  Yes, your Honor.

13          THE COURT:  You already did that on direct.  Let's

14    move on.

15   BY MR. MARKO:

16   Q.   So you were asked questions about your statement and

17   whether or not it was rooted in your religious beliefs.

18          Do you remember that?

19   A.   Yes.

20   Q.   Did you talk about the Bible in your statement?

21   A.   I did.

22   Q.   Did you quote the Apostle Paul in your statement?

23   A.   Yes, I did.

24   Q.   Did you talk about fetal cells in your statement?

25   A.   Yes.

1   Q.   Did you talk about your opinion that maybe others don't

2   share that the use of fetal cells could be a sin against God?

3   A.   Yes.

4   Q.   Did you tell them that it violates your Christian faith?

5   A.   I did.

6   Q.   Are Catholics Christians?

7   A.   Yes.

8   Q.   Are Baptists, who you used to be a Baptist, are Baptist

9   Christians?

10  A.   Yes.

11  Q.   Did you tell them that these are a few examples of why you

12  must honor God?

13  A.   Yes, I did.

14  Q.   Did you tell them that you lived your best to live by the

15  Bible's teaching your entire life?

16  A.   Yes.

17          THE COURT:  You had an exhibit up on the screen, and

18   for the record, that is?

19          MR. MARKO:  Oh, yes.  I apologize, your Honor.  This

20   is Exhibit 206.

21          THE COURT:  Thank you.  Go ahead.

22  BY MR. MARKO:

23  Q.   Did you tell them that you relied on the power of prayer

24  in coming to this decision?

25  A.   Yes, I did.

1   Q.   Is that a true statement?

2   A.   Very true.

3   Q.   Did you pray?

4   A.   Yes.  I pray every day.

5   Q.   And did you tell them that you prayed on this?

6   A.   Yes, I did.

7   Q.   And did you tell that you sought the guidance of the

8   Holy Spirit?

9   A.   Yes.

10  Q.   And did you?

11  A.   Yes.

12  Q.   Did you do this through prayer?

13  A.   Oh, absolutely.

14  Q.   Did you tell them that the Holy Spirit has spoken to you

15  through your heart that you must not accept the vaccine?

16  A.   I did.

17  Q.   Is that true?

18  A.   It is very true.

19  Q.   Did you tell them that if you go against the guidance of

20  the Holy Spirit that you would be sinning and it would violate

21  the sanctity of your conscience?

22  A.   Yes.

23  Q.   Is that true?

24  A.   It's very true.

25  Q.   Did you tell them that due -- that you were requesting an

1    accommodation due to your sincerely held personal religious

2    beliefs?

3    A.   Yes.

4    Q.   Is everything that you wrote in here consistent with

5    Christianity?

6    A.   Yes, it is.

7    Q.   Is everything in here consistent with Catholicism?

8    A.   Yes.

9    Q.   Are those your sincerely held religious beliefs?

10   A.   Those are.

11   Q.   And did you convey all of these through this written

12   statement that you worked on so hard to Blue Cross and

13   Blue Shield?

14   A.   I did.

15   Q.   And did they ever tell you at any time, ever, that they

16   needed anything other than your statement?

17   A.   They never did.

18   Q.   And let me show you Plaintiff's Exhibit 60, which is the

19   EEOC guidance, which is an exhibit in this case.  It's been

20   admitted.

21            That says, quote, "When making the request" --

22            MR. HUBBARD:  Judge, I think this one is outside the

23   bounds of the cross, but also a foundation has to be laid.

24            THE COURT:  Outside --

25            MR. HUBBARD:  Outside the bounds of the cross, but

1    also, lack of foundation.  Counsel has not yet established

2    that this particular witness is familiar with this document.

3            THE COURT:  What's this have to do with anything that

4    was covered on cross?

5            MR. MARKO:  He was asking her questions about parsing

6    words through the statement.  I want to ask her if she was

7    ever trained or informed that she only -- that she did not

8    have to use specific words or magic words according to the

9    EEOC.

10           THE COURT:  All right.  You can -- according to the

11   EEOC?  Yes, the objection is sustained.

12           MR. MARKO:  According to anyone, according to them.

13           THE COURT:  The objection is sustained.

14   BY MR. MARKO:

15   Q.   Okay.  Did anyone ever tell you --

16           THE COURT:  Take that exhibit down.

17   BY MR. MARKO:

18   Q.   Did anyone ever tell you that you didn't have to use magic

19   words in creating a religious accommodation statement?

20   A.   They didn't tell me anything.  There was no guidance.

21   BY MR. MARKO:

22   Q.   Okay.  Now let me show you what you -- do you remember

23   being asked about this letter that you wrote to American Faith

24   after you were told that your job was going to be terminated?

25   And you were showed this letter.  It's Exhibit 45.

 1    A.   And can you repeat the question?  Sorry.

 2    Q.   Yeah.  Did you write this letter to American Faith which

 3    has been marked and entered as an exhibit, our Exhibit 45?

 4    A.   I did.

 5    Q.   Okay.  And this is -- let's go over this date.  This is

 6    December 10.

 7    A.   Yes.

 8    Q.   And first of all, what is American Faith now?

 9    A.   It's just a -- it's a newspaper, a Christian newspaper

10    that I follow.

11    Q.   Okay.  And so December 10, is that eight days after you're

12    told that your religious exemption has been denied?

13    A.   Yes.

14    Q.   And that you are shortly going to be fired for not getting

15    the vaccine?

16    A.   Yes.

17    Q.   And did you tell American Faith:  I am reaching out and

18    hope in faith that your newspaper or someone in the news

19    industry will feel compelled to tell my story about what is

20    happening in Detroit, Michigan with one of the largest health

21    insurance companies, Blue Cross Blue Shield of Michigan, and a

22    loss of religious freedom?

23    A.   Yes, I did.

24    Q.   Why?  Why did you do this?  Why did you write to American

25    Faith and tell them what was going on inside Blue Cross

1    Blue Shield?

2    A.   Because I -- I got denied.  I was about to lose my job.

3    I was very angry.  I was very hurt.  I had put so much time and

4    effort into the company, a company that I loved to go to, the

5    company that I loved to help people at.  I felt compelled for

6    them to know that here I am, a Christian, and this is how the

7    company is treating me.

8    Q.   Okay.  You said:  As I sit here, like many of my former

9    colleagues are doing right now, I begin to prepare mentally

10   for my forced unpaid leave and eventually termination.  I

11   have three days left of my 32 years total with Blue Cross

12   Blue Shield of Michigan because I am standing firm in my

13   sincerely held religious beliefs.

14        Was that a true statement that you made?

15   A.   Very true.

16   Q.   I am one of many employees who are choosing faith over

17   their job.

18        What did you mean by that?

19   A.   It meant that I wasn't going to let anybody tell me what

20   I can and cannot believe and that I had to choose because of

21   something that the secular side of the world thought was

22   needed.

23   Q.   Blue Cross Blue Shield implemented a mandate for all

24   employees to be vaccinated, and then you talk about -- you say,

25   they asked for our religious leader information and supporting

 1   documentation that aligns with our sincerely held religious

 2   beliefs.

 3            Is that in reference to that question involving

 4   Father Ptak?

 5   A.   Yes, it is.

 6   Q.   And you were asked questions about -- well, let's finish

 7   this real quick.

 8            Apparently invoking my religious exemption through

 9   the Civil Rights Act Article VII was not acceptable, so a

10   15-minute interview with labor relations and a company attorney

11   was set up.

12            Is that referring to your interview with Jeff Walters

13   and Bruce Henderson?

14   A.   It is.

15   Q.   I have never been on trial before.

16            What did you mean by that?

17   A.   I felt -- I was very intimidated.  I have never been on

18   trial.  I never had to meet with an attorney before.

19   Q.   But, boy, did I experience how innocent people must feel

20   when they are interrogated and harassed.

21            Why did you say that?

22   A.   Because of the tone, the high pitch, the way that they

23   didn't like how I was responding, even though I did answer the

24   question.

25   Q.   And, Lisa, this was December 10.

1          Was this before there was any Civil Rights case?

2    A.   Oh, yes.

3    Q.   Was this before there was, you know, any lawyers?

4    A.   Yes.

5    Q.   I didn't understand why they were asking me questions that

6    were already answered in my accommodation letter.

7          What do you mean by that?

8    A.   I had already told them what my religious beliefs were and

9    why in good conscience I could not take the vaccine.

10   Q.   You said:  I only made it through two questions because

11   they did not like my answers.  In the beginning of the

12   interview I was assured this was, quote, "strictly voluntary."

13         Was that true?

14   A.   Yes.

15   Q.   Did you tell them what you said in the interview?

16   A.   Yeah.  It looks like I quoted a few things.

17   Q.   Okay.  And --

18         THE COURT:  I understand this was all touched on on

19   cross examination, but you reviewed it in abundance on direct

20   examination, so be prudent in these questions.

21         MR. MARKO:  Understood, Judge.

22         And by the way, this is a different -- I never

23   reviewed this exhibit with her.  Brandon -- Mr. Hubbard did.

24   I have never shown this before.

25         THE COURT:  All right.

1              MR. MARKO:  Just for the record.  Okay.

2              But I understand.  And I know it's been a long day,

3       and I know we got a lot to do.  I'm going to move very

4       quickly.  Let me just point out a couple things.

5       BY MR. MARKO:

6       Q.  Did you say:  Imagine my surprise when I found out others

7       had been approved.  I thought, who are they to tell me what my

8       relationship with God is and what my belief is or isn't?  They

9       have discriminated me --

10          (Reporter clarification.)

11      BY MR. MARKO:

12      Q.  Imagine my surprise when I found out others had been

13      approved.  I thought, who are they to tell me what my

14      relationship with God is and what my belief is or isn't.

15              Did you say that?

16      A.  I did.

17      Q.  And you say:  For this reason I am in the process of

18      seeking legal assistance.

19              So you had -- didn't even have a lawyer at that time?

20      A.  I did not.

21      Q.  And you didn't have any legal help?

22      A.  I did not.

23      Q.  Did you have anybody to give you advice or tell you how

24      to write an affidavit or how to put together documents for

25      Blue Cross?

1    A.   No, I did not.

2    Q.   And you said:  Thank you for your time.  I will continue

3    to pray for Blue Cross Blue Shield of Michigan.

4            Why -- why would you -- after getting terminated for

5    having -- working there for 38 years, 32 years, whatever, for

6    having working there for over 30 years, continue to pray for

7    the employer that, in your words, betrayed you?

8    A.   Because that's what we do as Christians.  We -- we treat

9    everyone equally.  We forgive.

10   Q.   And did you say that you were going to pray for your

11   colleagues who remain employed and who are standing firm in

12   your religious beliefs?

13   A.   I did say that.

14   Q.   Why did you say that?

15   A.   Because I felt bad for them.  If they were making choices

16   that they had to take the vaccine and perhaps maybe didn't rely

17   on their faith and had to make certain decisions that were

18   personal to them.

19   Q.   And did --

20   A.   And --

21   Q.   I'm sorry, Lisa.

22   A.   That's okay.  Go ahead.

23   Q.   Did you see some of your friends at Blue Cross Blue Shield

24   have to give up their religious beliefs in order to keep

25   working there?

```
 1              MR. HUBBARD:  Objection, your Honor.  Calls for
 2      foundation.  Speculation.  This question is outside the
 3      bounds, also, as to cross.
 4              MR. MARKO:  I'm following up on the letter.
 5              THE COURT:  On the what?
 6              MR. MARKO:  On just this exhibit that he showed her.
 7              THE COURT:  Right.  The objection is sustained.
 8              MR. MARKO:  Okay.
 9              Lisa, thank you.
10              MR. HUBBARD:  Very brief, Judge.
11              THE COURT:  Okay.
12                          *       *       *
13                        RECROSS EXAMINATION
14      BY MR. HUBBARD:
15      Q.   Ms. Domski, you would agree with me that to articulate
16      your religious beliefs to this jury, that you articulated those
17      beliefs in terms of your Catholic faith, didn't you?
18      A.   In terms of my beliefs as a Christian and what the Bible
19      teaches me and showing them that I do belong to a Catholic
20      church.
21      Q.   You're not trying to suggest that when you're talking to
22      this jury about your religious beliefs that you didn't talk
23      primarily about Catholicism, are you?
24      A.   Here in trial, all of these days, I talked about my
25      Catholic faith.
```

140

```
 1              MR. HUBBARD:  Thank you.
 2              THE COURT:  All right.  No further questions?
 3              MR. MARKO:  No, your Honor.
 4              THE COURT:  Do you have any further witnesses?
 5              MR. MARKO:  No, your Honor.  But before plaintiffs
 6    rest --
 7              THE COURT:  The question is, do you have any further
 8    witnesses?
 9              MR. MARKO:  I'm sorry.  No, I don't.
10              THE COURT:  Very well.  Do you have a stipulation you
11    would like to place on the record?
12              MR. MARKO:  Yes, I do.
13              THE COURT:  You may proceed.
14              MR. MARKO:  May I place it?
15              THE COURT:  Before you do, members of the jury, a
16    stipulation is an agreement between the parties that a certain
17    fact exists, and you may take that fact as having been
18    established, if you wish, without the necessity of calling
19    witnesses or presenting other evidence.
20              Would you state your -- Mr. Marko?
21              MR. MARKO:  I'm sorry.  It has been stipulated and
22    agreed upon by the parties that in the year 2022, the year of
23    Ms. Domski's termination, Blue Cross Blue Shield had a total
24    reported revenue of 32,000 $800,000,000 [sic].
25              THE COURT:  All right.  Thank you.
```

```
 1              MR. MARKO:  Or 32.8 billion.

 2              THE COURT:  All right.  You may be seated.

 3              Is that the stipulation?

 4              MR. HUBBARD:  That's fine, Judge.

 5              THE COURT:  Thank you.

 6              Do you have any further evidence?

 7              MR. MARKO:  No.  No further evidence.  We rest.

 8      Yeah.  We rest.

 9              THE COURT:  Thank you.  Yeah.  I know most of us

10      don't use magic words, but that's one of the ones we do use.

11              MR. MARKO:  As a lawyer, I should be -- it is my job

12      to use the magic words.  So I apologize, Judge.

13              THE COURT:  Thank you, Mr. Marko.

14              Mr. Hubbard, what's your pleasure?

15              MR. HUBBARD:  Permission to approach?

16              THE COURT:  Oh, all right.

17              Ms. Domski, you can stand down for right now.

18              THE WITNESS:  Thank you.

19         (Sidebar discussion held outside the hearing of the jury.

20              MR. HUBBARD:  Is your Honor intending to proceed

21      with closings?

22              THE COURT:  No.  I intend to talk about the jury

23      instructions.  Instructions first, then closing, then

24      final instructions.

25              MR. HUBBARD:  Yeah, that's fine.  I think --
```

```
 1              THE COURT:  Was there confusion about that?
 2   Yesterday I thought I was --
 3              MR. HUBBARD:  No, there is no confusion about that,
 4   Judge.  I was saying just in terms of order.  We're inclined
 5   to proceed in terms of the instructions and closings.
 6              THE COURT:  Okay.  All right.  But while we're here --
 7              MR. HUBBARD:  I'm sorry.
 8              THE COURT:  Did you want to talk?
 9              MR. MOODY:  No, I'll let him talk.
10              THE COURT:  While we're here, does Blue Cross have
11   a formal position about reinstatement?
12              MR. HUBBARD:  Bear with me, if I --
13         (Discussion held off the record.)
14              MR. HUBBARD:  Not interested, Judge.
15              THE COURT:  Okay.  That clears up a lot.
16              MR. HUBBARD:  And then --
17              THE COURT:  If that's the case, then I can formally
18   establish that reinstatement is not a practically available
19   remedy.
20              I take it you have no objection to that.
21              MR. HUBBARD:  That's fine, Judge.
22              THE COURT:  And I certainly believe you have no
23   objection.
24              MR. MARKO:  You're right, Judge.  You used the magic
25   words.
```

 1          THE COURT:  Thank you.  All right.

 2          MR. HUBBARD:  At the appropriate time, outside the

 3     presence of the jury, we may make a brief motion for directed

 4     verdict.

 5          THE COURT:  Well, that's what I was asking about.

 6          Okay.  I'm going to excuse the jury for about

 7     45 minutes.  You can make your motion, and we will finalize

 8     the jury instructions.  You can make your objections to the

 9     instructions that we discussed in chambers yesterday.  And we

10     will take a lunch break, and we will get started after.

11          MR. MARKO:  And is defendant going to formally rest?

12          THE COURT:  I'm sorry?

13          MR. MARKO:  Is defendant going to rest?

14          THE COURT:  Not until he makes his motion.

15          MR. MARKO:  After the motion, yeah.

16          THE COURT:  And I'll bring the jury back in before we

17     give them the instructions and let him do that on the record.

18          MR. MARKO:  Okay.  Thank you.

19          MR. HUBBARD:  Thank you, Judge.

20        (Sidebar concluded.)

21          THE COURT:  We will take a break for about

22     45 minutes, members of the jury.  You are invited to leave

23     the jury room if you wish.

24          But under the circumstances, please do not discuss

25     the case among yourselves.  Please don't try to gather any

```
 1     information on your own.  Don't let anyone speak to you about
 2     the case.  And make sure your juror badges are on and visible.
 3             You may escort the jury out, Mr. Beyer.
 4             THE CLERK:  All rise for the jury.
 5        (Jury left courtroom at 12:30 p.m.)
 6             THE COURT:  You may be seated.
 7             The record should reflect the parties and attorneys
 8     are present.  The jury is not present.
 9             Mr. Hubbard, your motion?
10             I'm sorry.  Who is presenting the motion?
11             MR. HUBBARD:  Just a brief moment.
12        (Discussion held off the record.)
13             THE COURT:  Why don't you use the lectern.
14             MS. MOODY:  May I proceed?
15             THE COURT:  Please do.
16             MS. MOODY:  Thank you, your Honor.
17             The defendant moves for judgment as a matter of law
18     as to plaintiff's intentional discrimination claims, Counts 2
19     and 3 of the amended complaint.
20             As the Court knows, the standard for judgment as a
21     matter of law is if it's -- judgment as a matter of law is
22     appropriate if a reasonable jury would not have a legally
23     sufficient evidentiary basis to find for the non-movant on
24     an issue.
25             Under Title VII, when the Court --
```

1         THE COURT:  Taking the evidence in the light most

2    favorable to the plaintiff; correct?

3         MS. MOODY:  Yes, your Honor.

4         THE COURT:  All right.

5         MS. MOODY:  And on a Title VII claim the proper

6    inquiry is whether the Court can assess the ultimate question

7    of discrimination, which here in the religious discrimination

8    context is whether the plaintiff was discharged because of her

9    religion.

10        This question can be framed, I think, in three ways

11   for the Court.

12        The first is with respect to the testimony of Jeffrey

13   Walters, who, there is undisputed evidence in the record that

14   he was the decision-maker.

15        The evidence also establishes that he wasn't

16   motivated by discriminatory animus.  He testified that he

17   respects all faiths, that his own personal religion teaches

18   him not to discriminate, that he does not discriminate against

19   any religion, that no magic words are required to obtain an

20   accommodation, that the sincerity of employees' beliefs and

21   practices are not generally in dispute, but that his honest,

22   reasonable, non-discriminatory belief in making the decision

23   that he did with respect to Ms. Domski's accommodation was

24   because he didn't believe that the letter was her own.

25        And, of course, in her interview, she provided no

Jury Trial - Volume 4 - November 7, 2024

1    additional context or information about her religious beliefs

2    and how they conflicted with the vaccination policy.

3           The second bucket to consider is the testimony of

4    Mr. Feinbaum and Ms. Snyder.  And in order for their testimony

5    to be relevant to show discriminatory animus, it has to be

6    imputed to Mr. Walters, who was the decision-maker.  But all

7    of the evidence establishes that there is no connection.

8           Mr. Walters was not present during the meeting that

9    was repeatedly referenced in Court, the October 12, 2021,

10   HR meeting.  Mr. Walters wasn't trained by Mr. Feinbaum or

11   Ms. Snyder.  Neither Mr. Feinbaum nor Ms. Snyder spoke to

12   Mr. Walters about how to address religious accommodation

13   requests.  And, in particular, they didn't speak to Mr. Walters

14   about how to address Ms. Domski's accommodation request.

15          So even to the extent that the comments of

16   Mr. Feinbaum and Ms. Snyder that were elicited through

17   testimony can be considered discriminatory, they can't be

18   imputed to show Mr. Walters' discriminatory animus, because

19   there is no connection between the two.  There is no evidence

20   showing that Mr. Feinbaum or Ms. Snyder influenced the

21   decision that Mr. Walters made.

22          Finally, your Honor, the third bucket to consider

23   here is whether the plaintiff established a prima facie case.

24   And although whether a plaintiff proves the prima facie

25   elements is not dispositive, it is relevant.  And here there

1    has been no testimony, no evidence elicited to establish that

2    any similarly situated employee was treated more favorable to

3    Ms. Domski.

4              So for these reasons, your Honor, the plaintiff has

5    not been able to prove and establish a sufficient evidentiary

6    basis to send to the jury that she was terminated because

7    of her religion or because of discriminatory animus, and

8    Blue Cross is entitled to judgment as a matter of law as to

9    the intentional discrimination claims.

10             THE COURT:  Thank you.

11             Who wants to respond?

12             MR. MARKO:  I will.

13             THE COURT:  All right, Mr. Marko.

14             MR. MARKO:  Judge, as this Court knows, one of the

15   ways that we can show pretext or motive is through the reason

16   given for the termination in this case and that it had no

17   basis in fact.

18             The defense that has been presented is because Lisa

19   did not indicate her Catholicism, that somehow she did not

20   fall into Blue Cross's policy or processes as it relates to

21   that.

22             THE COURT:  Oh, no.  That's the accommodation count.

23   I thought the motion was addressed to Counts 2 and 3 of the

24   complaint, which is the intentional discrimination count.

25             And the proper analysis there is whether there is

1      a legitimate basis for termination.  And I understand,

2      based on the evidence, that the offered legitimate basis

3      for termination is that she didn't get vaccinated and that

4      violated the company policy.  And the question is whether that

5      was a pretext.

6             MR. MARKO:  Yeah.  We -- and we have -- when the

7      facts are viewed in the light most favorable to the plaintiff,

8      there is sufficient evidence to go to the jury on that.

9             As you said, we start with the first link in the

10     chain, as this Honorable Court described it yesterday,

11     with Patricia Snyder, who we know, as much as they tried

12     to distance themselves from her involvement in this, began

13     the process, monitored the process, had daily meetings on

14     the process, and had 7 -- I believe it was at 7:15 a.m., she

15     met with individuals, including Jeff Walters.

16            And although they tried to term Mr. Walters as the

17     ultimate decision-maker, he indicated under oath that he was

18     not; that he simply made recommendations, and they went out

19     into the ether somewhere and someone else, who we still don't

20     know, made those ultimate decisions.

21            Ms. Snyder, specifically on -- during her early

22     meeting on October 12 of 2021, without having any basis to do

23     so, made direct comments, which we submit is direct evidence

24     of discrimination, including saying we're not going to approve

25     all religious accommodation requests, which could show a

1    religious motivation as it relates to that.

2         Ms. Domski followed the process that was set up for

3    her.  We believe that the process was pretextual.  And we have

4    shown that through, for example, Father Ptak's references

5    being listed, where we heard Jeff Walters say that he didn't

6    call a single reference.  Out of over 100 interviews that he

7    did, he didn't bother to make a single call.

8         So I think that there is sufficient evidence in this

9    case for the jury to make a decision, your Honor, on those

10   counts raised by the defendants based on the evidence that

11   I cited and the other evidence that this Court has heard

12   throughout the trial.

13        THE COURT:  All right.  There is colorable merit

14   to the defendant's motion.  I am going to take it under

15   advisement.  I will submit the case to the jury, however,

16   and that can be renewed under Rule 50 after the verdict is

17   returned, if you wish.

18        MS. MOODY:  Thank you.

19        THE COURT:  All right.  Now, let's just cover

20   the jury instructions here just to -- oh, you know what,

21   I have final copies, which basically reflect our discussion

22   yesterday.  I think the only logistical problem is the

23   pagination, because we took out some instructions.

24        But my recollection is that -- which I confess is

25   imperfect -- is that there was a concern about language

1   defining the term, religion, which you will find on page 27

2   of the final version of the instructions.

3           Mr. Hurwitz, is that something you wanted to make

4   a record on?

5           MR. HURWITZ:  Judge, on page 7?

6           THE COURT:  7?

7           MR. HURWITZ:  Have stipulations on page 7, Judge.

8   Plaintiff doesn't have any objections to page 7.

9           THE COURT:  Well, right.  I'm just trying to put on

10   the record the objections that you do have.

11           MR. HURWITZ:  Oh, okay.  Judge, let me -- with

12   the new pagination, give me one second to address that.

13           Judge, first, plaintiff objects to any instruction

14   requiring more from the plaintiff in terms of notice or

15   informing of the religious objection.  That's because a

16   written objection is sufficient to satisfy notice, so we

17   don't believe that should go to the jury.

18           THE COURT:  You want to point to the instruction

19   that you are addressing, please?

20           MR. HURWITZ:  Yes, Judge.  Page 24.

21           THE COURT:  Okay.

22           MR. HURWITZ:  Section 2 states:  And the employer

23   knows of the belief.

24           Under Abercrombie, it's our objection that knowledge

25   is not a requirement in this matter, either for direct or

1    failure to accommodate.  And we would like to place that

2    objection on the record.

3            THE COURT:  You're objecting to page 24, paragraph 2?

4            MR. HURWITZ:  Correct, Judge, just to the extent it

5    requires the employer to know of the employee's religious

6    belief.

7            THE COURT:  So it's your suggestion that the law

8    provides that if an employer -- if an employee has a religious

9    belief, but the employer doesn't know about it, there is still

10   an accommodation requirement?

11           MR. HURWITZ:  Well, Judge, it's the letter of the law

12   in Abercrombie that knowledge -- it states specifically that

13   knowledge is not necessary, which, again, Judge, is not to mean

14   that no indication of the religious accommodation belief, but

15   in this case, when there is an express written accommodation

16   request delivered to the employer, that satisfies the notice

17   element under all religious accommodation jurisprudence.

18           And so the question of advising the jury that the

19   plaintiff still needs to inform the company of the religious

20   belief would be improper.

21           THE COURT:  The language of the instruction is when

22   an employment requirement conflicts with the employee's

23   sincerely held religious belief, and the employer knows of

24   the employee's belief, federal law requires that the employer

25   accommodate the employee's religious belief unless the

1    employer demonstrates that it is unable to reasonably

2    accommodate the employee's religious belief without undue

3    hardship to the employer's business.

4            It's my understanding that that is pretty much

5    black-letter law.  I do not believe the Abercrombie case --

6    or at least I do not read the Abercrombie case to contradict

7    that.

8            So with respect, that objection is overruled.

9            MR. HURWITZ:  Understood, Judge.

10           THE COURT:  All right.  Let's move on then.

11           MR. HURWITZ:  Judge, on page 26, Section 1(b),

12   similar request.  It says:  Second, that she informed the

13   defendant about the conflict.

14           The confusion here is, Judge, that -- it's undisputed

15   that she did inform the company of her religious belief,

16   certainly to the extent required under Abercrombie, and that

17   such an instruction allowing that issue to go to the jury is

18   improper as well.

19           THE COURT:  So you want me to direct a verdict on

20   that point?

21           MR. HURWITZ:  Judge, it's --

22           THE COURT:  It's one of the elements, isn't it?

23           MR. HURWITZ:  The objection is that it's not an

24   element under Abercrombie in a religious discrimination case.

25           THE COURT:  All right.  Do you -- who is taking this?

```
 1              Mr. Hubbard, do you want to respond to that?
 2              MR. HUBBARD:  Yeah, your Honor.  I think we do
 3    absolutely have to be informed.  And my understanding of the
 4    law is that that's required.  I have not seen anything to the
 5    contrary.
 6              THE COURT:  Actually, I see that there might be a
 7    problem with that, and that phraseology might be confusing,
 8    and it should instead say that the employer -- or that the
 9    defendant was informed about the conflict, not that she did it.
10    I think that satisfies Abercrombie.  And so I'm going to --
11              First of all, would that satisfy your objection?
12              MR. HURWITZ:  Yes, Judge, that would.
13              THE COURT:  Do you have any objection to that?
14              MR. HUBBARD:  I'm fine with that, Judge.  That the
15    defendant was informed, is that the --
16              THE COURT:  Yes.
17              MR. HUBBARD:  Understood.
18              THE COURT:  Anything else, Mr. Hurwitz?
19              MR. HURWITZ:  Yes, Judge.
20              On page 28 there is a stand-alone instruction, and
21    it says:  With respect to the second element, the plaintiff
22    must inform her employer of her request with enough detail to
23    permit the employer to determine that it is motivated by her
24    sincerely held religious belief.
25              Again, we find that to be in conflict with
```

1    Abercrombie where, for example, simply wearing religious garb

2    without actually requesting an accommodation -- some sort of

3    religious accommodation would be sufficient to place the

4    company on notice.

5         THE COURT:  And, therefore, the plaintiff would have

6    satisfied that by making -- by informing the employer?

7         MR. HURWITZ:  Yes, Judge.

8         THE COURT:  All right.  I think we're talking past

9    each other, but I believe that the instruction on page 28

10   is consistent with the Abercrombie pronouncement of -- I'm

11   sorry -- articulation of the elements of a Title VII failure

12   to accommodate claim.

13        So that objection is overruled.

14        MR. HURWITZ:  Okay.  And, Judge, just to renew that

15   objection as to one point, I'll be more specific, it states:

16   With enough detail to permit the employer to determine that

17   it is motivated by her sincerely held religious belief.

18        THE COURT:  Do you have any further objections?

19        MR. HURWITZ:  Yes, Judge.

20        THE COURT:  Okay.  Go ahead.

21        MR. HURWITZ:  Judge, on page 30, Section 2 invokes

22   what the defendant has called the honest belief rule in this

23   case.  And that would be an objection just because the honest

24   belief rule, as has been discussed with this Court, has no

25   appearance in the jurisprudence of religious accommodation or

 1    discrimination.

 2            MR. HUBBARD:  Judge, we have been over this before.

 3    Our position, obviously, is that it's perfectly --

 4            THE COURT:  We have been over it in chambers, but

 5    I just wanted to give an opportunity to state it on the

 6    record.

 7            MR. HUBBARD:  Fair enough, Judge.  And thank you.

 8            Our position is that the honest belief defense is

 9    perfectly appropriate under the law.  We haven't seen any

10    case, and I don't believe that counsel has cited any case,

11    that says it's not.

12            THE COURT:  Yeah.  There is no case that I have

13    been able to find that says the honest belief rule has been

14    jettisoned with respect to cases of this context, cases of

15    this type.  The honest belief rule is certainly firmly

16    established in the jurisprudence, and I don't find that

17    there is an exception.

18            So that objection is overruled.

19            MR. HURWITZ:  Thank you, Judge.

20            THE COURT:  Okay.

21            MR. HURWITZ:  Same page, Judge, Section 3 -- almost

22    done -- the last sentence states:  Therefore, standing alone,

23    the fact that an employer inquired about the religious nature

24    and sincerity of the employee's belief is not evidence that

25    the plaintiff's religion was a motivating factor.

```
 1              Judge, there, it's really an excerpt not from legal
 2    authority but from EEOC guidance.  And that EEOC guidance,
 3    actually, to give the Court the full picture of the law,
 4    requires the issue to be once the employer has an objective
 5    basis to inquire further, they are then allowed to.
 6              And so, Judge, the plaintiff would like somewhere the
 7    words to be used:  Once the employer has an objective basis to
 8    inquire.
 9              And adding further, my suggestion -- my suggestion
10    would be an employer's permitted by -- well, once an employer
11    has an objective basis to inquire regarding the sincerity of
12    religious beliefs, then the employer is permitted by law.
13              MR. HUBBARD:  Judge, I'm not aware of any sort of
14    condition precedent saying that there first has to be an
15    objective basis for this kind of an instruction, that standing
16    alone the mere fact that we inquired isn't evidence, that the
17    inquiry itself was evidence of a motivating factor in terms
18    of my client's decision.
19              THE COURT:  All right.  I'm confident paragraph 3 on
20    page 30 is an accurate statement of the law, so that objection
21    is overruled.
22              Further?
23              MR. HURWITZ:  Judge, on page 32, Section B, it
24    states:  You may award front-pay damages only through
25    December 31, 2004.
```

1            THE COURT:  No, 2034.

2            MR. MARKO:  2034.

3            And plaintiff believes that there is not a factual

4     predicate to suggest that plaintiff would not have worked

5     beyond 2034.

6            THE COURT:  When she is 67?

7            MR. HURWITZ:  67 was a -- it was never asked, when

8     are you going to retire.  The 67, I think, came up from

9     witnesses, but plaintiff never actually said into the record,

10    I would have retired when I was 67.  Instead, plaintiff

11    actually, I believe, testified that she didn't know at this

12    time when she would have retired.  So her answer -- any answer

13    about that would have been speculative.

14           THE COURT:  There is other evidence in the record,

15    however, that indicates that the plaintiff intended to work

16    through age 67.  And under the circumstances, since front pay

17    is an equitable remedy, I make that determination that that

18    would adequately compensate for the loss if liability is

19    determined.

20           So that objection is overruled.

21           MR. HURWITZ:  Thank you, Judge.  Give me one second,

22    and that may be it.

23           Judge, that is all of plaintiff's objections.

24           THE COURT:  Thank you.  I think we talked about some

25    others, but I believe we reached an accommodation in chambers

1    and changed some language; for example, the compensatory

2    damage articulation and so forth.

3              But if there is no further objections, let me turn to

4    the defendant.

5              Do you have any objections to the jury instructions?

6              MR. HUBBARD:  Just a note, your Honor, that we would

7    propose that the Court would be willing to let the jury know

8    that Mr. Henderson, Bruce Henderson, who was in the meeting

9    with Ms. Domski, is unavailable to testify in light of his

10   medical condition that occurred in January of this year.

11             I think that it's important that the jury know that

12   the gentleman is not able to testify, so that the jury isn't

13   left wondering, for example, why not Mr. Henderson in terms of

14   being in court.

15             THE COURT:  Well, that's an evidentiary item.  You

16   certainly could have asked a witness about that, particularly

17   Mr. Walters, who was his interview partner at the time.  But

18   I don't think it's up to the Court to take upon itself to

19   direct a fact to the jury.

20             I understand why you want to do that, but I suppose

21   you could call a witness to testify to that, because you

22   haven't rested yet.  But I'm not going to instruct the jury

23   on it.

24             MR. HUBBARD:  If I may respond, your Honor, the

25   underlying basis is in the record of the Court.  You will

recall that we sought entry of a protective order --

THE COURT: I understand that, but it's not in the record of the trial.

No, I'm sorry to cut you off, but I acknowledge that with respect to the motions revolving around the subpoena to Mr. Henderson or the request to take his de bene esse deposition that you submitted some affidavit, I believe, from his spouse to that effect, and I made a ruling accordingly. But that's not the record of the trial, and that's not how I would be instructing the jury as to a fact in the case.

MR. HUBBARD: Understood. And so we will have the opportunity to, if we so choose, to call a witness to address that fact?

THE COURT: Before you rest, your case is still open.

MR. HUBBARD: Thank you, Judge.

THE COURT: All right. If there is nothing further, then, we will be in recess for about another half an hour, plus two minutes.

MR. HURWITZ: Thank you, Judge.

MR. MARKO: Judge, what's the schedule, then? Do you have an idea when we will get to openings -- closings?

THE COURT: Closing arguments?

MR. MARKO: Yeah. See, I don't want to open again. Closings.

THE COURT: When we come back, I'm going to give the

```
 1    jury the preliminary instructions.  Then you will have your
 2    opportunity to present your initial argument.
 3            I think I told you, you could have an hour.  The
 4    defense then -- I guess I told you, you could have an hour.
 5    It was my intention to have you divide it up between opening
 6    and rebuttal.  I guess I didn't say that to you, though.
 7            And then we will probably take a break, give my court
 8    reporter some oxygen, and then come back with the rest of the
 9    arguments.
10            Did that answer your question?
11            MR. MARKO:  Yes.
12            THE COURT:  Okay.  We're in recess.
13            MR. HUBBARD:  Thank you, Judge.
14       (Recess taken from 12:55 p.m. to 1:40 p.m.)
15            THE CLERK:  All rise.  Court is back in session.
16            THE COURT:  You may be seated.
17            Are you ready for the jury?
18            MR. MARKO:  Yes, your Honor.
19            THE COURT:  Mr. Hubbard, do you intend to call any
20    witnesses?
21            MR. HUBBARD:  No, your Honor.
22            THE COURT:  All right.  Thank you.
23            Would you bring in the jury, please?
24            THE CLERK:  All rise for the jury.
25       (Jury entered courtroom at 1:41 p.m.)
```

```
 1              THE COURT:  You may be seated.
 2              When we took our break, members of the jury, the
 3    plaintiff rested.
 4              Mr. Hubbard, do you have any additional witnesses to
 5    call other than the ones who have testified already?
 6              MR. HUBBARD:  No, your Honor.
 7              Oh, forgive me.  We rest, Judge.
 8              THE COURT:  Thank you.
 9              Do you have any rebuttal?
10              MR. MARKO:  No, your Honor.
11              THE COURT:  Thank you.
12              Members of the jury, now the evidence is in and
13    I will be giving you the preliminary final instructions.
14    I promised you that I would give you written copies, and
15    we have those for you.
16              So Mr. Beyer, would you hand those out to the jurors,
17    please?
18              All right.  I'm going to deliver these instructions
19    to you.  You have them in writing.  You can follow along with
20    me if you want.  You don't have to do that.  If you do follow
21    along, I ask that you just stay with me and not read ahead.
22              And each of you has a copy of the instructions, and
23    if you want to take notes on them or make marginal notes,
24    you're free to do that as well.
25              So it's time for me now to instruct you on the law
```

1    that you are to apply in deciding this case.

2         I wilt start by explaining your duties and the

3    general rules that apply in every civil case.

4         Then I will explain to you some of the rules that you

5    must use in evaluating particular testimony and evidence.

6         Then I will explain the elements or parts of the

7    claims brought by the plaintiff and the defenses asserted by

8    the defendants.

9         And last, I will explain the rules that you must

10   follow during your deliberations in the jury room and the

11   possible verdicts that you may return.

12        Please listen carefully to everything I say.

13        I have given each of you a copy of these instructions

14   and that's for your use while deliberating.  If you have

15   questions about the law or your duties as jurors, you should

16   try to consult or you should consult the copy of the

17   instructions as given to you.

18        Now, you have two main duties as jurors.  The first

19   one is to decide what the facts are from the evidence that you

20   saw and heard here in court.  Deciding what the facts are is

21   your job and not mine, and nothing that I have said or done

22   during this trial was meant to influence your decision about

23   the facts in any way.

24        Your second duty is to take the law as I give it to

25   you, apply it to the facts, and decide if the plaintiff has

1    proved her case and if the defendant has proved its defenses.

2            It is my job to instruct you about the law, and you

3    are bound by the oath that you took at the beginning of the

4    trial to follow these instructions that I give you, even

5    if you personally disagree with them.

6            This includes the instructions that I gave you before

7    and during trial and these instructions.  All the instructions

8    are important and you should consider them together as a whole.

9            The lawyers may talk about the law during their

10   arguments, but if what they say is different from what I say,

11   you must follow what I say.  What I say about the law

12   controls.

13           Perform these duties fairly.  Do not let any bias,

14   sympathy, or prejudice that you may feel towards one side or

15   the other influence your decision in any way.

16           The fact that a corporation is involved as a party

17   must not affect your decision in any way.  When a corporation

18   is involved, of course, it may act only through people as its

19   employees and, in general, a corporation is responsible under

20   the law for the acts and statements of its employees that are

21   made within the scope and duties of their -- as employees of

22   the company.

23           So this case should be considered and decided by

24   you as a dispute between parties of equal standing in the

25   community, of equal worth, and holding the same or similar

1    stations in life.  All parties stand equal before the law and
2    are to be treated as equals.

3          You must make your decision based only on the
4    evidence that you saw and heard here in court.  Do not let
5    rumors, suspicions, or anything else that you may have seen
6    or heard outside of court influence your decision in any way.

7          Likewise, sympathy must not influence your decision,
8    nor should your decision be influenced by prejudice regarding
9    race, sex, religion, national origin, age, handicap, or any
10   other factor irrelevant to the rights of the parties.

11         The evidence in this case includes only what the
12   witnesses said while they were testifying under oath, the
13   exhibits that I allowed into evidence, and the stipulations
14   that the lawyers agreed to.

15         Nothing else is evidence.  The lawyers' statements
16   and arguments are not evidence.  Their questions and
17   objections are not evidence.  My legal rulings are not
18   evidence.  And my comments and questions are not evidence.

19         However, an admission of fact by an attorney is
20   binding on his or her client.

21         During the trial I did not let you hear the answers
22   to some of the questions that the lawyers asked and see some
23   of the exhibits that were offered in evidence.  I also ordered
24   you to disregard some things that you heard or saw or I struck
25   things from the record.

1          You must completely ignore all of these things.  Do

2     not even think about them.  Do not speculate about what a

3     witness might have said or what an exhibit might have shown.

4     These things are not evidence and you are bound by your oath

5     not to let them influence your decision in any way.

6          Make your decision only on the evidence as I have

7     defined it here and nothing else.

8          The parties have reached a stipulation -- or I should

9     say, several stipulations -- that have eliminated the need to

10    call certain witnesses to testify to certain facts:

11         The parties agree on the following facts.

12         On October 31, 2021, the defendant announced a

13    COVID-19 vaccine mandate.

14         Lisa Domski submitted a written religious

15    accommodation request to the defendant on November 10, 2021.

16         The defendant denied Lisa Domski's religious

17    accommodation request.

18         The defendant placed Lisa Domski on unpaid leave on

19    December 9, 2021.

20         On January 5, 2022, the defendant terminated the

21    plaintiff as a result of her failure to comply with the

22    defendant's COVID-19 vaccination policy.

23         The annual revenue of the defendant, Blue Cross

24    Blue Shield of Michigan, in 2022 was approximately

25    $32.8 billion.

1        You may accept these stipulations as proof of the

2    facts covered by the stipulations without the testimony from

3    any witness.

4        In determining whether any fact has been proved you

5    shall consider all of the evidence bearing on that fact

6    without regard to which party produced the evidence.

7        Now, some of you may have heard the term direct

8    evidence and circumstantial evidence.

9        Direct evidence is simply like the testimony of an

10   eyewitness which, if you believe it, directly proves a fact.

11   So using an example, if a witness testified that she saw it

12   raining outside and you believed her, that would be direct

13   evidence that it was raining.

14       Circumstantial evidence is simply a chain of

15   circumstances that indirectly proves a fact.

16       So continuing our example, if someone walked into

17   a courtroom wearing a raincoat that was covered with drops

18   of water and carrying a wet umbrella, that would be

19   circumstantial evidence from which you could conclude that

20   it was raining.

21       It is your job to decide how much weight to give

22   the direct and circumstantial evidence.  The law makes no

23   distinction between the weight that you should give to either

24   one or says that one is any better evidence than the other.

25   You should consider all the evidence, both direct and

1    circumstantial, and give it whatever weight you believe it

2    deserves.

3           You are to consider only the evidence in the case.

4    However, you are not limited to the statements of the

5    witnesses.

6           In other words, you are not limited to what you see

7    and hear as the witnesses testify.  You may draw from the

8    facts that you find have been proved such reasonable

9    inferences as seem justified in light of your experience.

10          Inferences are deductions or conclusions that reason

11   and common sense lead you to draw from facts established by

12   the evidence in the case.

13          You have a right to consider all the evidence in

14   light of your own general knowledge and experience in

15   the affairs of life and to take into account whether any

16   particular evidence seems reasonable and probable.  However,

17   if you have personal knowledge of any particular fact in

18   the case, such knowledge may not be used as evidence.

19          Another part of your job as jurors is to decide how

20   credible or believable each witness was.  This is your job,

21   not mine.  It is up to you to decide if a witness's testimony

22   was believable and how much weight you think it deserves.

23          You are free to believe everything that a witness

24   said or only part of it or none of it at all.  But you should

25   act reasonably and carefully in making these decisions.

1              Let me suggest some things for you to consider in

2      evaluating each witness's testimony.

3              Ask yourself if the witness was able to clearly see

4      or hear the events.  Sometimes even an honest witness may not

5      have been able to see or hear what was happening and may make

6      a mistake.

7              Ask yourself how good the witness's memory seemed to

8      be.  Did the witness seem able to accurately remember what

9      happened?

10             Ask yourself if there was anything else that may have

11     interfered with the witness's ability to perceive or remember

12     events.

13             Ask yourself how the witness acted while testifying.

14     Did the witness appear honest or did the witness appear to be

15     lying?

16             Ask yourself if the witness had any relationship

17     to the plaintiff or the defendants or -- the defendant or

18     anything else to gain or lose from the case that might

19     influence the witness's testimony.

20             Ask yourself if the witness had any bias, prejudice,

21     or reason for testifying that might cause the witness to lie

22     or slant the testimony in favor of one side or the other.

23             Ask yourself if the witness testified inconsistently

24     while on the witness stand or if the witness said or did

25     something or failed to say or do something at any other time

1    that is inconsistent with what the witness said while

2    testifying.

3              If you believe that the witness was inconsistent,

4    ask yourself if this makes the witness's testimony less

5    believable.  Sometimes it may, other times it may not.

6    Consider whether any inconsistency was about something

7    important or about some unimportant detail.  Ask yourself if

8    it seemed like an innocent mistake or if it seemed deliberate.

9              And ask yourself how believable the witness's

10   testimony was in light of all the other evidence.  Was the

11   witness's testimony supported or contradicted by other

12   evidence that you found believable?

13             If you believe that a witness's testimony was

14   contradicted by other evidence, remember that people sometimes

15   forget things and that even two honest people who witness the

16   same event may not describe it exactly the same way.

17             These are only some of the things that you may

18   consider in deciding how believable each witness was.

19             You may also consider other things that you think

20   shed some light on the witness's believability.  Use your

21   common sense and your everyday experience in dealing with

22   other people, and then decide what testimony you believe and

23   how much weight you think it deserves.

24             If you decide that a witness said something earlier

25   that is not consistent with what the witness said in court,

1    you may consider the earlier statement in deciding whether to

2    believe the witness, but you may not consider it as proof of

3    the facts in the case.

4          However, there are some exceptions.  You may consider

5    an earlier statement as proof of the facts in the case if the

6    statement was made by the plaintiff, the defendant -- I'm

7    sorry -- the statement was made by the plaintiff, a defendant,

8    or an agent or employee of either party, or the statement was

9    given under oath, subject to the penalty of perjury at a

10   deposition, or the witness testified during the trial that the

11   earlier statement was true.

12         During the trial certain evidence was played to you

13   or presented to you by the playing of videotape deposition.

14   There was one.  A deposition is the sworn testimony of parties

15   or witnesses taken before an authorized person.  All parties

16   and their attorneys had the right to be present and to examine

17   and cross examine the witnesses.

18         This evidence is entitled to the same consideration

19   as you would give the same testimony had the witness testified

20   in open court.

21         You have heard a video recording of the deposition

22   of Dawn Rodriguez that was received in evidence and you were

23   provided a written transcript of the recording on your screen;

24   that is, on the screen that displayed the deposition

25   testimony.

1          Keep in mind that the transcript is not evidence.  It

2    was given to you only as a guide to help you follow what was

3    being said.  The recording itself is the evidence.

4          If you noticed any differences between what you heard

5    on the recording and what you read in the transcript, you must

6    rely on what you heard, and not on what you read.  And if you

7    could not hear or understand certain parts of the recording,

8    you must ignore the transcript as far as those parts are

9    concerned.

10         Although you may consider the number of witnesses

11   testifying on one side or the other when you weigh the

12   evidence to a particular fact, the number of witnesses alone

13   should not persuade you if the testimony of the lesser number

14   of witnesses is more convincing.

15         The law does not require any party to call as

16   witnesses all persons who may have been present at any time

17   or any time or place involved in the case or who may appear

18   to have some knowledge of the matters at issue in this trial.

19   Nor does the law require any party to produce as exhibits all

20   papers and things mentioned in the evidence in this case.

21         It has been brought out that an attorney has talked

22   with a witness.  There is nothing wrong with an attorney

23   talking to a witness for the purpose of learning what the

24   witness says or knows about the case and what testimony the

25   witness will give.

1              You have heard some of the attorneys object to

2    certain testimony and exhibits based on the attorney-client

3    privilege.  The attorney-client privilege is allowed by law --

4        (Pause in proceedings due to computer technical issues.)

5              THE COURT:  All right.  You have heard some of

6    the attorneys object to certain testimony based on the

7    attorney-client privilege.  The attorney-client privilege

8    is allowed by law to permit free communication between an

9    attorney and a client for the purpose of obtaining legal

10   advice.  You may not draw any adverse inference solely because

11   a witness or a party has asserted this privilege

12             There is one more general subject that I want to talk

13   to you about before I begin explaining the elements of the

14   plaintiff's claims.

15             The lawyers for both sides objected to some of the

16   things that were said or done during the trial.  Do not hold

17   that against either side.  The lawyers have a duty to object

18   whenever they think that something is not permitted by the

19   rules of evidence.  Those rules are designed to make sure that

20   both sides receive a fair trial.

21             And do not interpret my rulings on their objections

22   as any indication of how I think the case should be decided.

23   My rulings are based or were based on the rules of evidence,

24   not on how I feel about the case.

25             Remember that your decision must be based only on the

1    evidence that you saw and heard here in court.

2           That concludes the part of my instructions explaining

3    the duties, the general rules that apply in every civil case,

4    and the rules that you must use in evaluating particular

5    testimony and evidence.

6           In a moment, I will explain the elements of the

7    plaintiff's claims and the defendant's defenses.

8           I shall now give you the definition of some important

9    legal terms.  Please listen carefully to these definitions so

10   that you will understand the terms when they are used later.

11          When I say the party has the -- that a party has the

12   burden of proof, or if I use the expression "if you find" or

13   "if you decide," I mean the evidence must satisfy you that the

14   proposition on which that party has the burden of proof has

15   been established by evidence which outweighs the evidence

16   against it.  You must consider all the evidence regardless of

17   which party produced it.

18          Similarly, to establish by preponderance of the

19   evidence means to prove that something is more likely so than

20   it is not so.

21          In other words, a preponderance of the evidence

22   in this case or in the case means such evidence as when

23   considered and compared to that opposed to it has more

24   convincing force and produces in your mind a belief that what

25   is sought to be proved is more likely true than not true.

1          In determining whether any fact in issue has been

2    proved by a preponderance of the evidence in the case, you

3    may, unless otherwise instructed, consider the testimony of

4    all witnesses, regardless of who may have called them, and

5    all exhibits received in evidence, regardless of who may have

6    produced them.

7          Both federal and state laws prevent employers from

8    discriminating against individuals in the workplace on account

9    of certain protected characteristics such as race, color,

10   gender, national origin, and religion.

11         The law prohibits an employer from discriminating

12   against an employee because of her religion.  One type of

13   religious discrimination is an employer's failure to

14   reasonably accommodate an employee's sincerely held religious

15   beliefs.

16         When an employment requirement conflicts with an

17   employee's sincerely held religious belief and the employer

18   knows of the employee's belief, federal law requires that the

19   employer accommodate the employee's religious belief unless

20   the employer demonstrates that it is unable to reasonably

21   accommodate the employee's religious belief without undue

22   hardship to the employer's business.

23         Another type of discrimination occurs when an

24   employee takes an adverse action against an employee because

25   of her religion.  Federal and Michigan law provide that an

1    employer shall not discriminate against a person regarding

2    employment, compensation, or a term, condition, or privilege

3    of employment because of race, color, gender, national origin,

4    or religion.

5           In this lawsuit plaintiff Lisa Domski says that

6    defendant Blue Cross Blue Shield of Michigan violated federal

7    and Michigan civil rights laws when it denied her request for

8    an exemption from its COVID-19 vaccination requirement which

9    was based on her religious beliefs.  She also contends that

10   Blue Cross discriminated against her by firing her because of

11   her religion.

12          Blue Cross contends that Ms. Domski failed to meet

13   the requirements for a religious accommodation because she

14   did not demonstrate that her objections to the vaccine -- I'm

15   sorry -- the vaccination requirement was based on a sincerely

16   held religious belief.  It also contends that the plaintiff's

17   religion was not a consideration in the termination.

18          The plaintiff has the burden of proof on all the

19   elements of her claims and the defendants have the burden of

20   proof on all the elements of their defenses.  I will explain

21   both to you in a moment.

22          For the first claim the plaintiff contends that the

23   defendant discriminated against her in violation of federal

24   law by denying her request for a religious accommodation

25   consisting of an exemption to the defendant's policy that all

1    employees be vaccinated against COVID-19.  To establish her

2    claim of discrimination for failure to accommodate, the

3    plaintiff must prove each of the following elements by a

4    preponderance of the evidence:

5            First, that she holds a sincere religious belief that

6    conflicts with an employment requirement; second, that the

7    defendant was informed about the conflict; and third, that she

8    was discharged for failing to comply with the conflicting

9    employment requirement.

10            If you find that the plaintiff has proved each of

11    these elements by a preponderance of evidence, your verdict

12    should be for the plaintiff.

13            If, on the other hand, you find that the plaintiff

14    has failed to prove any of these elements, your verdict should

15    be for the defendant.

16            With respect to the first element, the term

17    "religion" includes all aspects of religious observance,

18    practice, and belief.  The law -- the law's protections apply

19    whether the religious beliefs or practices in question are

20    common or non-traditional and regardless of whether they are

21    recognized by any organized religion.  However, beliefs that

22    are essentially social, political, or philosophical, a matter

23    of personal preference or conscience, or the product of a

24    personal moral code are not religious beliefs protected?

25    A.   By law.

1          Overlap between a religious and a non-religious view

2     does not place it outside the scope of the law's religious

3     protection as long as the belief is part of a comprehensive

4     religious belief system and is sincerely held.

5          Only sincerely held religious beliefs warrant

6     protection under the law.  To determine whether a conflict with

7     an employment requirement is based on the kind of religious

8     belief that merit an accommodation, you should look to whether

9     the beliefs possessed by the plaintiff are sincerely held and

10    whether they are in her own scheme of things religious.  An

11    employee's sincerity is largely a matter of credibility.

12         With respect to the second element, the plaintiff

13    must inform her employer of her request for an accommodation

14    with enough detail to permit the employer to determine that

15    it is motivated by her sincerely held religious belief.

16         If the employer is not certain about the basis for

17    the request, its managers are entitled to ask the employee to

18    clarify the nature of the request.

19         For her second claim the plaintiff contends that the

20    defendant discriminated against her in violation of Michigan

21    and federal law by terminating her employment because of her

22    religion.

23         To establish this claim the plaintiff must prove each

24    of the following elements by a preponderance of the evidence.

25         First, that the defendant discharged the plaintiff;

1      and second, that religion was one of the motives or reasons

2      that made a difference in determining to discharge the

3      plaintiff.

4              If you find that the plaintiff has proved both of

5      these elements by a preponderance of evidence, your verdict

6      will be for the plaintiff.

7              If, on the other hand, you are -- you find that the

8      plaintiff has failed to prove either of these elements, your

9      verdict will be for the defendant.

10             With respect to the second element, the plaintiff

11     must prove that she was discriminated against because of

12     religion.  The discrimination must have been intentional.  It

13     cannot have occurred by accident.  Intentional discrimination

14     means that one of the motives or reasons for the plaintiff's

15     discharge was religion.

16             Plaintiff does not have to be the only -- or I'm

17     sorry -- religion does not have to be the only reason or even

18     the main reason, but it does have to be one of the reasons that

19     makes a difference or that made a difference in determining

20     whether or not to discharge the plaintiff.

21             If you find that the defendant conducted a

22     reasonable investigation into the plaintiff's request for

23     an accommodation and came to the honest belief that it had

24     a legitimate non-discriminatory reason for terminating the

25     plaintiff, you may consider that finding when you decide if the

1    plaintiff has proved intentional discrimination.

2              After receiving a religious accommodation -- after

3    receiving a religious accommodation request from an employee,

4    an employer is permitted by law to make inquiry into the

5    religious nature and sincerity of the employee's religious

6    beliefs.

7              Therefore, standing alone, the fact that an employer

8    inquired about a religious -- about the religious nature and

9    sincerity of the employee's religious beliefs is not evidence

10   that the plaintiff's religion was a motivating factor in its

11   employment decision.

12             If you find for the plaintiff on either of her claims

13   of employment discrimination then you must determine the amount

14   of plaintiff's actual damages.

15             The plaintiff has the burden of proving actual

16   damages by a preponderance of the evidence.

17             Damages means the amount of money that reasonably and

18   fairly will compensate the plaintiff for any injury you find

19   was caused by the defendant's unlawful conduct.

20             Damages must be reasonable.  If you find that the

21   plaintiff is entitled to a verdict you may award it only such

22   damages as will reasonably compensate her for such injury and

23   damages as you find from a preponderance of the evidence in the

24   case that she has sustained as a proximate result of the

25   unlawful conduct by the defendant.  You are not permitted to

1    award speculative damages.

2             In determining the amount of damages, you should

3    consider the following:

4             First, economic damages for back pay.  Back pay

5    consists of any wages and fringe benefits the plaintiff would

6    have earned on her employment with the defendant if she had not

7    been placed on unpaid leave on December 9, 2021, and later

8    discharged through the date of your verdict, taking into

9    consideration any increase in wages and benefits she has proven

10   minus the amount of earnings and benefits the plaintiff may

11   have received from other employment during that time.

12            Second, economic damages for front pay.  Front pay

13   consists of lost future wages and lost future benefits that you

14   decide the plaintiff is reasonably certain to sustain in the

15   future taking into consideration any increases in wages and

16   benefits that could reasonably have been expected.

17            You may award front pay damages only through

18   December 31, 2034.

19            Non-economic damages.  You should include damages

20   for embarrassment, humiliation, fright and shock, and mental

21   anguish that you decide must have been sustained by the

22   plaintiff to the present time that the plaintiff is reasonably

23   certain to sustain in the future.

24            Which, if any, of these elements of damages has been

25   proved is for you to decide based upon the evidence and not

1    upon speculation, guess, or conjecture.

2          The amount of money to be awarded for certain

3    non-economic damages cannot be proved in a precise dollar

4    amount.  The law leaves such amount to your sound discretion --

5    I'm sorry -- to your sound judgment.

6          Your verdict must be solely to compensate the

7    plaintiff for her damages and not to punish the defendant or to

8    serve as an example or to warn others.

9          If you find that the plaintiff was injured as a

10   result of illegal conduct by the defendant you must determine

11   whether the plaintiff could have done something to lessen the

12   harm that she suffered after the jury.

13         The defendant has the burden to prove by a

14   preponderance of the evidence that the plaintiff could have

15   lessened or reduced the harm suffered to the plaintiff by

16   following the jury by, for example, obtaining alternate

17   employment and that the plaintiff has failed to do so.

18         If the defendant establishes by a preponderance of

19   the evidence that the plaintiff could have reduced the harm she

20   suffered but failed to do so, the plaintiff is entitled only to

21   damages sufficient to compensate for the injury that

22   the plaintiff would have suffered had the plaintiff taken

23   appropriate action to reduce the harm following the injury.

24         In addition to the damages and other instructions,

25   the law permits the jury under certain circumstances to award

1    the injured person punitive damages in order to punish the

2    individual defendant for some extraordinary misconduct and to

3    serve as an example or warning to others not to engage in

4    such conduct.  These punitive damages may be awarded for

5    violations of the plaintiff's rights.

6          If you find that -- if you find in favor of the

7    plaintiff, and if you find that the defendant has acted with

8    malice or reckless indifference to the plaintiff's right not to

9    be discriminated against on the basis of her religion, you may

10   but are not required to award the plaintiff an additional

11   amount as punitive damages if you find it is appropriate to

12   punish the defendant or deter the defendant and others from

13   like conduct in the future.

14         Whether to award the plaintiff punitive damages and

15   the amount of those damages are within your sound discretion.

16         Factors which, in appropriate circumstances, you may

17   consider in awarding punitive damages include but are not

18   limited to the nature of the defendant's conduct, the impact of

19   the defendant's conduct on the plaintiff, the relationship

20   between the plaintiff and the defendant, the likelihood that

21   the defendant would repeat the conduct if a punitive award

22   is not made, the defendant's financial condition, and any other

23   circumstance shown by the evidence, including any circumstances

24   of mitigation that bear on the question -- on the question of

25   the size of any punitive award.

```
 1            The fact that I have instructed you as to the proper
 2   measure of damages should not be considered as indicating any
 3   view of mine as to which party is entitled to your verdict in
 4   this case.
 5            Instructions as to the measure of damages are given
 6   for your guidance only in the event that you should find in
 7   favor of the plaintiff from a preponderance of the evidence
 8   in the case in accordance with the other instructions.
 9            Now that concludes the part of my instructions
10   explaining the rules for considering some of the testimony
11   and evidence.
12            Now we will hear the closing arguments of the
13   attorneys.  Please pay attention to the arguments, but remember
14   that the closing arguments are not evidence, but they are only
15   intended to assist you in understanding the evidence and the
16   theory of each party.  You must base your decision based solely
17   on the evidence.
18            Now, the attorneys will begin their arguments now.
19   We will hear from the plaintiff first.  Then we will take a
20   break.  And then we will hear the rest of the arguments and
21   I'll give the final instructions and then you'll have the case
22   to deliberate on.
23            So please pay attention and remember that the
24   arguments are not evidence themselves.  What you have heard
25   over the last several days in court through the presentation
```

1    of evidence is the facts based upon which you must decide the

2    case.

3              Mr. Marko, are you prepared to address the jury?

4              MR. MARKO:  I am, your Honor.

5              THE COURT:  You may proceed.

6              MR. MARKO:  May I set up my timeline?

7              THE COURT:  Yeah.

8              MR. MARKO:  Thank you.

9              THE COURT:  You want to put it up here?

10             MR. MARKO:  Is that okay?

11             THE COURT:  Yeah.

12             MR. MARKO:  Thank you, Judge.

13             Good afternoon, ladies and gentlemen.  This will be

14    the -- one of the last times I talk to you.  So this is

15    closing argument.

16             I want to thank you so much for your time and

17    attention to this case.  As I told you when we started, this

18    is an important case.  It goes beyond just Lisa Domski.  It

19    goes beyond just this courtroom.

20             And I know that many of you had to make great

21    sacrifices and drive in from far away and it was a busy week.

22    So I appreciate your time on behalf of Lisa.

23             You know, I have been fighting for Lisa, and I hope

24    you know and I hope you can tell that I have done the best job

25    that I can here and that I sincerely care about her and I care

```
 1    about this result, just as we all do in this room.
 2              THE COURT:  Mr. Marko, just pull that back so I can
 3    see it.
 4              MR. MARKO:  Yeah, no problem, Judge.
 5              THE COURT:  That's good.  I can get a view.
 6              MR. MARKO:  Can you get a good view?
 7              THE COURT:   I can see.  Thanks.
 8              MR. MARKO:  I know, look, I have had a lot of stuff,
 9    because there's a lot of stuff in this case, and I wanted to
10    make sure that I could present it as clear as I possibly
11    could.
12              There's, like, tens of thousands of documents, and
13    you saw all the things that we had to go through in this case.
14    And I started off this case by telling you that -- about the
15    Constitution and about these rights.
16              And you know what, it can get lost sometimes as we
17    sit here in 2024, and we grew up with these rights and we take
18    a lot of them for granted.  I mean, but these really are
19    rights that are over 200 years old that people had to fight
20    and die for.
21              This -- this was not a right that was just given.
22    This was a right that had to be fought for and had to be
23    taken.  And it was fought on battlefields.  People have died
24    in the history of this country for these rights, for the
25    freedom of religion, for the freedom to be treated equally,
```

1    for the freedom -- for the freedom not to have you be judged
2    based on the color of your skin or your religious beliefs or
3    maybe your not religious beliefs.  But it's your choice.
4         And so never forget these principles we always have
5    to fight for.  And now the fight is in the courtroom.  We
6    don't fight on the battlefield anymore, thank God.  At least
7    not now.  At least not in the late 80 years.
8         But these fights, this fight is in the courtroom.
9    And that's why we trust you.  We trust all of you.  And
10   as I said in my opening, we don't trust anybody else.  We
11   certainly don't trust the lawyers.  We don't trust even
12   federal judges to make these decisions and protect these
13   rights.  We trust you.
14        And that's why I'm going to be asking for a verdict
15   on behalf of Lisa Domski for what happened to her and for a
16   violation of those rights, because there is no other option.
17   You know, there's no appeal process in this case.  We can't go
18   back in time.  There's no other option.
19        Here we are, we're forced to be here.  If these
20   rights mean anything, they need to mean something through you
21   and through a verdict.  And I hope that you will give full
22   justice in this case and a full verdict that protects these
23   rights of every single one of us in the room.
24        It's not just Lisa.  It's every single one of us.
25   And that's why this case is so important.  This case is so

1    important for everyone, not just Lisa Domski.  And I -- I hope

2    that our verdict and I trust your verdict will reflect it.

3            It's always hard to do closing arguments because, you

4    know, I have been working on this case, I get -- I get mad,

5    I get sad, I get happy, you know, I get everything in between

6    while we're getting ready and while we're here, and today

7    I have to give it up.  And it's hard, because I will have no

8    more control over what happens.  But that's okay.  And that's

9    why you're here.  Because it will be in your hands today.  It

10   will be your decision to protect Lisa and to protect these

11   rights.

12           And I mean that from the bottom of my heart and my

13   conscience.  We talked a lot about conscience and what's in

14   our heart, and I mean that from the bottom of my heart in

15   this case.

16           Thomas Jefferson once said -- and again, I go back to

17   the founding fathers because that's where this all started.

18   He said the constitutional freedom of religion is the most

19   inalienable and sacred of all human rights.  And that's why

20   they put it in the First Amendment of the Bill of Rights, the

21   very First Amendment.

22           And a corporation, regardless of what you believe

23   about the vaccine, regardless of what you believe about

24   prudent decisions and what you would have done, that's not

25   what this case is about.

1          And so if somebody back there, when you guys go --
2   when you ladies and gentlemen, when you go back there and you
3   start discussing this case and somebody says, I would have
4   done something differently, please remind them, that's not
5   what this case is about.
6          It's about your individual right not to have a
7   corporation, an insurance company, an insurance -- an
8   insurance corporation that's making over $30 billion a year
9   to tell you what you have to put in your body, and to tell you
10  what you have to believe.  That's illegal.  That is illegal.
11  And that's why we're here.  That's why we're here.
12         The -- we heard about the Civil Rights Act, and
13  I talked about how important it was, and that's what this case
14  has brought up.  And I talked a little bit about the law.  The
15  Judge has instructed you on the law.  But you know who hasn't
16  talked about the law throughout this whole case?  Blue Cross
17  Blue Shield.
18         We heard so many excuses.  We heard so many things.
19  They never talked about the law.  Didn't hear about the
20  Constitution.  Didn't hear about the Civil Rights Act of 1964.
21  Didn't even hear about the EEOC guidelines that they -- that
22  they told they were supposed to be using and supposed to be
23  trained on.
24         And you know why?  Because they lose under the law.
25  They lose under the law.  And they have looked for loopholes.

1     Oh, Lisa, you didn't put the word, Catholic.  You didn't put

2     the word, Catholic, in this accommodation request, so it's

3     your fault.  That's not how the law works.  There is no magic

4     words, ladies and gentlemen.

5          And if they sincerely needed more information, there

6     is a way to go about it, like a human being.  Like a human

7     being.  Lisa, we need some more information.

8          And by the way, they knew she was Catholic.  She

9     put Father Ptak, the Very Most Reverend, right in the

10    questionnaire.  What do you think Our Lady of Our Sorrows is?

11    What do you think Our Lady of Sorrows is?  They knew.  But

12    they are looking for a loophole.

13         So let's talk about the law a little bit.  And I know

14    there's a lot of jury instructions.  I mean, and they are

15    confusing to even lawyers, believe it or not.  But the law is

16    that an employer must provide a reasonable accommodation to

17    employees because of their sincerely held religious belief.

18    That's the law.

19         It's not because you're Catholic.  It's not because

20    you're Baptist or any other religion.  And as you saw from

21    that exhibit that I did on redirect with Lisa, they knew this

22    because they put it in their own questionnaire, secret memos

23    to Jeff Walters.

24         They said:  Don't ask the employee what religion they

25    are, because that's not the question.  So if somebody back

1    there says:  Well, what about, you know, the defense said that

2    she didn't use the word Catholic?  Remind them, that's not

3    the law.  That's not what is required.

4         It's a reasonable accommodation for religious belief.

5    And she struggled with it and she did the best that she could.

6    She's not a lawyer.  She didn't have legal experience.  And

7    she didn't want to be here.  She didn't want to be here in

8    front of a bunch of strangers to have to take you out of your

9    lives to defend her religion, and have her daughter up on the

10   stand crying and embarrassing, and have Larry have to get up

11   here, and have to call in all these people from the community.

12        It's like the Salem witch trials, defending your

13   religion in front of a bunch of strange people and putting

14   your religion on display.  It didn't have to happen.

15        They could have made one phone call to Father Ptak,

16   but they didn't want to.  They didn't want to.  They could

17   have told her, we're too lazy.  Your 30-plus years -- 38,

18   32, whatever, 30-plus years, you do the math yourself back

19   there -- your 30-plus years, they couldn't make a phone call?

20        Go tell her, Lisa, if you don't get us a statement

21   from your priest, the office of general counsel or whoever

22   else was really making the decisions in this case, we still

23   don't really know, whoever was making the decisions in this

24   case might deny your request.

25        But they didn't do that, because they didn't care.

1    They didn't want to know.  So if somebody back there says:

2    Well, she didn't use the word, Catholic, you remind them,

3    there's no magic words.  That's not the law.  That's not how

4    this works.

5            And they have specific guidelines for COVID.  And

6    they specifically say that they have to provide a religious

7    accommodation to an employee and that they have to consider

8    other options unless it would cause an undue hardship.

9            They're not claiming undue hardship in this case.

10   You know why?  Because they make over $32 billion a year.

11   Ladies and gentlemen, $32 billion, over 32,000 million

12   dollars, 32,000 million dollars a year.  It is so

13   astronomical.

14           Ford Motor Company just reported its big decrease in

15   revenue, a big bummer, that they only made 800 million.  This

16   company is making 32,000 $800 million dollars a year, and

17   that's why they are not going to tell you it was an undue

18   hardship.

19           And another reason it wasn't an undue hardship is

20   because she was already working from home.  She was already

21   working from home.  Who was she hurting?  Who was she a danger

22   to?  Sitting in her basement, with that big screen she had to

23   go use her own money to buy, working on their -- working on

24   their stuff.  And so look at the law.  And they didn't offer

25   her any other options.

1          Once an employer has notice of an employee's

2    sincerely held religious belief, practice, or observance,

3    the employer must provide an accommodation.

4          Notice what it doesn't say.  It doesn't say once an

5    employer has notice of how you label yourself.  You know, we

6    all label ourselves.  Even among the Catholic faiths there's

7    different views on things.  All right?  There's a lot of

8    different Catholics who have a lot of different opinions.  It

9    doesn't say you have to be Catholic or Baptist or any of that.

10   It says, what is your belief.  And that's why they asked it.

11         EEOC guidance explains that the definition of

12   religion is broad and protects not only just beliefs but

13   practices and observances, even ones that the employee may be

14   unfamiliar; therefore, that the employer should ordinarily

15   assume that the employee's request for religious accommodation

16   is sincere.

17         Did they assume in this case -- did -- let's go back

18   to the start.

19         Did Blue Cross Blue Shield follow this requirement?

20   Did they start with the assumption that our employees who are

21   making these claims are sincere or did they start with the

22   assumption that during that October 12 secret meeting that

23   she didn't know was being recorded that we're going to start

24   denying these requests, and that we're going get Bart

25   Feinbaum, whose conducted over a 100 depositions, to help us

 1    develop a process to do that?  They didn't follow that rule.

 2         An employer should thoroughly consider all possible

 3    reasonable accommodations, including telework or

 4    reassignments.

 5         Ask Blue Cross when they get up, what other option

 6    did you consider in this case?  What one?  They didn't name

 7    one option that they considered in this case.  The ax came

 8    down on Lisa Domski without any consideration.  She was

 9    already teleworking.  She was already teleworking.

10         And this is their own guidance.  That's why they want

11    to stay away from the law.  That's why you haven't heard them

12    talk about it at all.  That's why everybody suddenly forgets

13    from Blue Cross.

14         They didn't call a single witness.  Most trials, both

15    sides call and put on their evidence.  Blue Cross didn't call

16    a single human being to come into this court to talk to you

17    and explain what's really going on here.  Not one.  Not one

18    witness.

19         Go ahead to the next one.

20         Prohibits employment discrimination based on

21    religion.  This includes the rights of employees to request a

22    reasonable accommodation that -- again, if it conflicts with

23    their beliefs.

24         Under Title VII it is called a request for a

25    reasonable accommodation.  And here's -- here's the one that

1    I used a lot.  Magic words.  Because they realize, look, this
2    is not a trick.  This isn't a loophole that we can get through
3    the Constitution.  It's not like a big loophole where we can
4    say, "Ah, gotcha."

5        We had general counsel on this case.  We set up a
6    process so that you will lose, employee Lisa Domski.  We set
7    up a process that is stacked against you so you're going to
8    lose.

9        No, the EEOC says it doesn't work like that.  This
10   shouldn't be that hard.  This shouldn't be that hard.  You
11   don't have to use magic words.  And you know what, we have
12   more.  You can look at it.  This is Plaintiff's Exhibit 60.
13   I know you have been paying attention.  I know that you
14   understand.

15       So go ahead.  Let's go through that.

16       So let's talk about what happened.  All right?
17   So October 12, 2021, we know, and thank God we have this
18   recording, because imagine if we didn't.  Imagine if this was
19   just blocked out and we had no idea that this went on; right?
20   We would be hearing a whole different story.

21       But we know that on October 12 they all get together
22   and Patricia Snyder, who couldn't remember just about anything
23   when I asked her questions, it was like she had amnesia or
24   something when she came here, and then when the defense
25   counsel asked her questions she suddenly perked up and was

1   looking over there and Mr. -- Mr. -- he was shaking his head

2   and, yeah, yeah, this is what we want.

3          But on October 12, they had this secret meeting where

4   she straight up says, we're not going to accept all religious

5   requests.  And you know what, it's fair to say, you know what,

6   we want to make sure that we have some legitimate requests

7   here and people aren't gaming the system.  That's fine.  Okay.

8   That's fine.

9          But they are starting off, the head person is

10  literally starting off with this idea, we're going to

11  deny these requests.  And then they start talking about

12  scrutinizing and conducting depositions, which is what happens

13  in a lawsuit at an October 12 meeting with an attorney who has

14  40-plus years of experience in employment law, in employment

15  litigation, which is like three times the experience that

16  I have in employment law.

17         And then they say, we don't want there to be any

18  witnesses.  Who would say who?  That would say that?  You

19  know who says that is criminals.  It's people who are breaking

20  the law, don't want any witnesses.

21         If you're the victim of a crime, you sure want as

22  many witnesses as you can get.  And they could have done this

23  real simple.  Let's have recordings.  Let's record every

24  single meeting.  Let's make sure we have a fair record so,

25  God forbid, we have to go in front of a bunch of strangers in

1    the Eastern District of Michigan, Federal Court, we're going

2    to have all the evidence there.

3            But no, they set this up behind closed doors.  They

4    set up a corrupt process, because they wanted to get the

5    result, and they started scheming.  They had attorneys there.

6    Then they started putting things behind a wall of what's

7    called attorney-client privilege.

8            And as the judge has told you, attorney-client

9    privilege is fine because it allows people to talk to their

10   attorneys and get honest legal advice.

11           Lisa didn't have that opportunity before this

12   interview, they did, because they had the entire office of

13   general counsel who then they were running everything through

14   behind a wall.  And everybody that we heard on this stand

15   from Blue Cross said:  I don't know nothing about nothing

16   about the decision.

17           We even had Patricia Snyder come in here and say:

18   Well, I executed the termination but I didn't make the

19   decision.

20           Well, who made the decision?  Who was pulling the

21   strings in this case?  Oh, you can't ask that, Mr. Marko.

22   That's privileged behind the office of general counsel.

23           If you -- if you're just following the law and doing

24   things the right way, why would you need to set up a secret

25   process with an attorney so everybody can have what's called

1    plausible deniability?  But they think that we're that stupid?
2    Look at what happens when these people get on the stand.  They
3    crumble.

4          You know who was honest?  Lisa Domski.  Larry Domski.
5    Alyse Domski.  Jill Fortener.  Father Ptak.  Ask yourself when
6    you're evaluating, did they seem honest and credible to you?
7    Or was it the people that can't seem to remember anything and
8    say:  I can't answer that because that went behind the office
9    of general counsel.

10         Who's playing games here?  Who's hiding the ball?
11   Who's violating the law?  It's not Lisa Domski.  She did the
12   best darn she could.  It's Blue Cross Blue Shield.  And they
13   need to pay for it.  They need to pay big time for what they
14   did in this case, because it's going to go beyond this
15   courtroom.

16         And you're going to tell them, I hope, that they --
17   not only can they not do this to Lisa Domski, but they can't
18   do this to anybody.  They can't get away with it.  They can't
19   hide.  They can't lie.  They can't blame a victim, because
20   that's not how it works.  And that's why we have you.  That's
21   why we have you.  Because you're the only people that can stop
22   it.  I can't stop it.  I'm -- I can do the best I can here.
23   Judge Lawson can't stop it.  Lawyers can't stop it.  Only you
24   can stop it.

25         Wizard of Oz.  It's like the Wizard of Oz, as

 1   I was thinking about this case and the frustration that

 2   I experienced, not even being able to have this corporation

 3   explain, who fired Lisa Domski?  Maybe we will find out in

 4   closing when I sit down.  Who fired Lisa Domski?  We still

 5   don't know.

 6          We have Jeff Walters saying he made a recommendation

 7   that went behind a secret wall of secrecy, and we don't have

 8   recordings of that.  Who fired Lisa Domski?  It's like the

 9   Wizard of Oz.  I was watching Wizard of Oz with my son

10   Jonathan who is six years old.  And in the Wizard of Oz, there

11   is this wizard who is behind this curtain and you hear his

12   voice and you have Dorothy there.

13          And finally, at the end of the -- of the movie, the

14   curtain gets taken back and there is this decrepit old man,

15   the wizard behind there, and he is ashamed.

16          And you can take the curtain away, because that --

17   I mean, I can't think of anything else of how absurd this is

18   that we're in federal court and they can't even come in here

19   and be honest with you, I made the decision.  I fired her,

20   look, I'm sorry.  Here's why I did it.

21          We didn't hear that.

22          Mr. Hubbard told you in opening, he said, I want

23   you to remember two words.  He said inform and cooperation.

24   Remember that?  Inform and cooperation.  So let's take a look

25   at that.

1        Who informed in this case?  Did they inform
2    Ms. Domski that she needed to provide additional information?
3    Did they inform Ms. Domski that if she didn't provide
4    additional information she was going to be terminated?  Did
5    they inform Ms. Domski that they needed to know the exact
6    label of her religious beliefs?
7        I didn't hear them inform her of any of that.  And
8    you would think that after 30-plus years of working for a
9    corporation and giving your most valuable asset in life that
10   you can give is not money, it's time, just like you all have
11   given your time here this week.  When you give your time to
12   somebody for over 30 years, you would think that you would get
13   more than what they gave her in this case.
14       Did they inform Lisa and thank her for her 30 --
15   I still say 38, but you guys can do the math back there --
16   her 30-plus years of service?  No.  They sent her a one-page
17   template letter that said:  You're terminated.  Box up your
18   stuff and send it back to us.
19       Let's talk about cooperation.  Did they cooperate
20   with Lisa in this case?  Did they -- was there a mutual
21   cooperation?  She filled out -- she filled out those questions
22   even though she had just buried a family member.  Imagine
23   that.  She kept pursuing that interview process, even though
24   she didn't want to go.  She cooperated with them.
25       Did they cooperate with her?  Did they call Father

1    Ptak?  Did they call anybody?  Did they tell her?  They

2    didn't.

3            Did they go into her employment file, by the way?

4    They didn't even look at her employment file, they say, which

5    shows 38 years of service and the best reviews I've ever seen

6    in my life of an employee.

7            No.  They blamed Lisa.  They blamed Lisa.  I told

8    you in the beginning that they were going to blame Lisa.

9       (Display with technology attempted.)

10           No?  Doesn't work.

11           They did.  They blamed Lisa.  They blamed Lisa in

12   this case.  They said it was her fault, even though they told

13   her in that interview that it was completely voluntary.

14           What is she supposed to think when there is an HR

15   person and a lawyer and they tell her twice it's completely

16   voluntary and it's fine to rely on her statement, which is

17   exactly what she did.  What is she supposed to do?

18           So when you go back there -- and I had this slide

19   in my opening, because I just want to remind everybody, if

20   somebody says:  Well, look, she didn't follow the policy, or,

21   you know -- and I don't know what that policy is, but the

22   policy can't override the law.  You can't have a policy that

23   says we're going to discriminate against all these people.

24   You can't have it.  It's unconstitutional.  It's illegal.  So

25   if somebody says -- bring up policy, remind them, that's not

1    the law.

2           And so let's talk about what it's going to take in

3    this case.  And we have -- you're going to go back there and

4    there is going to be a verdict form that you're going to be

5    given.  And I had it blown up so we can go through this,

6    because it was just finalized.

7           And you're going to go and you're going to have this

8    big verdict form.  This is going to be your verdict back

9    there.  Okay?  This is how your verdict is going to be entered

10   into the court and it's going to be a public verdict and we're

11   all going to be waiting on your decision in this case.

12          And a couple -- as the Judge said, you all are going

13   to deliberate back there.  And the standard is preponderance

14   of the evidence.

15          So this isn't a criminal case.  Criminal is beyond

16   a reasonable doubt; right?  You're putting somebody in jail

17   or prison, it's beyond a reasonable doubt.

18          This is a constitutional civil rights case under

19   the Civil Rights Act of 1964.  It's preponderance of the

20   evidence.  All that means is what side had a little more

21   evidence.

22          So remember we talked about the 50-yard line in

23   voir dire.  Can you be on the 50-yard line?

24          For Lisa to win, she only has to be on the 51-yard

25   line.  I hope that you find that we blew that out and that,

1    you know, like the Lions, like we're hitting touchdowns.

2    I hope you do.  I don't know what's in your mind and my --

3    I always worry.  I always worry that I missed something, that

4    I maybe should have been a little more longwinded.  I'm sure

5    you are thinking that is not the case, but I always do worry

6    that -- should I have done something else.

7            But there's two claims here, and they are fairly

8    easy.  So the first claim here, and I know the Judge likes me

9    to stand behind the podium, so the first claim here is, did

10   they deny her a request for an accommodation?

11           And I think that is so easy.  Was it based on a

12   sincerely held religious belief?

13           They have not provided one witness or one piece of

14   evidence to say that Lisa's beliefs were not sincere or were

15   insincere.  We have provided extensive evidence.  And I hope

16   you see, after hearing from Lisa and all the loved ones, that

17   she has -- you may not agree with all of her beliefs, and

18   that's okay.  That's your right to do.  Just like you are

19   allowed to have whatever beliefs you want in your heart, no

20   matter what religion you are, no matter what beliefs you have,

21   that's okay.  But she is sincere.

22           So I would ask that you answer that yes.  You can put

23   "yes" here for that question.

24           And then the second question is very similar, but we

25   also have a claim under Michigan law as well, because Michigan

1    also passed a Civil Rights Act after the Federal Government

2    passed their Civil Rights Act.

3          And the second question is, under both federal and

4    state law, but it says under Michigan and Federal law, did

5    Blue Cross -- I'm paraphrasing here -- terminate Lisa Domski

6    because of her religion.

7          And remember, it doesn't have to be, as are in your

8    instructions, it doesn't have to be the only reason.  It

9    doesn't even have to be the main reason.  It just has to be

10   did her religious beliefs, did her religious background,

11   constitute a contributing factor to her getting terminated?

12   Of course it did.  We wouldn't be here if it wasn't for her

13   religious beliefs, her submitting a religious accommodation.

14   Her telling them -- and you can read the accommodation request

15   back there if you want.

16         You know, they keep saying -- they keep attacking it

17   like somehow it's not good enough.  You know, well, what is?

18   We would like to know exactly what is.

19         Oh, we use the word, Catholic, so now she is suddenly

20   approved?  That's not true.  We all know that's not true.  If

21   Lisa used the word, Catholic, in her request we would still be

22   here.  She said she was Christian.  She cited the Bible.  And

23   she cited what her beliefs were.  So I would ask that you say

24   "yes" to this question.

25         These are very important.  They affect the verdict in

 1      this case.  So I ask that you answer those questions "yes."

 2             And now we get to what the verdict looks like.  All

 3      right?  And the first part is pretty simple, because it's

 4      adding up a bunch of numbers.

 5             So the first part of the verdict is for back pay.

 6      And all that means is what money did she lose by having her

 7      job cut short?  And that's just a math -- that's just, take

 8      out the calculator and you add it up.  So we have $100,000 she

 9      was making in 2002.  She said she had merit raises.  She told

10      us about all this other stuff.  Ladies and gentlemen, I am not

11      going to ask for --

12             THE COURT:  Mr. Marko, did you mean to say 2002?

13             MR. MARKO:  Oh, I'm so sorry, Judge.  2022.

14             THE COURT:  Okay.

15             MR. MARKO:  Yeah.  I'm sorry.  And I have limited

16      time, ladies and gentlemen.  I'm sure you would love to hear

17      me for the next five hours.  I can't.  I'm almost done and

18      it's going to be yours.  And I know I'm joking, but I have

19      to kind of -- I have to go fast, and I'm sorry for that.

20             But look, we're not even going to ask for all this

21      stuff.  Disability, even though she was getting all this

22      stuff, even though they were paying for it, I'm not going

23      to make it that complicated.  Not even the 401(k).

24             She made a hundred grand a year, roughly, just under.

25      She had bonuses and she had merit pay increases.  I'm not even

1   going to ask for the bonuses, because they varied from year to

2   year.  So it would be -- I don't want to -- I don't feel

3   comfortable doing that.

4        So if you take a hundred grand for 2022, you assume

5   she was getting raises because costs are going up, she was

6   getting raises every year, 105 in 2023, 110 in 2024, that

7   would be -- without all this other stuff, that would be

8   $315,000.  All right?  And that's out-of-pocket for lost

9   wages, lost income that she would have otherwise made.

10       And the law requires that there is full and

11  reasonable compensation.  So when you're back there discussing

12  it, and I know we're going to be talking about big numbers in

13  this case, this is an important case.  We're talking about

14  big, big numbers.  This isn't the big number yet.  We're

15  going to talk about big numbers.  But this is just for

16  out-of-pocket.

17       Then we go into the future, because that's the next

18  question.  And Lisa said she didn't know if she would have

19  ever retired or when she would retire, but I believe Larry

20  testified until about 67, so I'm just going to ask until age

21  67.  Because, remember, she had to go work at Henry Ford and

22  at the Ward Church and was making, like, $6,000.

23       So if you continue with the $5,000 a year raise

24  assumption, total merit increases, the total front pay going

25  to the year 2034, which would be when she is 67 years old,

1       would be $1.375 million.

2              And you have to write in your determination on that

3       issue, and you have to check this.  I forgot.

4              Okay.  Now, this is the real -- these are the --

5       these are the real damages in this case because, you know,

6       look, economics are easy, because it's just a calculator that

7       you can get out and you can talk about it and you can figure

8       it out.  And you may say, well, you know, maybe she wouldn't

9       have gotten that big of a bonus or whatever.

10             But the real damages in this case are what's

11      called -- the first one is to punish Blue Cross.  Okay?  And

12      the other one is to make up for the harm that was caused to

13      Lisa.  So there's two categories of damages that we're going

14      to talk about.

15             One of them is to punish.  And how do you punish a

16      corporation that is literally making $32.6 billion a year?

17      And just so you know what that looks like, it is literally

18      32,000 $800 million a year.

19             Now, the only way that somebody at Blue Cross --

20      because we're all going to go home.  You guys are going to go

21      home to your families, to what -- your jobs, to everything.

22      Lisa is going to go home.  I'm going to go back to my office

23      and go to my house.  They are going to go back to theirs.

24      Mr. Makupson is going to go back to the office of general

25      counsel and tell them about what happened here.

```
1              And there is only one thing that the defendant
2   insurance company corporation cares about.  It's money.
3   That's all that they care about.  And when you fashion a fine,
4   you fine a rich person more than you fine a poor person when
5   we talk about this type of punishment, because they just won't
6   care.
7              And if you look at the instruction, it says that you
8   can consider their financial status when you award punitive
9   damages, which is one of the elements -- which is one of the
10  elements of damages.
11             So I am going to be asking you for a very large
12  punitive damage award that I hope that the next time they have
13  a secret meeting, that we will all be at our house when they
14  have, they are going to talk about what happened and what you
15  did in Judge Lawson's courtroom for Lisa Domski, and they are
16  going to say, we can never do this again.  We can never do
17  this to people again.
18             And if you give a small punitive damage award, a
19  small award for her pain and suffering, they are not going to
20  talk about that.  They are just going to go back and high five
21  and say, it worked.  It worked.  On to the next one.
22             So I'm going to be asking for a very large verdict
23  that they hear and that they have to discuss.
24             Part of the verdict is going to be for what Lisa has
25  been through.  So part is to punish, part is to help heal, and
```

1      for the harm and for the things that they took away from her,

2      and that's non-economic damages.  And I think those are the

3      most important in this case, because that's for the -- what

4      they took away from Lisa.

5             So how do we decide that?  And the Judge read you,

6      we get -- it's called non-economic, it's pain and suffering,

7      it's everything.  But to really understand that, and you heard

8      from Lisa, and you heard from her family, we have to go back

9      to 1984, because that's when she started with Blue Cross

10     Blue Shield.

11            We don't start at 2022 when they gave her the ax and

12     she had to go out and start looking for other jobs, because

13     time is our most important and valuable asset.  So imagine if,

14     back in 1984, Lisa Domski, 17 years old, she is all excited

15     for her interview at Blue Cross Blue Shield to make $7 an

16     hour.  $7 an hour.

17            And there is a knock on the door.  And it's someone

18     in a black suit from the office of general counsel.  And Lisa

19     says:  What?  What are you doing here?

20            And he says:  I'm from the office of general counsel

21     from Blue Cross Blue Shield.  You're about to walk out that

22     door and go for a job interview that I know you're very, very

23     excited about.  Blue Cross Blue Shield is going to hire you

24     and they are going to start paying you seven bucks an hour.

25            You're then going to spend the next 38 years working

1    day in and day out, not seeing your daughter, not seeing your

2    family every day, and you're going to work your way up through

3    the corporate ladder over those 38 years.  And then one

4    day there is going to be a meeting with a lawyer and human

5    resources and you're not going to know that it's going on.

6          They are going to tell you that you have to choose

7    between your honest-to-God beliefs and giving up your job that

8    you had worked so hard for for all those years, 38 years that

9    you will never get back, that you will never get back, and

10   then they are going to put you through a sham interview

11   process with a lawyer not acting as a lawyer and a human

12   resources person.  They are going to tell you it's fine to

13   rely on your statement.  And then the very next day they are

14   going to terminate you.

15         And you know what else happened on the next day?

16         Samantha, could you go to that chart, the very last

17   page that says Snyder on it?  Right there.

18         You are going to be one of 433 people for an

19   artificial end date for Blue Cross on December 2, 2021, and

20   your religious accommodation request is going to be denied.

21         THE COURT:  I'm sorry to interrupt.  That's not

22   evidence in the case.  No witness testified to that, counsel.

23         MR. MARKO:  Judge, Patricia Snyder testified to that.

24         THE COURT:  No, she didn't.  You asked her.  You

25   stated the number.  You wrote it down.  She said she didn't

1    know.  Take that down.

2          MR. MARKO:  Okay.  Fair enough.

3          You're going to be among others who had to make the

4    decision between their religious freedom and their rights --

5          THE COURT:  I need to instruct the jury.

6          Members of the jury, counsel do their best in terms

7    of presenting the case and summarizing the evidence.  If

8    some -- either lawyer says anything to you that has not been

9    established by the evidence as you heard it, then you should

10   disregard it.  I'm not suggesting anybody is trying to fool

11   you or engage in any sort of bad faith.  But those are the

12   rules that we have to apply.

13         You may continue, counsel.

14         MR. MARKO:  And you're going to have to make a choice

15   between your religion and your job, and a job that meant a lot

16   to you.  A job that you had worked at for 38 years, that you

17   loved, that you loved so much that the godmother of your child

18   was your supervisor at your job, that you loved helping

19   people, that you loved for 38 years.  You worked your way up.

20         And a corporation is going to tell you that you have

21   to choose between your honest-to-God beliefs in your heart and

22   in your soul and in choosing that or to lose your job.  That's

23   not right for Lisa and it's not right for anybody and that's

24   illegal.

25         And so I'm asking for a verdict for the harm that

1   they did to Lisa and that they took away.  I'm asking for a

2   verdict of $36 million for the non-economic damage portion of

3   this case.

4        And I'm asking for a punitive award, a punitive

5   damage award against Blue Cross Blue Shield of $10 million.

6   And I got to be honest with you, when you have revenue of this

7   much, I don't even know if it's going to make that big of a

8   difference, that punitive damage award to them.  But I don't

9   want to be outrageous and I don't want to offend anybody here.

10        But part of this case, the punitive part of this case

11  is to make sure this doesn't happen to anybody else.  And

12  we're allowed to say that.  And you read those instructions.

13  They say the same thing.  It's not just about Lisa.  It's

14  about these rights and to make sure that they don't happen to

15  anybody else.

16        And when they go back to their corporate office and

17  they tell the other people in that meeting what happened, they

18  are going to say, we can't ever do this again.  We cannot do

19  this again.

20        Ladies and gentlemen, thank you.  I appreciate your

21  time.  I am now going to sit down.  You're going to hear from

22  the attorney for Blue Cross Blue Shield, and then I get to

23  talk to you just for a very brief amount of time before you go

24  back there to deliberate.

25        On behalf of Lisa Domski and her family, I want to

1    thank you so much for your time here and thank you.

2              THE COURT:  Thank you, Mr. Marko.

3              Members of the jury, we will take a break.  Even

4    though the evidence is in, you have heard the arguments of

5    one side, you still must not talk about the case among

6    yourselves.  That will come very shortly, but it's not yet.

7              And please don't try to gather any information on

8    your own.

9              Would you escort the jury out, please?

10             THE CLERK:  All rise for the jury.

11      (Jury left courtroom at 3:00 p.m.)

12             THE COURT:  Court is in recess.

13             (Recess taken from 3:00 p.m. to 3:25 p.m.)

14             THE CLERK:  All rise.  Court is back in session.

15             THE COURT:  You may be seated.

16             Ready?

17             MR. HUBBARD:  Yes.

18             THE COURT:  Bring in the jury, please.

19             THE CLERK:  All rise for the jury.

20      (Jury entered courtroom at 3:26 p.m.)

21             THE COURT:  You may be seated.

22             Mr. Hubbard, are you ready to address the jury?

23             MR. HUBBARD:  I am, your Honor.

24             THE COURT:  You may proceed.

25             MR. HUBBARD:  Thank you.

```
 1              Ladies and gentlemen, first, my thanks to each of
 2      you.  I know that coming to trial and being here every day
 3      listening carefully takes you away from your daily lives, your
 4      families, your jobs.  And I thank you, not just myself, but on
 5      behalf of my client.  We certainly appreciate you listening to
 6      the evidence in this case.
 7              I want to address something that Mr. Marko said in
 8      his closing statement.  I'll start there first.
 9              He kind of took a shot at me and my client.  He says,
10      Blue Cross didn't even call a witness in this case.  Remember
11      that?  They didn't even call a witness.  What kind of party
12      doesn't call a witness?
13              I want you to know, and Mr. Marko knows this, that we
14      had the opportunity when he was calling our employees to that
15      stand that we could either choose to take their testimony at
16      that point or we could wait until Mr. Marko had rested in
17      his case.  And I hope that it's okay with you, as a matter of
18      efficiency, to try to get through this trial, that we chose to
19      ask them questions when Mr. Marko was asking them questions.
20              He told you that we didn't call anybody, and he wants
21      you to believe that it's because my client has something to
22      hide.  But what he did not tell you is that we had the choice
23      to call at that time and that's what we did.
24              Another thing that Mr. Marko likes to refer to is
25      Blue Cross, a $32.8 billion company.  I understand that's a
```

```
 1    big number.  I get it.  But what he doesn't tell you is that
 2    it's Blue Cross's revenue.  Doesn't talk about the profits.
 3    He doesn't talk to you about the losses that Blue Cross takes.
 4    He just wants to headline that Blue Cross is a $32.8 billion
 5    company.  And then he compares it to Ford as if Blue Cross is
 6    much larger than Ford Motor Company.
 7            When we started this case, I shared with you that
 8    COVID-19, the shutdown, the pandemic, that was a tough time,
 9    a very tough time.  A tough time for Detroit, a tough time
10    for this state, a tough time for this country.
11            Decisions during COVID-19, the pandemic, they were
12    not easy.  And I said it in my opening and I'll say it again
13    now:  The decision by Blue Cross to implement the policy, no,
14    it wasn't easy.  But Blue Cross did what it thought was best
15    in terms of vaccination at the time, if you take yourself back
16    in time to the shutdown of 2020 and 2021.  And I shared with
17    you that Blue Cross had an accommodation process for both
18    medical and religious.  Those decisions, they were not easy.
19            Remember, this case, this case, it's not about what
20    you can see.  This case is not about what you can ascertain
21    from me, my gender.  And I suggested in my opening that you
22    might be able to guess my weight, and maybe even my age, but
23    my religious beliefs?  Truth is, as you sit there now, you
24    don't know my religious beliefs.  And the reason you don't
25    know is because you have to be informed.  And yes, Mr. Marko
```

1    said during his closing that during my opening I talked about

2    two words:  Informed.  Cooperation.

3           And it's not like "informed" is just some word that

4    has no meaning.  No, it has meaning.  It has meaning under the

5    law.  Mr. Marko, he focused on the EEOC guidelines.  But what

6    he didn't focus on was the instructions that the Judge read to

7    you about how to decide this case.

8           Ms. Domski, she alleges in her first claim that

9    my client discriminated against her on the basis of her

10   religion -- you can't see it -- on the basis of her religion

11   for failing to accommodate her request.  And in those jury

12   instructions, she has to establish first that she holds a

13   sincerely held religious belief that conflicts with the

14   policy; and, two, that my client was informed of that

15   conflict.

16          And with respect to being informed, with respect to

17   being informed, there are additional instructions that the

18   Judge has provided to you that Ms. Domski provides enough

19   detail to permit my client, Blue Cross, to determine that her

20   request is motivated by her sincerely held religious beliefs

21   and that, also, my client, its managers, Jeff Walters, are

22   entitled to ask the employee, Ms. Domski, to clarify the

23   nature of the request.  Informed.

24          And so while Mr. Marko talks about informed as if it

25   shouldn't have meaning, it does.  The law says that it has

1    meaning.  The jury instructions that you have say that it

2    has meaning.

3          And yes, the second word that I used was cooperation.

4    And that's because you will see in those very same

5    instructions that after receiving a religious accommodation

6    request the employer, Blue Cross, is permitted by law to make

7    an inquiry.  Jeff Walters is permitted by law to make an

8    inquiry into the religious nature and sincerity of the

9    employee's religious request -- excuse me -- beliefs.

10          Informed.  Cooperation.

11          Now, Lisa's written request, Exhibit 206, can we

12    please pull that up?

13          I first want to draw your attention to the fact that

14    when Ms. Domski's counsel was asking her, well, which request

15    did you actually submit?  Which one?  The one that's longer

16    with the footnotes that you signed or the one that's short

17    and doesn't have the footnotes?  Which one did you actually

18    submit?  And you heard her on that stand and she said:

19    I don't recall.

20          I don't recall?  We are in federal court, a jury

21    trial, and we have taken a week of your time, and the

22    plaintiff doesn't recall what request she actually submitted

23    to my client?

24          The truth is that she very much does recall.  And we

25    know that, because in September of 2024 she swore under oath

1    to this Court which one she submitted.  She swore under oath

2    that the one that she submitted is the one that you're looking

3    at that doesn't have the footnotes.

4           So how is it that here we are now at the jury trial

5    when she told the Court which one she submitted and now she

6    says to you:  I don't recall?

7           Now, she says in this letter that she is Christian.

8    But we heard testimony that within Christianity there are many

9    tenets, tenets of faith.  Reverend Ptak, he was asked the

10   following question.  And I'm going to focus on the testimony.

11   That's the evidence.

12          Reverend Ptak was asked:  Are all Christians

13   Catholic?

14          The answer is:  No.

15          Mr. Keller, fine gentlemen.  Ms. Domski did great

16   things for Mr. Keller, not going to deny that.  But Mr. Keller

17   was asked about Christianity, and this is what he had to say:

18          There is certain things within the Catholic field

19   that -- or not field, but the Catholic religion that

20   differentiates from, say, Lutheran or non-denomination --

21   excuse me -- non-denominational.  You have things like

22   Mother Mary and confession.  Even though it's all one root

23   cause from Christianity, they have what they call branches of

24   them, like Baptist believe in different things, Lutherans

25   believe in different things, Catholics believe in different

 1    things.

 2            And so he was asked:  Is it helpful in understanding

 3    where somebody might lie or fall within those tenets of faith?

 4            And his answer was:  Yes.

 5            Jeff Walters.  The gentleman that interviewed

 6    Ms. Domski.

 7            He says:  And there are a lot of different sects of

 8    religion; right?

 9            Answer:  Yes.  There's a lot of different rules.

10            And Mr. Marko asked him:  I bet the Methodists have

11    different rules than that apply for us Catholics.

12            Answer:  Yeah.  It's a big umbrella, Christianity.

13            Mr. Marko responded:  Yes, it is.

14            And so we're back to the jury instruction.  Again,

15    the law.  We're back to the jury instruction that an employer

16    is permitted to make an inquiry, and managers are entitled to

17    ask, to clarify the nature of the request.  They are entitled

18    to ask.  And that's what my client did when Jeff Walters had

19    the meeting with Ms. Domski.

20            Now, Father Ptak, he acknowledged in his testimony

21    that people can do a good job of pretending.  That's the very

22    Reverend Ptak who Ms. Domski called in her case-in-chief, his

23    testimony.  We could do a good job pretending.

24            So Mr. Walters, he says:  I really want -- excuse me.

25    I don't want to misquote.

1          I wanted to really understand in the employee's own

2    words why they were requesting the accommodation, and that's

3    because Christianity is such a big umbrella.

4          It helps to be informed.

5          Now, counsel, Mr. Marko, he wants to focus on

6    Mr. Feinbaum and Tricia Snyder.  And look, they said some

7    things that were insensitive.  I understand that.  But

8    Mr. Feinbaum, within 18 or 19 days of having said that, he

9    is no longer involved.  And Ms. Snyder, she actually -- she

10   acknowledges that maybe not the best choice of words.

11   I understand that.

12         But Ms. Domski didn't meet with Mr. Feinbaum.

13   Ms. Domski did not meet with Ms. Snyder.  And we know from

14   Plaintiff's Exhibit 94, we know from their own very exhibit

15   that Mr. Feinbaum is out, Jeff Walters and Rudy Makupson,

16   who I have known for a long time, are now overseeing it.

17         And I just would like to offer to you an observation.

18   That happened with Blue Cross's on its own accord.

19         What do I mean by that?  You keep hearing counsel

20   referencing a transcript or a recording in early October that

21   involved Mr. Feinbaum and Ms. Snyder.  Mr. Feinbaum being out

22   of the process in a matter of 18 or 19 days thereafter,

23   Blue Cross did that on its own accord without even knowing

24   that there were some recording or whatever out there.  It

25   didn't take a recording or a transcript before Mr. Feinbaum

 1   was no longer involved.

 2         Mr. Walters, he wasn't trained by Mr. Feinbaum.  He

 3   wasn't trained by Ms. Snyder.  Mr. Walters, he was trained by

 4   Rudy Makupson.  And he testified that Rudy:  Makupson trained

 5   me probably, maybe a total of five to ten hours during -- or

 6   excuse me -- prior to the interviewing process.

 7         And then you heard Mr. Marko talk about the Wizard of

 8   Oz, and we're trying to hide behind the curtain.  I would

 9   suggest to you quite the contrary.  I actually see nothing

10   wrong with going to Rudy Makupson to make sure that the

11   process is sound, to make sure that the process is sound,

12   with Rudy Makupson training Jeff Walters.

13         Now, Ms. Domski, she is a very effective communicator.

14   She described herself as having core strengths in

15   communications and that she is, quote, "excellent," excellent,

16   when it comes to communications.

17         And again, Mr. Keller, he agreed.  I asked him:  And

18   so you always found in talking with your Aunt Lisa that it

19   was fairly easy for her to explain things; yes?

20         Answer:  Yes.

21         I asked him again:  She would explain things to you;

22   yes?

23         Answer:  Yes.

24         Reverend Ptak said:  She was always genuine in what

25   she said.

```
 1              And you asked her questions about how she felt and
 2    she told you; right?
 3              Answer:  Yes.
 4              And so he also said she articulated the reasons why
 5    her Catholicism, not Christianity, her Catholicism, don't
 6    allow her to take the vaccine; yes?
 7              Answer:  Yes.
 8              And then when it came time to actually meeting with
 9    Ms. Domski, Ms. Domski said that she understood that we were
10    looking for cooperation.
11              Her answer to Mr. Walters was:  Absolutely.
12              She didn't say:  I'm going to have trouble answering
13    questions today.
14              And I say this respectfully, but she didn't say:  I'm
15    going to have trouble answering questions today because I had
16    somebody most recently pass away.
17              She instead had a stock answer, an answer that she
18    gave verbatim to the questions repeatedly.
19              Question 1:  Why are you requesting an accommodation
20    to the vaccine?
21              And I'm only going to say it once, because I have
22    said it a lot, but you know what the answer was:  I understand
23    the company has issued a vaccine mandate.  I have asked for a
24    religious accommodation.  I have submitted a statement in
25    support of the accommodation and the statement speaks for
```

```
 1    itself.  I have nothing to add.
 2          To me, and you will decide this, but to me, that
 3    sounds like an answer given by somebody not that a big weight
 4    came off their shoulders because somebody said it was
 5    completely voluntary, but it was an answer that they gave
 6    because they knew they were going to give it when they went
 7    into the meeting.
 8          I even asked Ms. Domski:  Do you usually use
 9    precisely the same words when asked questions?
10          No, I don't usually do that.
11          But she did that here.  And she did that here because
12    she knew going in how she was going to answer.  She gave that
13    answer three times, including about:  What are your religious
14    beliefs?
15          Is that cooperation?
16          In Mr. Marko's opening he said:  And when you hear
17    about why she believes what she believes, you hear how
18    sincere she is.  Mr. Marko in his opening statement said to
19    you, when you hear -- not when you read -- when you hear about
20    why she believes what she believes, you hear how sincere her
21    belief is.
22          And she was asked a number of questions about her
23    religious beliefs.  And she was asked that because as part
24    of her claim she has to establish to you that her religious
25    beliefs are sincere.  And when she was describing to you her
```

1   religious beliefs, she was talking about Catholicism, the

2   Catholic church, taking the eucharist, being a eucharistic

3   minister, being part of a Catholic church that's part of the

4   Archdiocese of Detroit, all things that she informed you of,

5   but for which she never informed my client, Blue Cross.

6           And Mr. Marko, in his opening statement, he said:

7   She is not going to come in here to this Court and bad mouth

8   Blue Cross because she loved her job.  She loved her job.

9           But if she loved her job, and she was applying for

10  an accommodation to a policy which she knew that she had to

11  secure the accommodation for and she wanted to keep that job,

12  why not speak during the meeting?

13          We know that -- and we will get to it in a minute,

14  but we know that even before she went into that meeting she

15  was announcing to the public on Facebook that she too is going

16  to be fired.  So before she even goes and meets with Jeff,

17  before she submits that accommodation request, she announces,

18  I too am about to be fired from my job of 31 years.

19          And so if you are thinking you're about to be fired

20  and you're submitting an accommodation request and the

21  fundamental basis of your religious beliefs is your

22  Catholicism, why not mention that in the meeting when you

23  didn't mention it in the letter?

24          And she could have explained, just like Father Ptak

25  explained, that Catholics, they actually highly encouraged

1    vaccination, the religion, as a general matter.  The

2    Archdiocese did.

3           And she would have been able to explain, however,

4    that she believed that it was still against her Catholicism,

5    because she was following her heart and her conscience.

6           Now, counsel is critical of the meetings being

7    15 minutes.  But Jeff Walters was asked:  Sir, can you prove

8    to us in 15 minutes or less that you are sincerely Methodist?

9           Answer:  I think I could.

10          And when that gentleman was asked to talk about his

11   religious beliefs, I could barely get him to stop.  And it

12   comes natural.  And you can hear it.

13          But it wasn't just Jeff that was able to do it.

14   Again, Mr. Keller was able to do it.

15          I asked him:  In your own words, could you describe

16   it for us, please, sir?  In your own words, could you please

17   describe it?

18          And he did.

19          And he said:  I do believe that Jesus was the son of

20   God, but I don't believe in some of the teachings of certain

21   sectors of religion and what they truly believe in.  I think,

22   like, for example, when it comes to Catholicism, you pray to

23   Mother Mary and you can give confession.

24          And he goes on to talk about how he prays to God.

25          Now, when Ms. Domski submitted her letter, she made

1    no reference to Catholicism, but when she was talking with

2    you, that was the fundamental basis of her letter.

3            And they are critical of Jeff for not having called

4    Reverend Ptak, but Ms. Domski says:  I have nothing else to

5    add.  It's all in my letter.

6            Her letter didn't identify the very Reverend Ptak.

7    In fact, she told Jeff:  I have nothing else to add.

8            And there is suggestions that, well, we don't know

9    who the decision-maker is.  That's not true.  In Jeff's own

10   words when he testified:  Bruce and I made the decision to

11   deny her accommodation request.

12           Now, Ms. Domski knew that if the request was denied

13   that Blue Cross was going to follow through on the policy,

14   and that's what happened.  Blue Cross followed through on the

15   policy and she was terminated effective January 5 of 2022, the

16   very same month and within two weeks of her explaining to

17   potential employers that she is retired, and that she is

18   looking for part-time work.

19           And she says she was doing that because she was

20   embarrassed.  But after she had learned that the accommodation

21   request was denied, she had already gone to the press.  And

22   before that, she was posting on Facebook.

23           And so we have a circumstance where you have a

24   witness that is suing my client for discrimination, a very

25   serious allegation, who announced to the public on Facebook

1   that she is about to be fired before she even goes through the

2   process, goes to the press after she learns that she has been

3   denied, and then is saying to you:  Well, I used the word,

4   retired, because I didn't want others to know and I wanted to

5   convey to my employer, my potential employer, that I was, in

6   fact, retired.

7           And it didn't just happen once.  It wasn't a slip.

8   It happened in January of 2022, it happened again in January

9   of 2023, and it happened again in March of 2023, seeking

10  part-time employment.

11          And when I asked her, when I asked her, did you seek

12  full-time employment relative to the kind of experience that

13  you have?  And her answer was:  I didn't, because they all

14  required a degree, and so I didn't submit an application.

15          And then I asked her:  Well, if that's the case,

16  did you -- did you consider informing a potential full-time

17  employer that you have all these years of experience -- 31,

18  according to her Facebook post -- that will make up for

19  the degree that you don't have?

20          Never gave that a shot.

21          And then I asked her:  Who were the potential

22  employers that you actually looked at for the full-time work?

23          Answer:  I don't recall.

24          You're going to see a jury instruction that has

25  already been read to you that deals with damages, and it talks

1    about whether there was something that Ms. Domski could have

2    actually done to reduce the amount of damages that she alleges

3    that she has suffered.

4         And I ask you, if she can't recall to where she

5    actually looked for the full-time employment, but we have

6    the letters saying I want part-time employment because I'm

7    retired, has she done what she can do to secure full-time

8    employment?

9         I had in my outline that I was going to talk about

10   Mr. Marko's opening statement and she was working from home,

11   she was working from home, she was working from home.

12        Well, the truth is that in 2019, she worked 104 days

13   in Detroit, and she continued to work in Detroit before the

14   shutdown in March of 2020.  But I want to focus on something

15   that Mr. Marko also said in his opening statement.

16        He said:  And by the way, they didn't even have her

17   written statement.  They didn't even take a look prior to

18   this interview.

19        That's what he told you that he was going to prove.

20        And by the way, they didn't even have her written

21   statement.  They didn't even take a look prior to this

22   interview.  This is how sloppy this process was, how bad

23   it was.

24        But Ms. Domski told you on the stand that she can't

25   even recall what statement she submitted, even though two

1    months ago, she swore under oath precisely which one she

2    submitted.

3            And Mr. Walters, he testified, did you even look at

4    this prior to interviewing Lisa Domski?

5            Answer:  Yes.

6            And then he testified that after the meeting with her

7    he actually went back to the letter, and he went back to the

8    letter a second time because she was unwilling to answer the

9    questions that he had.

10           And because she was unwilling to answer the questions

11   that he had, he had the honest belief that the letter didn't

12   come from her.  And that was an honest belief from an honest

13   man that was on that stand who shared with you what his faith

14   is.

15           None of this was easy.  Blue Cross does not like

16   firing employees that have 32 years of service.  They don't

17   like firing employees that have three months of service.  Good

18   reviews, bad reviews, they don't like to do that.  But they

19   did have a policy, and that policy was applied equally across

20   the board.  And Ms. Domski was aware of that policy.

21           This case is about what you cannot see.  That's why

22   "inform" and "cooperation" are so important.

23           I said to you before, you can ascertain my gender,

24   probably even guess my age and my weight.  But my religious

25   beliefs?

 1          Born and raised Catholic.  Baptized at two months,
 2   August of 1982.  Took my first communion in the third grade.
 3   I was confirmed in the eighth.  I was an altar boy.  I recall
 4   my parents sitting near the front, and I didn't understand the
 5   rules as well as perhaps I should have.  And so my mother in
 6   the front, while I was an altar boy, was encouraging me, like
 7   this, to stand up, because I was sitting down at a point in
 8   time when I shouldn't have been.

 9          And I remember after taking my first communion as a
10   young lad, that I would kneel after I took the communion, the
11   sacrament.  And I remember that my knees would get sore.  And
12   because I was young and perhaps I didn't understand well
13   enough yet, I was waiting with eagerness for what we call
14   the tabernacle to close, because the tabernacle is where the
15   eucharist was held, and until that tabernacle closed, we were
16   not supposed to sit back in our seats.

17          I was an usher in my church.  My father was the lead
18   usher.  He was a teacher at the same school for 37 years.  We
19   would go to Saturday mass and sometimes twice on Sunday to be
20   ushers.

21          My wife and I of almost 20 years, we have twin boys
22   and we are blessed.  Their names, Luke and Joseph.

23          When the pandemic hit they were five and they started
24   behind a computer screen for kindergarten.  I know how tough
25   this was.  It wasn't easy on anyone.  My wife and I, we're

```
 1    religious.  We believe.  And so do my boys.
 2           When we sit down and we have dinner and I'm blessed
 3    enough to be there at the table with them, we go around the
 4    table and we each pray.  Not just one person, all four.
 5    And their prayers that they offer, a lot of times they are
 6    innocent, as you can imagine, because they are nine.  But
 7    when they talk, and you hear it, you can see that they are
 8    sincere, and you can see that they believe.
 9           Ms. Domski, very effective in communication.  In her
10    50s, she is not 9, she is in her 50s, and when she explained
11    to you her beliefs, she sounded genuine.
12           The problem in this case is that she has sued my
13    client for discrimination on the basis of her religious
14    beliefs that are rooted in Catholicism and she never shared
15    that with us.
16           And so I am asking you to return a verdict in favor
17    of my client, because my client and Jeff Walters did not
18    discriminate against Ms. Domski.
19           Thank you.
20           THE COURT:  Thank you, Mr. Hubbard.
21           Mr. Marko, you may address the jury.
22           MR. MARKO:  Thank you, your Honor.
23           I grew up Catholic too.  And my father was the chair
24    of the theology department at Aquinas College, the Catholic
25    theology department.
```

```
 1              I went to Catholic school my whole life, St. Thomas
 2    the Apostle in Grand Rapids, Michigan.  I went to Catholic
 3    Central in Grand Rapids.  And when I was a freshman, I was
 4    expelled by the nuns because I didn't follow the rules.  I was
 5    a little bit too loud.  You can see I sometimes get yelled at,
 6    just like you saw in this courtroom.
 7              And I thought my life was over at that time, because
 8    my father, who was a theology professor and professed his
 9    theology, said you have to go to an inner-city school, where
10    I was a minority, where nobody else at that school was like
11    me, and they weren't like what I was used to.
12              But it was the best thing that ever happened to me in
13    my life, because I wouldn't be here today representing people
14    like Lisa Domski if I wasn't kicked out of that Catholic
15    school by those nuns.
16              And I learned a thing or two about discrimination by
17    the friends I made at that inner-city school.  I learned that
18    discrimination is often silent.  I learned that people who
19    discriminate aren't going to get up and admit that they are
20    discriminating against you.  They are going to make up a bunch
21    of excuses like we just heard here today.
22              I learned that when discrimination happens, it's
23    often planned behind closed doors.  And things that people
24    say when they think nobody is listening, when they don't know
25    that they are being recorded, then they go out and they act on
```

1          those, but they don't tell you what really is going on, and
2          that's what this case is about.

3                  I just heard Lisa Domski, who I think you got to know
4          over this week, be called essentially a liar.  I just heard
5          she was lazy because she didn't work, she didn't try to get
6          jobs hard enough after they terminated her.  I heard she is
7          essentially a pretender, and that's wrong.  That's not who
8          she is, and I know that's not who you think she is.

9                  And it's absurd that with all the questions, with all
10         this legal team over here, and all these questions and all
11         this preparation that they are going to pick on her because
12         she said to, what, one question, I don't recall exactly,
13         because she's being honest.

14                 Look at their witnesses.  Look at Patricia Snyder.
15         Look at Bart Feinbaum.  Do you know how long I had to prepare
16         that packet of documents just to try to keep them honest?

17                 And then even when she would read the document, she
18         would say:  I don't recall.

19                 Ma'am, the document is right in front of you.  You
20         can see it.  You know what's on it.

21                 I don't recall.

22                 Because she knows -- she knows how to hide it.  She
23         knows how to hide the discrimination that went on in this
24         case.  She knows how to bury it.  She knows how to explain
25         away that October 12 meeting.

1          That meeting is everything you need to know.  That's

2     when the plan started.  When you say, we're not going to

3     accept religious accommodation requests, and then for them to

4     explain it away -- you think if we didn't have that recording,

5     what would they be telling you?

6          And then for them to tell you that it's so tragic, we

7     don't like to fire employees, it's so horrible?  Bart Feinbaum

8     talked about how it was going to be a fun experience, an

9     interesting experience, where they couldn't have any witnesses

10    at the meetings.

11         That's discrimination.  That is discrimination.  And

12    then to come here and say, oh, they explained it away.  It's

13    the blame game.

14         So let's talk about this, this accommodation request

15    that she submitted.  As you know, she doesn't have to use

16    magic words.  That's law.  When they keep saying inform, it

17    doesn't mean they have to be informed about her specific

18    religion.

19         They want you to believe that had she used the word

20    Catholic on her accommodation request, that it would have been

21    stamped approved when it went through this mysterious process?

22    That is a bald-faced misrepresentation.

23         And you know how we know that?  Because we have the

24    internal communication between the office of general counsel

25    and Jeff Walters, which is Plaintiff's Exhibit -- or

1    Defendant's Exhibit 210 that I showed you previously, between

2    Rudy Makupson -- it's an interoffice memorandum involving Lisa

3    Domski, where they tell her, this question is not asking what

4    religion you are, because they know that it doesn't matter.

5         It doesn't matter if you're Catholic.  You don't get

6    special treatment if you're Catholic or you're Baptist or

7    you're Sikh or you're anybody else.  It's all the same under

8    the First Amendment and under the law, under the -- under the

9    law, the Civil Rights Act of 1964.

10        What's the criteria?  We still haven't heard.  And

11   I said:  Please tell us, who terminated Lisa Domski?  We

12   still don't know.  As we sit here today, we still don't know.

13   They -- Jeff Walters said:  I made a recommendation.

14        Who made the decision?  Where are they?  What's the

15   training?  We asked, what are you trained in?  What's the

16   criteria?

17        It's very easy to rubber stamp a denial when you

18   don't tell people how you got there.  How did you get there?

19   What was the criteria?  What should have been different in

20   Lisa Domski's statement that said:  I rely on the Bible and

21   my Christian beliefs, which is exactly what she was supposed

22   to do?

23        She said:  What belief do you follow?  She told them

24   in her statement.  I'm Christian.  I don't believe in the use

25   of fetal cells.

1          You may disagree with that.  I'll say that a hundred

2     times.  Abortion is a very divisive issue.  This case is not

3     about abortion.  It's not about what you believe.  It's about

4     her right to have a belief.  And they can't take that away

5     from her, no more than anybody can take it away from you if

6     you were sitting in that chair.  And that's what this case is

7     about.  And they continue to blame her.  They continue to

8     blame her.

9          They tell her that she should have went out as she

10    was driving across the state of Michigan to various jobs like

11    General RV, trying to get a job involving RVs, that she should

12    have put on her job application:  I was fired from my job at

13    Blue Cross that I worked at for 17 -- since I was 17 years old

14    because I refused to give up my religious beliefs.

15         Are you kidding me?  Who would do that?  Who would

16    put that in a job application?  Oh, it's her fault.  She

17    should have applied for jobs that she was disqualified for

18    because she didn't have the opportunity that her daughter was

19    given through her hard work to go to college, because she only

20    had a high school degree.  It's offensive.  It's offensive.

21         Who didn't we hear from?  They say that, oh, yeah,

22    we -- this regarding witnesses, they could have called anybody

23    they wanted at Blue Cross Blue Shield to come in here and give

24    you straight answers on what went on in this case.  They could

25    have called any person that they wanted.  They could have

```
 1    waived a privilege and allowed the office of general counsel,
 2    who they are hiding behind, to get up here, and they decided
 3    not to.  That's fine.  There is nothing wrong with that.  They
 4    can assert a privilege.  But they can't hide behind and say --
 5    and when they don't give us answers about what's going on.
 6          He said you can't see religion.  You're right, you
 7    can't see religion, because it's an intensely personal thing
 8    that each of us go through.  And if there was a problem, when
 9    you get back there, this inform, inform, inform, he keeps
10    saying it, inform, inform, inform.  The law requires she
11    inform.
12          She said:  I'm Christian.  I have an opposition to
13    fetal cells.  It's sincere.  She fulfilled her duty at that
14    point.
15          So if somebody says, well, she should have done more,
16    she should have done more, the burden is on the employer at
17    that point.  It's on them.  If they needed more information,
18    all they had to do was ask.  They didn't ask.
19          They said:  It's fine, Lisa.  It's fine.  Those are
20    their words, not mine.  They said it's fine.  You can rely on
21    your written statement.  It's completely voluntary.  They
22    didn't say it once, they said it twice, which is exactly the
23    law as provided by the EEOC guidance that was given to them.
24    And it's exactly what Makupson put in these memos that says
25    this is what you should tell them.  It's completely voluntary.
```

1          She had a right to rely on what they told her.  She

2     had been working there for over 30 years.  She had a right to

3     rely on what they told her.  And if there was a problem, they

4     could have told her so, and we would have -- we would be in a

5     different position here today.  Then you can say it's Lisa's

6     fault.

7          You can't blame her for something that she didn't

8     know and they didn't tell her.  They had the human resources.

9     They had the lawyers there.  They could have called Father

10    Ptak.  We talked about that.

11         Let's talk about this shell game a little bit.  So

12    they -- they obviously want to distance themselves from what

13    happened on October 12, because it's really bad for them.

14    I mean, it's really bad.

15         Here we are in an employment case where you have

16    individuals saying we're not going to approve religious

17    accommodations.  We got to depose people.  There's potential

18    legal ramifications.  There's potential problems.

19         So they set up a shell, a shell game, where nobody is

20    responsible and they are -- and Jeff Walters is really the

21    fall guy who came in here.  It's really the fall guy.

22         But the people who are really responsible, we still

23    haven't even seen them yet.  We still haven't even seen the

24    people up the Blue Cross corporate offices who are really

25    responsible for what happened to Lisa Domski.  And that's not

1    how this works.  You don't get to hide and have a shell game

2    with regards to that.

3          We heard about training.  Where was the training?

4    Did anybody ever explain the training process here?  Did

5    anybody ever come in here and say, you know, this was the

6    criteria, this is what we did?

7          I didn't hear it.  I didn't hear any training.  They

8    could have talked to us about that.

9          They could have contacted the spiritual advisor.

10   Look, I know this has been a long week.  I know this has been

11   long, and it's time for me to give up control of this case,

12   and it's time to put it in your hands to be able to go and do

13   the right thing for Lisa.

14         I just ask you, when you go back there, because

15   we're a diverse group of people in this room, we all have

16   different personal beliefs, and that's the beauty of this

17   process, that's the beauty of the justice system.

18         I just ask when you go back there, if you -- if

19   there's disagreements, that you remember how strong Lisa had

20   to be to be here, to stand up for her religious beliefs even

21   when it would have been easier for her to take the vaccine

22   that she felt would be a sin against her religion.  I ask you

23   to stand up back there like Lisa stood up to Blue Cross

24   Blue Shield.

25         Ladies and gentlemen, thank you so much.  Lisa's case

1    is now in your hands.  We will be waiting for you until you

2    reach a verdict.

3              THE COURT:  Thank you, Mr. Marko.

4              Members of the jury, let me finish up now by

5    explaining some things to you about your deliberations in

6    the jury room and your possible verdicts.

7              The first thing that you should do in the jury room

8    is choose someone to be your foreperson.  That person will

9    help guide your discussions and will speak for you here in

10   court.

11             Once you start deliberating, do not talk to the jury

12   officer or to me or to anyone else except each other about

13   the case.

14             If you have any questions or messages you must write

15   them down on a piece of paper, sign them, and then give them

16   to the jury officer.  The officer will give them to me and

17   I will respond as soon as I can.

18             I may have to talk to the lawyers about what you have

19   asked, so it may take me some time to get back to you.  And

20   questions or messages, any questions or messages normally

21   should be sent to me through your foreperson.

22             If you do have a question and write it down, there is

23   a button in the jury room to activate a buzzer so the jury

24   officer knows to retrieve the paper from you signed by your

25   foreperson and they will get it to me right away.

1          I will send the exhibits into the jury room with

2     you. The deposition of Ms. Rodriguez is not an exhibit,

3     technically, so that will not go back into the jury room, but

4     the other items will be.  You do not have to send me a message

5     to request those.

6          One more thing about messages.  Do not ever write

7     down or tell anyone how you stand on your votes.  For example,

8     do not write down or tell anyone that you are split five to

9     four or seven to two or whatever your division happens to be.

10    That should stay secret until you are finished.

11         Remember that you must make your decision based only

12    on the evidence that you saw here in court.  Do not try to

13    gather any information about the case on your own while you

14    are deliberating.

15         For example, do not conduct any experiments inside

16    or outside of the jury room.  Do not bring in any books like a

17    dictionary or anything else with you to help you with your

18    deliberations.  Do not conduct any independent research,

19    reading, or investigation about the case.  And do not visit

20    any of the places that were mentioned during trial.

21         During your deliberations you must not communicate

22    with or provide any information to anyone by any means about

23    the case.  You may not use any electronic device or media such

24    as a telephone, smartphone, tablet, or computer.  You may not

25    access the internet or access any device or application on

Case 2:23-cv-12023-DML-EAS   ECF No. 125, PageID.4046   Filed 11/12/24   Page 241 of 250

1    your phones, if you have them.  You may not text or instant

2    message anyone.  You may not access any internet chat room,

3    blog, or website, or any social media account to communicate

4    to anyone any information about the case or to conduct any

5    research about the case until I accept your verdict.

6         Make your decision based only on the evidence that

7    you saw and heard here in court.

8         Some of you have taken notes during the trial.

9    Whether or not you took notes, you should not be influenced

10   by the notes of another juror, but you should rely on your

11   own memory of what was said.  Notes are only an aid to

12   recollection and are not entitled to any greater weight than

13   the actual recollection or impression of each juror as to what

14   the evidence actually is.

15        Now, your verdict, whether it is for the plaintiff or

16   the defendant, must be unanimous.  To find for the plaintiff

17   every one of you must agree that the plaintiff has met her

18   burden of proof on all the elements of her respective claims

19   as to defendant -- as to the defendant as I have previously

20   explained them to you.

21        To find for the defendant, every one of you must

22   agree that the plaintiff has not met her burden of proof on

23   one or more elements of her respective claims or that the

24   defendant has proven all the elements of an applicable defense

25   to a claim.  Either way, your verdict must be unanimous.

1          Now that all the evidence is in and the arguments are

2    completed, you are free to talk about the case in the jury

3    room.   In fact, it is your duty to talk to each other about

4    the evidence and to make every reasonable effort that you can

5    to reach unanimous agreement.

6          Talk with each other.  Listen carefully and

7    respectfully to each other's views, and keep an open mind

8    as you listen to what your fellow jurors have to say.  Try to

9    do your best to work out your differences.  Do not hesitate

10   to change your mind if you are convinced that the other jurors

11   are right and that your original position was wrong.  But do

12   not ever change your mind just because other jurors see things

13   differently or just to get the case over with.

14          In the end your vote must be exactly that, your own

15   vote.  It is important for you to reach unanimous agreement,

16   but only if you can do so honestly and in good conscience.

17          No one will be allowed to hear your discussions in

18   the jury room and no record will be made of what you say.  So

19   you should all feel free to speak your minds.

20          Listen carefully to what the other jurors have to say

21   and then decide for yourself if the plaintiff has proved her

22   case.

23          Now, I have prepared a verdict form that you should

24   use to record your verdict.  Counsel has blown it up and shown

25   it to you during argument.  But the jury form states the name

1    of the case, and there are three sections.

2          The first is labeled liability.  The first question

3    or statement says:  On the claim by the plaintiff against the

4    defendant for unlawful discrimination under federal law by

5    denying her request for an accommodation consisting of an

6    exemption to the defendant's policy that all employees be

7    vaccinated against COVID-19 based upon a sincerely held

8    religious belief, we the jury find in favor of:

9          And then there are two options.  One says plaintiff

10   Lisa Domski.  The other says defendant, Blue Cross Blue Shield

11   Michigan.

12         Simply check it or put an X on the line after you

13   have reached unanimous agreement about that question.

14         Under Section B of the first section, it reads:  On

15   the claim by the plaintiff against the defendant for unlawful

16   discrimination under Michigan and Federal law by terminating

17   her employment because of her religion, we the jury find in

18   favor of:  Again, two options.  Plaintiff, Lisa Domski, or

19   defendant, Blue Cross Blue Shield of Michigan.

20         If you find for the plaintiff on either one of those

21   sections, then turn the verdict form over, and that is the

22   page that deals with damages.

23         Item 2 reads:  Compensatory damages.  And there are

24   four options.

25         If you believe that the plaintiff suffered back-pay

1    damages, you can X that in, check that box in, and then it

2    asks for an amount, and you can write in an amount.  Or if

3    you find that there are no damages, write in "none."

4         The second box deals with front-pay damages as

5    I explained them to you.  Same, if you find front-pay damages,

6    put an X in the box and write in the amount.

7         The third is non-economic damages.  If you find that

8    she suffered non-economic damages, X that in, and write in the

9    amount.

10        And finally, suffered no actual damages, if you find

11   none of the first three, X in that box.

12        And then, finally, there is a section on punitive

13   damages.  If you believe that the plaintiff has proved the

14   requirements for punitive damages, you may write in an amount.

15   Or if you don't believe there are any punitive damages, simply

16   write in "none."

17        Then there is a signature line for your foreperson.

18   The foreperson should put -- sign the form, print your name

19   under the signature, fill in the date, and then prepare a

20   note that says the jury has reached unanimous agreement.

21        The foreperson should sign that note, activate the

22   jury button, the button on the -- in the jury room to notify

23   the jury clerk, and then we will return you to the courtroom

24   and we will receive your verdict in open court.

25        Now, let me finish up by repeating something that

1    I said to you earlier.

2            Nothing that I have said or done in this trial was

3    meant to influence your decision in any way.  You must decide

4    for yourselves the issues presented to you for resolution by

5    the evidence and by my instructions on the law.

6            Now, it's somewhat late in the day.  I am going to

7    ask you to retire to the jury room.  Don't start to deliberate

8    on the case, but you can select a foreperson.

9            Once the evidence and the verdict form comes in, that

10   will be your signal to start deliberating.

11           The first thing I would like you to do, though,

12   is decide among yourselves if you want to take a crack at

13   deliberating today, and if so, how long, or if you would

14   like to have the Court recess this case and begin your

15   deliberations tomorrow morning.

16           We will have you back here by 8:30 tomorrow morning

17   on the fifth floor, bring you up to the jury room, and then

18   have you start deliberating.  You should not discuss the case

19   among yourselves until all nine of you are together, and you

20   may deliberate tomorrow on your verdict.

21           So make that decision first and then we will -- you

22   can notify the jury clerk and we will act accordingly, based

23   upon your decision.

24           Mr. Shaffer, would you swear the jury clerk, please?

25       (Oath administered to jury clerk at 4:33 p.m.)

1         THE COURT:  Mr. Beyer, please take the jury out.

2         THE CLERK:  All rise for the jury.

3     (Jury left courtroom at 4:33 p.m.)

4         THE COURT:  You may be seated.

5         Are there any objections from the plaintiff as to the

6    jury instructions as delivered?

7         MR. HURWITZ:  No objections, your Honor.

8         THE COURT:  Defendant?

9         MR. HUBBARD:  None.

10         THE COURT:  All right.  Do you have the exhibits

11    ready?

12         MR. MARKO:  I believe we dropped off binders of them.

13         THE COURT:  Well, you did, but the binders contain

14    exhibits that were admitted and several that weren't.

15         Do you have the exhibits ready with -- indexed so

16    that the jury can review them?

17         MR. MARKO:  Can we --

18         MR. HUBBARD:  For defendant, I believe so, yes,

19    your Honor, because all of our --

20         THE COURT:  If you have them, ask plaintiff's counsel

21    to take a look to ensure that, and then when you have yours

22    ready, make sure defense counsel takes a look.

23         MR. MARKO:  Understood.

24         THE COURT:  I have got some other matters that I have

25    to handle in court, so if you could make some space, I'd

Jury Trial - Volume 4 - November 7, 2024

 1  appreciate that.
 2          When the jury tells us what they want to do, I'll
 3  give you some further instructions.
 4          Court is in recess.
 5            (Recess taken from 4:35 p.m. to 5:05 p.m.)
 6                      *      *      *
 7          THE COURT:  All right.  Court is back in session.
 8          First of all, do you have the exhibits ready?
 9          MR. MARKO:  Yes.
10          MS. MOODY:  Yes, your Honor.
11          THE COURT:  All right.  Would you just leave them on
12  the corner of counsel table there for the moment?
13          The jury has sent a note that said they would like
14  to go home and deliberate in the morning.  I'm going to bring
15  them in and discharge the jury.
16          Mr. Beyer, would you bring the jury in, please?
17  You know what, you can give them their...
18          THE CLERK:  All rise for the jury.
19     (Jury entered courtroom at 5:06 p.m.)
20          THE COURT:  You may be seated.
21          Members of the jury, I have a note from your
22  foreperson indicating that you would like to leave.  I can't
23  imagine why.
24          We will adjourn this matter until tomorrow morning.
25  Please report to the assembly room on five no later than 8:30.

1   We will bring you up and you can start deliberating.

2           We have the exhibits ready for you and I will send in

3   the verdict form.  After you leave we will just put them on

4   the table in the jury room and you will be able to consult

5   those at the time.

6           The same cautions apply.  Don't gather any

7   information on your own and don't talk to anyone and don't

8   discuss the case among yourselves until you are all together,

9   all nine of you are together to deliberate.

10          Have a good evening.  It's been a long day.  We

11  appreciate your service.

12          Would you escort the jury out, please?

13          THE CLERK:  All rise for the jury.

14     (Jury left courtroom at 5:08 p.m.)

15          THE COURT:  Anything further for the record from the

16  plaintiff?

17          MR. MARKO:  No, your Honor.

18          THE COURT:  Defendant?

19          MR. HUBBARD:  No, Judge.

20          THE COURT:  All right.  What's your pleasure,

21  Mr. Marko?  Is your office downtown here?

22          MR. MARKO:  Yes, your Honor.

23          THE COURT:  Are you going to be in your office or are

24  you going to be back in the courthouse?

25          MR. MARKO:  At what time, your Honor?

```
 1                 THE COURT:  Tomorrow morning.
 2                 MR. MARKO:  Probably my office, if that's acceptable.
 3                 Are you going to bring the jury out before you put
 4      them back into the jury room?
 5                 THE COURT:  No.  They are just going to start
 6      deliberating.  I'm just going to bring them up when they
 7      are all here and let them begin.
 8                 MR. MARKO:  Then I would prefer to be in my office.
 9      It's within a block.
10                 THE COURT:  Would you make sure that Mr. Beyer has
11      all of your contact information?
12                 MR. MARKO:  Yes.
13                 THE COURT:  All right.  What about you folks?
14                 MR. HUBBARD:  Your Honor, I think that we would
15      probably do the same, if it's acceptable to the Court.
16                 THE COURT:  All right.  Again, make sure Mr. Beyer
17      knows.
18                 MR. HUBBARD:  Absolutely.
19                 THE COURT:  All right.  Anything further, then, for
20      the day?
21                 MR. MARKO:  No, your Honor.
22                 THE COURT:  I'll take a no.  That's good.
23                 MR. MARKO:  Long day.
24                 THE COURT:  Right.  I have another hearing that
25      I have to conduct.
```

1          MR. MARKO:  I'm sorry, Judge.

2          THE COURT:  So you are excused.

3          MR. MARKO:  Thank you, your Honor.

4          MR. HUBBARD:  Thank you, Judge.

5             (Proceedings adjourned at 5:10 p.m.)

6                  *      *      *

7

8              **CERTIFICATE OF COURT REPORTER**

9

10       I certify that the foregoing is a correct transcript

11   from the record of proceedings in the above-entitled matter.

12

13   _____        **November 12, 2024**
            *s/ Rene L. Twedt*
     RENE L. TWEDT, CSR-2907, RDR, CRR, CRC        Date
14       Federal Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25