## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

LISA DOMSKI,

        Plaintiff,

v.

BLUE CROSS BLUE SHIELD
OF MICHIGAN,

        Defendant.

Case No. 2:23-cv-12023

Hon. David M. Lawson

---

| | |
|---|---|
| Noah S. Hurwitz (P74063) | Scott R. Knapp (P61041) |
| HURWITZ LAW PLLC | Brandon C. Hubbard (P71085) |
| *Attorneys for Plaintiff* | Nolan J. Moody (P77959) |
| 340 Beakes St., Suite 125 | Zachary L. Pelton (P85197) |
| Ann Arbor, MI 48104 | DICKINSON WRIGHT PLLC |
| (844) 487-9489 | *Attorneys for Defendant* |
| Noah@hurwitzlaw.com | 123 W. Allegan Street, Suite 900 |
| | Lansing, MI 48933 |
| Jonathan R. Marko (P72450) | (517) 371-1730 |
| MARKO LAW, PLLC | sknapp@dickinsonwright.com |
| *Attorneys for Plaintiff* | bhubbard@dickinsonwright.com |
| 220 W. Congress, 4th Floor | nmoody@dickinsonwright.com |
| Detroit, MI 48226 | zpelton@dickinsonwright.com |
| (313) 777-7529 | |
| jon@markolaw.com | |

---

## PLAINTIFF'S RESPONSE TO DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW AND FOR NEW TRIAL

Plaintiff Lisa Domski, by and through her attorneys, Hurwitz Law PLLC and

Marko Law, PLLC, submits the following Response in Opposition to Defendant's

Renewed Motion for Judgment as a Matter of Law and for New Trial. Plaintiff

requests that this Court not deviate from binding legal and abide by the unanimous desire of nine jurors, whose award of $10,000,000 in punitive damages against Defendant (that will be reduced to $300,000 per statutory cap) signified that Defendant's actions in denying the remote-working Plaintiff's religious accommodation request and terminating her employment were overwhelmingly discriminatory. That should come as no surprise because Title VII and the Supreme Court give religious practices **favored treatment** and any conduct by Defendant "with the motive of avoiding the need for accommodating a religious practice" is discriminatory. *E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 774 (2015). *Abercrombie* is a huge umbrella under which the evidence presented in this case that is probative of religious discrimination is covered, including business records, witness testimony, and the glaring inability of Defendant's witnesses to recall or explain the simplest aspects of its religious accommodation process. Accordingly, there is ample evidence from which the jury inferred that Plaintiff's "religious practice, **confirmed or otherwise** [was] a factor in [Defendant's] employment decision."

Respectfully submitted,

HURWITZ LAW PLLC

/s/ Noah S. Hurwitz
Noah S. Hurwitz (P74063)
HURWITZ LAW PLLC
*Attorneys for Plaintiff*

Dated: November 24, 2024

2

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

LISA DOMSKI,

        Plaintiff,

Case No. 2:23-cv-12023

v.

Hon. David M. Lawson

BLUE CROSS BLUE SHIELD
OF MICHIGAN,

        Defendant.

| | |
|---|---|
| Noah S. Hurwitz (P74063) | Scott R. Knapp (P61041) |
| HURWITZ LAW PLLC | Brandon C. Hubbard (P71085) |
| *Attorneys for Plaintiff* | Nolan J. Moody (P77959) |
| 340 Beakes St., Suite 125 | Zachary L. Pelton (P85197) |
| Ann Arbor, MI 48104 | DICKINSON WRIGHT PLLC |
| (844) 487-9489 | *Attorneys for Defendant* |
| Noah@hurwitzlaw.com | 123 W. Allegan Street, Suite 900 |
| | Lansing, MI 48933 |
| Jonathan R. Marko (P72450) | (517) 371-1730 |
| MARKO LAW, PLLC | sknapp@dickinsonwright.com |
| *Attorneys for Plaintiff* | bhubbard@dickinsonwright.com |
| 220 W. Congress, 4th Floor | nmoody@dickinsonwright.com |
| Detroit, MI  48226 | zpelton@dickinsonwright.com |
| (313) 777-7529 | |
| jon@markolaw.com | |

## PLAINTIFF'S BRIEF IN RESPONSE TO DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW <u>AND FOR NEW TRIAL</u>

# TABLE OF CONTENTS

INDEX OF AUTHORITIES ........................................................ iii

ISSUES PRESENTED ............................................................. iv

INTRODUCTION ................................................................1

STANDARD OF REVIEW ........................................................4

ARGUMENT ....................................................................5

    I.    CONSTRUING THE FACTS MOST FAVORABLE TO
        PLAINTIFF, DEFENDANT KNEW PLAINTIFF HAD A
        RELIGIOUS PRACTICE, BUT STILL MADE RELIGION A
        MOTIVATING FACTOR IN AVOIDING ACCOMMODATION
        AND TERMINATING PLAINTIFF. ...................................6

        A.    The Elephant In The Room Is Walter's Admission That He
            Imposed His Own Subjective Standard of Religiosity on
            Plaintiff. ..................................................7

        B.    Defendant's Other Key Witnesses Lied To The Jury. ........13

        C.    Defendant Was Caught On Tape Admitting That Religious
            Accommodations Would Be Denied and Disparaging
            Applicants. ...............................................18

        D.    The Jury Learned Evidence That Defendant Denied
            Hundreds of Religious Accommodation Requests. ..............19

    II.    DEFENDANT INVOKES FED. R. CIV. P. 59(a) AS A MEANS
        TO REHABILITATE ITS TERRIBLE WITNESSES AND SPIN
        NEW YARNS FOR A NEW JURY, BUT THE EVIDENCE
        DOES NOT CHANGE AND THE RESULT WILL BE THE
        SAME OR WORSE. ...........................................21

CONCLUSION .................................................................25

# INDEX OF AUTHORITIES

**Cases**

*Bonkowski v. Allstate Ins. Co.*, 2012 WL 3013747, at *6 (E.D. Mich. July 20, 2012) ................................................................................................21

*E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 775 (2015)............3, 4

*Eder v. Blue Cross Blue Shield of Michigan*, No. 23-12024, 2024 WL 4132669, at *5 (E.D. Mich. Sept. 10, 2024)................................................................19

*Griffin v. Finkbeiner*, 689 F.3d 584, 595 (6th Cir. 2012) ........................................5

*Holmes v. City of Massillon*, 78 F.3d 1041, 1045-46 (6th Cir. 1996) ......................5

*Imwalle v. Reliance Med. Prod., Inc.*, 515 F.3d 531 (6th Cir. 2008) .......................4

*Kaino v. Harney Cnty. Health Dist.*, 2024 WL 4298212, at *3 (D. Or. Sept. 26, 2024) ................................................................................................11

*Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 543 (2022) ...................................4

*Kidd. v. University Medical Center of Southern Nevada*, 2024 WL 4046249, at *5 (D. Nev. July 2, 2024).......................................................................11

*Sturgill v. Am. Red Cross*, 114 F.4th 803, 810 (6th Cir. 2024) ................................3

*Thomas v. Review Bd. of Ind. Empl. Sec. Div.*, 450 U.S. 707, 714 (1981)......... 3, 13

*Tisdale v. Fed. Express Corp.*, 415 F.3d 516, 527 (6th Cir. 2005) ...........................4

**Rules**

Rule 50(b).……………………………………………………………………….4

Rule 59(a)...............................................................................................................4

## ISSUES PRESENTED

1.  Whether Defendant is entitled to judgment as a matter of law under FRCP 50(b) as to Plaintiff's Disparate Treatment claims (Counts II and III) when a unanimous jury easily concluded from the evidence that Plaintiff's "religious practice, ***confirmed or otherwise*** [was] a factor in [the] employment decision" because Defendant imposed its own subjective standard of religiosity on Plaintiff, cast unreasonable doubt on her religious practices, lied repeatedly about the religious accommodation process, shrouded the process in a veil of secrecy, planned prior to the religious accommodation process not to accommodate all employees, denied hundreds of religious accommodations, and put forth no evidence of a non-discriminatory reason to terminate a remote worker who was an exemplary employee for 38 years.

    Plaintiffs Answers "No"
    The Court Should Answer "No"

2.  Whether Defendant is entitled to a new trial under FRCP 59(a) where a unanimous jury concluded that Plaintiff possessed sincere religious beliefs and Defendant made religion a factor in its decision to deny Plaintiff a religious accommodation and terminate her, before awarding a verdict that was objectively reasonable for an amazing woman who served Defendant since she was a teenager, but was discriminated against when Defendant engaged in an inquisition that allowed a human resources professional to impose his subjective standard of religiosity in determining that Plaintiff lacked religious sincerity, without conducting any sort of investigation.

    Plaintiffs Answers "No"
    The Court Should Answer "No"

## **INTRODUCTION**

As Jeff Walters preached about his own cherished religious practice, jurors stared wide-eyed in disbelief wondering how a giant insurance company let any one person, let alone someone callous enough to brag about his own retirement party in the face of the person whom he got fired from the job that she held for 38 years since she 17, play God. In the moments that Walters sang the praises of his own spirituality and cast doubt on Ms. Domski, it could not have been clearer why employers should steer clear of imposing subjective religiosity tests on employees. Walters would go on to blatantly lie about why he denied Ms. Domski's accommodation (*i.e.*, because she relied on a written accommodation request instead of a "completely voluntary" interview and failed to say that she was "Catholic" when the interview template said that Defendant was "not asking what religion" the employee practiced) and shockingly admit that he (a) conducted "no investigation"; and (b) had "no evidence" to doubt the sincerity of Ms. Domski's written accommodation request. It is therefore no surprise that Defendant barely cites trial transcript and eschews Supreme Court legal authority in favor of unpublished Florida cases in its motion.

However, the evidence in this case is the elephant in the room that cannot be ignored. Nine jurors unanimously found that corporate witnesses lacked credibility and allowed religion to play a factor in Ms. Domski's accommodation denial and termination. Defendant tried to sell the theory that Walters denied Ms. Domski's

accommodation because she bypassed a "completely voluntary" interview in reliance on her detailed written accommodation request. Defendant lied to the jury that Ms. Domski needed to specifically tell them she was "Catholic," when the religious accommodation interview template stated that Defendant did not want to know her specific religion. Defendant then failed to call any witness who could explain why Ms. Domski was terminated. It was all a mess.

Defendant's witnesses could not recall how they were trained or qualified to determine what constituted a sincere religious belief. They instead pointed the finger at a faceless Office of the General Counsel and fictitiously relied on "EEOC Guidance" that required Walters to "assume" Ms. Domski's religious beliefs were sincere unless he had an objective reason to doubt her—which he testified that he did not. Defendant admitted firing Ms. Domski without contacting either her religious leader or her direct supervisor who was the Godmother of her daughter. Defendant had egg on its face seemingly the entire trial with (a) Walters boasting about his retirement party; (b) Feinbaum lying about his involvement in designing the accommodation process; and (c) Snyder very candidly regretting that somebody had secretly recorded her promising colleagues that they were not going to accept all religious accommodation requests. Not to mention that all three developed the worst case of selective amnesia when it came time to remember anything about a religious accommodation process that denied over 400 applicants.

This trial was an evidentiary massacre of Defendant's religious accommodation process. Defendant authors a revisionist history by passing off bad witness testimony as uncontested fact—forgetting the fact that the evidence in this motion is viewed in the light most favorable to Plaintiff. And while Defendant relies on unpublished authorities, Ms. Domski trusts in binding law, such as:

> Title VII does not demand mere neutrality with regard to religious practices—that they be treated no worse than other practices. Rather, it gives them favored treatment, affirmatively obligating employers not to fail or refuse to hire or discharge any individual because of such individual's religious observance and practice.

*E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 775 (2015). And "Title VII requires otherwise-neutral [employment] polices to give way to the need for an accommodation." *Id*. Of course, Plaintiff's religious beliefs do not even need to be "acceptable, logical, consistent, or comprehensible to others." *Thomas v. Review Bd. of Ind. Empl. Sec. Div.*, 450 U.S. 707, 714 (1981).

Where Defendant takes the position that it can dissect religious sincerity, that is unavailing because the "overlap between a religious and political view does not place it outside the scope of Title VII's religious protections, as long as the view is part of a comprehensive religious belief system." *Sturgill v. Am. Red Cross*, 114 F.4th 803, 810 (6th Cir. 2024). Walters' determination that Ms. Domski's religious beliefs did not pass muster under his own subjective standard of religiosity was patently unlawful because "[a]n employer may not make an [employee's] religious

practice, **confirmed or otherwise**, a factor in employment decisions." *Abercrombie*, 575 U.S. at 773. All of which is to say that this trial is not an opportunity for Defendant to test novel legal theories in the face of axiomatic laws. It is instead a reckoning for denying religious accommodations in a nation where "[r]espect for religious expressions is indispensable to life in a free and diverse Republic— whether those expressions take place in a sanctuary or on a field, and whether they manifest through the spoken word or a bowed head. *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 543 (2022).

## STANDARD OF REVIEW

Nine impartial jurors favored Plaintiff's disparate treatment claims, so the Rule 50(b) motion can only prevail if, viewing evidence in the light most favorable to Plaintiff, reasonable minds could come to **but one conclusion** in favor of Defendant. *Imwalle v. Reliance Med. Prod., Inc*., 515 F.3d 531 (6th Cir. 2008). "The evidence should not be weighed, and the credibility of the witnesses should not be questioned. The judgment of [the] court should not be substituted for that of the jury." *Tisdale v. Fed. Express Corp.*, 415 F.3d 516, 527 (6th Cir. 2005).

Rule 59(a) permits a court to "grant a new trial on all or some of the issues . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." But courts interpret this rule "to mean that a new trial is warranted when a jury has reached a **seriously erroneous** result as

4

evidenced by: (1) the verdict being against the weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some fashion, *i.e.*, the proceedings being influenced by prejudice or bias." *Holmes v. City of Massillon*, 78 F.3d 1041, 1045-46 (6th Cir. 1996). The Sixth Circuit has held, however, that "a jury's verdict should not be overturned as being against the weight of the evidence unless that verdict was unreasonable." *Id.* at 1047

## <u>ARGUMENT</u>

Defendant cites authority outside the religious discrimination jurisprudence for numerous propositions, including that evidence of religious discrimination requires "only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor." ECF No. 127, PageID.4078. That ignores the seminal holding in *Abercrombie* that Plaintiff can prove discrimination by showing her "need for an accommodation was a motivating factor in the employer's decision." 575 U.S. at 772. Plaintiff can likewise prove discrimination through a "mixed-motive" theory under Title VII/ELCRA if religion was a "motivating factor for the defendant's adverse employment action." *Griffin v. Finkbeiner*, 689 F.3d 584, 595 (6th Cir. 2012). Defendant leaves out mixed-motive evidence (ECF No. 127, PageID.4077), which is an analytical error because, both direct *and* circumstantial evidence is sufficient in a mixed-motive case. *Griffin*, 689 F.3d at 595 (evidence of mixed motive "can be direct or circumstantial"). Plaintiff

5

is left with a massive umbrella to cover evidence that is probative of religious discrimination. Accordingly, giving favored treatment to Plaintiff and allowing the jury to infer from the business records, witness testimony, and Defendant's shocking inability to recall much of anything about the accommodation process, there was ample evidence from which the jury could (and did) infer a discriminatory motive.

## I.   CONSTRUING EVIDENCE MOST FAVORABLE TO PLAINTIFF, DEFENDANT KNEW PLAINTIFF HAD A RELIGIOUS PRACTICE BUT STILL MADE RELIGION A MOTIVATING FACTOR IN AVOIDING ACCOMMODATION AND TERMINATING HER.

Defendant moves for a directed verdict on Plaintiff's disparate treatment religious discrimination claims. Disparate treatment requires that Plaintiff "need only show that [her] need for [a religious] accommodation was a motivating factor in the employer's decision." *Abercrombie*, 575 U.S. at 772. In *Abercrombie*, the Supreme Court held that a job applicant merely wearing a "headscarf" placed the employer on notice of a "religious practice," *id*. at 773, so Plaintiff's written religious accommodation request easily constituted notice of a religious practice. All that was left for Plaintiff to show the jury was that Defendant acted "with the motive of avoiding accommodation" or that it made religion "a motivating factor in the employer's decision." That was easily demonstrated at trial when Jeff Walters admitted to imposing his own ***subjective standard of religiosity*** on Plaintiff. Walters' conduct, however, was not the only evidence of disparate treatment. For example, Defendant's other two witnesses lied about the religious accommodation

process, Defendant shrouded the religious accommodation process in a veil of secrecy, hundreds of religious accommodations requests were denied, and, of course, there was evidence that Defendant decided before Plaintiff even submitted a religious accommodation request not to "accommodate all employees."

Giving all religious practices "***favored treatment***" under the law and "***prohibiting actions taken with the motive of avoiding the need for accommodating a religious practice***," there was plenty of evidence from which a juror could side with Plaintiff—and they unanimously did. Defendant cannot change the Supreme Court's holding that "religious practice is one of the protected characteristics that cannot be accorded disparate treatment and must be accommodated." *Id*. at 775. It is also unavailing for Defendant to argue that "Plaintiff was terminated for failing to comply with BCBSM's vaccination policy," because "Title VII requires otherwise-neutral policies to give way to the need for an accommodation." *Id*.

### A.  The Elephant In The Room Is Walter's Admission That He Imposed His Own Subjective Standard of Religiosity on Plaintiff.

Contrary to *Abercrombie*, Walters made religion a factor by determining that Plaintiff was insincere despite ample evidence of her religious beliefs being right in front of him. Walters at first extols his training with testimony that "Rudy Makupson trained me probably, ***maybe***, a total of five to ten hours prior to the interviewing process," but Walters could not recall what the training entailed, aside from talking

with Makupson "a little bit about EEOC [Guidance]"—which Walters did not know if he had ever read. ECF No. 116, PageID.3478. Walters admitted not learning (from the EEOC Guidance) that an employer should "assume that an employee's request for religious accommodation is based on a sincerely held religious belief." ECF No. 116, PageID.3484 (quoting EEOC Compliance Manual § 12-I.A.3 (January 15, 2021)). Walters, however, did not assume Plaintiff's religious beliefs were sincere, but instead testified profusely about his own religious being more sincere than Plaintiff's beliefs because he could better articulate his "relationship with my God and Jesus," "the role [he has] at church," that he says a "prayer" each night," and that he is "kind of known as a man of faith." ECF No. 116, PageID.3493. Meaning, without any theological or legal training, Walters imposed his subjective standard of religiosity on Plaintiff, making religion a factor in the accommodation denial.

Once the discussion moved away from his own religious beliefs, Walters flip-flopped constantly and lacked credibility. He testified that Plaintiff's objection to "the use of fetal cells and how she believed it conflicted with her . . . Christian faith . . . ***did not dictate what was going to happen, you know, what [his] decision would be***." ECF No. 116, PageID.3495. Walters said he "heard it both ways" and fetal cells may not have been used to develop the vaccines. *Id*. Walters at first claimed that he could only ask interview questions "given . . . from the Office of General Counsel to ask," but then testified that he needed an "authentic conversation" with Plaintiff.

*Id*. at 3496. Walters said that he read Plaintiff's written request "five, ten minutes before the interview," but paradoxically added that he "didn't want to be reading anything." ECF No. 116, PageID.3504. Walters even emphasized that "this wasn't an investigation." ECF No. 116, PageID.3509. That admission is important because the jury instructions (which Defendant never objected to) stated, "***If you find that the defendant conducted a reasonable investigation into the plaintiff's request for an accommodation*** and came to the honest belief that it had a legitimate non-discriminatory reason for terminating the plaintiff, you may consider that finding when you decide if the plaintiff has proved intentional discrimination." ECF No. 125, PageID.3983. Walters admitted there was no investigation. He did not call Plaintiff's religious leader, whose contact information Defendant requested. ECF No. 116, PageID.3509. "In the over 100 interviews that [I] made decisions or recommendations on [I] didn't contact a single religious advisor." *Id*. Walters never contacted Plaintiff's supervisor, who was Godmother to her daughter. *Id*. at 3510.

Things get worse for Defendant. Walters told the jury that a religious accommodation interview was mandatory, but then admitted he told Plaintiff **twice** that it was "completely voluntary", and it would be "fine" for Plaintiff to rely on her written statement. *Id*. at 3528. Plaintiff explained that she was "relieved" when Walters told her it was "completely voluntary . . . like a weight had been lifted off [her] shoulders. ECF No. 125, PageID.3852. Walters testified that employees

normally get "warnings" before adverse job actions, but the religious accommodation applicants received no warning (*i.e.*, disparate treatment). ECF No. 116, PageID.3535. And Walters testified that Plaintiff's written religious beliefs were disregarded because "anybody can write a letter" (*Id.* at 3552) and that he imposed his own subjective religious test on Plaintiff—***meaning he made religion a factor in his decision***. After admitting that Defendant typically has "policies and procedures for just about everything" (*Id.* at 3474), Walters conceded that the massive religious accommodation undertaking that required him to interview "hundreds" of applicants had ***no policies or procedures***. *Id.*

Despite Walters stating that Catholics are all Christians (*Id.* at 3492), Defendant claimed that Plaintiff's letter "didn't make any reference to her being Catholic or part of the Catholic Church. And when [Walters] asked her questions during the interview, she didn't share those beliefs with him either. She never informed Blue Cross of that." ECF No. 114, PageID.3329. However, the jury was left shocked (*i.e.*, two jurors audibly gasped) when they found out that Defendant's "Religious Accommodation Request Interview" template stated, "***This question is not asking what religion***." ECF No. 125, PageID.3927. The jury was more confused when Defendant said Walters was a "decision-maker," but Walters testified, "I didn't make employment decisions." ECF No. 116, PageID.3478. Adding to the

confusion, Defendant's business record (Ex. 94) states that interviewers "give their recommendation," but make no decision. ECF No. 120, PageID.3682.

The evidence showed that Walters made religion a factor in his decision to deny Plaintiff's accommodation because he disregarded her written religious accommodation request despite testifying that he had "no evidence that [Plaintiff's written accommodation request was] not true." ECF No. 116, PageID.3521. An employer admitting that it denied religious accommodation and terminated an employee despite having no evidence that the employee's religious accommodation request was insincere is ***disparate treatment***. That is because EEOC Guidance (all that Walters was trained on) states that an employer can only do "a limited factual inquiry and seek[] additional supporting information" when it "***has an objective basis for questioning either the religious nature or the sincerity of a particular belief***." EEOC Guidance, § 12-I(A)(2). Walters' admission that he had no "objective basis for questioning" the sincerity of Plaintiff's particular belief is *per se* discrimination. *Kaino v. Harney Cnty. Health Dist.*, 2024 WL 4298212, at *3 (D. Or. Sept. 26, 2024) (there is no legal authority "to support defendant's argument that an employee forfeits any subsequent religious discrimination claim by failing to cooperate with an employer's requests for verification of the sincerity of that employee's professed religious belief); *Kidd. v. University Medical Center of Southern Nevada*, 2024 WL 4046249, at *5 (D. Nev. July 2, 2024) (same).

11

The biggest problem with Walters' subjective denial of Plaintiff's accommodation request was that Plaintiff's religious beliefs were right in front of Walters. He admitted reading the accommodation request "five, ten minutes before the interview." There was no reason to question Plaintiff's sincerity.

> I have provided reasons why this policy violates my Christian faith and why I cannot, in good conscience, take part in it. It is my sincere personal religious belief that human life begins at conception, that the sanctity of life is precious to God and that it is a mortal sin to destroy innocent human life. The three COVID vaccines were either developed or tested using fetal cells that originated in abortion. My religious view has always been and continues to be that abortion is murder and a sin against God. I must consider the moral aspects of the use of all vaccines that have connection to fetal cell lines obtained from an abortion. As a Christian, I live everyday through my faith in God and the Bible, which I believe to be God's revealed and inspired Word (2 Timothy 3:12-17). In 1 Corinthians 6:19-20, the Apostle Paul addresses Christians about the importance of their bodies: "Or do you not know that your body is the temple of the Holy Spirt who is in you, whom you have from God? You are not your own, for you were bought with a price. Therefore, glorify God in your body." It is my utmost belief that my body belongs to God and my sincerely held personal religious belief that God will heal my temple by living my faith and trusting in God—not man. These scriptures and my personal religious beliefs are a few examples of why I must honor God with my body, mind, and spirit. I have been a Christian for many years and my beliefs are genuine and sincere.  I have done my best to live by the Bible's teachings my entire life. I firmly believe that to go against these teachings, would be a terrible sin and distance my relationship with God . . . If I go against the guidance of the Holy Spirit I would be sinning and violating the sanctity of my conscience.

Unable to cite any qualifications (*e.g.*, training or expertise) to the jury, Walters admitted to relying on his own subjective religious conscience and denying Plaintiff's accommodation request because "***it may not have been her letter that she***

12

*wrote*", after looking at the request five minutes before Plaintiff's interview and lacking any contemporaneous evidence to support his "fake note" theory. ECF No. 116, PageID.3552. Meaning, Walters made a subjective determination based on no objective evidence that Plaintiff's letter were fake, even though religious beliefs do not need to be "acceptable, logical, consistent, or comprehensible to others." *Thomas*, 450 U.S. at 714. Accordingly, Walters made Plaintiff's "religious practice, ***confirmed or otherwise***, a factor in [his] employment decision[]." *Abercrombie*, 575 U.S. at 773.

### B. Defendant's Other Key Witnesses Lied To The Jury.

Defendant's other two witnesses (Feinbaum and Snyder) had the worst cases of selective amnesia, which this Court instructed the jury was relevant for credibility:

> Ask yourself how good the witness's memory seemed to be. Did the witness seem able to accurately remember what happened? Ask yourself if there was anything else that may have interfered with the witness's ability to perceive or remember events. Ask yourself how the witness acted while testifying. Did the witness appear honest or did the witness appear to be lying? [ECF No. 125, PageID.3973]

Feinbaum sought to play down his role designing a religious accommodation process that a month later resulted in Plaintiff's accommodation denial. Feinbaum, a trial attorney and HR Director, denied that he "started creating . . . a Religious Objection and Evaluation Form" that would mirror Plaintiff's accommodation process. ECF No. 116, PageID.3388. However, he was soon impeached on that testimony and conceded that he and Patricia Snyder (his boss) did a "redline" of the Form to

develop a religious accommodation process. *Id*. at 3390. Asked why he started "marking up" the form, Feinbaum said, "I don't recall" (*id*. at 3393), but he admitted creating Defendant's "religious spiritual exemption statement." *Id*. at 3394.

Feinbaum next tried the fuzzy memory routine. Asked if he attended "numerous meetings with the human resources department about religious and spiritual exemptions," Feinbaum said, "I don't know." *Id*. at 3395. So Feinbaum was reminded that he attended a meeting with Snyder on the "vaccine protocols" and then suddenly remembered that he was "managing the religious accommodation process." *Id*. at 3397. He testified that Snyder was the "top guy" in that process. *Id*. And Feinbaum admitted that Plaintiff "eventually had to partake in this process." *Id*. at 3399. From there, Feinbaum did not cite any difference between the October 2024 Feinbaum process and the November 2024 Makupson process, other than there being three interviewers under Feinbaum and only two under Makupson. In fact, Defendant did not submit any evidence during the trial that the Makupson process substantively differed from the Feinbaum process.

Feinbaum next testified that his role in religious accommodation ended on October 26, 2021 ("I did not play a role in the religious accommodation process after that date")—a highly suspicious answer given that moments ago he could not remember big events, let alone very specific dates. *Id*. at 3401. But Feinbaum would get even more tangled in his web of lies. Feinbaum argued that he did not send an

14

email about religious accommodation to his subordinate, Jeff Walters, on November 1, 2021—***but he actually did***. *Id*. at 3407. Then Feinbaum admitted that on November 1, 2021, he was being asked by Walters for help with the religious accommodation process, which he said was "Correct." *Id*. Feinbaum also admitted that the religious accommodation process forms he finalized were distributed to the interviewers. *Id*. at 3410. Finally, after telling the jury that he was not involved in religious accommodation meetings in November 2021, Feinbaum conceded again to being present at a November 2, 2021 meeting ("Okay. I was involved in that meeting"), which Feinbaum characterized as "not high level"—even though Vice President Patricia Snyder and In-House Attorney Rudy Makupson were in the meeting. *Id*. at 3413-16. No surprise, Feinbaum did not "have any recollection of this meeting at all." *Id*. at 3416. Feinbaum would be impeached again when he admitted that a November 3 email to employees told them specifically to contact Feinbaum if they had any religious accommodation questions. *Id*. at 3420.

Despite Feinbaum's repeated lies and failure to recall critical information, this Court prevented the playing of audio from the October 12, 2021 secretly recorded meeting that Defendant had not objected to in the Final Pretrial Order. As for the October 12 meeting, Feinbaum outlandishly claimed that when he described applicant interviews as "mini depositions" that he only meant he wanted applicants to have "a thorough process." *Id*. at 3423. And Feinbaum claimed that his description

of those "mini depositions" as being "an interesting, fun experience" really only meant "a respectful experience." *Id*. at 3424. Feinbaum said that he only warned meeting participants that he did not want them "to be deposed as a witness" in order to "impart to the audience . . . that this is a very serious process." *Id*. at 3429. Finally, Feinbaum tried to score points with the jury by saying that "people were dying of COVID" (*id*. at 3433), but he was quickly reminded that the "Lions were back at full capacity" at the time—not that it mattered because Defendant never claimed "undue hardship" as a defense. Accordingly, the jury likely concluded that Feinbaum lacked credibility, and that Defendant had a discriminatory motive.

Both Walters and Feinbaum reported up to Vice President of Human Resources Patricia Snyder, but she too barely recalled her role in a religious accommodation process that she had no reason to doubt denied at least 433 applicants. Snyder could not recall "daily calls held at 7:45 a.m." beginning in November (*i.e.*, when Makupson had taken over) or who attended the calls despite being shown a meeting invite with the attendees. ECF No. 120, PageID.3613. Snyder then backtracked and admitted that she and Laura Byars (who was head of talent acquisition and at the October 12, 2021 secretly recorded meeting) were on the religious accommodation calls "every day." *Id*. at 3616-17.

Despite it being obvious to the jury that Snyder knew she was going to be questioned about the October 12 secretly recorded meeting, Snyder played dumb

when first confronted about the meeting and said, "I'm not sure what meeting you're referring to"—before then acknowledging that she had actually read "part of the transcript of the meeting" and "listened to the audio or video of the meeting." *Id*. at 3617. Jurors rolled their eyes. Snyder would go along with Feinbaum's story that the religious accommodation process "changed" when it transferred to Makupson. *Id*. at 3611. However, Snyder broke rank and admitted that the talent acquisition religious accommodation process (Feinbaum) was "similar" to the Lisa Domski process (Makupson). *Id*. at 3619. Snyder even testified that she "cannot tell [the jury] a single difference between the new employee religious accommodation process and the regular employee accommodation process." *Id*. at 3620. Snyder conceded that the process was substantively the same. *Id*. at 3636.

Snyder would go on to play the dutiful Sergeant Schultz from Hogan's Heroes who repeated the catchphrase, "I see nothing! I hear nothing! I know nothing!" Asked who could testify about "how this religious accommodation process was done," Snyder testified, "I can't answer that question." *Id*. at 3624. Asked who fired Plaintiff, Snyder testified "the formal notification, that would have come from me." *Id*. at 3644. Meaning, the jury heard the Vice President of Human Resources testify that she could not identify anyone with knowledge about religious accommodation denials, even though she attended morning religious accommodation meetings for a whole month, circulated religious accommodation forms, was on lots of emails about

religious accommodation denials, and ***signed Plaintiff's termination letter***. Snyder tried to play dumb a lot, but she could not hide from the October 12, 2021 meeting.

### C. Defendant Was Caught On Tape Admitting That Religious Accommodations Would Be Denied and Disparaging Applicants.

While Defendant begged the jury not to look at the "man behind the curtain" and tried to paint Walters as the Lee Harvey Oswald of religious accommodation, acting as the lone "decision-maker," the testimony contradicted Defendant's theory. It was implausible that a giant insurance company would leave a bunch of low-level human resources staff with the task of deciding hundreds of religious accommodations or that Walters' supervisors, who took part in the secretly recorded meeting, were somehow divorced from the religious accommodation process that never substantively changed between October 12 (the secretly recorded meeting) and December 1 (Plaintiff's interview). Meaning, the October 12 meeting was relevant, or as this Court described it, "a link in a chain or a way-point along the way of the process that ultimately was formulated and which was applied to the plaintiff in this case." ECF No. 120, PageID.3783.

At the October 12 meeting, Snyder would say, "***I want to be very realistic with this group to say we're not going to accept all religious accommodation requests***. We might not accept all medical accommodation requests." *Id*. at 3636. Snyder testified that it was "not the best choice of words." *Id*. at 3637. Snyder also admitted that she wanted the new hire (Feinbaum) process to "be consistent with

how we handle the same process with our own employees ['like Lisa Domski']" and to have the processes "mirror" each other. *Id*. at 3638, 3641. Snyder wanted to "really scrutinize" the religious accommodation requests, which aligns with Feinbaum's desire to treat the requests like "mini depositions" that would be "fun and interesting," and establishes an unlawful motive that played out as expected—with hundreds of accommodation requests being denied. *Id*. at 3639.

Defendant argues that the religious accommodation process changed from "a three-person religious exemption review committee" with Feinbaum was a member to a team of interviewers. ECF No. 127, PageID.4087. However, Defendant never demonstrated that the process itself had changed. While there might have been new chefs in the kitchen, the menu stayed the same.

In addition, three federal judges opined that statements from the October 12, 2021 meeting were probative of disparate treatment discrimination, including the Honorable Judith E. Levy, who held that "statements from the Director of Employee and Labor Relations display disregard or animus towards certain religious beliefs." *Eder v. Blue Cross Blue Shield of Michigan*, No. 23-12024, 2024 WL 4132669, at *5 (E.D. Mich. Sept. 10, 2024); *see* ECF No. 105, PageID.3111-22.

### D. The Jury In Fact Learned That Defendant Denied Hundreds of Religious Accommodation Requests.

Near the close of trial, this Court instructed the jury to disregard Mr. Marko's statement that Defendant denied at least 433 religious accommodation requests,

opining that Snyder had not testified that Defendant denied at least 433 religious accommodations. ECF No. 125, PageID.4014. However, she did. Ms. Snyder was confronted for impeachment purposes with her own email correspondence stating that Defendant had denied 433 of 763 religious accommodation requests as of December 2, 2021. ECF No. 120, PageID.3662. She indeed verified the number upon reviewing the email. Ms. Snyder was asked whether she was "provided by Karen Jozwiak, in part of your role as VP of labor relations, the religious accommodation numbers; is that true?" She responded, "Yes." *Id*. Asked, "[a]nd of the 763 religious accommodations, Blue Cross declined 433 of them," Ms. Snyder testified, "I wouldn't have recalled that number had it not been in front of me." *Id*. Fighting her own previous admission regarding the denial numbers, Ms. Snyder stated that she did not know if "that's an accurate number." *Id*. at 3663. However, asked if she had "reason to disagree with the number of declined religious accommodation requests as of December 2, 2021, of 433," Ms. Snyder admitted that she had "no specific reason" to disagree with that number. *Id*. Hence, the jury did have evidence in the form of Snyder's testimony that Defendant declined 433 out of 763 religious accommodations, which aligns with Walters' testimony that he interviewed "over a hundred" employees. ECF No. 116, PageID.3494. The denial evidence, viewed in the light most favorable to Plaintiff, was probative of whether Defendant made religion a factor in the employment decisions.

## II. DEFENDANT INVOKES FED. R. CIV. P. 59(a) AS A MEANS TO REHABILITATE ITS TERRIBLE WITNESSES AND SPIN NEW YARNS FOR A NEW JURY, BUT THE EVIDENCE DOES NOT CHANGE AND THE RESULT WILL BE THE SAME OR WORSE.

Defendant's burden is substantial under Fed. R. Civ. P. 59(a). "A new trial is warranted when a jury has reached a 'seriously erroneous result' as evidenced by: (1) the verdict being against the weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some fashion, *i.e.*, the proceedings being influenced by prejudice or bias." *Bonkowski v. Allstate Ins. Co.*, 2012 WL 3013747, at *6 (E.D. Mich. July 20, 2012). As a threshold matter, Defendant cannot cause a new trial on Plaintiff's failure to accommodate claim because, among plenty of other reasons, Walters conclusively admitted that he had "no evidence that [Plaintiff's written accommodation request was] not true." ECF No. 116, PageID.3521. An employer is only allowed to inquire about the sincerity of an employee's religious beliefs when it has an objective basis for questioning either the religious nature or the sincerity of a particular belief." EEOC Guidance, § 12-I(A)(2). Walters' admission that, after reading Plaintiff's written accommodation letter, he had no objective basis to question Lisa Domski's sincerity is *per se* evidence of religious discrimination. *Kaino*, 2024 WL 4298212 at *3 (there is no legal authority "to support defendant's argument that an employee forfeits any subsequent religious discrimination claim by failing to cooperate with an employer's requests for verification of the sincerity of that employee's professed religious

21

belief); *Kidd.*, 2024 WL 4046249 at *5 (same). It is a mystery why Defendant takes aim at the failure to accommodate jury verdict where Plaintiff easily demonstrated that she informed Defendant of a sincere religious belief conflicting with COVID-19 vaccination. Based on the jury's unanimous verdict and the incredible evidence of sincerity from Plaintiff, her family and friends, and Fr. Ptak, not even one out of a hundred juries could find that Plaintiff's religious beliefs were insincere.

As for disparate treatment, against the great weight of religious discrimination jurisprudence, Defendant cites *Papin Enterprises* (an unpublished case from the Middle District of Florida) for the proposition that there was "nothing intentionally discriminatory" about Plaintiff's denial and termination. Had there been any binding legal authority for the same proposition, Defendant would have cited it. In the absence of legal authority, Defendant makes "lawyer arguments" about the evidence and strains credulity with the statement, "Walters reasonably inquired into the sincerity and religious nature of Plaintiff's purported beliefs, and came to the honestly-held belief (because Plaintiff would not explain her religious views or the reason for her accommodation request) that Plaintiff did not hold sincere religious beliefs in conflict with COVID-19 vaccination." ECF No. 127, PageID.4094. The truth is that this was not a fair fight. Plaintiff overcame a childhood that would make Orphan Annie cringe. She utilized an undeterrable faith to feed her soul and conquer obstacles on a path toward redemption. Once a foster child longing for a family, she

made a family that could foster her own nephew and other needy members of the community. She did not merely join a church, but instead joined the church to her family, embracing Fr. Ptak as a spiritual advisor *and* close friend.

In the other corner of the ring were three witnesses who were coached to "accentuate the positive, eliminate the negative." None of them were credible and all had bad moments. Walters lauded a retirement party that Plaintiff never received. A distraught Snyder lamented being recorded telling her colleagues that Defendant was "***not*** going to accept all religious accommodation requests," but suggesting that they "***might*** not accept all medical accommodation requests." Snyder's regret for having spoken those words was palpable in the courtroom. And Feinbaum could not get much of anything right, telling the jury that "fun and interesting . . . mini depositions" were better than Disney World. Therefore, Defendant's conclusory statement that "nothing intentionally discriminatory" happened rings hollow.

The jury saw a corporation running from the truth and hiding from its own religious accommodation process. Defendant's lies were conspicuous in the face of a perfect Plaintiff. When Defendant in closing arguments wildly accused Plaintiff of intentionally failing her religious accommodation test in order to enjoy an early retirement, it was clear that Defendant was grasping for unsubstantiated conspiracy theories in the eleventh hour. In the end, the jury not only found for Plaintiff, but it clearly found ***against*** Defendant by awarding $10,000,000 in punitive damages.

23

After the losing effort at trial, Defendant submits an intellectually dishonest brief that omits lies by Walters, instead claiming that the bulk of "Plaintiff's proofs focused on the statements and conduct of non decision-makers." ECF No. 127, PageID.4094. That theory requires us to believe that the jury bought into the idea that Defendant's two executive-level witnesses (Snyder and Feinbaum) had nothing to do with the religious accommodation process. It also requires us to pretend that the one of the biggest moments of the trial was not the audible gasp from the jury when Walters admitted that he specifically told applicants that Defendant ***did not want to know their specific religion***. Walters had thus used up his credibility capital with the jury after telling them for hours that Plaintiff could have earned a religious accommodation had she just explained that she was Catholic. The moment left jurors stunned, realizing that Walters would lie about anything, including his training, the interview being "completely voluntary," that Plaintiff did not write her religious accommodation letter, and that he needed to hear Plaintiff was Catholic.

Defendant also takes aim at Mr. Marko's "inappropriate statements at trial." *Id*. at 4096. The argument lacks merit. Mr. Marko's reference to other religious accommodation requests being denied came out at trial in Ms. Snyder's affirmation that she had "no specific reason . . . to disagree with the number of declined religious accommodation requests as of December 2, 2021, of 433." ECF No. 120, PageID.3663. It is also false that Mr. Marko exaggerated the "end date of December

2, 2021." ECF No. 127, PageID.4097. Defendant has only itself to blame for not calling a witness to testify as to when and why it terminated Plaintiff. The problem was not Plaintiff's line of questioning, but Snyder's obscene lack of knowledge for someone who had earned the title, Vice President of Human Resources, and found herself involved with so many aspects of the religious accommodation process.

Finally, Rule 59 permits a court to grant a new trial where there was unfairness to the movant, or the proceedings were influenced by prejudice. *Bonkowski*, 2012 WL 3013747, at *9. Respectfully, Plaintiff believes that Defendant caught most of the breaks in this case. Eight jurors were dismissed for cause based on alleged bias against Defendant, while no juror was struck for cause based on bias against Plaintiff. Defendant had three preemptory challenges—Plaintiff had two. The secretly recorded meeting audio was not played for the jury. Defendant precluded Makupson from testifying at trial but let him sit for a deposition before trial began and testify profusely about the religious accommodation process. Defendant prevailed on pretrial motions to restrict lay and expert witnesses and documentary evidence. Defendant cannot cry foul on what occurred at the trial.

<u>**CONCLUSION**</u>

Plaintiff requests that this Court honor the unanimous jury verdict as a culmination of Plaintiff's hard-fought battle that began when she chose her faith over her career back in December 2021 and deny Defendant's motions.

Respectfully submitted,

HURWITZ LAW PLLC

*/s/ Noah S. Hurwitz*
Noah S. Hurwitz (P74063)
HURWITZ LAW PLLC
Dated: November 24, 2024                *Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on November 24, 2024, the foregoing document

was served upon Defendant's counsel-of-record via ECF.

*/s/ Noah S. Hurwitz*

Noah S. Hurwitz (P74063)
