## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

LISA DOMSKI,

                Plaintiff,

v.

BLUE CROSS BLUE SHIELD
OF MICHIGAN,

                Defendant.

Case No. 2:23-cv-12023

Hon. David M. Lawson

Mag. Elizabeth A. Stafford

| | |
|---|---|
| Noah S. Hurwitz (P74063) | Scott R. Knapp (P61041) |
| Grant M. Vlahopoulos (P85633) | Brandon C. Hubbard (P71085) |
| HURWITZ LAW PLLC | Nolan J. Moody (P77959) |
| 340 Beakes St., Ste. 125 | Maureen J. Moody (P85032) |
| Ann Arbor, MI 48104 | DICKINSON WRIGHT PLLC |
| (844) 487-9489 | 123 W. Allegan St., Ste. 900 |
| noah@hurwitzlaw.com | Lansing, MI 48933 |
| grant@hurwitzlaw.com | (517) 371-1730 |
| *Attorneys for Plaintiff* | sknapp@dickinsonwright.com |
| | bhubbard@dickinsonwright.com |
| Jonathan R. Marko (P72450) | nmoody@dickinsonwright.com |
| MARKO LAW, PLLC | mmoody@dickinsonwright.com |
| 220 W. Congress, Fourth Floor | *Attorneys for Defendant* |
| Detroit, MI 48226 | |
| (313) 777-7526 | |
| jon@markolaw.com | |
| *Attorneys for Plaintiff* | |

## PLAINTIFF'S RESPONSE TO
## <u>DEFENDANT'S MOTION FOR REMITTITUR</u>

Plaintiff Lisa Domski ("Plaintiff"), by and through her attorneys, HURWITZ

LAW PLLC and MARKO LAW, PLLC, hereby responds to Defendant Blue Cross

Blue Shield of Michigan's motion for remittitur. In support of her Response, Plaintiff relies on the facts, laws, and argument set forth in the accompanying Brief in Support, as well as the trial record.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter an order denying Defendant's Motion for Remittitur and honoring the unanimous verdict.

Respectfully submitted,

HURWITZ LAW PLLC

*/s/ Noah S. Hurwitz*
Noah S. Hurwitz (P74063)
Grant M. Vlahopoulos (P85633)
HURWITZ LAW PLLC
340 Beakes St., Ste. 125
Ann Arbor, MI 48104
(844) 487-9489
noah@hurwitzlaw.com
grant@hurwitzlaw.com
*Attorneys for Plaintiff*

Dated: November 24, 2024

2

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

LISA DOMSKI,

                Plaintiff,

v.

BLUE CROSS BLUE SHIELD
OF MICHIGAN,

                Defendant.

Case No. 2:23-cv-12023

Hon. David M. Lawson

Mag. Elizabeth A. Stafford

---

Noah S. Hurwitz (P74063)
Grant M. Vlahopoulos (P85633)
HURWITZ LAW PLLC
340 Beakes St., Ste. 125
Ann Arbor, MI 48104
(844) 487-9489
noah@hurwitzlaw.com
grant@hurwitzlaw.com
*Attorneys for Plaintiff*

Jonathan R. Marko (P72450)
MARKO LAW, PLLC
220 W. Congress, Fourth Floor
Detroit, MI 48226
(313) 777-7526
jon@markolaw.com
*Attorneys for Plaintiff*

Scott R. Knapp (P61041)
Brandon C. Hubbard (P71085)
Nolan J. Moody (P77959)
Maureen J. Moody (P85032)
DICKINSON WRIGHT PLLC
123 W. Allegan St., Ste. 900
Lansing, MI 48933
(517) 371-1730
sknapp@dickinsonwright.com
bhubbard@dickinsonwright.com
nmoody@dickinsonwright.com
mmoody@dickinsonwright.com
*Attorneys for Defendant*

---

## PLAINTIFF'S BRIEF IN SUPPORT OF RESPONSE TO
## <u>DEFENDANT'S MOTION FOR REMITTITUR</u>

## <u>TABLE OF CONTENTS</u>

**TABLE OF AUTHORITIES** ................................................................. ii

**ISSUES PRESENTED** .......................................................................... iv

**INTRODUCTION** ................................................................................ 1

**STATEMENT OF MATERIAL FACTS** ............................................ 3

**LEGAL STANDARD** .......................................................................... 4

**ARGUMENT** ........................................................................................ 4

      **I.**    **DEFENDANT FAILS TO PROVIDE A SUFFICIENT BASIS TO REDUCE THE JURY'S NON-ECONOMIC DAMAGES AWARD BASED ON THE SUBSTANTIAL PROOFS OFFERED AT TRIAL.** .............................................................. 4

      **II.**   **DEFENDANT FAILS TO PROVIDE A SUFFICIENT BASIS TO REDUCE THE JURY'S FRONT PAY DAMAGES AWARD BASED ON THE SUBSTANTIAL PROOFS OFFERED AT TRIAL.** ............................................................. 17

**CONCLUSION** .................................................................................... 25

i

# <u>TABLE OF AUTHORITIES</u>

## Cases

*Bergman v. United States*, 579 F. Supp. 911 (W.D. Mich. 1984) ............................14

*Bruner v. Dunaway*, 684 F.2d 422 (6th Cir. 1982).......................................................14

*Champion v. Outlook Nashville, Inc.*, 380 F.3d 893 (6th Cir. 2004) ............... 14, 16

*Dillon v. Coles*, 746 F.2d 998 (3d Cir.1984) ...............................................................19

*Donlin v. Philips Lighting N. Am. Corp.*, 581 F.3d 73 (3d Cir. 2009) .....................19

*Duty v. United States Dept. of Interior*, 735 F.2d 1012 (6th Cir. 1984).....................5

*Emerman v. Fin. Commodity Invs., L.L.C.*, No. 1:13CV2546, 2015 WL 6742077 (N.D. Ohio Nov. 2, 2015) ...................................................................................25

*Erickson v Soyars*, 356 Mich 65 (1959) ....................................................................22

*Fantozzi v. Sandusky Cement Prod. Co.*, 1992-Ohio-138, 64 Ohio St. 3d 601, 597 N.E.2d 474 ........................................................................................ 15, 25

*Farber v. Massillon Bd. of Educ.*, 917 F.2d 1391 (6th Cir. 1990) ...........................14

*Fielden v. CSX Transp.*, Inc., No. 2:03-cv-995, 2009 U.S. Dist. LEXIS 82140 (S.D. Ohio Aug. 26, 2009) .....................................................................................14

*Fischer v. United Parcel Serv., Inc.*, 390 F. App'x 465 (6th Cir. 2010) ..................15

*Ford Motor Co. v. E. E. O. C.*, 458 U.S. 219 (1982) ................................................23

*Green v. USX Corp.*, 843 F.2d 1511 (3d Cir.1988) ...................................................19

*Hawkins v. Ctr. for Spinal Surgery*, 247 F. Supp. 3d 897 (M.D. Tenn. 2017) ..........4

*Hicks v Gillespie*, 346 Mich 593 (1959).....................................................................22

*Hubbell v. FedEx Smartpost, Inc.*, No. 14-13897, 2018 WL 1288988 (E.D. Mich. Mar. 13, 2018), aff'd, 933 F.3d 558 (6th Cir. 2019)..............................................3

*Huhta v Maloney*, 363 Mich 348 (1961).....................................................................22

*Hukkanen v. Int'l Union of Operating Eng'rs, Hoisting & Portable Local No. 101,* 3 F.3d 281 (8th Cir.1993).............................................................................20

*Hyldahl v. AT&T*, 642 F. Supp. 2d 707 (E.D. Mich. 2009)............................... 17, 18

*King v. Gen. Motors Corp.*, 136 Mich. App. 301 (1985)..........................................6

*Lowe v. Walbro LLC*, No. 1:18-cv-12835, 2024 WL 4545961 (E.D. Mich. Oct. 22, 2024)...............................................................................................................15

*Meacham v. Knolls Atomic Power Lab.,* 381 F.3d 56 (2d Cir.2004) ......................20

*Moody v. Pepsi-Cola Metro. Bottling Co., Inc.*, 915 F.2d 201 (6th Cir. 1990)........16

*NLRB v. Madison Courier, Inc.,* 472 F.2d 1307 (D.C.Cir.1972)..............................23

*Patterson v. Winfrey*, No. 05-71528, 2010 U.S. Dist. LEXIS 16243 (E.D. Mich. Feb. 24, 2010)................................................................................................5

*Peden v Carpenter*, 352 Mich 604 (1958) .............................................................22

*Pierce v. Atchison, Topeka & Santa Fe Ry. Co.,* 65 F.3d 562 (7th Cir.1995) ..........20

*Pohrybienyk v. Kirchner*, 410 F.2d 1114 (6th Cir. 1969) ..........................................6

*Sambrano v. United Airlines, Inc.*, 19 F.4th 839 (5th Cir. 2021) .............................16

*Schafke v. Chrysler Corp.*, 147 Mich. App. 751 (1985) ............................................6

*Smith v. Heath*, 691 F.2d 220 (6th Cir. 1982) ..........................................................5

*Suggs v. ServiceMaster Educ. Food Mgmt.*, 72 F.3d 1228 (6th Cir. 1996) .............24

*Turic v. Holland Hosp. Inc.*, 85 F.3d 1211 (6th Cir. 1996) ......................................15

*Watrous v. Conor*, 266 Mich. 397 (1934)................................................................16

*Weber v. Infinity Broad. Corp*, No. 02-74602, 2005 WL 3726303 (E.D. Mich. Dec. 14, 2005)..................................................................................................14

*West v. Tyson Foods*, 374 F. App'x 624 (6th Cir. 2010) ...........................................16

**Statutes**

42 U.S.C. § 2000e–5(g)(1).......................................................................................22

## <u>ISSUES PRESENTED</u>

I.    Whether Defendant is entitled to remittitur with respect to Plaintiff's *non-economic damages* where Plaintiff testified at length to the mental and physical anguish she endured as a result of an unlawful termination under bizarre circumstances after working for Defendant since she was 17 years old and explaining the huge role that religion had played in her life, which was corroborated by her priest, nephew, daughter, husband, and friends.

> Plaintiff Answers:              No.
> This Court Should Answer:    No.

II.   Whether Defendant is entitled to remittitur with respect to Plaintiff's *front pay damages* where the jury assessed Plaintiff's credibility and found that indeed she had never retired and instead dutifully attempted to find replacement work only to encounter difficulties in mitigating her damages because she had only ever worked for Defendant and found herself unemployed at the age of 55 without a college degree, and this Court instructed the jury that it could award front pay up until the age of 67 and Defendant never objected to that instruction.

> Plaintiff Answers:              No.
> This Court Should Answer:    No.

III.  Whether Defendant is entitled to remittitur with respect to Plaintiff's compensatory damages in the event this Honorable Court denies Defendant's motion for judgment as a matter of law regarding Plaintiff's ELCRA claims when the ELCRA does not have a cap on non-economic damages?

> Plaintiff Answers:              No.
> This Court Should Answer:    No.

## **INTRODUCTION**

Lisa Domski had a childhood reminiscent of a Laura Ingalls Wilder novel, filled with trials and tribulations. However, unlike Ms. Wilder, Ms. Domski had no real family. Ms. Domski had been a foster child and her siblings were torn away from her at a young age. She was reclaimed by a disinterested father, but only to become a stepdaughter to an abusive stepmother. The jury learned that Ms. Domski survived strictly because of her faith in God. Specifically, the jury learned that Ms. Domski was never indoctrinated into religion at a young age like most children are. Her faith was entirely voluntarily, something she discovered on her own as a child and cherished as the only stable force in an otherwise treacherous upbringing. Religion became Ms. Domski's salvation, first as an unwavering guiding light and second as the fabric that would bind her to family and friends, including her direct supervisor at Blue Cross who was her daughter's Godmother. And it was getting her first job with Defendant at the age of 17 that allowed Ms. Domski to escape the hardship and abuse of her youth. As an employee with Defendant, Ms. Domski for the first time in her life felt safe, independent, and optimistic.

It is therefore the cruelest of ironies that Defendant would weaponize what had been Ms. Domski's salvation, religion, and use it against her and coworkers who found themselves with the horrible Hobson's choice of having to choose between faith and financial stability. Ms. Domski testified that the circumstances could not

have felt more dire at that time. Her faith and employment both occupied such important places in her life. But Ms. Domski chose faith over finance.

The jury heard from Ms. Domski's family, friends, and priest about how deeply the wrongful termination affected her emotionally, physically, and financially. She had served Defendant for 32 years and had always been an exemplary employee. Everyone who knew her at work understood the role that religion played in her life. Likewise, so much of her personal identify was wrapped up in being a Blue Cross employee. Her husband suggested that she would work there until she was 67, but Ms. Domski said she could never see herself retiring. Regardless, who would question how painful this must have been for Ms. Domski after hearing about her scars from childhood abandonment. Ms. Domski had seen her coworkers violate policies and get second chances. She knew that Defendant, more than most companies, was skilled in conducting all sorts of appeals processes. But in her case, despite incredible seniority and expertise, Defendant considered Ms. Domski's religious accommodation for less than 24 hours and then suspended her. A month passed while Ms. Domski prayed over Christmas for redemption, but Defendant fired her on January 5, 2022 without further explanation.

Defendant now has the gall to say that Ms. Domski has not suffered enough emotional distress to earn the verdict, despite the fact she explained to the jury for hours how much she suffered in the aftermath of termination. Ms. Domski explained

2

how being fired revived feelings of trauma and abuse from childhood. She explained the difficulty of finding a comparable job without a college degree after she had never held a different job for 38 years. Here we are, just weeks after the verdict, and now for a second time Blue Cross is calling Ms. Domski a faker. The problem for Defendant is that it is wrong again. Defendant already tested all of these conspiracy theories mentioned in the remittitur motion during trial and it backfired. Defendant argued to the jury that Plaintiff was a malingerer who embraced termination as a desirable early retirement and that she never tried to find a new job. How did that go over with the jury? $315,000 in back pay damages, $1,375,000 in front pay damages, $1,000,000 in non-economic damages, and $10,000,000[1] in punitive damages. There is no factual or legal justification to grant Defendant's motion.

## STATEMENT OF MATERIAL FACTS

Because this Court heard all of the evidence at trial, Plaintiff will dispense with a factual statement and instead cite to the relevant pages of the trial transcript in the argument sections, see *infra*.

---

[1] Plaintiff concedes that her punitive damages can be reduced by Title VII's statutory cap, but that her non-economic damages cannot be altered. Although 42 U.S.C. § 1981a(b)(3)(A) limits punitive and non-economic damages to $300,000, Plaintiff remains entitled to the full reward of $1,000,000 for past non-economic damages because that amount was awarded as a unitary number for both the federal and state law retaliation claims. See *Denhof v. City of Grand Rapids*, 494 F.3d 534, 548 (6th Cir. 2007) ("Since the Michigan statute has no damage caps, the Title VII limits do not apply."); *Hubbell v. FedEx Smartpost, Inc.*, 2018 WL 1288988, at *5 (E.D. Mich. Mar. 13, 2018).

## LEGAL STANDARD

"Remittitur is not appropriate simply because an award is extremely generous; rather, it is allowed only when an award is ***grossly disproportionate to the adduced evidence***." *Hawkins v. Ctr. for Spinal Surgery*, 247 F. Supp. 3d 897, 905 (M.D. Tenn. 2017). The Sixth Circuit requires a party requesting remittitur to meet a high burden.

> ***The standard for obtaining a remittitur is high: A trial court is within its discretion in remitting a verdict only when, after reviewing all evidence in the light most favorable to the awardee, it is convinced that the verdict is clearly excessive, resulted from passion, bias or prejudice; or is so excessive or inadequate as to shock the conscience of the court. If there is any credible evidence to support a verdict, it should not be set aside. The trial court may not substitute its judgment or credibility determinations for those of the jury.***

*Advanced Accessory Sys., LLC v. Gibbs*, 71 F. App'x 454, 460 (6th Cir. 2003).

## ARGUMENT

**I.  DEFENDANT FAILS TO PROVIDE A SUFFICIENT BASIS TO REDUCE THE JURY'S NON-ECONOMIC DAMAGES AWARD BASED ON THE SUBSTANTIAL PROOFS OFFERED AT TRIAL.**

Defendant avoids the very difficult burden on the moving party for remittitur and barely discusses any relevant trial testimony of Plaintiff, nephew Mark Keller, husband Larry Domski, daughter Alyse Domski, Fr. Ptak, and Plaintiff's friends. All that testimony needs to be part of the remittitur analysis because establishing an "unreasonable" verdict is quite difficult. In the face of its difficult burden, Defendant's motion is nine pages of law, with less than a page devoted to what

occurred at trial. As the court in *Patterson v. Winfrey*, No. 05-71528, 2010 U.S. Dist.

LEXIS 16243, at *16-18 (E.D. Mich. Feb. 24, 2010) held:

> A jury's verdict should not be overturned as being against the weight of
> the evidence unless the verdict was unreasonable.  In *Holmes*, the Sixth
> Circuit did overturn a trial court's grant of a motion for new trial in a
> case, like the present case, that "came down to a question of who the
> jury believed . . . ."  If the jury in this case, having heard both versions
> of the facts, could reasonably have found for the Defendants, this Court
> cannot overturn that decision.

*Patterson v. Winfrey*, No. 05-71528, 2010 U.S. Dist. LEXIS 16243, at *16-18 (E.D.

Mich. Feb. 24, 2010). As a threshold matter, Defendant's argument fails because

Defendant did not put forth the effort of describing the evidence that might

demonstrate that the jury's award was unreasonable.

In any event, "[t]he determination of the amount of damages to be awarded is

left to the discretion and good judgment of the fact finder as guided by the facts of

the particular case." *Smith v. Heath*, 691 F.2d 220 (6th Cir. 1982). "Questions raised

concerning damages are essentially questions of fact." *Duty v. United States Dept.

of Interior*, 735 F.2d 1012 (6th Cir. 1984). With respect to the imprecise nature of

calculating an award for Plaintiff's pain and suffering, the Court generally grants the

determination to the jury. In fact, the Sixth Circuit has held that:

> Where the respective claims and theories have been fully presented and
> properly charged, the courts are slow to interfere with the verdicts so
> rendered, so that only the gross abuse of the jury's discretion will
> warrant the court in substituting its judgment for that of the jury. Thus,

> it (is) said that the value of pain and suffering, both past and
> prospective, and the loss of future earnings, in an action for personal
> injuries, are questions peculiarly for the jury. There is no measuring
> stick to determine the value of pain and suffering; it is primarily left to
> the sound judgment of the jury.

*Pohrybienyk v. Kirchner*, 410 F.2d 1114, 1115-16 (6th Cir. 1969). Michigan law is in lockstep with the standards under federal law, particularly with ELCRA claims, which contain no artificial limit on the amount of recoverable damages and leave the jury in charge of damages. *Schafke v. Chrysler Corp.*, 147 Mich. App. 751, 753 (1985); *King v. Gen. Motors Corp.*, 136 Mich. App. 301, 308-09 (1985).

Ms. Domski began this hard-fought battle even before her termination in January 2022. She had anguished about her decision to remain unvaccinated, but still made the decision knowing that it was irreparably harm her family's finances and reopen wounds of abandonment that she had thought were healed. The jury heard about Plaintiff's harrowing childhood and how she found salvation and a semblance of stability through God. ECF No. 120, PageID.3760-65. The jury learned that the job with Defendant when she was only 17 finally gave her independence and would prove to support her family financially for the next 38 years as she climbed the corporate ladder. ECF No. 125, PageID.3822-29; ECF No. 125, PageID.3831 ("It was an identity. It gave me a purpose. It was - - I got up every morning. I felt like I was contributing. I was helping. I was bringing home a paycheck. I could help my family. I could also help my colleagues. I always asked, what can I do to

6

help anyone?  What Can I do to help make your job easier?  What can I help to do to help make your deadlines met?").  Plaintiff "struggled" when the COVID-19 vaccine mandate was announced. *Id*. at 3832-33. She spent "many days and nights praying about it" and sought guidance from her spiritual leader, Fr. Ptak. *Id*. at 3834. Her decision to not avoid vaccination was incredibly difficult. "I was tormented in what I believe in and what I needed to do to keep my family supported, what I needed to do to keep the livelihood, the love of going into the office - - or not into the office, but love of doing my job." *Id*. She "felt like I had to choose between my faith and my job." *Id*. at 3835.

> Q:   Did you think about just saying, you know what, I'm just going to get it for my family's sake?
>
> A:   No.
>
> Q:   Why Not?
>
> A:   I couldn't.  I - - I believe so strong and it's - - my faith has carried me throughout my whole life, my prayers, my connection hat I felt with God, there was no way, no way I could do this.  *Id*.

Plaintiff's January 2022 termination would trigger old feelings of pain, abandonment, and betrayal that had haunted her since she was a little girl. *Id*. at 3857 ("I was betrayed.  I was angry.  I was sad.  I was - - I can't believe this.  It was disbelief.  I had worked there for so long.  I had done so much for the company.")

> Q:   And did you ever get - - did you get – what did you do when you get this termination letter in the mail?

A:    You know, I - - the feeling of **abandonment**.  The feeling - - *all of those feelings that I have hidden for so long began to stir up again*.

Q:    What do you mean by that?

A:    Feelings of **betrayal**, feelings of **abandonment**, feelings from my childhood, feelings of, *I gave my life to this*.  I - - *this place was my identity*.  It's what I got up every day and went for.  It's how I supported my family.  It's how my future was going to lay out with, you know, the plans that I had working there.

Q:    Did you feel like the company that you had worked for, for 38 years made you choose between your faith and religion and your career?

A:    I did.  I absolutely felt that way.

Q:    How did that feel?

A:    It was - - it was horrible.  It was - - *it was probably one of the worst times in my life next to my childhood*.

*Id*. at 3859. This was not a run of the mill termination but one in which Plaintiff was told that she was faking the thing she held most dear—her faith. And that somehow this occurred in a workplace where Plaintiff's supervisor is her daughter's Godmother is outrageous. *Id*. at 3819-20.

Q:    Would you be able, physically and mentally able, to go back to Blue Cross Blue Shield after everything that you have been through?

A:    There is no way.  They betrayed me.  They lost my trust.  I compared it to being married to someone.  If someone betrayed a husband or wife, how could that person stay with that person? (*Id*. at PageID.3872).

8

Defendant argues that the pain and suffering was mild. The jury did not think so. Plaintiff testified she "became ***withdrawing***, ***isolating myself***, not wanting to spend time with people. I did still pray a lot. But I'm human. ***These things don't go away***. ***Guilt***. I couldn't help my family." *Id*. at 3873. Even Plaintiff's physical health deteriorated. She gained "anywhere between ***20 to 30 pounds***" and experienced "[p]ractically ***no sleep***." *Id*. "And if I did fall asleep, I was awoke - - I was awake because ***I couldn't turn my mind off***.  I kept thinking about everything.  I became very distraught, very ***depressed***." *Id*.

Plaintiff's family was forced to make dramatic lifestyle changes. "We couldn't have the luxuries that we had when I was working. There was no more, hey, let's just go here, let's go out to eat, let's take a vacation to Myrtle Beach, or - - let's watch what we're spending at the grocery store, let's make sure we, you know, keep the lights on - - off, turn the heat down, just things like that." *Id*. at 3874.  Plaintiff drained retirement funds that she had been saving for years to pay for living expenses. *Id*. at 3875. Plaintiff was forced to drive "40 to 45 minutes away" from her family to interview for new jobs, which Plaintiff testified was "horrible." *Id*. at 3868-69.  Plaintiff was unable to find a comparable job. *Id*. Her termination "of course" resulted in a strain in her relationship with her husband. *Id*. at 3875.

The testimony of Mark Keller, Larry Domski, and Alyse Domski corroborates Plaintiff's testimony. Mark testified that he witnessed how Plaintiff's religion was important in her life:

> I remember from day one, it's always been religious - - or religion in her life, and that was number one.  She would put religion number one, her family second, forthcoming things after that.  But it was such a big key part that even if I wouldn't understand things, and I couldn't understand things, when I would come over on the weekends, she would read to me verses out of the Bible or she would explain things to me.  And it tied into being courteous and respectful to others an always be a very giving person.

(ECF No. 120, PageID.3692). Mark also commented on the pride and enthusiasm that Plaintiff had in being an employee of Defendant. ECF No. 120, PageID.3695-96.

> She was so proud, and she had so much enthusiasm for her job, for her part in her career, and she was proud and happy to work there. . . She would talk about how involved she was in the company products.  She would talk about all the promotions she's earned over the years.  How much of a family it is considered to work there.  And she couldn't imagine herself working anywhere else.  And, in fact, she told me several times from the time I was a little boy to even now that she planned on spending the rest of her life working for the company until at least age 60 - - 67.

But life changed in January 2022 when Mark received a phone call from Plaintiff to explain she had been fired for refusing to sacrifice her sincerely held religious beliefs. *Id*. at PageID.3696-98. Mark "heard the pain in her voice[.]" *Id*. at 3708. Mark then observed how being fired devastated Plaintiff.

10

A:     Every time I would go over to visit, oftentimes she didn't want anything to - - *she didn't want to come out of the room*.  She wanted to stay in her pajamas.  She wanted to leave.  It was almost as if she wanted to just watch Netflix.

And I said: ***This is not right.  This is not my aunt***.

Her - - ***socially, physically, emotionally, even spiritually, where she was going to church and wanting to go often, she didn't want to do those things anymore***.  ***And she was so hurt psychologically that you could tell she didn't want to leave the house***.  [*Id*. at 3698.]

Larry was testify that he knew all about how Plaintiff's faith had guided her since a traumatic childhood. *Id*. at 3720-21.  His wife felt like she was "forced to take the shot to help [their] household out." *Id*. at PageID.3723. Larry saw the "guilt" in his wife over staying true to her religious beliefs, much to the financial detriment of the family. ECF No. 120, PageID.3723. Plaintiff was fired while daughter Alyse was in her first year of college at Wayne State. Larry said that he and his wife felt obligated to pay for her education. *Id*. at PageID.3723-24.

Q:     So when Lisa made this decision and she was terminated, were you able to see how it affected her?

A:     Oh yes.  ***It took the wind out of her.  She was devastated***.

Q:     Why?

A:     She was - - ***she had to choose between her beliefs and her job. That was a tough decision.  And she was just - - there was a lot of emotions that she was - - feeling that she was guilty that she was putting the burden on me***.  (*Id*. at PageID.3724-25).

11

The trauma of termination followed Plaintiff in her job search. Larry explained that Plaintiff "would be sitting at the computer crying because she couldn't find [a job]." *Id*. at PageID.3728.

Defendant also fails to mention the daughter's testimony, which nobody in the courtroom will forget. Alyse understood that her mom "loved being able to help provide for [their] family. She loved knowing that the income that she made was going to be able to provide for [them] for anything that [they] would need in case of emergencies or recreation." *Id*. at 3749-50. Alyse observed the trauma inflicted on her mother by Defendant when it forced her into an "ultimatum" to either vaccinate or lose her job. Alyse worried about her mother because "what that would mean for her relationship with God, with her faith, because she felt in good conscience she could not get the vaccine." *Id*. at PageID.3753. In describing Plaintiff's reaction to being terminated, Alyse testified that her mom "was in ***disbelief***. She couldn't believe that after all these years this is what it came to. And she was ***heartbroken***. She was ***worried***, because now that choice of working was taken away from her." *Id*. at 3754. Alyse watched her mom experience "***grief***", which interfered with her mom's ability to feel safe and secure. "***She had a really hard time sleeping. She couldn't sleep at night because she was worried about our family***, worried about what that would mean in the moment down the line. She lost a lot of motivation to be able to do things. . . ***she secluded herself from people because she didn't want***

12

*to have to talk about what happened*." *Id*. at 3755-56. Plaintiff's emotional distress

went beyond sadness—she "*lost a part of her purpose*." *Id*. at 3756-57 ("[F]or years

she woke up at 5:30, 5:00 a.m. to get ready for work and she would come home and

still do things around the house, help make dinner, make sure I didn't need any help

with my homework. And after she was terminated, she, you know, would sleep in

more, *wouldn't get out of bed*. *She didn't do as much*. *She stopped seeing as many*

*people*. It was like she - - she lost a part of her purpose").

> Q:  Had you ever seen your mom like this before?
>
> A:  My mom has grieved people when we have lost loved ones, but
>     not - - *not a grief like this*.
>
> Q:  Why was it different?
>
> A:  It was different because when someone passes, no matter the
>     situation, you know that they are at peace and that they are with
>     God.  *The only closure that she got was that she was fired for*
>     *her beliefs and it was, you know, something that she - - that's*
>     *not a peaceful thing*.  That doesn't bring a person peace.  And so
>     it was - - *this type of grief was different, because it was*
>     *something that was out of her control*.  (*Id*. at PageID.3756).

Alyse will "never" forget watching her mom crying "a lot" because of the

termination. *Id*. at 3757-58. Defendant's argument does not pass muster when it skips

over the trial testimony in favor of truncated false characterizations of the evidence.

Defendant ignored the law because it favors Plaintiff.  The fact is that

"calculating the amount of damages for pain and suffering does not lend itself to the

application of a mathematical formula; it requires the application of the jury's best

judgment and common sense based on the evidence presented." *Fielden v. CSX Transp.*, Inc., No. 2:03-cv-995, 2009 U.S. Dist. LEXIS 82140, at *9 (S.D. Ohio Aug. 26, 2009) (citing *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893 (6th Cir. 2004)) (holding that pain and suffering cannot be "mechanistically" measured). The court in *Bergman v. United States*, 579 F. Supp. 911, 935 (W.D. Mich. 1984) recognized that:

> Assessing the value of personal injuries is a difficult task. There is no fixed standard for computing such damages as physical pain and mental suffering, and the measure depends on the facts of each case. Normally, these factors are left to a jury to assign a value to their worth, but a court must draw upon its reasoning powers and, more importantly, its sensitivity to arrive at an appropriate level of compensation for these elements. [*Id.*]

And "courts are reluctant to overturn jury verdicts on the grounds of excessive or inadequate damages." *Bruner v. Dunaway*, 684 F.2d 422, 427 (6th Cir. 1982). "If there is any credible evidence to support a verdict, it should not be set aside." *Farber v. Massillon Bd. of Educ.*, 917 F.2d 1391, 1395 (6th Cir. 1990).

All of which is to say that all of the evidence of Plaintiff's terrible emotional distress, which does not all fit in the 25 pages of this response brief, is quite factually distinct from the cases cited by Defendant. Such as *Weber v. Infinity Broad. Corp*, No. 02-74602, 2005 WL 3726303 (E.D. Mich. Dec. 14, 2005), in which "[t]he only evidence introduced at trial regarding the mental anguish and emotional distress suffered by plaintiff consisted of plaintiff's own testimony. [The] [p]laintiff's

14

testimony was not corroborated by anybody who would have been in a position to confirm how the loss of her job and the way she was treated by defendants affected plaintiff." *Id*. at *6. Or, Defendant's reliance on *Lowe v. Walbro LLC*, No. 1:18-cv-12835, 2024 WL 4545961 (E.D. Mich. Oct. 22, 2024), which is currently on appeal in the Sixth Circuit. *Lowe* is odd because it relies on plaintiff not seeking psychological treatment or counseling for distress following termination. However, the Sixth Circuit rejects that proposition because "***a plaintiff need not present medical evidence to receive compensation for emotional distress***." *Fischer v. United Parcel Serv., Inc.*, 390 F. App'x 465, 472 (6th Cir. 2010). Rather, emotional distress must be proven by "competent evidence." *Id*., citing *Turic v. Holland Hosp. Inc.*, 85 F.3d 1211, 1215 (6th Cir. 1996). Plaintiff's damages are comparable to *Fischer* because Plaintiff offered heart-breaking testimony regarding the emotional impact of termination that clearly resonated with the jury.

Defendant attacks emotional distress without even mentioning Plaintiff's trial, which is totally bizarre. Defendant is likely shy to contest the facts because courts have held that damages are quintessential questions of credibility that are the province of the jury. *Fantozzi v. Sandusky Cement Prod. Co.*, 64 Ohio St. 3d 601, 612, 597 N.E.2d 474, 481 (1992) ("[t]he assessment of [pain and suffering] damage is, however, a matter solely for the determination of the trier of fact because there is no standard by which such pain and suffering may be measured. In this regard, this

court has recognized that 'no substitute for simple human evaluation has been authoritatively suggested.'")

In addition, both state and federal law discourage a party's efforts to analogize the present case with other verdicts as a means of demonstrating that a particular verdict is excessive, because obviously the factual circumstances of each vary so widely. *See, e.g., Watrous v. Conor*, 266 Mich. 397, 401-02 (1934); *West v. Tyson Foods*, 374 F. App'x 624, 643 (6th Cir. 2010); *Moody v. Pepsi-Cola Metro. Bottling Co., Inc.*, 915 F.2d 201, 211 (6th Cir. 1990); *Champion.*, 380 F.3d at 905 (6th Cir. 2004). Regardless, analogizing is unnecessary here because Plaintiff could not in a just few days put more substantial testimony regarding her damages in front of a jury. And it bears repeating that this is a religious discrimination case in which the Plaintiff is to receive "favored treatment." Thus, the words spoken by the Fifth Circuit Court of Appeals on what Plaintiff encountered is accurate.

> Forcing individuals to choose between their faith and their livelihood imposes an obvious and substantial burden on religion . . . vaccine mandates . . . presents a crisis of conscience for many people of faith. ***It forces them to choose between the two most profound obligations they will ever assume—holding true to their religious commitments and feeding and housing their children.*** To many, this is the most horrifying of Hobson's choices.

*Sambrano v. United Airlines, Inc.*, 19 F.4th 839, 841 (5th Cir. 2021). Accordingly, remittitur is not warranted under the facts or law of this case.

16

II.   **DEFENDANT FAILS TO PROVIDE A SUFFICIENT BASIS TO REDUCE THE JURY'S FRONT PAY DAMAGES AWARD BASED ON THE SUBSTANTIAL PROOFS OFFERED AT TRIAL.**

The court in *Hyldahl v. AT&T*, 642 F. Supp. 2d 707, 721-22 (E.D. Mich. 2009)

articulated relevant factors on front pay awards:

> The  following factors are considered determining the propriety of an award of front pay: "(1) the employee's future in the position from which she was terminated; (2) her work and life expectancies; (3) her obligation to mitigate damages; (4) the availability of comparable employment opportunities and the time reasonably required to find a substitute; and (5) the present value of future damages as determined through application of the appropriate discount rate." An award of front pay may not be "purely speculative."  However, "[n]o per se rule governs the appropriateness of front pay damages in a particular case . . . Ultimately, the question to be answered is whether front pay damages are needed in a particular case to make the plaintiff whole." *Id.* (internal citations omitted).

The *Hyldahl* court then opined that, based on the evidence presented at trial, the jury

was properly permitted to consider front pay damages, reasoning:

> In light of the proofs, an award of front pay was warranted.  Plaintiff offered testimony regarding mitigation attempts, the anticipated date of retirement, and her inability to find employment that was similarly compensated.  Defendant argues that Plaintiff's own testimony is insufficient to establish the propriety of front pay.  Notwithstanding the fact that Plaintiff did not offer testimony from an economist, an award of front pay was proper in this circumstance.  Plaintiff offered testimony concerning the factors addressed in *Arban*.  In addition, the Court specifically inquired of Defendant's counsel whether Defendant was willing to reinstate Plaintiff's employment and it was not. Defendant elected to eliminate that equitable remedy, thus, leaving front pay as the

17

> reasonable alternative.  Consequently, the Court submitted the question
> of front pay to the jury for an advisory verdict.  *Id.*

As a threshold issue, Defendant looks silly complaining about front pay when this Court was willing to award Plaintiff reinstatement and Defendant tersely responded, "***Not interested, Judge***." ECF No. 125, PageID.3947. It would not be fair to allow Defendant to have its cake and eat it too if Defendant was allowed to not only reject reinstatement (with zero hesitation) at trial, but then impose an artificial cap on front pay damages when the front pay awarded by the Court perfectly aligns with the enumerated factors in *Hyldahl* because (1) Plaintiff had no future in her industry after she was fired due to age and not having a college degree; (2) the jury awarded her front pay only until the limitation imposed by this Court related to retirement age; (3) Plaintiff attempted to mitigate damages but could not find a comparable job; and (4) there was no comparable employment opportunities for a 55 year old with no college degree.

It should also insult this Court when Defendant claims that giving Plaintiff's front pay a term of 13 years was "imaginary" (ECF No. 128, PageID.4112), when it was this Court that recognized during a discussion of front pay that "[t]here is other evidence in the record, however, that indicates that the plaintiff intended to work through age 67." ECF No. 125, PageID.3962. Very importantly, ***Defendant never objected*** during to the jury instruction that front pay damages could be awarded

"through December 31, 2034" (ECF No. 125, PageID.3985), thus waiving the belated protest in this motion that damages until age 67 were inappropriate. *Bonkowski v. Allstate Ins. Co.,* 2012 WL 3013747, at *7 (E.D. Mich. July 20, 2012) (a party waives a jury instruction objection when no objection is made "out of the jury's hearing before the instructions and arguments are delivered") (citing Fed. R. Civ. P. 51); *Ford v. Cnty. of Grand Traverse*, 535 F.3d 483, 493–94 (6th Cir. 2008) (defendant waived its jury instructions argument because it had not raised it in a pre-verdict motion for judgment as a matter of law or objected to the jury instructions); *Clarksville–Montgomery Cnty. School Sys. v. U.S. Gypsum Co*., 925 F.2d 993, 1006 (6th Cir.1991) ("We first note that Clarksville's failure to object to a specific charge before and after the jury charge is given constitutes waiver of the objection.").

The jury got front pay right. An employee's work and life expectancy are pertinent factors in calculating front pay, such an award "necessarily implicates a prediction about the future." *Dillon v. Coles*, 746 F.2d 998, 1006 (3d Cir.1984). Courts should "not refuse to award front pay merely because some prediction is necessary." *Green v. USX Corp*., 843 F.2d 1511, 1532 (3d Cir.1988), *vacated on other grounds*, 490 U.S. 1103, 109 S.Ct. 3151, 104 L.Ed.2d 1015 (1989), *reinstated in relevant part*, 896 F.2d 801, 801 (3d Cir.1990).  In *Donlin v. Philips Lighting N. Am. Corp.*, 581 F.3d 73 (3d Cir. 2009), the Third Circuit affirmed an award of 10

years front pay even when there was uncertainty and prediction involved in the calculation.

> Though the 10–year damages period granted by the District Court exceeds that awarded in *Green,* we note that there will often be uncertainty concerning how long the front-pay period should be, and the evidence adduced at trial will rarely point to a single, certain number of weeks, months, or years. More likely, the evidence will support a range of reasonable front-pay periods. Within this range, the district court should decide which award is most appropriate to make the claimant whole.

*Id*. at 87.  In fact, other appellate courts have affirmed front-pay awards of ten years or more. *See, e.g., Meacham v. Knolls Atomic Power Lab.,* 381 F.3d 56, 79 (2d Cir.2004) (affirming a district court's award of front pay for 9–12.5 years to victims of age discrimination); *Pierce v. Atchison, Topeka & Santa Fe Ry. Co.,* 65 F.3d 562, 574 (7th Cir.1995) (10–year front pay award did not constitute an abuse of discretion); *Hukkanen v. Int'l Union of Operating Eng'rs, Hoisting & Portable Local No. 101,* 3 F.3d 281, 286 (8th Cir.1993) (same).

Here, Plaintiff's testimonial and documentary evidence allowed the jury to reasonably determine that she was entitled to front pay damages of 13 years. Defendant's motion alleges *ad nauseam*, that Plaintiff "retired" and/or voluntarily "never sought full-time employment." ECF No. 128, PageID.4113. But Plaintiff's purported voluntary retirement was a ridiculous theory that the jury scoffed at. Moreover, Defendant's "early retirement" theory is contradicted by the evidence.

*First*, Plaintiff rejected the notion multiple times, including when she was directly asked by opposing counsel on cross-examination:

> Q:   And we can agree that your frame of mind at that time was you're retired?
>
> A:   **That wasn't my frame of mind. That was my way to avoid saying that I got fired in a job interview**.
>
> Q:   I see. And so if in January 2022 you were using the word, retired, were you trying to convey to your potential employers that you were retired?
>
> A:   No. I was just trying to convey that the reasons I was no longer at Blue Cross, for myself, and that I didn't get fired, that I would use the word, retired.  [ECF No. 125, PageID.3886].

Plaintiff was asked again and maintained her answer:

> Q:   And your testimony today is that even though you used the word, retired, that it - - that was not your frame of mind?
>
> A:   **That was not my frame of mind for myself and my family.**
>
> Q:   And that is because you were, I'm gathering, embarrassed to share with folks the circumstance?
>
> A:   **Yes.  I was embarrassed to share that I was fired**.

*Id*. at 3886-87. The jury clearly understood that Plaintiff was 55 years old at the time of her termination and had no plans to retire. *Id*. at PageID.3830-31. She testified, "I had no idea when I was going to retire. It wasn't even on my mind." *Id*. Asked about her retirement plans while working for Defendant, Plaintiff stated:

> A:   I did plan on working there. **You know, I didn't think about [retirement]**.  I was - - I would think I would stay there until my

> late 60s. **I wasn't thinking about retiring**. I was thinking about, you know, my daughter. She just got her bachelor's degree, perhaps she is going to move on to her master's degree. You know, there is weddings, all of those things. Those were things that I wanted to provide to her.  (*Id*. at PageID.3874-75).

As Defendant should know, it was for the jury, not the former employer who wrongfully terminated her, to decide whether Plaintiff's testimony was credible. This is true even if the witnesses' testimony is impeached or contradicted—and Plaintiff was never impeached. Even if there had been contradictory testimony, such criticism goes to the weight of the testimony, not its admissibility. *Huhta v Maloney*, 363 Mich 348, 352 (1961) ("The credibility of the witnesses and any inconsistencies and contradictory statements of the witnesses are for the jury to weigh"); *Erickson v Soyars*, 356 Mich 65, 69 (1959) ("The fact that the [witness] changed his testimony…goes to the credibility but not the admissibility…"); *Peden v Carpenter*, 352 Mich 604, 610, 612 (1958); *Hicks v Gillespie*, 346 Mich 593, 600 (1959) ("It was also the jury's function to choose between inconsistent or contradictory statements on the part of the witness").

As for mitigation efforts, damages are reduced under Title VII for "interim earnings or *amounts earnable with reasonable diligence* by the person or persons discriminated against." 42 U.S.C. § 2000e–5(g)(1). The availability of an ***equivalent or better job*** "terminates the ongoing ill effects" of a defendant's discriminatory action, so the right to damages ends when such an opportunity becomes available.

*Ford Motor Co. v. E. E. O. C.*, 458 U.S. 219, 234 (1982). To hold otherwise regarding mitigation, the Supreme Court reasoned, would "requir[e] a defendant to provide what amounts to a form of unemployment insurance." *Id.* at 235. Despite knowing that the burden to prove Plaintiff's failure to mitigate damages fell on Defendant by demonstrating that substantially equivalent work was available, Defendant gave no effort at trial (or in the present motion) to attack mitigation. There is no factual predicate in the trial transcript from which to conclude that Plaintiff failed to mitigate her damages. Moreover, an employee need not seek employment "which involves conditions that are substantially more onerous than [her] previous position." *NLRB v. Madison Courier, Inc.,* 472 F.2d 1307, 1320–21 (D.C.Cir.1972). Notably, the employee is not required to accept employment which is located an unreasonable distance from her home. *Id.* at 1314. Plaintiff's testimony actually shows that she was willing to work a longer distance from home—but the circumstances of being 55 years old, only having one job her entire life, and not having a college degree made finding another six-figure job impossible.

Case in point, the jury learned that Plaintiff her job search for the first time in 38 years. ECF No. 125, PageID.3864-65. "It was hard.  It was – in some respects, it was humiliating. Sometimes, you know, the – looking at lower classified, lower paying, from what I had come from and what I knew that I could do[.]" *Id.*  Plaintiff found herself at a disadvantage in the 2022 workforce since she did not have a

college degree. *Id*. "Numerous times I searched the internet looking for something closely related to what I knew from Blue Cross Blue Shield. Most of them said a degree was required" and Plaintiff was ineligible for those positions. *Id*. at 3865-66. Plaintiff was unable to find a comparable job. *Id*. at 3866, 3868. She sought out many roles and applied to various employers, including Goos Ile Township School, General RV, Habitat for Humanity, John Paul II Classical Catholic School, All Saints Catholic School, Greenfield Village, and Ward Church. *Id*. at 3866-71. Plaintiff even drove 40 to 45 minutes away from her home to apply for jobs. *Id*. at 3868. Meaning, there was no "substantially equivalent" employment opportunities for Plaintiff, and she cannot be penalized for getting a job as a 17-year-old without a college degree and then working her way up through grit and numerous promotions to earn a six-figure living. There was not going to be another substantially equivalent position like the one that Plaintiff lost, and Defendant never tried to meet its burden, so Defendant cannot now argue that Plaintiff should have worked at McDonalds. "An employee is not required to go to heroic lengths in attempting to mitigate his damages, but only to take reasonable steps to do so." *Suggs v. ServiceMaster Educ. Food Mgmt.*, 72 F.3d 1228, 1233 (6th Cir. 1996).

Finally, Defendant had Plaintiffs' financial information in its possession but never attempted to impeach Plaintiff's compensation testimony. "[C]osts and expenses of the injury and loss of time from employment, entail only the rudimentary

process of accounting to calculate." *Fantozzi*, 597 N.E.2d at 482; *see also Emerman v. Fin. Commodity Invs., L.L.C.*, No. 1:13CV2546, 2015 WL 6742077, at *6 (N.D. Ohio Nov. 2, 2015) ("Defendants already have in their possession the information necessary to calculate Plaintiffs' damages and 'only the most rudimentary of math skills' is required to make those calculations"). "Rudimentary" is the key word because Plaintiff supported her damages request to the jury with very simple math and Defendant neither objected nor attacked Plaintiff's front pay calculations. The jury was comprised of both a teacher and mechanical engineer, whom we can assume were able to perform the rudimentary math required to confirm future earnings.

## CONCLUSION

Plaintiff respectfully requests that this Court deny Defendant's Motion for Remittitur.

Respectfully submitted,

HURWITZ LAW PLLC

*/s/ Noah S. Hurwitz*
Noah S. Hurwitz (P74063)
Grant M. Vlahopoulos (P85633)
HURWITZ LAW PLLC
340 Beakes St., Ste. 125
Ann Arbor, MI 48104
(844) 487-9489
noah@hurwitzlaw.com
grant@hurwitzlaw.com
Dated: November 24, 2024          *Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on November 24, 2024, the foregoing document

was served upon Defendant's counsel-of-record via ECF.

<u>*/s/ Noah S. Hurwitz*</u>

Noah S. Hurwitz (P74063)